UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

_____

In re:

   CENTERSTONE LINEN SERVICES, LLC,             Case No. 18-31754
    d/b/a Clarus Linen Systems, *et al.*, [1]              Chapter 11 Cases
                                                      Main Case
                                Debtors.       Joint Administration Requested

_____

**MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING DEBTORS TO PAY PREPETITION WAGES, SALARIES
AND BENEFITS, (II) AUTHORIZING THE CONTINUATION OF EMPLOYEE
BENEFIT PROGRAMS IN THE ORDINARY COURSE OF BUSINESS AND
(III) DIRECTING BANKS TO HONOR PREPETITION CHECKS FOR
PAYMENT OF PREPETITION WAGE, SALARY AND BENEFIT OBLIGATIONS**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by and through their undersigned counsel, hereby move the United States Bankruptcy Court for the Northern District of New York (the "Court") for interim and final Orders, pursuant to sections 105(a), 363(b)(1), 507(a)(4), 507(a)(5), 1107(a) and 1108 of title 11 of the United States Code §§ 101, *et seq.*, as amended (the "Bankruptcy Code"), (i) authorizing, but not directing, the Debtors to pay prepetition wages, salaries and benefits to their employees; (ii) authorizing, but not directing, the Debtors to continue employee benefit programs in the ordinary course of business; and (iii) authorizing and directing banks to honor prepetition checks for payment of prepetition wage, salary and benefit obligations. In support of this Motion, the Debtors respectfully represent as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Centerstone Linen Services, LLC d/b/a Clarus Linen Systems (5594) ("Centerstone"); Atlas Health Care Linen Services Co., LLC d/b/a Clarus Linen Systems (2681) ("Atlas"); Alliance Laundry & Textile Service, LLC d/b/a Clarus Linen Systems (8284) ("Alliance"); Alliance Laundry and Textile Service of Atlanta, LLC d/b/a Clarus Linen Systems (4065) ("Atlanta"); and Alliance LTS Winchester, LLC d/b/a Clarus Linen Systems (0892) ("Winchester").

3235876.3

## JURISDICTION

1.  This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.  The bases for the relief requested herein are sections l05(a), 363(b)(1), 507(a)(4), 507(a)(5), 1107(a) and 1108 of the Bankruptcy Code.

## BACKGROUND

3.  On December 19, 2018 (the "Petition Date"), the Debtors filed separate, voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the Court, commencing the Debtors' chapter 11 cases (the "Chapter 11 Cases").  The Debtors remain in possession of their respective assets and continue to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases and, as of the date of the filing of this Motion, no official committees have been appointed or designated.  Concurrently herewith, the Debtors have filed a motion seeking joint administration of their Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

4.  The Debtors are leading providers of high-quality linen rental and commercial laundry services to the healthcare industry, primarily supplying scrubs, sheets, towels, blankets, patient apparel and other linen products to hospitals and healthcare clinics via long-term contacts.  The companies employ strict quality assurance measures and have been recognized for outstanding performance in the areas of infection control, hygienically clean linens and employee safety.  Centerstone is the corporate parent of four subsidiary corporations (Atlas, Alliance, Atlanta and Winchester) and provides back-office and administrative support to them.

Atlas and Alliance currently operate five production facilities in three states (Atlas operates two facilities in New York and Alliance operates two facilities in Georgia and one in South Carolina) that provide daily pick-ups and deliveries to their customers. Atlanta and Winchester are not currently operating production facilities.

5. A more detailed factual background relating to the commencement of these Chapter 11 Cases is set forth in the *Affidavit of John J. Giardino in Support of Chapter 11 Petitions and First Day Motions* sworn to on the 19th day of December, 2018 (the "Giardino Affidavit") filed in these Chapter 11 Cases and incorporated herein by reference[2].

**RELIEF REQUESTED**

6. By this Motion, the Debtors request that this Court enter interim and final Orders, pursuant to sections 105(a), 363(b)(1), 507(a)(4), 507(a)(5), 1107(a) and 1108 of the Bankruptcy Code, authorizing, but not directing, the Debtors to pay or otherwise honor prepetition wages and salaries and prepetition obligations arising under various employee benefit programs (collectively, the "Prepetition Wages and Benefits"), owing to the Debtors' current employees. The Debtors further seek authority to continue various employee benefit programs (the "Employee Benefit Programs") in the ordinary course of business[3].

7. As part of the foregoing relief, the Debtors also seek authorization to pay payroll-related taxes relating to prepetition periods including, but not limited to, all federal, state and local withholding taxes, Social Security taxes and Medicare taxes, as well as other withholdings such as charitable contributions and garnishment contributions.

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Giardino Affidavit.

[3] The Employee Benefit Programs are described in more detail below and include: employee leave policies, expense reimbursement, medical, dental, optical, life and disability insurance and workers' compensation programs.

8.  Finally, the Debtors request the entry of an Order (a) directing HSBC USA Bank, National Association ("HSBC Bank") to honor the Debtors' pre-petition checks for payment of the Prepetition Wages and Benefits and (b) prohibiting all banks from placing any holds on, or attempting to reverse, any automatic transfers to employees' accounts for Prepetition Wages and Benefits.

**A.   Wages and Salaries**

9.  Currently, Centerstone has approximately 24 active employees. Approximately 23 of the employees are full-time and 1 is part-time. Approximately 12% of all Centerstone employees are hourly wage earners, while the remaining 88% are salaried personnel. All of the Centerstone employees are non-union employees.

10.  Alliance has approximately 191 active employees. Approximately 186 of the employees are full-time and 5 are part-time. Approximately 94% of all Alliance employees are hourly wage earners, while the remaining 6% are salaried personnel. All of the Alliance employees are non-union employees.

11.  Atlas has approximately 337 active employees. Approximately 321 of the employees are full-time and 16 are part-time. Approximately 93% of all Atlas employees are hourly wage earners, while the remaining 7% are salaried personnel. Atlas has approximately 241 union employees across all of its facilities pursuant to six Collective Bargaining Agreements covering the following employees: (i) the International Union of Operating Engineers, Local 17-17S AFL-CIO, (ii) the Rochester Regional Joint Board, Local 51, (iii) the Rochester Regional Joint Board, Local 2607, (iv) the Teamsters, Local Union 182, (v) the Teamsters, Local Union 294, and (vi) the Laundry, Distribution and Food Service Joint Board.

12. Atlanta and Winchester are not currently operating laundry facilities and have no employees.

13. Centerstone's and Alliance's employees are paid biweekly in arrears, and Atlas's employees are paid weekly in arrears. Based upon historical data, the average biweekly payroll for Centerstone's employees is approximately $76,000.00, the average biweekly payroll for Alliance's employees is approximately $216,000.00, and the average weekly payroll for Atlas's employees is approximately $211,000.00. The Debtors are current with respect to their payroll obligations owed to employees. As of the Petition Date, the accrued, unpaid payroll for the employees is approximately $717,000.00, including the Debtors' portion of payroll taxes. Of that total, the Centerstone portion is approximately $99,000.00, the Alliance portion is approximately $280,000.00, and the Atlas portion is approximately $338,000.00. The next scheduled pay date for the Centerstone and Alliance employees is December 21, 2018, and it covers the pay period from December 2, 2018 through December 15, 2018. The next scheduled pay date for the Atlas employees is December 21, 2018, and it covers the pay period from December 9, 2018 through December 15, 2018.

14. Pursuant to this Motion, the Debtors seek to pay, in the ordinary course of business, the outstanding amounts owed as of the Petition Date for accrued and unpaid wages and salaries, including amounts that the Debtors are required by law to withhold from employee payroll checks in respect of federal, state and local income taxes, garnishment contributions, social security and Medicare taxes.

15. None of the Debtors' employees are currently owed amounts that are at or over the $12,850.00 cap on priority claim amounts set forth in section 507(a)(4) of the Bankruptcy Code.

B.    **Other Compensation and Reimbursable Expenses**

16.    The Debtors offer their Employees other forms of compensation, including, but not limited to, vacation pay, paid holidays, paid sick time and other earned time off, reimbursement of certain business expenses, severance and 401(k) and pension plan contributions. These forms of compensation are usual, customary and necessary if the Debtors are to retain qualified employees to operate their businesses.

17.    <u>Vacation Time and PTO</u>. For non-union employees, the Debtors combine vacation time together with paid sick leave and personal time off (collectively, "PTO"). All non-union employees are eligible to accrue PTO based upon each employee's level within the Debtors' organization and years of service with the Debtors. For non-union employees, PTO accrues, on a weekly basis, starting on the date of hire for each employee.

18.    Atlas employees in the International Union of Operating Engineers, Local 17-17S AFL-CIO, accrue vacation, on an hourly basis, starting on the date of hire for each employee and are entitled to two personal days and three sick days per calendar year. Employees in the Rochester Regional Joint Board, Local 51 accrue vacation on January 1st of each contract year based on their seniority and are entitled to five sick days per calendar year after they have completed six months of service. Employees in the Rochester Regional Joint Board, Local 2607, start accruing vacation after one year of service and are entitled to from five to nine sick days per calendar year depending on when they were hired by Atlas. Employees in the Teamsters, Local Union 182, accrue vacation based on their seniority and are entitled to five sick days per calendar year. Employees in the Teamsters, Local Union 294, start accruing vacation after one year of service based on their seniority and are entitled to 40 hours of sick or personal leave per year after they have completed one year of service. Employees in the Laundry, Distribution and Food

6

Service Joint Board accrue vacation based on their seniority and are entitled to from three to seven sick days per calendar year based on their years of service.

19. PTO that has accrued but remains unpaid as of the Petition Date totals approximately $538,000.00. By this Motion, the Debtors seek authority, but not direction, to honor in the ordinary course of business, the liabilities to its employees that arose under their PTO policies or practices prior to the Petition Date. The Debtors anticipate that their employees will utilize any accrued PTO in the ordinary course without resulting in any material cash flow requirements beyond the Debtors' normal payroll obligations.

20. <u>Expense Reimbursement</u>. Employees are entitled to reimbursement of certain limited categories of expenses incurred in the ordinary course of business. The Debtors routinely reimburse employees for certain expenses incurred within the scope of their employment, including expenses for travel, lodging, professional seminars and conventions, transportation, meals, supplies and miscellaneous business expenses (collectively, the "Business Expenses"). Most Business Expenses are reimbursed directly to the employees within one to two weeks following the date the expenses are incurred in paycheck supplemental payments or expense report submissions.

21. To the Debtors' knowledge, all employees have been reimbursed for Business Expenses previously incurred. The employees submit receipts for reimbursement which are processed through the normal expense report and accounts payable process. It is difficult for the Debtors to confirm if any Business Expenses remain outstanding as of the Petition Date because employees may not have submitted expense reports as of the Petition Date. It is critical that the Debtors be authorized to reimburse all such expenses as and when reports are submitted. By this

Motion, the Debtors therefore seek authority to pay all prepetition Business Expenses in the ordinary course of business.

22.     <u>Severance</u>.  In the ordinary course of their businesses, the Debtors maintain a Severance Policy.  When an employee is terminated, severance is calculated based on the years of service of the employee.  On December 14, 2018, Atlas terminated 18 hourly employees.  The severance amount for all 18 employees totals $17,544.00 and is to be paid with the December 21, 2018 payroll. The maximum severance amount awarded to an individual employee totals $1,622.40.

23.     It is critical that the Debtors be authorized to continue their Severance Policy and honor any accrued, but unpaid, severance in the ordinary course of their businesses. Accordingly, by this Motion, the Debtors seek authority to pay all prepetition severance in the ordinary course of business and to continue their prepetition practice of providing severance to their employees.

24.     <u>Contributions to 401(k) and Pension Plans</u>.  In the ordinary course of their businesses, the Debtors maintain a 401(k) plan for their non-union employees, and Atlas contributes to several multi-employer pension plans for their union employees.  The employee remittances for the 401(k) plan total approximately $6,200.00 per month, and the employer contributions to the union pension plans total approximately $23,700.00 per month.  The Debtors are current with respect to these obligations.  By this Motion, the Debtors therefore seek authority to (i) pay and/or remit any accrued, but unpaid, contributions in the ordinary course of business, and (ii) continue such prepetition practices in the ordinary course of business.

C.   **Employee Benefit Plans**

25.   Medical Plans.  The Debtors provide primary health coverage for all full-time and part-time employees and their eligible dependents through Blue Cross and Blue Shield ("Medical Plan"), with the exception of certain Syracuse employees who are covered under the Teamsters policy (the "Teamsters Plan").  In general, all employees are eligible for the benefits described herein on the first day of the month following 30 days of employment, unless otherwise noted.

26.   The Debtors pay a portion of the Medical Plan premiums due for each employee, depending on the type of plan that is selected by the employee.  In general, the Debtors pay 65% or 72% of the premiums due on behalf of each employee.  The balance of the premiums is funded through contributions by participating employees, through payroll deduction.  In addition, the Debtors pay medical and drug claims received from Blue Cross and Blue Shield on a weekly basis.  Payment and funding of the Medical Plan and the Teamsters Plan is handled under varying arrangements, as appropriate.  The Debtors spend approximately $65,000.00 per month for the premiums under the Medical Plan and the Teamsters Plan and pay approximately $125,000.00 per month for medical and drug claims to Blue Cross and Blue Shield.

27.   The Debtors believe that the employee contribution portion of such premium payments, to the extent that it remains in the Debtors' possession, constitutes monies held in trust and, therefore, is not property of the Debtors' bankruptcy estates.  Out of an abundance of caution, the Debtors seek the approval of the Court for the Debtors to pay employee funds which have been withheld to pay the Medical Plan or the Teamster Plan premiums and to continue the practice of withholding funds from employees to pay for coverage under the Medical Plan or the Teamster Plan in the ordinary course of business.  By this Motion, the Debtors seek authority to

continue making any such payments, claims and remittances related to the Medical Plan or the Teamsters Plan in the ordinary course of business.

28. <u>Dental Plan</u>. In addition to the Medical Plan and the Teamsters Plan, the Debtors also offer employees dental benefits through MetLife (the "Dental Plan"). The Debtors currently pay 65% of the premiums for the Dental Plan, totaling approximately $6,500.00 in premiums per month. The balance of the premiums is funded through contributions by participating employees, through payroll deduction. The Debtors believe that the employee payroll contributions are funds held in trust, and are not property of the Debtors' bankruptcy estates. By this Motion, the Debtors seek authority to continue making any such payments, claims and remittances related to the Dental Plan in the ordinary course of business.

29. <u>Vision Plan</u>. In addition to the Medical Plan, the Teamsters Plan and the Dental Plan, the Debtors also offer their employees vision benefits through Davis Vision (the "Vision Plan"). The Debtors pay 65% of the premiums due Davis Vision, totaling approximately $2,100.00 in premiums per month. The balance of the premiums is funded through contributions by participating employees, through payroll deduction. The Debtors believe that the employee payroll contributions are funds held in trust, and are not property of the Debtors' bankruptcy estates. By this Motion, the Debtors seek authority to continue making any such payments, claims and remittances related to the Vision Plan in the ordinary course of business.

30. <u>Life Insurance</u>. The Debtors offer basic term life insurance to their employees pursuant to policies provided by MetLife (the "Life Insurance Plan"). Under the Life Insurance Plan, employees are eligible for coverages based upon their earnings. The Debtors pay 100% of the monthly premiums totaling approximately $2,000.00 under the Life Insurance Plan.

31. By this Motion, the Debtors seek authority to continue to making any such payments, claims and remittances related to the Life Insurance Plan in the ordinary course of business.

**D.    <u>Workers' Compensation</u>**

32. The Debtors provide workers' compensation insurance coverage to all employees. This benefit is provided under the Debtors' workers' compensation insurance programs, which are insured and administered by Great American Insurance Group. The Debtors' workers' compensation insurance policy renewed effective on July 3, 2018 for the annual premium amount of $919,797.00. At the time of renewal, the Debtors paid 25% of the annual cost in the amount of $285,278.00 as the renewal fee. The remaining insurance premium, in the amount of $634,519.00, is paid in nine equal monthly installments of approximately $70,502.00 each.

33. The Debtors' workers' compensation insurance policy was renewed as of July 3, 2018 and coverage runs through July 3, 2019. The workers' compensation insurance policy has per-occurrence deductibles of $500,000.00 for the 2018-2019 policy year. Failure to maintain this insurance could result in the institution of administrative or legal proceedings against the Debtors and their officers and directors.

34. There are several open workers' compensation claims pending against the Debtors for which the Debtors are not required to reserve any funds, and which are covered by insurance. Currently, Great American Insurance Group holds a cash deposit in the amount of $170,000.00 and letters of credit totaling $1,080,000.00, as security in the event claim reserves are required, but are unpaid.

35. By this Motion, the Debtors seek authority to continue paying and/or contesting in good faith, as appropriate in the Debtors' business judgment, all amounts related to the workers'

compensation insurance policy and claims that arose prior to the Petition Date, including, without limitation, any required payments to the insurer, as they become due in the ordinary course of the Debtors' businesses.

### E. Social Security, Income Taxes, and Other Withholdings

36. Finally, the Debtors routinely withhold from employee paychecks amounts that they are required to transmit to third parties. Examples of such withholding include Social Security, FICA, federal, state and local income taxes, garnishments, health care payments and charitable donations. The Debtors believe that such withheld funds, to the extent that they remain in the Debtors' possession, constitute monies held in trust and therefore are not property of the Debtors' bankruptcy estates. Thus, the Debtors believe that their practice of directing such funds to the appropriate parties is in the ordinary course of business and seek authority to continue such practice.

### F. Direction to Banks

37. Finally, the Debtors seek an Order authorizing and directing all banks, including, without limitation, HSBC Bank, to receive, process, honor and pay any and all checks drawn on the Debtors' payroll and general disbursement accounts related to Prepetition Wages and Benefits, whether presented before or after the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

### BASIS FOR RELIEF

38. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code require that certain claims for prepetition wages, salaries, vacation, sick leave and employee benefit contributions be accorded priority in payment in an amount not to exceed $12,850.00 for each employee. Because of the large number of employees who work for the Debtors and because some amounts

due employees are unknown pending submission of claims, it would be administratively burdensome and highly impractical to pinpoint the exact prepetition amount owing to each individual employee while still making timely payroll payments on the existing payroll schedule. All of the Debtors' employees are currently owed amounts that are under the $12,850.00 priority cap set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code. As such, payment of the Prepetition Wages and Benefits in the ordinary course of business should neither prejudice general unsecured creditors nor materially affect the Debtors' estates, because section 507(a)(4) and section 507(a)(5) priority claims are already entitled to payment in full under a reorganization plan. *See* 11 U.S.C. § 1129(a)(9)(B).

39. In order to retain their employees and maintain morale, the Debtors must have authority to pay or otherwise satisfy all Prepetition Wages and Benefits as summarized above. The amounts to be paid to employees pursuant to this Motion are reasonable compared with the importance and necessity of the employees and the losses the Debtors will likely suffer if these amounts are not paid.

40. Finally, the relief requested will also significantly reduce the administrative burden which might otherwise be imposed in these cases. For the Debtors to identify the extent to which individual employees hold priority or general unsecured claims for employee benefits, and to modify benefit policies to enforce these distinctions, would impose additional burdens of administration and expenses which are unwarranted under the circumstances.

41. Based upon the foregoing, the Debtors respectfully request that the Court enter an Order authorizing the Debtors to pay, in the ordinary course of business, the Prepetition Wages and Benefits. Such relief is justified because the failure to pay any such amounts will likely

disrupt the services that the employees provide to the Debtors and ultimately, the Debtors' ability to administer their Chapter 11 Cases.

42. The relief requested in this Motion is necessary – indeed crucial – and should be authorized under sections 105(a), 363(b)(1), 507(a)(4), 507(a)(5), 1107(a) and 1108 of the Bankruptcy Code. The employees are vital to the continued operation of the Debtors' businesses and to the successful administration of their Chapter 11 Cases. Accordingly, the Debtors submit that the relief sought herein is consistent with and authorized by sections 105(a), 363(b)(1), 507(a)(4), 507(a)(5), 1107(a) and 1108 of the Bankruptcy Code.

## APPLICABLE AUTHORITY

43. Section 105(a) of the Bankruptcy Code provides as follows:

> The court may issue any order process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court or order or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a). This section allows bankruptcy courts broad authority and discretion to enforce the provisions of the Bankruptcy Code either under specific statutory or equitable common law principles.

44. The purpose of section 105(a) is to "assure the Bankruptcy Courts' power to take whatever action is appropriate or necessary in aid of the exercise of its jurisdiction." 2 *Collier on Bankruptcy* ¶ 105.01 (15th rev. ed. 2006). Thus, section 105(a) essentially codifies the Bankruptcy Court's inherent equitable powers. *See Management Tech. Corp. v. Pardo*, 56 B.R. 337, 339 (Bankr. D.N.J. 1985) (Court's equitable power derived from section 105).

45. Numerous Courts have used their section 105(a) powers under the "doctrine of necessity" to authorize payment of prepetition obligations where, as here, such payment is an essential element of the preservation of the debtor in possession's potential for rehabilitation. *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("Under [section 105] the Court can permit pre-plan payment of a prepetition obligation when essential to the continued operation of the debtor.");[4] *see also In re Just for Feet. Inc.*, 242 B.R. 821, 824 (D. Del. 1999) ("Courts have used their equitable power under section 105(a) . . . to authorize the payment of prepetition claims when such payment is deemed necessary to the survival of a debtor in a chapter 11 reorganization"); *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (reasoning that because the debtor in possession has fiduciary duties it must meet, it is logical that the bankruptcy court may "authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate" under section 105(a)); *In re Synteen Techs., Inc.*, No. 00-02203-W, 2000 WL 33709667, at *2 (Bankr. D.S.C. Apr. 14, 2000) (Courts have permission to "allow payment of a prepetition claim 'when essential to the continued operation of the debtor'") (citation omitted).

46. In addition, it has been noted that the "doctrine of necessity" demonstrates the courts' understanding that "paying certain prepetition claims may be necessary to realize the goal of chapter 11 – a successful reorganization." *Just for Feet*, 242 B.R. at 825-26; *In re Ionosphere Clubs. Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (use of equitable powers to "authorize the

---

[4] The "doctrine of necessity," also known as the "necessity of payment" doctrine, was first articulated in *Miltenberger v. Logansport*, C. & S.W. Ry. Co., 106 U.S. 286, 311-12 (1882) (payment of pre-receivership claim prior to completion of reorganization permitted to prevent "stoppage of. . . [crucial] business relations. . ." ). The Fourth Circuit has recognized the validity and application of this doctrine for more than a century. *See e.g., Southern Ry. Co. v. Flournov*, 301 F.2d 847, 851-52 (4th Cir. 1962); *Finance Co. of Pa. v. Charleston, C. & C.R.R.*, 62 F. 205, 208 (4th Cir. 1894). The "necessity of payment doctrine" was first applied to railroad reorganizations, but it is equally applicable in chapter 11 cases. The doctrine recognizes the existence of judicial power to authorize a debtor in possession to pay prepetition claims if they are essential to the continued operations of the debtor.

15

payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept") (citation omitted).

47. The "doctrine of necessity" is frequently invoked early in reorganization cases, during the so-called "breathing spell", when preservation of the estate is most critical and often extremely difficult. For example, in *In re Structurlite Plastics Corp.*, 86 B.R. 922 (Bankr. S.D. Ohio 1988), the Court embraced "the principle that a bankruptcy court may exercise its equity powers under section 105(a) to authorize payment of prepetition claims where such payment is necessary to 'permit the greatest likelihood of survival of the debtor. . . .'." *Id*. at 931 (*citing In re Chateaugay Corp.*, 80 B.R. 279, 287 (S.D.N.Y. 1987)). The Court explained that "a *per se* rule proscribing the payment of prepetition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code." *Structurlite*, 86 B.R. at 932. Flexibility of payment is particularly critical when the prepetition creditor provides vital goods or services to the debtor.

48. The Bankruptcy Court's exercise of its authority under the "doctrine of necessity" is appropriate to carry out specific statutory provisions of chapter 11, specifically, sections 363(b)(1), 1107(a), and 1108, which authorize a debtor in possession to maintain and operate the debtor's business and use estate property out of the ordinary course of business. Indeed, a debtor in possession operating a business under section 1108 of the Bankruptcy Code has a fiduciary duty to protect and preserve the estate, including the going concern value of an operating business. *See In re CoServ. L.L.C.*, 273 B.R. at 497 ("There are occasions when this [fiduciary] duty can only be fulfilled by the preplan satisfaction of a prepetition claim."). A Bankruptcy Court's exercise of its authority under section 105(a) is also necessary to carry out two central policies underlying chapter 11: (i) to permit the successful rehabilitation of the debtor, *NLRB v.*

16

*Bildisco & Bildisco*, 465 U.S. 513, 527 (1984), and (ii) to preserve going concern value and maximize property available to satisfy all creditors. *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. La Salle St. P'ship*, 526 U.S. 434, 453 (1999). Granting the relief requested in this Motion will enhance the likelihood of the successful rehabilitation of the Debtors and the probability of maximizing the value of estate assets and, ultimately, the return to creditors.

49. As part of the foregoing relief, the Debtors also seeks authority to pay to the appropriate entities any and all payroll withholding amounts, including, but not limited to, Social Security, FICA, federal, state and local income taxes, garnishments and health care payments.

50. The failure to make such payments may subject the Debtors and their officers to federal or state liability. *See City of Farrell v. Sharon Steel Corp. (In re Sharon Steel Corp.)*, 41 F.3d 92, 94-96 (3rd Cir. 1994) (state law requiring debtor to withhold city income tax from its employees' wages created trust relationship between debtor and city for payment of withheld taxes); *DuCharmes & Co. v. Michigan (In re DuCharmes)*, 852 F.2d 194, 195 (6th Cir. 1988) (noting the special liabilities for failure to pay trust fund taxes). Because such funds are not property of the Debtors' estates, the funds are not subject to the normal bankruptcy prohibitions against payment. *See Begier v. IRS*, 496 U.S. 53, 67 (1990) (debtor's payment of employee withholding for federal income and FICA taxes not a preferential transfer because withholding held in trust for taxing authority and not a part of debtor's estate); *Old Republic Nat'l Title Ins. Co. v. Tyler (In re Dameron)*, 155 F.3d 718, 721 (4th Cir. 1998).

51. The Debtors therefore request that the Court confirm that such trust fund withholding is not property of the Debtors' estates and that the Debtors may transmit such withheld amounts to the proper parties in the ordinary course of business. Courts in the cases

cited above have routinely granted the same or substantially similar relief to that requested in this Motion.

52. Finally, the Debtors request that the Court enter an Order directing HSBC Bank to honor all prepetition checks for payment of Prepetition Wages and Benefits and prohibiting HSBC Bank from placing any holds on, or attempting to reverse, any automatic transfers to employees' accounts for Prepetition Wages and Benefits.

53. Nothing in this Motion should be construed as a request for authority to: (a) assume any executory contract under section 365(a) of the Bankruptcy Code, or (b) change the classification of any claim or alter the rights of any employee or other person. In particular, nothing in this Motion should be construed as a request to grant any person administrative expense priority pursuant to sections 507 and 503 of the Bankruptcy Code.

54. For the foregoing reasons, the Debtors believe that granting the relief requested herein is appropriate and in the best interest of all parties in interest.

## BANKRUPTCY RULE 6003 IS SATISFIED

55. Bankruptcy Rule 6003 provides that a bankruptcy court may approve a motion to "use, sell, [or] lease" property of the estate, or to "pay all or part of a claim that arose before the filing of the petition," prior to twenty-one (21) days after the filing of the petition, "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. Immediate and irreparable harm exists where, as is the case here, the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. *See In re Ames Dep't. Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in the context of Bankruptcy Rule 4001). The Debtors submit that the relief requested in this Motion is necessary to avoid immediate and irreparable

harm to the Debtors, as described herein, and that cause exists under Bankruptcy Rule 6003 for the Court to grant immediate relief.

## WAIVER OF NOTICE AND STAY REQUIREMENTS

56. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rules 6004(h), 7062, 9014 or otherwise.

## RESERVATION OF RIGHTS

57. Nothing in this Motion, nor any payment made pursuant to the relief sought herein, if granted, is intended or should be construed as an admission as to the validity, priority or amount of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim or an approval or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code and the Debtors expressly reserve their rights with respect thereto.

## NOTICE

58. Notice of this Motion will be given to (i) the Office of the United States Trustee for the Northern District of New York, (ii) counsel for HSBC Bank; (iii) all required governmental agencies; and (iv) the twenty largest unsecured creditors in each Debtor's case. In light of the nature of the relief requested herein, the Debtors submit that no further notice is necessary.

59. No previous application for the relief sought in this Motion has been made to this Court.

**WHEREFORE**, the Debtors respectfully request that the Court enter an Order: (i) authorizing, but not directing, the Debtors to pay all Prepetition Wages and Benefits, (ii) authorizing, but not directing, the Debtors to continue all Employee Benefit Programs in the ordinary course of their business operations, (iii) directing all banks, including HSBC Bank, to

honor prepetition checks for payment of Prepetition Wages and Benefits and (iv) granting such other and further relief as is just and proper.

Dated: December 19, 2018
      Syracuse, New York      BOND, SCHOENECK & KING, PLLC

By:    /s/ Stephen A. Donato
Stephen A. Donato, Bar Roll No. 101522
Camille W. Hill, Bar Roll No. 501876
Office and Post Office Address:
One Lincoln Center
Syracuse, New York 13202
Tel: (315) 218-8000
Fax: (315) 218-8100
Email: sdonato@bsk.com
      chill@bsk.com

*Proposed Counsel to the Debtors and Debtors in Possession*