UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:

CENTERSTONE LINEN SERVICES, LLC                    Case No. 18-31754
d/b/a Clarus Linen Systems, *et al.*,[1]            Chapter 11 Cases
                                                    Main Case
                                  Debtors.          Joint Administration Requested

### MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING ON A SUPER-PRIORITY, SENIOR SECURED BASIS AND (B) USE CASH COLLATERAL, (II) GRANTING (A) LIENS AND SUPER-PRIORITY CLAIMS AND (B) ADEQUATE PROTECTION, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING AND (V) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by and through their undersigned counsel, hereby move this Court (this "Motion") for entry of: one or more orders in substantially the form attached hereto as **Exhibit A** (the "Interim DIP Order(s)"), (i) authorizing the Debtors to (A) obtain postpetition financing on a senior secured, superpriority basis and (B) use cash collateral on the terms provided in this Motion; (ii) granting (A) liens and super-priority claims and (B) adequate protection; (iii) modifying the automatic stay to the extent necessary to grant the relief requested in this motion, (iv) scheduling hearings to consider entry of a proposed final order (the "Final DIP Order" and, together with the Interim DIP Order(s), the "DIP Orders") authorizing the relief granted in the Interim DIP Order(s) on a

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Centerstone Linen Services, LLC d/b/a Clarus Linen Systems (5594); Atlas Health Care Linen Services Co., LLC d/b/a Clarus Linen Systems (2681); Alliance Laundry & Textile Service, LLC d/b/a Clarus Linen Systems (8284); Alliance Laundry and Textile Service of Atlanta, LLC d/b/a Clarus Linen Systems (4065); and Alliance LTS Winchester, LLC d/b/a Clarus Linen Systems (0892).

permanent basis as described in this Motion, and (v) granting related relief.  In support of this Motion the Debtor respectfully represents as follows:

### Jurisdiction

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

2.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

3.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory and rule-based predicates for the relief requested herein are sections 105, 361, 362, 363 and 364 of title 11 of the United States Code (11 U.S.C. § 101 *et seq*., as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6003 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Bankruptcy Rules for the Northern District of New York (the "Local Rules").

### Background

5.      On December 19, 2018 (the "Petition Date"), the Debtors filed separate, voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the Court, commencing the Debtors' chapter 11 cases (the "Chapter 11 Cases").  The Debtors remain in possession of their respective assets and continue to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases and, as of the date of the filing of this Motion, no official committees have been appointed or designated.  Concurrently herewith, the Debtors have filed motions seeking joint administration of their Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3268641.3

6.      The Debtors are leading providers of high-quality linen rental and commercial laundry services to the healthcare industry, primarily supplying scrubs, sheets, towels, blankets, patient apparel and other linen products to hospitals and healthcare clinics via long-term contacts.  The companies employ strict quality assurance measures and have been recognized for outstanding performance in the areas of infection control, hygienically clean linens and employee safety.  Centerstone is the corporate parent of four subsidiary corporations (Atlas, Alliance, Atlanta and Winchester) and provides back-office and administrative support to them. Atlas and Alliance currently operate five production facilities in three states (Atlas operates two facilities in New York and Alliance operates two facilities in Georgia and one in South Carolina) that provide daily pick-ups and deliveries to their customers.  Atlanta and Winchester are not currently operating production facilities.

7.      A more detailed factual background relating to the commencement of these Chapter 11 Cases is set forth in the *Affidavit of John J. Giardino in Support of Chapter 11 Petitions and First Day Motions* sworn to on the 19th day of December, 2018 (the "<u>Giardino Affidavit</u>") filed in these Chapter 11 Cases and incorporated herein by reference[2].

### **Relief Requested**

8.      By this Motion, the Debtors seek entry of the DIP Orders providing for, among other things:

  (i)    authority for the Debtors to obtain senior secured revolving postpetition financing on a super-priority basis pursuant to the terms and conditions of that certain Senior Secured Super-Priority Debtor-in-Possession Loan and Security Agreement by and among, Centerstone Linen Services, LLC, Atlas Health Care Linen Services, Co., LLC, Alliance Laundry & Textile Service of Atlanta, LLC, Alliance LTS Winchester, LLC, and Alliance Laundry & Textile Service, LLC (collectively, the "<u>DIP Borrowers</u>"), and HSBC Bank USA, National Association ("<u>HSBC Bank</u>"), as administrative agent and collateral agent for the DIP Lenders

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Giardino Affidavit.

(as defined below) (in its capacity as administrative and collateral agent, and including any of its Affiliates (including any branches thereof) performing any of the functions of administrative agent or collateral agent hereunder or under any of the other Loan Documents, the "DIP Agent") for HSBC Bank (together with any other lenders party thereto and their respective affiliates, successors and assigns, the "DIP Lenders"), substantially in the form attached as Exhibit 1 to the proposed Interim DIP Order (as such agreement may be amended, restated, amended and restated, extended, modified, supplemented, or replaced from time to time in accordance with its terms, the "DIP Loan Agreement" and the financing and financial accommodations made available pursuant to the DIP Loan Agreement and the DIP Other Documents, the "DIP Facility");[3]

(ii)   authority for the Debtors to (a) execute, deliver, and perform under the DIP Loan Agreement, DIP Other Documents, and all other related or ancillary documents and agreements (including the Budget) (collectively, the "DIP Documents"), and (b) perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii)   authority for the Debtors to (a) use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code and/or under the DIP Documents, as applicable (the "Cash Collateral"), subject to the restrictions set forth in the DIP Documents and the DIP Orders and (b) access and use the liquidity provided under the DIP Facility on an interim basis until the Final Hearing (the "Interim Period"), as follows (1-2 below being collectively defined as the "Interim DIP Financing"):

   1.   access and use up to $500,000 of the postpetition revolving loans made available under the DIP Facility during the Interim Period to (x) convert all letters of credit issued by any Prepetition Secured Parties under the Prepetition Loan Documents (as defined below) to letters of credit under the DIP Documents, (y) fund the Debtors' chapter 11 cases and the continued operation of their businesses as Debtors, and (z) fund certain fees and expenses associated with the consummation of the transactions contemplated in the DIP Documents, each on the terms set forth herein and the DIP Documents, and in each case consistent with the Budget;

   2.   pay the fees and expenses arising in accordance with the terms of the DIP Documents;

(iv)   a grant of and authority to pay adequate protection to the Prepetition Secured Parties for any diminution in value of their interests in the Prepetition Collateral.

---

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the proposed Interim DIP Order and/or the DIP Loan Agreement, as applicable. The summary descriptions of the DIP Facility set forth in this Motion are provided for the convenience of the Court and are qualified, in their entirety, by the actual terms set forth in the DIP Loan Agreement and other DIP Documents.

(v)    a grant, subject to the Carve Out described in paragraph 9(i) below of automatically perfected, valid, enforceable, and unavoidable security interests and liens, pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, on all DIP Collateral (as such term is defined in the proposed Interim DIP Order) and assets of the Borrowers and the other Debtors providing credit support under the DIP Facility (the "Credit Parties"), including with respect to Bankruptcy Recoveries and the products and proceeds thereof, as more fully described herein;

(vi)    a grant, with respect to the obligations of the Borrowers and the other Credit Parties hereunder and under the DIP Other Documents (and subject only to the Carve-Out), of an allowed super-priority administrative expense claim in each of the Debtors' bankruptcy cases (and against each of the Debtors' estates created pursuant to section 541 of the Bankruptcy Code) pursuant to section 364(c)(1) of the Bankruptcy Code having priority, subject to the Carve-Out, over all administrative expenses of the kind specified in or arising under any section of the Bankruptcy Code (including, sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(6), 546(c), or 726 thereof);

(vii)    authority for the Debtors to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become due, including, the reasonable and documented fees and disbursements of the DIP Agent and the DIP Lenders' attorneys, advisers, accountants, and other consultants, all to the extent provided in and in accordance with the terms of the DIP Documents and this Interim Order;

(viii)    a modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order, as set forth herein;

(ix)    approval of the Chapter 11 Case Milestones (as set forth in Section 6.11 and Section 10.21 of the DIP Loan Agreement, the "Milestones") in respect of the 363 sale process as described in the Giardino Affidavit; and

(x)    scheduling of a final hearing (the "Final Hearing") to consider entry of the Final Order.

## **STATEMENT PURSUANT TO RULE 4001(b) AND (c)**

9.    The Debtors submit this concise statement listing certain material terms of the DIP Facility and the Debtors' use of Cash Collateral.  The Debtors believe that the following terms, which are required to be identified pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, are necessary and justified in the context and circumstances of these Chapter 11 Cases.

3268641.3

(a)     HSBC Bank, as the Existing Agent for the Existing Lenders under the Existing Loan Agreement is the only party with an interest in the Cash Collateral.

(b)     Use of Proceeds.  Proceeds of Advances and any Cash Collateral may be used only for (i) working capital purposes of the Debtors from and after the Closing Date, (ii) current interest and fees due to the Agent and the Lenders pursuant to the terms of this Agreement, (iii) payment of adequate protection payments to the Existing Agent and the Existing Lenders, and (iv) the allowed administrative costs and expenses of the Cases, in each case of clauses (i) through (iv) solely in accordance with the Budget (subject to the Permitted Variance) and the Orders.  DIP Loan Agreement at ¶ 2.15(a).

(c)     Borrowing.  The Maximum Revolving Advance Amount available under the DIP Facility is $1,580,000, provided, however, that the amount of the Existing Obligations and Obligations shall never exceed, in any event, $23,457,995.  DIP Loan Agreement at ¶¶ 1.2; 2.5.  From the Maximum Revolving Advance Amount, $1,080,000 shall be used to convert all letters of credit issued by any Prepetition Secured Parties under the Prepetition Loan Documents to letters of credit under the DIP Documents and up to $500,000 shall be available in the form of Revolving Advances. Interim DIP Order at p. 3.

(d)     Liens and Adequate Protection.  The liens and superpriority claims proposed to be granted to the DIP Agent, on behalf of the DIP Lenders pursuant to Bankruptcy Code Section 364(c) and (d) are described in detail in Recital D of the DIP Loan Agreement and in paragraph 8 of the proposed Interim DIP Order.  As adequate protection for the use of Cash Collateral, the Debtors propose to provide the Prepetition Secured Parties with replacement liens, a superpriority claim, and adequate protection payments and to achieve certain sale related milestones, all as set forth in more detail in paragraph 14(a)-(e) of the proposed Interim DIP Order.

(e)     Conditions to Closing and Borrowing.  The conditions precedent to initial advances under the DIP Facility include, among other items, the DIP Agent's receipt of customary closing documentation, certain fees and expenses described below, and a duly executed copy of the asset purchase agreement with respect to the Proposed Southern Asset Sale, as well as Undrawn Availability of at least $250,000,  an approved Budget, and entry of the DIP Orders in a form acceptable to the DIP Agent and providing the liens and other adequate protection required by the DIP Loan Agreement. DIP Loan Agreement.  Moreover, each advance is subject to conditions precedent with respect to the accuracy of the Debtors' representations and warranties, absence of any Default or Material Adverse Change, and availability under the DIP Facility.  DIP Loan Agreement at ¶¶ 8.1-8.2.

6

(f)    <u>Pricing and Fees</u>.

    i.    The DIP Facility contemplates a Revolving Interest Rate calculated based upon either (a) a variable Base Rate plus four percent (4.00%), with respect to Domestic Rate Loans and (b) the sum of the Eurodollar Rate plus six and one-quarter percent (6.25%), with respect to Eurodollar Rate Loans. An additional 5% Default Rate applies after the occurrence of an Event of Default. DIP Loan Agreement at ¶¶ 1.2; 3.1.

    ii.    Letters of Credit issued under the DIP Facility accrue fees equal to the average daily face amount thereof multiplied by 3.25% per annum and are subject to a fee in connection with the issuance, amendment, payment or renewal of any such Letter of Credit equal to the greater of one-quarter of one percent (0.25%) and $100. Following an event of default Letter of Credit Fees may be increased by an additional two percent (2.0%). DIP Loan Agreement at ¶ 3.2.

    iii.    The DIP Facility further contemplates the following fees:

    (a)    Unused Revolving Commitment Fee of 0.50% per annum;

    (b)    Closing Fee in the amount $20,000 which is equal to of 4% of the Revolving Advance Commitments;

    (c)    Collateral Monitoring Fee pursuant to Agent's customary charges (or in the event Agent hires a third party to conduct such monitoring the amount such third party charges Agent);

    (d)    Commitment Fee in the amount of $2,500.

DIP Loan Agreement at ¶¶ 3.3-3.4; Fee Letter.

(g)    <u>Term of Facility</u>. The DIP Facility has a Maturity Date of March 29, 2019. DIP Loan Agreement ¶¶ 1.2; 13.1.

(h)    <u>Waivers and Challenges</u>. The Debtors stipulate to the prepetition amounts owed to the Prepetition Agent on behalf of the Prepetition Lenders and to the validity and priority of the liens on the Prepetition Collateral granted pursuant to the Prepetition Loan Documents and the absence of offsets, defenses, claims, objections, challenges, causes of action; and/or choses in action, including, without limitation, avoidance claims under chapter 5 of the Bankruptcy Code. Interim DIP Order at ¶ E(ii). The Interim DIP Order further provides that any adversary proceeding or contested matter challenging the liens, claims, or any other rights of the Prepetition Secured Parties under the Prepetition Loan Documents must be brought (i) with respect to the Committee, before the earlier of (a) sixty (60) calendar days from the date the United States Trustee appoints the Committee or (b)

seventy-five (75) calendar days following entry of the Final Order, or (ii) with respect to all other parties, seventy-five (75) calendar days following the date of entry of the Final Order.  Interim DIP Order at ¶ 38.

(i)  Carve Out.  The Carve-Out applies to (i) all United States Trustee fees and fees payable to the Clerk of the Court, (ii) all reasonable fees and expenses up to $30,000 incurred by a trustee under section 726(6) of the Bankruptcy Code, (iii) all Allowed Professional Fees incurred at any time before or on the first business day following the delivery of a Carve-Out Trigger Notice, and (iv) Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $50,000, incurred after the first business day following delivery by the DIP Agent of the Carve-Out Trigger Notice, to the extent allowed at any time.  Interim DIP Order at ¶ 35.

i.  Permitted Variance.  The Borrowers are required to perform strictly in accordance with the Budget, provided, however, that (i) the Borrowers' aggregate domestic Cash Receipts (for Cash Receipts from within the United States) shall be at least 90% of the projected amounts set forth in the Budget; and (ii) the Borrowers' cumulative Cash Disbursements shall be not more than 110% of the projected amounts set forth in the Budget, in each case calculated on an aggregate (and not a line-item) basis; and (iii) At all times during the term of the DIP Loan Agreement, a Budget shall be in place in form and content satisfactory to the Agent in its sole discretion. DIP Loan Agreement at ¶ 6.9(a), (b).

(j)  Events of Default.  The DIP Facility and the Debtors' authority to use Cash Collateral are subject to certain of Events of Default, including: (i) failure to pay any installment of principal or interest when due; (ii) failure to perform, keep or observe certain covenants, representations and warranties; (iii) unauthorized judgments or Liens; (iv) occurrence of a Material Adverse Effect; (v) lack of perfection or priority with respect to Liens granted in favor of the Agent; (vi) default under any Material Contract; (vii) Change of Control; (viii) revocation, suspension or termination of any license, permit, patent, trademark or tradename; (ix) impairment of Collateral; (x) certain events with respect to pension plans; (xi) termination of the Debtors' CRO; (xii) filing of a chapter 11 plan other than as approved by the Agent; (xiii) any attempt to vacate or modify the DIP Orders in a manner adverse to the Lenders or Agent; (xiv) entry of an order amending, supplementing or modifying any DIP Orders in a manner adverse to the Lenders or Agent; (xv) reversal, vacation or stay of the effectiveness of any DIP Order; (xvi) any violation of the terms of any DIP Order; (xvii) dismissal of the Case or conversion of the Case to a case under Chapter 7 of the Bankruptcy Code; (xviii) appointment of a Chapter 11 trustee or an examiner with expanded powers; (xix) any sale of all or substantially all assets that does not allow for payment in full of all Obligations and Existing Obligations unless consented to by the Agent;

3268641.3

(xx) granting of relief from the automatic stay in the Case to permit foreclosure or enforcement on, or any right or remedy with respect to any material asset of any Debtor; (xxi) the Debtors' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or Lien (except as contemplated herein) that is senior to or pari passu with the Lenders' claims under the the DIP Loan Agreement or the Other Documents and the transactions contemplated thereby to the extent that, upon approval of such motion and closing of the transactions contemplated thereby, the Obligations would not be paid in full; (xxii) payment of or granting adequate protection with respect to prepetition debt, other than as expressly set forth in the Orders or the Budget; (xxiii) except as otherwise provided in the Interim Order or the Final Order, any of the Loan Parties seek or if there is entered, an order under Section 365 of the Bankruptcy Code rejecting a material lease (a) to which any Loan Party is a party, and (b) that is part of (or whose premises contain any of) the Collateral; or (xxiv) any of the Liens or the DIP Superpriority Claims granted under the DIP Orders cease to be valid, perfected and enforceable in any respect.  DIP Loan Agreement ¶ 10.1-10.20.

### Overview of the Debtors' Prepetition Secured Financing

10.     Debtor Centerstone Linen Services, LLC, as Prepetition "Borrowing Agent", Atlas Health Care Linen Services, Co., LLC, Alliance Laundry & Textile Service of Atlanta, LLC, Alliance LTS Winchester, LLC, and Alliance Laundry & Textile Service, LLC (collectively with the Borrowing Agent, the "Prepetition Borrowers"), the financial institutions from time to time party thereto (collectively, the "Prepetition Lenders"), and HSBC Bank, as administrative agent and collateral agent for the Prepetition Lenders (in its capacity as administrative and collateral agent, and including any of its Affiliates (including any branches thereof) performing any of the functions of administrative agent or collateral agent hereunder or under any of the other Loan Documents, the "Prepetition Agent" and, together with the Prepetition Lenders, the "Prepetition Secured Parties"), are parties to that certain Loan and Security Agreement dated October 29, 2013 (as it may have been amended, restated, modified, supplemented, or replaced from time to time, the "Prepetition Loan Agreement"). The Prepetition

9

3268641.3

Loan Agreement provides the Debtors with a revolving credit facility with $20.0 million maximum aggregate availability to the borrowers thereunder, subject to a borrowing base (and as reduced by reserves), which includes two term loans in the aggregate amount of $6.189 million and an equipment loan in the amount of $6 million (collectively, the "Prepetition Facility"), all as set forth in the Prepetition Loan Agreement (together with all documents executed and filed in connection therewith, the "Prepetition Loan Documents").  As of the Petition Date, approximately $21,877,995 was outstanding under the Prepetition Facility, of which (i) approximately $ 19,529,345 comprised Revolving Advances (as defined in the Prepetition Loan Agreement), (ii) approximately $920,625 comprised Term Loan B (as defined in the Prepetition Loan Agreement), and (iii) approximately $1,428,025 comprised Equipment Loan (as defined in the Prepetition Loan Agreement), plus letters of credit in the approximate stated amount of not less than approximately $1,080,000, plus interest accrued and accruing at the rates set forth in the Prepetition Loan Documents (together with any other amounts outstanding under the Prepetition Loan Documents as provided therein, including obligations in respect of the cash management system, cash collateral for letters of credit, purchase charge cards, purchase card services, fees, expenses, and indemnity, collectively, the "Prepetition Obligations").  The Prepetition Obligations are secured by first priority security interests and liens on the Debtors' Receivables, Equipment, General Intangibles, Inventory, Investment Property, Leasehold Interests, Commercial Tort Causes plus additional property set forth in the definition of "Collateral" in the Prepetition Loan Agreement (collectively, referred to herein as the "Prepetition Collateral").

11.     As a result of Debtors' defaults under the Loan Documents, on March 30, 2018, the Debtors and HSBC Bank entered into a Forbearance Agreement covering the period through August 31, 2018.  On or about May 10, 2018, the Debtors engaged business brokerage firm SSG

10

Advisors, LLC ("SSG") which has undertaken extensive efforts to market the Debtors' assets and business operations for sale.  As discussed in more detail below, Alliance has entered into an Asset Purchase Agreement with Crown Health Care Laundry Services, LLC ("Crown") for the sale of the assets it owns in South Carolina and Georgia and has received a Letter of Intent from United Hospitality Group, LLC ("UHS") to purchase the furniture, fixtures, machinery and equipment located at the East Point Facility (the "East Point PP&E").  SSG continues to market Atlas's assets for sale and has received indications of interest from several parties.  Since August 31, 2018, the Debtors and HSBC Bank have entered into several Amended and Restated Forbearance Agreements which extended the forbearance period through the Petition Date.

### The Debtors' Need For Postpetition Financing

12.     Recently, the Debtors' revenues have declined due to loss of contracts.  As a result, the Debtors estimate that they will incur a consolidated operating loss for 2018 of between $13.5 and $14 million.

13.     During the past year, the Debtors have explored all available options in an effort to reorganize their financial affairs, including seeking refinancing and new capital contributions, and selling some or all of their assets.  They have also reduced expenses and made other operational adjustments, including closing below-capacity plants and laying off a number of employees.

14.     As a condition to the Forbearance Agreement, HSBC Bank required Debtors to retain a chief restructuring officer. On or about October 8, 2018 the Debtors retained Ronald Teplitsky of Next Point, LLC to act as the Debtors' Chief Restructuring Officer (the "CRO"). Since that date, the CRO has been actively engaged in overseeing the Debtors' business operations, and in the preparation of the Chapter 11 Cases.

3268641.3

15.     The foregoing operating adjustments, however, have not produced the required amount of relief.  Absent chapter 11 relief and the availability of additional borrowing under the DIP Facility, the Debtors project that they will not have sufficient cash flow to continue their operations over the long term.

16.     The Debtors' need to use Cash Collateral and to obtain credit pursuant to the DIP Facility as provided for herein to enable the Debtors to continue operations and to administer and preserve the value of their estates.  The ability of the Debtors to finance their operations, to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, and otherwise to finance their operations requires the availability of working capital from the DIP Facility and the use of Cash Collateral.  Without the ability to access the DIP Facility or Cash Collateral, the Debtors, their estates, their creditors, and the possibility for a successful reorganization would suffer immediate and irreparable harm.  The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facility and authorized use of Cash Collateral.

17.     Pursuant to the terms of the DIP Documents, the Debtors will make periodic draws upon the DIP Facility to fund their payroll and operations.  Accordingly, without the use of Cash Collateral and the DIP Facility proposed in this Motion, the Debtors will not have the funds necessary to pay postpetition payroll, payroll taxes, trade vendors, suppliers, overhead and other expenses necessary for the continued operation of their business and the management and preservation of their assets and properties.

18.     The Debtors request that, pursuant to the DIP Orders, the DIP Agent permit the Debtors to use the Cash Collateral, make loans and advances to the Debtors and provide other

3268641.3

financial accommodations to the Debtors under the DIP Facility, in each case to be used by the Debtors solely for the purposes set forth in and in accordance with the terms of the Budget and the DIP Orders.  The ability of the Debtors to continue their business and effectuate the asset sales contemplated in these Chapter 11 Cases depends upon the Debtors obtaining the use of Cash Collateral and the DIP Facility as provided for herein.

19.     The DIP Agent is willing to make the Cash Collateral available, and is willing to make such loans and advances and provide such other financial accommodations on a secured basis, as more generally described herein, solely in accordance with the DIP Orders and pursuant to the terms and conditions of the DIP Loan Documents.  Accordingly, the relief requested herein is necessary, essential and appropriate for the continued operation of the Debtors' business, the management and preservation of its assets and properties and is in the best interests of the Debtors, their estates and creditors.

### The Proposed Postpetition Financing

20.     After arm's-length negotiations, the DIP Agent agreed to provide the DIP Facility.  As set forth in the DIP Loan Agreement, the DIP Agent has agreed to consent to the Debtors' use of Cash Collateral and to provide up to $500,000 in Revolving Advances, subject to the terms and conditions of the DIP Orders and the DIP Loan Documents.

21.     Pursuant to the DIP Credit Agreement, the DIP Agent has agreed to a Maximum Revolving Advance Amount of $1,580,000, subject to a provision that the amount of Prepetition Obligations and Obligations under the DIP Facility shall never exceed, in the aggregate, $23,457,995.  From the Maximum Revolving Advance Amount, $1,080,000 will be used to convert all letters of credit issued by any Prepetition Secured Parties under the Prepetition Loan

13

Documents to letters of credit under the DIP Documents and up to $500,000 will be available in the form of Revolving Advances to fund the Debtors' working capital needs.

22.     The Debtors' obligations under the DIP Facility (the "Obligations") will be secured by:

>        (i)     pursuant to Section 364(c)(1) of the Bankruptcy Code and the Orders (as defined herein), as applicable, a DIP Superpriority Claim in the Cases and any Successor Cases (without the need to file a proof of claim) for all of the Obligations with priority over any and all administrative expense claims and unsecured claims of any entity against the Debtors or their estates, including, without limitation, the pre-petition claims and adequate protection claims of the Existing Agent on behalf of the Existing Lenders, and any claims specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b) (except as set forth in the Orders), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114 or any other provisions of the Bankruptcy Code, which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative, subject only to the Carve-Out (as defined herein);

>        (ii)    pursuant to Section 364(c)(2) of the Bankruptcy Code and the Orders, as applicable, an automatically perfected, valid, enforceable, unavoidable, and first-priority security interest and Lien on all Collateral and assets of the Borrowers and the other Loan Parties of any kind (including, subject to the entry of the Final Order, the proceeds of Avoidance Actions), whether now existing or hereafter acquired that is not subject to a valid, perfected, and non-avoidable lien in existence on the Petition Date, which first-priority liens and security interests shall be perfected without necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents, subject only to the Carve-Out;

>        (iii)   pursuant to Section 364(c)(3) of the Bankruptcy Code and the Orders and subject to clause (iv) below, an automatically valid, enforceable, unavoidable and perfected Lien on all Collateral and assets of the Borrowers and the other Loan Parties as more fully described herein which shall be junior in priority and subject to (a) unavoidable valid and perfected Liens in existence at the time of the commencement of the Cases, including Permitted Encumbrances, other than with respect to the Primed Liens (as defined herein), (b) unavoidable valid Liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code, and (c) the Carve-Out; and

14

(iv)        pursuant to Section 364(d)(1) of the Bankruptcy Code and the Orders, as applicable, an automatically perfected, first priority, valid, enforceable, unavoidable and, senior, priming Lien on all Existing Collateral securing obligations under the Existing Loan Agreement and any Liens that are junior to such Liens, all of which existing Liens (the "Primed Liens") shall be primed by and made subject and subordinate to the perfected first-priority senior Liens to be granted to the Agent, which senior priming Liens in favor of the Agent shall also prime any Liens arising after the commencement of the Cases to provide adequate protection in respect of any Primed Liens, subject only to the Carve-Out.

23.      Additional terms and conditions of the DIP Facility are set forth in the summary description in paragraph 9 above, in the DIP Loan Agreement attached as Exhibit 1 to the proposed Interim DIP Order, and in the other DIP Documents.

**Basis for Relief**

24.      As set forth in the Giardino Affidavit, the Debtors believe that the DIP Facility is the only financing available to the Debtors at this time.  The Debtors have been unable to procure alternative financing (a) in the form of unsecured credit allowable under section 503(b)(l) of the Bankruptcy Code, or (b) solely as an administrative expense under section 364(a)-(b) of the Bankruptcy Code.

25.      In addition, the DIP Facility will allow the Debtors to maintain their existing cash management system and avoid the operational complications that would be associated with setting up new bank accounts with a new lender.  Therefore, for the reasons stated herein, the Debtors submit that they have satisfied the requirements to access postpetition financing on a superpriority, secured basis pursuant to section 364 of the Bankruptcy Code.

26.      Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or with security.  If a debtor in possession cannot obtain sufficient postpetition credit on an unsecured basis, section 364(c) of

the Bankruptcy Code permits a bankruptcy court to authorize a debtor to obtain credit or incur

debt, repayment of which is (x) entitled to superpriority administrative expense status or (y) is

secured by a senior lien on unencumbered property or a junior lien on encumbered property, or

both.  11 U.S.C. § 364(c).

27.     As discussed, the DIP Facility is secured by substantially all of the assets of the

Debtors' estate through superpriority claims, security interests, and secured liens pursuant to

section 364(c) and (d) of the Bankruptcy Code.

**A.**     **Financing Under Section 364(c) and (d) of the Bankruptcy Code**

28.     Section 364(c) of the Bankruptcy Code provides that if a debtor is unable to

obtain unsecured credit allowable as an administrative expense, the court may authorize the

debtor to obtain credit or incur debt (a) on a superpriority administrative basis, (b) secured by a

lien on the Debtors' unencumbered assets or (c) secured by a junior lien on the Debtors' already

encumbered assets.  11 U.S.C. § 364(c).

29.     Courts consider various factors in determining whether obtaining postpetition

financing pursuant to section 364(c) is appropriate, including whether (i) a debtor is unable to

obtain unsecured credit under section 364(b), (ii) the transaction is necessary to preserve the

assets of the Debtors' estate, and (iii) the terms of the transaction are fair, reasonable and

adequate under the circumstances.  *See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312-13

(Bankr. D. Del. 2011) (noting these three factors in considering proposed postpetition financing)

(citations omitted); *see also In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y.

1990) (noting that a court "may not approve any credit transaction under subsection (c) unless

the debtor demonstrates that it has reasonably attempted, but failed, to obtain unsecured credit

under sections 364(a) or (b)") (citations omitted); *In re Farmland Indus., Inc.*, 294 B.R. 855, 879

16

(Bankr. W.D. Mo. 2003) (noting that courts look to various factors including whether "the proposed financing is an exercise of sound and reasonable business judgment").

30.     If a debtor is unable to obtain credit solely under the provisions of section 364(c) of the Bankruptcy Code, the debtor may nonetheless obtain credit secured by a senior or equal lien (a "priming lien") on property of the estate that is already subject to a lien under section 364(d). Section 364(d)(1) of the Bankruptcy Code provides:

> (d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if -
>
> > (A) the trustee is unable to obtain such credit otherwise; and
> >
> > (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

**(i)     The Debtors could not obtain financing on an unsecured or more junior basis**

31.     As set forth in the Giardino Affidavit, the Debtors have not been able to obtain postpetition financing of the type and magnitude required for these Chapter 11 Cases on an unsecured or on a junior secured basis, particularly within the accelerated timeframe required to commence these Chapter 11 Cases.  SSG also attempted to identify potential postpetition lenders willing to provide funding to the Debtors on more advantageous terms but was not successful. Accordingly, financing under the DIP Facility is the Debtors' only viable financing option with terms comparable to those offered by the DIP Loan Agreement, and the DIP Liens are an essential part of the protections provided to the DIP Agent and DIP Lenders thereunder.

17

3268641.3

      **(ii)**    **The DIP Facility is necessary to preserve assets
of the Debtors' estates and is in the best interests of creditors**

32.    The Debtors' decision to accept the terms of the DIP Facility is the culmination of a search to procure financing available under the difficult circumstances in which the Debtors find themselves.  Borrowing under the terms of the DIP Facility is the best option available to the Debtors and entry of the DIP Orders is in the best interests of the Debtors, their estates, and stakeholders.

33.    The DIP Facility will provide immediate access to capital to pay vendors and employees, establish prudent cash balances for a business of the Debtors' size and stabilize operations.  The proceeds from the DIP Facility will be used to satisfy working capital requirements, and to fund restructuring costs.

34.    Failure to obtain the DIP Facility would gravely harm the Debtors and their stakeholders.  Without access to the DIP Facility, the Debtor could potentially be forced to cease operations and liquidate their business piecemeal to the detriment of all parties in interest.  *See In re Farmland*, 294 B.R. at 885 (approving postpetition financing that "gives the Debtors sufficient time to market and sell several of their major assets so as to pay down the debt to the DIP Lenders and then reorganize around their remaining core assets.  Without the continued financing, the Debtors would likely be forced into a Chapter 7 or 11 liquidation, to the detriment of all creditors").

      **(iii)**    **The terms of the DIP Facility are fair
and reasonable under the circumstances**

35.    In determining whether the terms of postpetition financing are fair and reasonable, courts consider the relative circumstances of both the debtor and the potential lender.  *In re Farmland*, 294 B.R. at 886-89; *see also Unsecured Creditors' Comm. Mobil Oil Corp.* v. *First*

*Nat'l Bank & Trust Co.* (*In re Ellingsen MacLean Oil Co., Inc.*), 65 B.R. 358, 364-65 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).   Judged from that perspective, the terms of the DIP Facility are fair and reasonable.   The DIP Facility provides the Debtors the liquidity they need to operate their businesses during these Chapter 11 Cases, thus permitting the Debtors the opportunity to restructure or to sell their assets.   After thorough analysis by the Debtors and their advisors, the Debtors have concluded that the terms of the DIP Facility are reasonable and appropriate under the circumstances.

36.   The DIP Facility subjects the security interests and administrative expense claims granted to the DIP Agent to the Carve-Out for certain administrative and professional fees, including (a) United States Trustee fees, (b) fees of the Clerk of the Court, (c) reasonable fees and expenses up to $30,000 incurred by a trustee under section 726(6) of the Bankruptcy Code, and (d) fees and expenses incurred by professionals retained by the Debtors or the Committee, subject to compliance with a Budget.   Carve-outs for professional fees have been found to be reasonable and necessary to ensure that statutory creditors' committees and debtors' estates are adequately assisted by counsel and other professionals.   *See In re Ames*, 115 B.R. at 38.

37.   The various fees and charges associated with obtaining the DIP Facility are within the range of reasonableness under the circumstances.   Courts recognize that lender fees often are the only way to obtain financing, and routinely approve them.   *See*, *e.g.*, *Resolution Trust Corp. v. Official Unsecured Creditors' Comm. (In re Defender Drug Stores, Inc.)*, 145 B.R. 312, 316-19 (B.A.P. 9th Cir. 1992) (approving financing facility pursuant to section 364 of the Bankruptcy Code that included a lender "enhancement fee").

3268641.3

(iv)    **The interests of the Prepetition Secured Parties are adequately protected**

38.    As explained more fully in paragraphs 41 to 44 below, the interests of the Prepetition Secured Parties are adequately protected by, among other things, the granting of superpriority claims and replacement liens, postpetition payments of interest accruing at the Default Rate, and the Debtors' commitments to a specified timeframe to sell their assets. Moreover, the Prepetition Agent has consented to the proposed adequate protection package on behalf of the Prepetition Secured Parties.

39.    Under the circumstances, the Debtors' decision to enter into the DIP Facility is a reasonable exercise of their business judgment, and the DIP Orders accordingly should be entered. *See, e.g.*, *In re Ames*, 115 B.R. at 38 (noting that courts permit debtors to "exercise their basic business judgment" when obtaining debtor-in-possession financing under section 364 of the Bankruptcy Code); *Trans World Airlines, Inc.* v. *Travelers Int'l AG* (*In re Trans World Airlines, Inc.*), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because the facility "reflect[ed] sound and prudent business judgment"); *see also In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("[D]iscretion to act with regard to business planning activities is at the heart of the Debtors' power.") (citation omitted).

40.    Moreover, in light of the facts that additional financing is necessary to preserve the Debtors' estates, unsecured or junior financing is not available, and the interests of the Prepetition Secured Parties are adequately protected, the granting of DIP Liens under section 364(c) and (d) of the Bankruptcy Code is appropriate in this instance.  *See*, *e.g.*, *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085 (4th Cir. 1986); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626 (Bankr. S.D.N.Y. 1992).

3268641.3

**B.      Adequate Protection Under Section 361 of the Bankruptcy Code**

41.      Adequate protection is decided on a case-by-case basis and can be provided in various forms, including granting of replacement liens and administrative claims.  *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case."); *see also In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted), *rev'd on other grounds*, 89 B.R. 336 (S.D.N.Y. 1988).   "A finding of adequate protection should be premised on facts, or on projections grounded on a firm evidentiary basis."   *In re Mosello*, 195 B.R. 277, 292 (Bankr. S.D.N.Y. 1996).

42.      As adequate protection for any postpetition diminution in value of the Prepetition Secured Parties' interests in the Prepetition Collateral, including, without limitation, for any diminution in value resulting from the use of Cash Collateral, the use, sale or lease of any other Prepetition Collateral, subordination to the DIP Facility and Carve-Out, or the imposition of the automatic stay, the Debtors propose to grant, and the Prepetition Secured Parties have agreed to accept, the following:

(i)      Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, solely to the extent of the Diminution in Value of the interest of the Prepetition Secured Parties in the Prepetition Collateral, the Prepetition Secured Parties shall have, subject to the terms and conditions set forth below, additional and replacement security interests and liens in the DIP Collateral (including, for the avoidance of doubt, pledges of 100% of the equity in each direct subsidiary of any Debtor) (the "Prepetition Secured Parties Replacement Liens"), which shall be junior only to the DIP Liens, the DIP Superpriority Claims, and the Carve-Out, and which shall be

21

granted only to the extent in priority as the replaced security interests and liens had as of the Petition Date.

(ii)     Solely to the extent of the Diminution in Value of the interests of the Prepetition Secured Parties in the Prepetition Collateral on account of the Prepetition Indemnity Obligations, the Prepetition Secured Parties shall have an allowed superpriority administrative expense claim (the "Prepetition Secured Parties Superpriority Claims") which shall have priority, except with respect to (i) the DIP Liens, (ii) the DIP Superpriority Claims, and (iii) the Carve-Out, in all of the Chapter 11 Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552, 726, 1113, and 1114 of the Bankruptcy Code, and, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment.  Other than the DIP Liens, the DIP Superpriority Claims, and the Carve-Out, (i) no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and (ii) no priority claims are, or will be, senior to, prior to or on parity with the Prepetition Secured Parties Superpriority Claims.

(iii)    Until the repayment in full of the Prepetition Obligations under the Prepetition Loan Documents, interest shall continue to accrue after the Petition Date at the Default Rate (as defined in the Prepetition Loan Agreement), and, on the last business day of each month, the Agent shall receive, for the benefit of the Prepetition Lenders, payment of all postpetition accrued and unpaid interest at the default rate set forth in the Prepetition Loan Agreement, and, subject to the provisions of the DIP Orders, reimbursement of any postpetition costs and expenses due to the Prepetition Agent and Prepetition Lenders under the Prepetition Loan Agreement;

(iv)    Upon any other sale of any Prepetition Collateral pursuant to section 363 of the Bankruptcy Code, any such Prepetition Collateral may be sold free and clear of the Prepetition Liens and the Replacement Liens on such terms as are acceptable to the Prepetition Secured Parties; provided, however, that such Prepetition Liens and Replacement Liens shall attach to the proceeds of any such sale in the order and priority as set forth in this Interim Order.

43.     In addition and as additional adequate protection, the Debtors have agreed to adhere to the sale milestones established in sections 6.11 and 10.21 of the DIP Loan Agreement, and have agreed that (i) upon the consummation of the Southern Asset Sale, the Prepetition Liens and the Prepetition Secured Parties' Replacement Liens shall attach to the proceeds of any such sale in the same manner and priority as such liens attached to the Prepetition Collateral and the DIP Collateral and all such proceeds shall be promptly paid at closing on any such sale to the Prepetition Agent for application to the Prepetition Obligations, and further, that (ii) upon any other sale of any Prepetition Collateral pursuant to section 363 of the Bankruptcy Code, any such Prepetition Collateral may be sold free and clear of the Prepetition Liens and the Prepetition Secured Parties' Replacement Liens on such terms as are acceptable to the Prepetition Secured Parties; provided, however, that such Prepetition Liens and Prepetition Secured Parties' Replacement Liens shall attach to the proceeds of any such sale in the order and priority as set forth in the DIP Orders.

44.     Accordingly, the Debtors believe that the adequate protection proposed herein and in the DIP Orders is fair and reasonable and is sufficient to satisfy the requirements of section 363(c) of the Bankruptcy Code.

**C.      The DIP Facility Was Negotiated In Good Faith and Should Be
Afforded the Protection of Section 364(e) of the Bankruptcy Code**

45.     Pursuant to section 364(e) of the Bankruptcy Code, any reversal or modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under section 364 of the Bankruptcy Code shall not affect the validity of that debt incurred or priority or lien granted as long as the entity that extended credit "extended such credit in good faith." *See* 11 U.S.C. § 364(e).

23

46.    Courts generally hold that "good faith" in the context of postpetition financing means, consistent with the Uniform Commercial Code, honesty in fact in the conduct or transaction concerned.  *See Unsecured Creditors' Comm.* v. *First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 834 F.2d 599, 605 (6th Cir. 1987) (citing U.C.C. § 1-201(19)). Additionally, "[g]ood faith is measured with respect to the good faith of the lender as contrasted to that of the borrower."  Transcript of Record *(Court Decision)* at 736:24-25, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009) [Docket No. 3740].  Moreover, a lender's desire to ensure that it is repaid, to make money on interest and fees and to protect prepetition positions are understandable and acceptable motivations for a postpetition lender in negotiating a deal.  *Id.* at 737:6-14.

47.    As explained in detail herein, the terms of the DIP Facility were negotiated at arm's length and reflect the only option available to the Debtors in light of their financial circumstances.

48.    All of the advances under the DIP Facility will be extended by the DIP Agent in good faith (as such term is used in section 364(e) of the Bankruptcy Code).  Moreover, the DIP Facility has been extended in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Agent should be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim DIP Order or any provision thereof is vacated, reversed, or modified on appeal or otherwise.

**D.    Approval of the DIP Facility and Use of Cash Collateral on an Interim Basis is Necessary to Prevent Immediate and Irreparable Harm**

49.    Bankruptcy Rules 4001(b)(2) and 4001(c)(2) govern the procedures for obtaining authorization to use Cash Collateral and to obtain postpetition financing.  They provide, in relevant part:

> The court may commence a final hearing on a moton for authorization to use cash collateral no earlier than 14 days after service of the motion.  If the motion so requests, the court may conduct a preliminary hearing before such 14 day period expires, but the court may authorize the use of only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(b)(2).  And:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than fourteen days after service of the motion. If the motion so requests, the court may conduct a hearing before such fourteen-day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2).

50.     Similarly, to the extent the Debtor is seeking authority to sell, use or otherwise incur an obligation regarding property of its estate, Bankruptcy Rule 6003 provides that the Court may only grant such relief to the extent it is necessary to avoid immediate and irreparable harm.  Fed. R. Bankr. P. 6003(b).

51.     Generally, courts find "immediate and irreparable harm" exists where loss of the business threatens the ability to reorganize.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990).  Approval of postpetition financing on an interim basis under Rule 4001(c)(2) is left to the discretion of the court as informed by the facts of each case.  *See In re Pan Am Corp.*, No. 91-8319, 1992 WL 154200, at *6 (S.D.N.Y. June 18, 1992).  There is no limit to the amount of funding that the court can approve on an interim basis.  *Id.*  After the fourteen-day period, the request for financing is not limited to those amounts necessary to prevent the destruction of the Debtors' business, and the debtor is entitled to borrow those

amounts that it believes are prudent to the operation of its business. *Ames Dept. Stores*, 115 B.R. at 36.

52.     Immediate and irreparable harm would result if the relief requested herein is not granted on an interim basis.  As described in the Giardino Affidavit, the Debtors need to obtain immediate access to liquidity under the DIP Facility in order to, among other things, continue the operation of their business, maintain business relationships with vendors and customers, make payroll, and satisfy other working capital and operational needs.  Without immediate financing, the Debtors will likely face a substantial, if not devastating, loss of customer support and other irreparable harm, loss of hundreds of employees and employee morale, and deteriorating relationships with suppliers and customers – all of which would adversely affect the value of the Debtors' businesses.

53.     Funding these expenditures is necessary to the Debtors' ability to preserve and maintain their going-concern value for the benefit of all parties in interest.

54.     The crucial importance of a Debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized by courts in similar circumstances. *See, e.g.*, *In re Mid-State Raceway, Inc.*, 323 B.R. 40 (Bankr. N.D.N.Y. 2005); *In Re Victory Memorial Hospital*, No. 06-44387 (Bankr. E.D.N.Y., Nov. 17, 2006) (order approving postpetition financing on an interim basis); *In re Hostess Brands*, No. 12-22052 (Bankr. S.D.N.Y. Jan. 12, 2012) (same); *In re Chemtura Corp.*, No. 09-11233 (Bankr. S.D.N.Y. March 20, 2009) (same); *In re Tronox Inc.*, No. 09-10156 (Bankr. S.D.N.Y. Jan. 13, 2009) (same); *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Jan. 8, 2009) (same); *In re Lenox Sales, Inc.*, No. 08-14679 (Bankr. S.D.N.Y. Nov. 25, 2008) (same); *In re Wellman, Inc.*, No. 08-10595 (Bankr. S.D.N.Y. Feb. 27, 2008) (same).

26

55.    Accordingly, the Debtors believe that, under the circumstances, entry of the Interim DIP Order is necessary to prevent immediate and irreparable harm to their estates and therefore is warranted under the requirements of Bankruptcy Rules 4001(b)(2) and 4001(c)(2).

**E.    Modification of the Automatic Stay Provided Under Section 362
of the Bankruptcy Code is Appropriate Under the Circumstances**

56.    The Interim DIP Order provides that the automatic stay imposed under section 362 of the Bankruptcy Code is modified to the extent necessary to permit the relief granted therein.  Stay modification provisions of this sort are ordinary and usual features of debtor-in-possession financing facilities and are reasonable under the present circumstances.  Accordingly, the Court should modify the automatic stay to the extent contemplated under the DIP Facility and the proposed DIP Orders.

## **Request for Final Hearing**

57.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date, no sooner than fourteen days after the date of this Motion and no later than thirty days after the entry of the Interim DIP Order, to hold a hearing to consider entry of the Final DIP Order and the permanent approval of the relief requested in this Motion.  The Debtors also request authority to serve a copy of the signed Interim DIP Order, which fixes the time and date for the filing of objections, if any, to entry of the Final DIP Order, by first class mail upon the notice parties listed below, and further request that the Court deem service thereof sufficient notice of the hearing on the Final DIP Order under Bankruptcy Rule 4001(c)(2).

## **Bankruptcy Rule 6003 is Satisfied**

58.    The Debtors have demonstrated that they will suffer "immediate and irreparable harm" if the Interim DIP Order is not entered and the Debtors are not provided immediate access to the DIP Facility.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y.

3268641.3

1990) (finding that "immediate and irreparable harm" exists where loss of the business threatens ability to reorganize). Accordingly, the Debtors respectfully submit that they have satisfied Bankruptcy Rule 6003 as it relates to the relief requested herein.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

59.     Given the nature of the relief requested herein, the Debtors respectfully request a waiver of (a) the notice requirements under Bankruptcy Rule 6004(a) and (b) the fourteen-day stay under Bankruptcy Rule 6004(h). As set forth above, the DIP Facility is essential to prevent irreparable damage to the Debtors' operations, value and ability to sell their assets as a going concern. Accordingly, the Debtors submits that ample cause exists to justify a waiver of the requirements under Bankruptcy Rule 6004(a) and fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent they apply.

### No Prior Request

60.     The Debtors have not previously sought the relief requested herein from this or any other court.

### Notice

61.     Notice of this Motion will be given to (i) the Office of the United States Trustee for the Northern District of New York (ii) counsel for the Prepetition Agent, (iii) counsel to the DIP Agent; (iv) the parties listed in the list of twenty (20) largest unsecured creditors filed by each Debtor in these Chapter 11 Cases; (v) those secured parties appearing in UCC, tax lien and judgment searches against the Debtors; and (vi) any such other party entitled to notice pursuant to Local Bankruptcy Rule 9013-1. In light of the circumstances and the nature of the relief requested herein, the Debtor submits that no further notice is required.

3268641.3

WHEREFORE, the Debtors respectfully request that the Court: (a) enter the Interim DIP

Order, in substantially the form attached hereto as **Exhibit A**, (i) granting the relief sought herein

on an interim basis, (ii) scheduling a hearing to consider entry of the Final DIP Order, and

(iii) granting such other and further relief as the Court may deem just and proper.

Dated:   December 19, 2018
    Syracuse, New York          BOND, SCHOENECK & KING, PLLC


By:       /s/  Stephen A. Donato
    Stephen A. Donato, Bar Roll No. 101522
    Camille W. Hill, Bar Roll No. 501876
    Sarah M. Harvey, Bar Roll No. 519993
    Office and Post Office Address:
    One Lincoln Center
    Syracuse, New York 13202
    Tel: (315) 218-8000
    Fax: (315) 218-8100
    Email:  sdonato@bsk.com
            chill@bsk.com
            sharvey@bsk.com


*Proposed Counsel to the Debtors and Debtors in Possession*

3268641.3