UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
_____

In re:

    CENTERSTONE LINEN SERVICES, LLC,        Case No. 18-31754
    d/b/a Clarus Linen Systems, *et al.*, [1]        Chapter 11 Cases
                              Main Case
                Debtors.      Joint Administration Requested
_____

## AFFIDAVIT OF JOHN J. GIARDINO IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

STATE OF NEW YORK    )
COUNTY OF NEW YORK  )  ss.:

      John J. Giardino, being duly sworn, hereby deposes and says:

      1.      I am the chief executive officer of Centerstone Linen Services, LLC d/b/a Clarus

Linen Systems ("Centerstone"), Atlas Health Care Linen Services Co., LLC d/b/a Clarus Linen

Systems ("Atlas"), Alliance Laundry & Textile Service, LLC d/b/a Clarus Linen Systems

("Alliance"), Alliance Laundry and Textile Service of Atlanta, LLC d/b/a Clarus Linen Systems

("Atlanta") and Alliance LTS Winchester, LLC d/b/a Clarus Linen Systems ("Winchester"), the

debtors and debtors in possession in the captioned chapter 11 cases (collectively, the "Debtors").

In my capacity as chief executive officer, I am familiar with all aspects of the Debtors'

businesses and operations.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Centerstone Linen Services, LLC d/b/a Clarus Linen Systems (5594); Atlas Health Care Linen Services Co., LLC d/b/a Clarus Linen Systems (2681); Alliance Laundry & Textile Service, LLC d/b/a Clarus Linen Systems (8284); Alliance Laundry and Textile Service of Atlanta, LLC d/b/a Clarus Linen Systems (4065); and Alliance LTS Winchester, LLC d/b/a Clarus Linen Systems (0892).

2.      To enable the Debtors to minimize the adverse effects of the commencement of these chapter 11 cases on their businesses, the Debtors have requested various types of relief in their "first day" pleadings and applications (each a "First Day Pleading").  The First Day Pleadings seek relief intended to allow the Debtors to effectively transition into chapter 11 and minimize disruption of the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates.

3.      I submit this Affidavit in support of the chapter 11 petitions and First Day Pleadings filed by the Debtors on December 19, 2018[2].  I am familiar with the contents of each First Day Pleading (including the exhibits and schedules thereto) and I believe that the relief sought in each First Day Pleading: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value; (b) constitutes a critical element to achieving successful sales of the Debtors' assets as going concerns; and (c) best serves the Debtors' estates and creditors' interests.

4.      Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, my review of relevant documents, my opinion, my experience and knowledge of the Debtors' operations and financial conditions, or are based upon knowledge of employees of the Debtors reporting to me that are derived in the course of his/her duties.  If I were called upon to testify, I could and would testify to the facts set forth herein.  I am authorized on behalf of the Debtors to submit this Affidavit.

5.      Part I of this Affidavit describes the Debtors' businesses and the circumstances surrounding the filing of their chapter 11 petitions.  Part II of this Affidavit sets forth the relevant

---

[2] All capitalized terms used but not defined herein shall have the same meanings ascribed to them in the relevant First Day Pleadings.

3230843.4

facts in support of the various first day applications and motions filed by the Debtors contemporaneously herewith.

## PART I - BACKGROUND

6.     On December 19, 2018 (the "Petition Date"), the Debtors filed separate, voluntary petitions for relief under chapter 11 of title 11 of the United States Code, U.S.C. §§ 101, *et seq.*, as amended (the "Bankruptcy Code") with the United States Bankruptcy Court for the Northern District of New York (the "Court").

7.     The principal assets of Atlas are located in Syracuse, New York and venue of the Atlas chapter 11 case in the Northern District of New York is appropriate under 28 U.S.C. § 1408(1).  Venue of the chapter 11 cases filed by Atlas's affiliates Centerstone, Alliance, Atlanta and Winchester in the Northern District of New York is appropriate by virtue of 28 U.S.C. § 1408(2).

8.     The Debtors remain in possession of their respective assets and continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these cases and, as of the date hereof, no official committees have been appointed or designated.  Concurrently herewith, the Debtors have filed motions seeking the joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

9.     The Debtors are leading providers of high-quality linen rental and commercial laundry services to the healthcare industry, primarily supplying scrubs, sheets, towels, blankets, patient apparel and other linen products to hospitals and healthcare clinics via long-term contacts.  The companies employ strict quality assurance measures and have been recognized for

3230843.4

outstanding performance in the areas of infection control, hygienically clean linens and employee safety.  As discussed more fully below, Atlas and Alliance currently operate five production facilities in three states (Atlas operates two facilities in New York and Alliance operates two facilities in Georgia and one in South Carolina) that provide daily pick-ups and deliveries to their customers.  Atlanta and Winchester are not currently operating production facilities.

## A.  CENTERSTONE

10.     Centerstone is a closely-held Delaware limited liability company with a principal office and place of business located at 60 Grider Street, Buffalo, New York 14215.  It is the corporate parent of four subsidiary corporations:  Atlas, Alliance, Atlanta and Winchester.

11.     Centerstone provides back-office and administrative support for its subsidiaries and, as discussed more fully below in connection with the Cash Management Motion, is the entity into whose bank account all accounts receivable collected by the Debtors are deposited and from which all operating cash is disbursed to the operating subsidiaries.

12.     The company's roots date back to 1923; however, Centerstone was formed on October 15, 2007 and its current iteration was formed following the acquisition of Atlas, Alliance and Atlanta in mid-2008.

13.     The three classes of membership interests in Centerstone are (i) a Mezzanine Interest, (ii) Class A Preferred Interests and (iii) Common Interests.  As of the Petition Date, the Mezzanine Interest was owned by Linen Investors, LLC (41.86% share of all interests); the Class A Preferred Interests were owned by Atlas Syracuse Holdings, Inc. (9.9948% share of all interests) and Xdolos Eqity, LLC (10.4657% share of all interests); and the Common Interests

3230843.4

were owned by GGCLS, LLC (23.0246% share of all interests) and F&L, LLC (14.6520% share of all interests).

14.     Centerstone currently has approximately 24 active employees.  One employee is a part-time wage earner and the remaining 23 are full-time salaried personnel.  All of the Centerstone employees are non-union employees.

## B.  **ATLAS**

15.     Atlas is a Delaware limited liability company that currently operates two linen rental and commercial laundry facilities at the following locations:  (i) 414 Taylor Street, Syracuse, New York 13202 (the "Syracuse Facility") and (ii) 60 Grider Street, Buffalo, New York 14215 (the "Buffalo Facility").  Atlas previously operated two other facilities located at (i) 3 East Industrial Parkway, Troy, New York 12180 (the "Troy Facility") that ceased operating on December 14, 2018 and (ii) 304 Jumonville Street, Pittsburgh, Pennsylvania 15219 (the "Pittsburgh Facility") that closed in December 2017.

16.     The Syracuse Facility consists of a 75,000 square foot plant with a current capacity of 400,000 pounds of linen per week that services numerous regional customers including six major customers (five hospitals and a rehabilitation center) that accounted for approximately $4.3 million in revenue in 2017.  The gross revenue earned at the Syracuse Facility totaled $12,586,000.00 in 2017.  This Facility has approximately 157 active employees, and approximately 149 are hourly wage earners and the remaining 8 are salaried personnel.  The workforce at the Syracuse Facility is unionized and Atlas is a party to three Collective Bargaining Agreements covering the Syracuse employees:  (i) the Rochester Regional Joint Board, Local 2607 (101 production employees – Agreement is currently under extension); (ii) the Teamsters, Local Union 182 (8 engineering/maintenance employees – Agreement expired on

3230843.4

June 30, 2018); and (iii) the Teamsters, Local Union 294 (21 drivers – Agreement expires on September 30, 2019).  Atlas is also a member of the respective Multi-Employer Pension Plans for those three unions.  Atlas owns all of the personal property assets located at the Syracuse Facility; however, the Syracuse Facility is leased from landlord ACN Companies, LLC ("ACN Companies")[3].

17.      The Buffalo Facility consists of a 56,445 square foot plant with a current capacity of 450,000 pounds of linen per week that services numerous regional customers including five major customers (three hospitals and two regional medical centers) that accounted for approximately $5.5 million in revenue in 2017.  The gross revenue earned at the Buffalo Facility totaled $11,531,000.00 in 2017.  This Facility has approximately 150 active employees, and approximately 141 are hourly wage earners and the remaining 9 are salaried personnel.  The workforce at the Buffalo Facility is unionized and Atlas is a party to two Collective Bargaining Agreements covering the Buffalo employees:  (i) the International Union of Operating Engineers, Local 17-17S AFL-CIO (6 engineering/maintenance employees – Agreement expires on April 12, 2019) and (ii) the Rochester Regional Joint Board, Local 51 (96 production employees – Agreement expires on October 31, 2019).  Atlas is also a member of the respective Multi-Employer Pension Plans for those two unions.  Atlas owns all of the personal property assets located at the Buffalo Facility; however, the Buffalo Facility is leased from landlord 60 Grider, LLC[4].

18.      The Troy Facility previously operated a 40,800 square foot plant with a capacity of 180,000 pounds of linen per week that accounted for approximately $4.2 million in revenue in 2017.  The gross revenue earned at the Troy Facility totaled $5,343,000.00 in 2017.  This

---

[3] Roland F. Anderson, Jr., the principal of ACN Companies, owns a membership interest in Atlas Syracuse Holdings, Inc., one of Centerstone's Class A Preferred Interest holders.
[4] John J. Giardino owns a 100% membership interest in 60 Grider, LLC.

3230843.4

Facility currently has approximately 20 active hourly employees who are winding down the Troy operations.  The workforce at the Troy Facility is unionized and Atlas is a party to one Collective Bargaining Agreement covering the Troy employees: the Laundry, Distribution and Food Service Joint Board (54 employees – Agreement is currently under extension).  Atlas is also a member of the respective Multi-Employer Pension Plans for that union.  Atlas owns all of the personal property assets located at the Troy Facility; however, the Troy Facility is leased from landlord ACN Companies and will be vacated by December 31, 2018.

## C. **ALLIANCE**

19.     Alliance is a Georgia limited liability company that operates three linen rental and commercial laundry facilities at the following locations:  (i) 355 Old Greenville Road, Spartanburg, South Carolina 29301 (the "Spartanburg Facility"); (ii) 1631 Willingham Drive, East Point, Georgia 30344 (the "East Point Facility"); and (iii) 404 Hodges Avenue, Albany, Georgia 31701 (the "Tristate Facility").

20.     The Spartanburg Facility consists of a 39,600 square foot plant with a current capacity of 327,000 pounds of linen per week that services numerous regional customers including five major customers (regional medical centers) that accounted for approximately $4.9 million in revenue in 2017.  The gross revenue earned at the Spartanburg Facility totaled $9,811,000.00 in 2017.  This Facility has approximately 101 active employees, and approximately 96 are hourly wage earners and the remaining 5 are salaried personnel.  All of the Spartanburg employees are non-union employees.  Alliance owns all of the personal property assets located at the Spartanburg Facility; however, the Spartanburg Facility is leased from landlord ULS Acquisitions, LLC[5].

---

[5] I own a one-third membership interest in ULS Acquisitions, LLC.

21.    The East Point Facility consists of a 57,000 square foot plant with a current capacity of 512,000 pounds of linen per week that services numerous regional customers including five major customers (two hospitals and three regional medical centers) that accounted for approximately $6.2 million in revenue in 2017.  The gross revenue earned at the East Point Facility totaled $13,435,000.00 in 2017.  This Facility has approximately 209 active employees, and approximately 197 are hourly wage earners and the remaining 12 are salaried personnel.  All of the East Point employees are non-union employees.  Alliance owns all of the personal property assets located at the East Point Facility; however, the East Point Facility is leased from landlord Willingham 1631, LLC.

22.    The Tristate Facility consists of a 21,234 square foot plant with a current capacity of 154,000 pounds of linen per week and services numerous regional customers including three major customers (three hospitals) that accounted for approximately $2.2 million in revenue in 2017.  The gross revenue earned at the Tristate Facility totaled $1,923,000.00 in 2017.  This Facility has approximately 56 active employees, and approximately 51 are hourly wage earners and the remaining 5 are salaried personnel.  All of the Tristate employees are non-union employees.  Alliance owns all of the personal property assets located at the Tristate Facility; however, the Tristate Facility is leased from landlord Phoebe Putney Memorial Hospital, Inc.

## D. **ATLANTA**

23.    Atlanta is a Georgia limited liability company that previously operated a linen rental and commercial laundry facility located at 1700 Maple Avenue, S.W., Rome, Georgia 30161  (the "Rome Facility").  The Rome Facility ceased operating during June 2018.  Atlanta currently has no employees.  The Rome Facility was leased from a third-party landlord and that lease terminated in June 2018.

3230843.4

### E.  **WINCHESTER**

24.      Winchester is a Tennessee limited liability company that previously operated a linen rental and commercial laundry facility located at 1280 Baxter Lane, Winchester, Tennessee 37398 (the "Winchester Facility").  The Winchester Facility ceased operating in April 2016. Winchester currently has no employees.  The Winchester Facility was leased from a third-party landlord and that lease terminated in April 2016.

### F.  **PRE-PETITION INDEBTEDNESS**

25.      As of the Petition Date, the Debtors were jointly and severally indebted to secured creditor HSBC Bank USA, National Association ("HSBC Bank") pursuant to a Loan and Security Agreement dated October 29, 2013 (as amended, "Loan Agreement"), a Revolving Credit Note dated October 29, 2013, in the original principal amount of $20,000,000 ("Revolving Credit Note"), a Term Loan A Note dated October 29, 2013, in the original principal amount of $2,752,000 ("Term Loan A Note"), a Term Loan B Note dated October 29, 2013, in the original principal amount of $3,437,000 ("Term Loan B Note"), and one or more Equipment Notes dated October 29, 2013, in the aggregate original principal amounts of $6,000,000 (collectively "Equipment Note").  The Loan Agreement, Revolving Credit Note, Term Loan Note A, Term Loan Note B, Equipment Note, all Guaranties, and all documents executed and delivered in connection therewith or relating thereto (including all renewals, modifications and replacements thereof, including, without limitation, the Guaranties) are the "Loan Documents".   As of December 18, 2018, the principal amounts of the Debtors' obligations owed to HSBC Bank under the Loan Documents are as follows[6]:

      a.      Revolving Credit Note - $19,277,762.33;

      b.      Term Loan A Note - $0.00

---

[6] In addition, there are outstanding Letters of Credit totaling $1,080,000.00.

3230843.4

      c.       Term Loan B Note - $920,625.00

      d.       Equipment Note - $1,428,025.29

Additional amounts for accrued interest, attorneys' fees and expenses are due by the Debtors to HSBC Bank under the Loan Documents.

26.      Repayment of the amounts due HSBC Bank under the Loan Documents is secured by duly-perfected security interests in, and first position liens upon, substantially all of the Debtors' assets.

27.      As a result of the Debtors' defaults under the Loan Documents, on March 30, 2018, the Debtors and HSBC Bank entered into a Forbearance Agreement covering the period through August 31, 2018.  On or about May 10, 2018, the Debtors engaged business brokerage firm SSG Advisors, LLC ("SSG") which has undertaken extensive efforts to market the Debtors' assets and business operations for sale.  As discussed in more detail below, Alliance has entered into an Asset Purchase Agreement with Crown Health Care Laundry Services, LLC ("Crown") for the sale of the assets it owns in South Carolina and Georgia and has received a Letter of Intent from United Hospitality Group, LLC ("UHS") to purchase the furniture, fixtures, machinery and equipment located at the East Point Facility (the "East Point PP&E").  SSG continues to market Atlas's assets for sale and has received indications of interest from several parties.  The forbearance period was extended after August 31, 2018.

28.      In addition to the obligations owed to secured creditor HSBC Bank, as of the Petition Date, the Debtors owed the following approximate amounts to priority and general unsecured non-insider trade creditors:

      a.      Centerstone:  $1,731,856.71
      b.      Atlas:  $4,560,018.24
      c.      Alliance:  $4,137,954.63
      d.      Atlanta:  $  556,473.93

e.      Winchester:    $  105,001.48

29.      Recently, the Debtors' revenues have declined due to the Debtors' inability to purchase additional linens to satisfy its contractual obligations to customers and the resulting loss of customer contracts.  As a result, the Debtors estimate that they will incur a consolidated operating loss for 2018 of between $13.5 million and $14 million.

30.      During the past year, the Debtors have explored all available options in an effort to reorganize their financial affairs, including seeking refinancing and new capital contributions, and selling some or all of their assets.  They have also reduced expenses and made other operational adjustments, including closing below-capacity plants and laying off a number of employees.

31.      As a condition to the Forbearance Agreement, HSBC Bank required the Debtors to retain a chief restructuring officer ("CRO").  On or about October 8, 2018, the Debtors retained Ronald Teplitsky of Next Point, LLC to act as the Debtors' CRO.  The CRO provides independent management of the Debtors' financial affairs and business operations.  The CRO's duties include, among other things, (a) performing detailed financial reviews of the Debtors, (b) identifying cost reductions and operation improvement opportunities and (c) developing possible restructuring plans and strategic alternatives to maximize the enterprise value of the Debtors. Since his retention, the CRO has been actively engaged in overseeing the Debtors' business operations and in the preparation of the Chapter 11 Cases.

32.      The foregoing operating adjustments, however, have not produced the required amount of relief.  Absent chapter 11 relief, the Debtors project that they will not have sufficient cash flow to continue their operations over the long term.  The Debtors, in consultation with the CRO, have concluded that the best option to protect the value of their operations for creditors

and to preserve the jobs of their employees is to enter into the Chapter 11 Cases and sell their

businesses as going concerns.

## G. ASSET SALES

33.    As stated above, SSG has actively marketed the Debtors' assets for sale since it

was engaged in May 2018.  Since that time, numerous prospective purchasers have signed Non-

Disclosure Agreements, have visited an electronic data room established by SSG containing the

Debtors' financial information, have toured the Debtors' northern and southern facilities, and

met with the CRO, plant managers and me to discuss the Debtors' operations.

34.    On December 19, 2018, Alliance entered into an Asset Purchase Agreement with

Crown (the "Crown APA") pursuant to which Crown will purchase substantially all of Alliance's

assets, except the East Point PP&E[7], for a purchase price of approximately $4,000,000.00,

subject to higher and better offers.  By December 21, 2018, Alliance will file a motion pursuant

to section 363 of the Bankruptcy Code seeking, among other things, approval of bidding

procedures, the appointment of Crown as the stalking horse bidder for Alliance's assets, the date

of an auction sale, if necessary, and ultimately, approval of the successful bidder for the assets.

Alliance anticipates that the hearing to approve the bidding procedures will be held during early

January 2019 and that the asset sale will close approximately 60 days after execution of the

Crown APA.

35.    On October 8, 2018, Alliance received a Letter of Intent from UHS pursuant to

which UHS expressed an interest in purchasing the East Point PP&E for a purchase price of

$600,000.00.  Alliance and UHS are currently negotiating the terms of an Asset Purchase

Agreement (the "UHS APA") which will be submitted to the Court under a separate motion

---

[7] Alliance has an option under the Crown APA to designate the East Point PP&E as a Purchased Asset through
delivery of a written notice to Crown no than five days prior to the bid deadline designated in connection with the
approval of the Crown APA.

3230843.4

pursuant to section 363 of the Bankruptcy Code to approve the sale of the East Point PP&E.

This sale will also be subject to higher and better offers, and may close on or around the same

date as the asset sale to Crown.

36.     The purpose of the Debtors' chapter 11 filings, therefore, is to ensure the ongoing

operations of the remaining commercial laundry facilities so that they may be sold as going

concerns, to market the Debtors' assets for sale as going concerns through a competitive bidding

process and to address the Debtors' financial difficulties for the benefit of their respective

creditors.

## PART II - FIRST DAY MOTIONS

**A.      Application for Order Pursuant to Sections 327(a) of the Bankruptcy Code
Authorizing the Retention of Bond, Schoeneck & King, PLLC as Attorneys for the
Debtors and Debtors in Possession**

37.     The Debtors have selected the law firm of Bond, Schoeneck & King, PLLC

("Bond") to act as their attorneys in connection with the prosecution of their chapter 11 cases and

will file a retention application with the Court within 21 days of the Petition Date.

38.     Due to Bond's recognized expertise in the field of debtors' and creditors' rights

and business reorganizations under chapter 11 of the Bankruptcy Code, as well as its specialized

and substantial expertise in corporate, litigation, labor and real estate law, I believe that Bond is

highly qualified to assist the Debtors with the intricate legal issues likely to arise in these chapter

11 cases.

39.     Prior to the Petition Date, the Debtors consulted with Bond with respect to,

among other things, the negotiation of the Amended and Restated Forbearance Agreement with

HSBC Bank, the efforts to sell the Debtors' assets, and the preparation, commencement and

prosecution of these cases.  Through such consultations, Bond has become familiar with the

13

3230843.4

Debtors' businesses and legal affairs.  Furthermore, the members and associates of Bond who

will advise the Debtors in these cases have considerable knowledge and experience in the field of

bankruptcy law and debtors' and creditors' rights, including insolvencies, restructurings and

business reorganizations and liquidations under chapter 11 of the Bankruptcy Code, as well as in

other areas of law related to these chapter 11 cases.

      40.    If retained, Bond will render the following services, without limitation, on the

Debtors' behalf:

    (a)    advising the Debtors with respect to their powers and duties as debtors and debtors in possession in the continued management and operation of their respective businesses and assets;

    (b)    attending meetings and negotiating with representatives of creditors and other parties in interest and advising and consulting on the conduct of the cases, including all of the legal and administrative requirements of operating in chapter 11;

    (c)    taking all necessary action to protect and preserve the Debtors' estates, including the prosecution of actions commenced under the Bankruptcy Code on their behalf, and objections to claims filed against the estates;

    (d)    preparing, on behalf of the Debtors, all motions, applications, answers, orders, reports and papers necessary to the administration of the estates;

    (e)    negotiating and preparing, on the Debtors' behalf, chapter 11 plans, disclosure statements and all related agreements and/or documents and taking any necessary action on behalf of the Debtors to obtain confirmation of such plans;

    (f)    advising the Debtors with respect to sales of assets;

    (g)    appearing before this Court, any appellate courts, and the U.S. Trustee, and protecting the interests of the Debtors' estates before such courts and the U.S. Trustee;

    (h)    performing all other legal services in connection with these chapter 11 cases.

3230843.4

41.    Bond has indicated its willingness to act in these cases as the Debtors' attorneys and to render the foregoing services.  The Debtors have agreed to pay Bond compensation on an hourly basis, plus reimbursement of actual and necessary expenses and other charges incurred by Bond.  I believe the fees that Bond will charge the Debtors, as set forth in the Affidavit of Stephen A. Donato, Esq. to be filed in support of Bond's retention application, are fair and reasonable in light of prevailing market rates, both in and out of chapter 11 proceedings, and Bond's extensive experience and the scope of the work to be performed pursuant to this retention.

42.    I believe that Bond is well qualified to represent the Debtors as debtors in possession in these chapter 11 cases and that the retention of Bond is necessary and in the best interests of the Debtors, their estates and their creditors.  Accordingly, the Debtors respectfully request that the Court issue an Order approving the appointment of Bond to act as the attorneys to the Debtors herein.

**B.**    **Motion of the Debtors for Entry of Interim and Final Orders: (i) Authorizing the Debtors to (a) Obtain Postpetition Financing on a Super-Priority, Senior Secured Basis and (b) Use Cash Collateral, (ii) Granting (a) Liens and Super-Priority Claims and (b) Adequate Protection, (iii) Modifying the Automatic Stay, (iv) Scheduling a Final Hearing, and (V) Granting Related Relief**

43.    The Debtors and HSBC have consented to the terms of an Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing on a Super-Priority, Senior Secured Basis and (B) Use Cash Collateral, (II) Granting (A) Liens and Super-Priority Claims and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief with HSBC Bank (the "Interim DIP Order") pursuant to sections 105, 361, 362 and 364 of the Bankruptcy Code, Rules 4001, 6003 and 9014 of the Federal Rules of Bankruptcy Procedure and Rule 4001-2 of the

3230843.4

Local Bankruptcy Rules for the Northern District of New York.  The Debtors seek to obtain

senior secured revolving post-petition financing on a super-priority basis and seek to provide

security for the repayment of post-petition advances under the terms of that certain Senior

Secured Super-Priority Debtor-In-Possession Loan and Security Agreement between HSBC

Bank and the Debtors (the "DIP Facility").  In addition, the Debtors seek authority to use cash

collateral and grant HSBC Bank adequate protection with respect to its prepetition liens in the

form of replacement liens, super-priority claims adequate protection payments, and approval of

sale milestone dates.

44.     It is my belief that the Debtors require the use of cash collateral and the funds

advanced under the DIP Facility to fund their day-to-day operations.  Indeed, absent such relief,

the Debtors' businesses will be brought to an immediate halt, with disastrous consequences for

the Debtors, their estates and creditors.  Accordingly, the Debtors seek authority, pursuant to

section 363(c)(2) of the Bankruptcy Code, to use their prepetition cash collateral and pursuant to

sections 364(c), (d) and (e) of the Bankruptcy Code, to obtain post-petition credit in the amount

of $500,000.00 under the DIP Facility in the operation of their businesses and administration of

their chapter 11 cases.  The Debtors have not been able to obtain, in the ordinary course of their

businesses, unsecured credit under section 503(b)(1) of the Bankruptcy Code as an

administrative expense sufficient to meet their operating needs.

45.     In order to adequately protect HSBC's interest in the cash collateral, the Debtors

are proposing to grant HSBC Bank adequate protection in the form of additional and replacement

security interests and liens in the DIP Collateral (as defined in the Interim DIP Order) (including

pledges of 100% of the equity in each direct subsidiary of any Debtor), which shall be junior

only to the DIP Liens, the DIP Superpriority Claims and the Carve-Out provided for in the

3230843.4

Interim DIP Order.  In addition, HSBC Bank shall be granted an allowed superpriority administrative expense claim which shall have priority, except with respect to the (i) DIP Liens, (ii) the DIP Superpriority Claim and (iii) the Carve-Out, over all other claims in all of the Chapter 11 Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code.

46.      In sum, without immediate access to the prepetition cash collateral and credit under the DIP Facility, the Debtors face a liquidity crisis that would threaten the viability of their businesses.  If cash is not available to maintain business-as-usual operations during the critical period immediately following commencement of these cases, the Debtors will likely face a substantial, if not devastating, loss of customer support and other irreparable harm from a severe tightening or elimination of trade credit, delayed deliveries, loss of hundreds of employees and employee morale and deteriorating relationships with suppliers and customers – all of which would adversely affect the value of the Debtors' businesses.  Thus, the Debtors' ability to remain viable operating entities and preserve value pending the orderly liquidation of their estates, depends upon obtaining the interim and final relief requested in the Interim Order.

**C.**      **Motion for Interim and Final Orders Authorizing (i) Continued Maintenance of Existing Bank Accounts, (ii) Continued Use of Existing Cash Management Systems, (iii) Continued Use of Existing Business Forms and (iv) Continued Intercompany Transactions**

47.      A list of the Debtors' respective bank accounts (collectively, the "Bank Accounts") is provided in the Motion of the Debtors for Entry of an Order Authorizing (A) Maintenance of Existing Bank Accounts, (B) Continued Use of Existing Cash Management System, (C) Continued Use of Existing Business Forms and (D) Authorizing Continued Intercompany Transactions dated December 19, 2018 (the "Cash Management Motion").  The Bank Accounts include a payment account, a loan account, an operating account and three disbursement accounts at HSBC Bank.

3230843.4

48.     The Debtors generate and receive funds primarily from their customers. Customer payments are deposited using a Remote Deposit Capture service or by ACH credits and wires into a centralized Payment Account maintained by Centerstone.  Once funds are collected and deposited as described above, the Debtors' secured lender, HSBC Bank, sweeps the payment account to pay down the Debtors' Loan Account.  All disbursements are paid out of a centralized Operating Account maintained by Centerstone.  Funds are drawn from the Loan Account to fund the Debtors' Operating Account.  The Debtors' operating obligations are then satisfied either by direct payment from the Operating Account or by payment from three separate Controlled Disbursement Accounts, which are funded by the Operating Account.  The first Controlled Disbursement Account is maintained for checks related to the Debtors' corporate office.  The second Controlled Disbursement Account is maintained for checks related to the Debtors' facilities in the Southeast, and the third Controlled Disbursement Account is maintained for checks related to the Debtors' facilities in the Northeast.

49.     As described above, the Bank Accounts and the Debtors' practices and procedures with respect to the collection of deposits, making disbursements and making payroll constitute the Debtors' cash management systems (the "Cash Management Systems").  The Cash Management Systems enable the Debtors to monitor collection and disbursement of funds, and maintain control over the administration of their bank accounts, all of which facilitate the effective collection, disbursement, and movement of cash.

50.     As of the Petition Date, the Debtors will instruct HSBC Bank to stop payment on all outstanding checks issued to vendors or other trade creditors on account of prepetition debts or liabilities, with the exception of those checks to employees for wages and/or employee benefits, as described more fully in the Motion for Order (I) Authorizing Debtors to Pay

3230843.4

Prepetition Wages, Salaries and Benefits, (II) Authorizing the Continuation of Employee Benefit Programs in the Ordinary Course of Business and (III) Directing Banks to Honor Prepetition Checks for Payment of Prepetition Wage, Salary and Benefit Obligations dated December 19, 2018 (the "Employee Wage Motion").

51.     Pursuant to the standard chapter 11 operating practice in this jurisdiction, the Debtors are required, among other things, to open new bank accounts upon the filing of the bankruptcy petitions and are further required to designate such accounts as "Debtor in Possession" on the respective account signature cards.

52.     The Debtors' existing Cash Management System is essential to the ordinary coordination of the Debtors' businesses.  The Debtors submit that the cost and expense of changing the Bank Accounts and creating a new cash management system would not only force the Debtors to incur significant and unnecessary costs and expenses, but would impair the operation of the Debtors' businesses.

53.     Indeed, forcing the Debtors to employ new cash management systems could cause confusion, diminish the prospects for a successful reorganization, disrupt payroll and introduce inefficiency at a time when efficiency is most critical, and place a strain on the Debtors' relationships with customers and vendors.  Naturally, these relationships must be maintained if the Debtors are to be given the opportunity to operate successfully.  Asking the Debtors' various commercial and government customers to remit payments to new and different accounts will result in a slowdown in the Debtors' collection of receipts just at the time when prompt collection of much-needed cash is most critical.

54.     Further, the preservation of the Bank Accounts will not adversely impact any of the Debtors' creditors.  The Debtors will work with the Office of the United States Trustee to

3230843.4

ensure that the Debtor's payment, loan, operating, and controlled disbursement accounts at

HSBC Bank are designated as Authorized Depositories.

55.     The Debtors seek to have HSBC Bank not honor prepetition checks, except as

expressly provided for by Orders of this Court.  As noted above, and in the Employee Wage

Motion, filed contemporaneously herewith, the Debtors request that the Court direct HSBC Bank

to continue honoring payroll checks (to the extent sufficient funds are on deposit to honor such

checks) without regard to when such payroll checks were issued.  Such relief is necessary to

implement, to the extent granted, and shall be subject to, the relief requested by the Debtors in

the Employee Wage Motion.  The Debtors intend to provide notice of entry of the order granting

the Cash Management Motion to HSBC Bank within one (1) business day of the entry of such an

order.

56.     The Debtors also request permission to use their existing business forms and

stationery without alteration or change.  The Debtors do not print their own business forms and

stationery.  Thus, substantial time and expense would be required if the Debtors were required to

print new business forms and stationery merely to indicate "debtor in possession".  The Debtors,

therefore, request that they be relieved of the requirement to stamp their business forms and

checks with the "DIP" or "debtor in possession" designation.

57.     Finally, in the ordinary course of their businesses, the Debtors utilize a cost

allocation system by which payroll and other relevant expenses are allocated between

Centerstone and its operating subsidiaries, Atlas and Alliance (the "Intercompany

Transactions").  As a result of the Intercompany Transactions, intercompany receivables and

payables are created in the ordinary course of business (the "Intercompany Claims")[8].  The

---

[8] The Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among
similar enterprises.  The Intercompany Transactions are ordinary course transactions within the meaning of section

3230843.4

Intercompany Transactions are sometimes settled by book entry rather than by an actual transfer

of cash.  Centerstone tracks all Intercompany Transactions in its accounting system and can

ascertain, trace and account for them as needed.  Continuing these Intercompany Transactions

and other intercompany services will benefit the Debtors' estates.  If the Intercompany

Transactions were to be discontinued, the Cash Management Systems and related administrative

controls would be disrupted to the Debtors' detriment.

58.    The Debtors submit that "cause" exists to waive the investment and deposit

restrictions under section 345(b) of the Bankruptcy Code to the extent that the Debtors' cash

management deposits and investments do not comply.  HSBC Bank, the financial institution at

which the Debtors maintain their Bank Accounts, is a financially stable banking institution and is

FDIC insured (up to the applicable unit per account).  All such deposits and investment are

prudent and designated to yield the maximum reasonable net return on the funds invested, taking

into account the safety of such deposits and investments.

59.    The Debtors believe that the deposit and investment of their cash in the HSBC

Bank Accounts provides the protection required by section 345(a) of the Bankruptcy Code,

notwithstanding the absence of a "corporate surety" requirement.  The requirement of obtaining a

bond secured by the undertaking of a corporate surety from such a financial institution would be

prohibitively expensive and administratively burdensome, and could offset any of the financial

gain derived from investing in private as well as federal or federally-guaranteed securities.

60.    The Debtors submit that sufficient cause exists under section 345(b)(2) of the

Bankruptcy Code to allow the Debtors to deviate from the approved investment practices

---

363(c)(1) of the Bankruptcy Code.  Nonetheless, out of an abundance of caution, the Debtors seek express authority
to engage in such transactions on a post-petition basis.  The continued performance of the ordinary course
Intercompany Transactions is integral to ensuring the Debtors' ability to operate their businesses as debtors in
possession.

3230843.4

otherwise required.  Accordingly, the Debtors respectfully request authority to deposit and invest

funds in a safe and prudent manner in accordance with their existing Cash Management Systems

and past practice.

61.     Based upon all of the foregoing, the Debtors submit that sufficient cause exists to

allow the Debtors to maintain its existing Bank Accounts, Cash Management Systems and

business forms, and to continue to effect Intercompany Transactions, and respectfully request

that they be authorized to continue using their current Cash Management Systems and business

forms during the post-petition period.

**D.**     **Motion for Entry of Interim and Final Orders (i) Authorizing Debtors to Pay
Prepetition Wages, Salaries and Benefits, (ii) Authorizing the Continuation of
Employee Benefit Programs in the Ordinary Course of Business and (iii) Directing
Banks to Honor Prepetition Checks for Payment of Prepetition Wage, Salary and
Benefit Obligations**

62.     To avoid the significant risks of resignations and of discontent or loss of morale

among essential employees, and in view of the priority awarded to wage claims, it is necessary

and appropriate that the Debtors be granted authorization requested in the Employee Wage

Motion.  The Debtors require the continued service of their employees in order to ensure that the

continuity and quality of its business operations will not be threatened and so that the Debtors

may continue, without unnecessary interruption, their efforts to achieve successful outcomes for

the chapter 11 cases.

63.     Centerstone currently employs 23 full-time employees and one part-time

employee (collectively, the "Centerstone Employees"), who are paid bi-weekly, in arrears, on

Friday.  Approximately 88% of Centerstone's employees are salaried personnel and 12% are

hourly wage earners.  The average bi-weekly gross payroll for the Centerstone Employees is

approximately $76,000.00.

3230843.4

64.      Alliance currently employs 191 active employees.  Approximately 186 are full-time employees and 5 are part-time employees (collectively, the "Alliance Employees"), who are paid bi-weekly, in arrears, on Friday.  Approximately 6% of Alliance employees are salaried personnel and 94% are hourly wage earners.  The average bi-weekly gross payroll for the Alliance Employees is approximately $216,000.00.

65.      Atlas currently employs 337 active employees.  Approximately 321 are full-time employees and 16 are part-time employees (collectively, the "Atlas Employees"), who are paid weekly, in arrears, on Friday.  Approximately 7% of the Atlas Employees are salaried personnel and 93% are hourly wage earners.  The average weekly gross payroll for the Atlas Employees is approximately $211,000.00.  As discussed in Section II(C) above, the Debtors maintain payroll accounts at HSBC Bank.  The Centerstone Employees, the Alliance Employees and the Atlas Employees are, collectively, the "Employees".

66.      As of the Petition Date, the accrued, unpaid payroll for all Employees is approximately $717,000.00, including the Debtors' portion of payroll taxes.  The next regularly-scheduled pay date for all Employees is December 21, 2018[9].  All of the wages and salaries earned by the Employees prior to the Petition Date and paid on December 21, 2018 constitute prepetition wages.  Therefore, it is imperative that the Debtors obtain authorization to pay priority prepetition wage claims to all of their Employees on or before December 21, 2018.

67.      No Employee is currently owed amounts that exceed the $12,850.00 cap on priority claim amounts set forth in section 507(a)(4) of the Bankruptcy Code.

68.      Further, in the ordinary course of their businesses, the Debtors maintain a Severance Policy.  When an employee is terminated, severance is calculated based on the years

_____

[9] This pay date covers the period of December 2-15, 2018 for Centerstone and Alliance Employees and the period of December 9-15, 2018 for Atlas Employees.

3230843.4

of service of each employee.  On December 14, 2018, Atlas terminated 18 hourly employees.

The severance amount for all 18 employees totals $17,544.00, with the maximum severance

amount being paid to an individual employee totaling $1,622.40, and is to be paid with the

December 21, 2018 payroll.  It is critical that the Debtors be authorized to continue their

Severance Policy and honor any accrued, but unpaid, severance in the ordinary course of their

businesses.  Accordingly, by this Motion, the Debtors seek authority to pay all prepetition

severance in the ordinary course of business and to continue their prepetition practice of

providing severance to their employees.

69.     Accordingly, the Employee Wage Motion seeks authority to pay accrued but

unpaid prepetition wages, salaries and severance payments due all Employees through the

Petition Date.  The Debtors seek to pay the wages, salaries and severance payments for all

Employees in the ordinary course when the first obligations come due on December 21, 2018,

including obligations that are not yet due.

70.     In addition, in the ordinary course of their businesses, the Debtors provide

benefits to their Employees (collectively, the "Employee Benefits").  The Employee Benefits

include, without limitation, vacation leave, paid time off, 401(k) plan, pension, health insurance,

dental insurance, vision insurance, life insurance, workers' compensation, disability insurance,

and related programs.

71.     The accrued pre-petition payroll and Employee Benefits owed is less than

$12,850.00 for each Employee in all circumstances under section 507(a)(5) of the Bankruptcy

Code.

72.     The Debtors further request that this Court authorize HSBC to process, honor and

pay all prepetition checks issued by, and fund transfer requests made from, the Debtors with

3230843.4

respect to Employee wages, salaries, commissions and Employee Benefits that were not

processed, honored or paid as of the Petition Date.

73.     Finally, the Debtors routinely withhold from Employee paychecks amounts that

the Debtors are required to transmit to third parties.  Examples of such withholding include

Social Security, FICA, federal, state, and local income taxes, 401(k) contributions, garnishments,

health care payments and charitable donations.  Such withheld funds, to the extent that they

remain in the Debtors' possession, constitute monies held in trust and, therefore, are not property

of the Debtors' bankruptcy estates.  I respectfully submit that the Debtors' practice of directing

such funds to the appropriate parties is in the ordinary course of business, and the Debtors are

seeking authority to continue such practice.

74.     The obligations for which the Debtors seek authorization to honor to their

Employees were earned by individuals employed by the Debtors, and are for services rendered

within 180 days before the commencement of the Debtors' cases.  The obligations are for wages

and payroll taxes based on such wages, and for the other Employee Benefits mentioned above.

75.     The relief requested pursuant to the Employee Wage Motion will not prejudice

creditors, but rather will protect the Debtors' and Employees' respective interests.

**E.     Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay
Prepetition Taxes and Regulatory Fees**

76.     I have reviewed the Motion for Entry of Orders Authorizing the Debtors to Pay

Prepetition Taxes and Regulatory Fees (the "Tax Motion").  Based upon my review of the Tax

Motion, I understand that the Debtors seek an Order from the Court authorizing, but not

directing, them to pay prepetition sales, use, payroll, trust fund and other taxes and federal, state

and local regulatory fees and licensing fees (collectively, "Taxes and Fees") to the respective

authorities in the ordinary course of the Debtors' businesses.  Prior to the Petition Date, the

3230843.4

Debtors generally paid the Taxes and Fees as they became due to Taxing Authorities.  Nothing contained in the Tax Motion, however, would preclude the Debtors from contesting, in their sole discretion, the validity and amount of any prepetition Taxes or Fees under bankruptcy or non-bankruptcy law, and the Debtors expressly reserve all of their rights with respect thereto.

77.     The Debtors, in the ordinary course of their businesses, incur various tax liabilities, including Taxes and Fees.  The Taxes and Fees are paid to various taxing authorities (collectively, the "Taxing Authorities") on a periodic basis that is established for each particular tax.

78.     As of the Petition Date, the Debtors believe that they are generally current with respect to the payment of Taxes except that (i) approximately $338,014.08 is owed for real property taxes, (ii) approximately $27,666.26 is owed for sales and use taxes, (iii) approximately $13,500.00 is owed for highway use taxes, and (iv) certain Taxes may have accrued prepetition but not yet come due for payment.

79.     I am informed that the Debtors generally do not have any legal or equitable interests in funds held to pay Taxes and Fees.  Moreover, to the extent that these "trust fund" taxes and other amounts are collected from third parties and held for payment to the Taxing Authorities, I am informed that they are not property of the estate.  The Debtors, therefore, generally have no equitable interest in funds collected and segregated to pay the Sales and Use Taxes.

80.     Further, I am informed that most, if not all, of the Taxes and Fees are entitled to priority status under the Bankruptcy Code.  The Debtors' payments of Taxes and Fees in the ordinary course of business, in all likelihood, will only affect the timing of the payments and not

3230843.4

the amounts to be received by such entities.  Therefore, I do not believe that other creditors and

parties in interest will be prejudiced by such payments.

81.     Without question, I believe that the payment of the Taxes and Fees is necessary to

avoid interruption of the Debtors' respective business activities.  The withholding of the payment

of the Taxes and Fees likely would cause taxing and other authorities to conduct audits and other

administrative proceedings, resulting in significant administrative burdens.  Prompt and regular

payment of the Taxes and Fees will avoid these unnecessary government actions.

82.     Furthermore, authority to pay the Taxes and Fees is necessary to avoid subjecting

the Debtors' officers and directors to lawsuits during the pendency of this proceeding that would

distract from the effort to successfully conclude sales of the Debtors' assets.  Many federal and

state statutes provide that various Taxes and Fees constitute "trust fund" taxes for which officers

and directors of the collecting entity may in certain circumstances be held personally liable.  To

the extent any accrued Taxes and Fees were unpaid as of the Petition Date, the taxing and other

authorities in such jurisdictions may attempt to enforce such personal liability provisions against

certain of the Debtors' officers and directors.  Such potential actions would prove extremely

distracting for the Debtors, and for the named officers and directors whose immediate and full-

time attention to the Debtors' operations is required.  I believe it is in the best interests of the

Debtors' estates to eliminate the possibility of such time-consuming and potentially damaging

distractions.

83.     I believe that granting the relief requested will enhance the likelihood of the

successful liquidation of the Debtors and the probability of maximizing the value of the estates'

assets and, ultimately, the returns to creditors.  Further, I believe that the timely payment of the

Taxes and Fees is necessary, is in the best interests of the Debtors' estates and is highly

3230843.4

beneficial to the operation of the Debtors' businesses.  Accordingly, the Debtors request that the

Court grant the Tax Motion and authorize the Debtors to pay, in their sole discretion, the Taxes

and Fees to the relevant Taxing Authorities in the ordinary course of business.

**F.**     **Motion for Entry of Interim and Final Orders (i) Authorizing Continuation of
Various Insurance Policies and (ii) Authorizing Payment of Prepetition and Post-
Petition Obligations in Respect Thereof**

84.     I have reviewed the Motion for Entry of Interim and Final Orders (I) Authorizing

Continuation of Various Insurance Policies and (II) Authorizing Payment of Pre-Petition and

Post-Petition Obligations in Respect Thereof (the "Insurance Motion").  I believe that, if the

requested relief is not granted and the Insurance Programs (discussed below) lapse or terminate,

the Debtors will be unable to continue their business operations, thereby endangering the

Debtors' on-going operations and substantially harming all creditors.

85.     In the ordinary course of the Debtors' businesses, they maintain numerous

insurance policies providing coverage for, among other things, general and professional liability,

commercial property, boilers and machinery, automobile liability, crime, director and officer

liability, and workers compensation, as well as umbrella coverage (collectively, the "Insurance

Policies") through several private insurance carriers (the "Insurance Carriers").  All of the

Insurance Policies referenced above are discussed more fully in the Insurance Motion and are

essential to the on-going operation of the Debtors' businesses.

86.     The aggregate cost of the annual premiums for the Debtors' Insurance Policies is

approximately $1,529,292.00.  It is not always economically advantageous for the Debtors to pay

the premiums on all of the Insurance Policies on a lump-sum basis.  Accordingly, in the ordinary

course of the Debtors' business, the Debtors finance the premiums on some of their Insurance

Policies by entering into premium finance agreements with the Insurers Carriers.

28

3230843.4

87.     Prior to the Petition Date, the Debtors financed the premiums for workers'

compensation coverage by making a 25% cash down payment to Great American Insurance

Group in the approximate amount of $285,278.00 and financing the remaining $634,519.00 of

premiums.  In exchange for the financing, the Debtors agreed to pay nine (9) monthly installment

payments of $70,502.00 each.  The workers' compensation insurance has per-occurrence

deductibles of $500,000.00 for the current policy year of July 3, 2018-July 3, 2019.

88.     All monthly, quarterly and annual premiums due in connection with the Insurance

Policies are current.

89.     In addition, because certain of the Insurance Policies are likely to expire during

the course of these Chapter 11 Cases, the Debtors seek authority to renew the Policies or to enter

into similar replacement policies in the ordinary course of their businesses, without further Court

approval.  The Debtors will need to continue their insurance coverage throughout the entire

duration of these Chapter 11 Cases.  The Debtors respectfully submit that renewal of the

Agreement falls squarely within their ordinary course of business, and, but for the constraints of

section 364 of the Bankruptcy Code, the Debtors would not need the Court's prior approval to

renew the Agreement.  To reduce the administrative burden, as well as the expense of operating

as debtors in possession, the Debtors seek the Court's authority now to renew the Agreement or

enter into new similar agreements if and when necessary.

90.     The nature of the Debtors' businesses and the extent of their operations make it

essential for the Debtors to maintain their Insurance Policies on an ongoing and uninterrupted

basis.  The nonpayment of any premiums, deductibles or related fees under the Insurance

Policies could result in one or more of the Insurance Carriers terminating or declining to renew

its insurance policies or refusing to enter into new insurance policies with the Debtors in the

3230843.4

future.  If the Insurance Policies lapse without renewal, the Debtors could be exposed to substantial liability for personal and/or property damages, to the detriment of all parties in interest.

91.    In order for the Debtors to maintain their operations in compliance with various legal and contractual obligations, the Debtors must be able to continue their Insurance Policies without disruption.  In addition, as directed by the Office of the United States Trustee for the Northern District of New York, debtors in chapter 11 cases have a fiduciary obligation and a legal duty to account for their operations of a business, which in part is met "substantially" by "obtaining and maintaining insurance" following the Petition Date.  The continuation of the Insurance Policies and the payment of all prepetition and post-petition Insurance Obligations arising under the Insurance Policies are therefore essential to preserve the Debtors' businesses and preserve the value of the Debtors' estates for all creditors.  I therefore respectfully request that the Court grant the relief requested in the Insurance Motion in its entirety.

**G.    Application for Entry of Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs**

92.    The Debtors seek entry of an order extending the time for the Debtors to file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases and statements of financial affairs (collectively, the "Schedules and Statements") until January 18, 2019.

93.    The Debtors estimate that they have more than 1,200 creditors and other parties in interest in these five Chapter 11 Cases.  Given the size and complexity of the Debtors' business operations, preparing the Schedules and Statements accurately and with sufficient detail will require significant attention from the Debtors' personnel and advisors.  The complexity of the Debtors' businesses, the limited staff available to perform the required internal review of

financial records and affairs, the numerous critical operational matters that the Debtors' accounting and legal personnel must address in the early days of these Chapter 11 Cases, the pressure incident to the commencement of these Chapter 11 Cases, and the fact that certain prepetition invoices may have not yet been received or entered into the Debtors' accounting system provide ample cause justifying, if not necessitating, the requested extension of the deadline to file the Schedules and Statements.

94.     In addition, the Debtors submit that focusing the attention of key personnel on critical, strategic operational and chapter 11 compliance issues during the early days of these Chapter 11 Cases will help the Debtors make a smoother transition into chapter 11 and, therefore, ultimately will maximize the value of the Debtors' estates for the benefit of creditors and all parties in interest.   Consequently, it is in the best interests of the Debtors and their creditors to obtain an extension of the filing deadline set forth under Bankruptcy Rule 1007(c), which would provide the Debtors with a total of 30 days from the Petition Date to file the Schedules and Statements.

[Signature Page Follows]

3230843.4

I swear, under penalty of perjury under the laws of the United States of America, that the

foregoing is true and correct to the best of my knowledge, information and belief.

_____
John J. Giardino

Sworn to before me this
19th day of December, 2018.

_____
Notary Public

EMILY CARLINO
NOTARY PUBLIC-STATE OF NEW YORK
No. 01CA6273649
Qualified In Suffolk County
My Commission Expires 12-17-2020