Date of Hearing to Approve Bid Procedures:  January 11, 2019
Hearing Time:  11:00 a.m.
Hearing Place:  Syracuse, New York
Objection Deadline:  January 9, 2019

Date of Hearing to Approve Sale:  February 12, 2019
Hearing Time:  11:00 a.m.
Hearing Place:  Syracuse, New York
Objection Deadline:  February 5, 2019

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Case Nos. |
| CENTERSTONE LINEN SERVICES, LLC, | ) | 18-31754 (main case) |
| ATLAS HEALTH CARE LINEN SERVICES CO., LLC, | ) | 18-31753 |
| ALLIANCE LAUNDRY & TEXTILE SERVICE, LLC, | ) | 18-31755 |
| ALLIANCE LAUNDRY AND TEXTILE SERVICE OF | ) | 18-31756 |
| ATLANTA, LLC, and | ) | |
| ALLIANCE LTS WINCHESTER, LLC | ) | 18-31757 |
| *d/b/a Clarus Linen Systems*[1], | ) | |
| | ) | Chapter 11 Cases |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |

**MOTION BY DEBTOR ALLIANCE LAUNDRY & TEXTILE SERVICE, LLC d/b/a
CLARUS LINEN SYSTEMS FOR ORDERS (A) (I) AUTHORIZING THE SALE OF
SUBSTANTIALLY ALL OF ALLIANCE'S ASSETS FREE AND CLEAR OF ALL
LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, SUBJECT TO THE TERMS
OF THE ASSET PURCHASE AGREEMENT AND SUBJECT TO HIGHER AND/OR
BETTER OFFERS; (II) AUTHORIZING AND APPROVING THE FORM OF A
CERTAIN ASSET PURCHASE AGREEMENT WITH CROWN HEALTH CARE
LAUNDRY SERVICES, LLC; AND (III) AUTHORIZING ALLIANCE TO
CONSUMMATE ALL TRANSACTIONS RELATED TO THE PROPOSED SALE;
(B) APPROVING BIDDING PROCEDURES AND OTHER RELATED RELIEF; AND
(C) AUTHORIZING ALLIANCE TO ASSUME CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES AND ASSIGN SUCH CONTRACTS AND LEASES TO
PURCHASER CROWN HEALTH CARE LAUNDRY SERVICES, LLC**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Centerstone Linen Services, LLC d/b/a Clarus Linen Systems (5594) ("Centerstone"); Atlas Health Care Linen Services Co., LLC d/b/a Clarus Linen Systems (2681) ("Atlas"); Alliance Laundry & Textile Service, LLC d/b/a Clarus Linen Systems (8284) ("Alliance"); Alliance Laundry and Textile Service of Atlanta, LLC d/b/a Clarus Linen Systems (4065) ("Atlanta"); and Alliance LTS Winchester, LLC d/b/a Clarus Linen Systems (0892) ("Winchester").

Alliance Laundry & Textile Services, LLC, d/b/a Clarus Linen Systems, a debtor and debtor in possession ("Alliance") in the above-referenced cases, by and through its undersigned counsel, hereby moves this Court (this "Motion") for entry of Orders pursuant to sections 105, 363 and 365 of title 11 of the United States Code (as amended, the "Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"): (A) (i) authorizing the sale of substantially all of Alliance's assets, as set forth herein, to Crown Health Care Laundry Services, LLC ("Purchaser"), free and clear of all liens, claims, interests and encumbrances, subject to the terms of that certain Asset Purchase Agreement dated as of December 19, 2018, which is attached hereto as **Exhibit A** (the "Purchase Agreement"), and subject to higher and better offers; (ii) authorizing and approving the Purchase Agreement; and (iii) authorizing Alliance to consummate all transactions related to the proposed sale; (B) approving the Bidding Procedures and granting other relief; and (C) authorizing Alliance to assume certain executory contracts and unexpired leases and to assign such contracts and leases to Purchaser pursuant to sections 365(a), (b) and (c) of the Bankruptcy Code and Bankruptcy Rule 6006(e)(1). In support of this Motion, Alliance respectfully represents as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      The statutory and rule-based predicates for the relief requested herein are sections 105, 363 and 365 of the Bankruptcy Code and Rule 6004 of the Bankruptcy Rules.

3242036.7

## BACKGROUND[2]

3.　　On December 19, 2018 (the "Petition Date"), Alliance and its affiliates, Centerstone Linen Service, LLC, d/b/a Clarus Linen Systems, Atlas Health Care Linen Services Co., LLC, d/b/a Clarus Linen Systems, Alliance Laundry and Textile Service of Atlanta, LLC d/b/a Clarus Linen Systems and Alliance LTS Winchester, LLC d/b/a Clarus Linen Systems filed separate, voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the Court, commencing the Debtors' chapter 11 cases (the "Chapter 11 Cases").  The Debtors remain in possession of their respective assets and continue to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases and, as of the date of the filing of this Motion, no official committees have been appointed or designated.  On December 20, 2018, the Court entered Orders directing the joint administration of the Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

4.　　Alliance is a Georgia limited liability company with a principal office located at 60 Grider Street, Buffalo, New York 14215.  It operates three linen rental and commercial laundry facilities at the following locations:  (i) 355 Old Greenville Road, Spartanburg, South Carolina 29301 (the "Spartanburg Facility"); (ii) 1631 Willingham Drive, East Point, Georgia 30344 (the "East Point Facility"); and (iii) 404 Hodges Avenue, Albany, Georgia 31701 (the

---

[2] A more detailed factual background relating to the commencement of these Chapter 11 Cases is set forth in the Affidavit of John J. Giardino in Support of Chapter 11 Petitions and First Day Motions sworn to on the 19th day of December, 2018 (the "Giardino Affidavit") filed in these Chapter 11 Cases and incorporated herein by reference. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Giardino Affidavit.

3242036.7

"Albany Facility").   Alliance currently has approximately 191 employees, and all of the employees are non-union.

5.      The Spartanburg Facility consists of a 39,600 square foot plant with a current capacity of 327,000 pounds of linen per week that services numerous regional customers including five major customers (regional medical centers).  The Spartanburg Facility is leased from landlord ULS Acquisitions, LLC.

6.      The East Point Facility consists of a 57,000 square foot plant with a current capacity of 512,000 pounds of linen per week that services numerous regional customers including five major customers (two hospitals and three regional medical centers).  The East Point Facility is leased from landlord Willingham 1631, LLC.  Alliance previously received a non-binding letter of intent from United Hospitality Services, LLC ("UHS") concerning UHS's interest in purchasing the furniture, fixtures and equipment located at the East Point Facility (the "Atlanta PP&E").  Alliance will file a separate motion under section 363 of the Bankruptcy Code seeking to approve the sale of the Atlanta PP&E once an asset purchase agreement between Alliance and UHS is signed.

7.      The Albany Facility (also known as Tristate) consists of a 21,234 square foot plant with a current capacity of 154,000 pounds of linen per week and services numerous regional customers including three major customers (three hospitals).  The Albany Facility is leased from landlord Phoebe Putney Memorial Hospital, Inc.

8.      Alliance sought relief under chapter 11 of the Bankruptcy Code to implement the sale of its business as a going concern pursuant to section 363 of the Bankruptcy Code.  Alliance seeks this relief in light of its financial inability to continue operating its business, and its desire to sell its business to a qualified purchaser as a going concern for the benefit of its creditors.

3242036.7

9.     In furtherance of this goal, on December 19, 2018, Alliance entered into the Purchase Agreement with Purchaser, pursuant to which Purchaser proposes (i) to purchase substantially all of Alliance's assets, with the possible exception of the Atlanta PP&E[3] and such other assets designated as Excluded Assets on Appendix 1.2 of the Purchase Agreement, (the "Purchased Assets"), free and clear of all liens, claims, interests and encumbrances[4], and (ii) to assume certain liabilities, including up to $25,000 in cure obligations owed under Assigned Contracts under section 365(b)(1) of the Bankruptcy Code in exchange for the payment of an aggregate purchase price in an amount determined as of the Closing pursuant to the methodology set forth on Appendix 2.1 to the Purchase Agreement (the "Purchase Price").[5]   The Purchase Agreement is subject to higher and better offers and to the approval of the Court.

### RELIEF REQUESTED

10.     By this Motion, Alliance seeks the entry by this Court of two orders:

(a)     first, an order (the "Bidding Procedures Order"), a proposed form of which is attached hereto as **Exhibit B**:

i.     providing a process for interested bidders to submit competing offers with respect to the Purchased Assets;

ii.     approving the form and manner of the Notice of Auction and Sale Hearing (as defined below) and the Notice of Assumption and Assignment (as defined below);

iii.     setting a deadline and approving requirements and procedures for interested parties to submit any competing bids for the Purchased Assets (the "Bidding Procedures");

---

[3] Alliance has the option under the Purchase Agreement to designate the Atlanta PP&E as a "Purchased Asset" through delivery of written notice to the Purchaser no later than five days prior to the Bid Deadline.

[4] The Purchased Assets and Excluded Assets are more specifically defined in Sections 1.1(a) and 1.1(b) of the Purchase Agreement, respectively, and the corresponding Appendices thereto.

[5] In addition to the Purchase Price calculated under the purchase price methodology described on Appendix 2.1 of the Purchase Agreement, the Purchaser may elect, in its discretion, to pay Cure Costs owed in connection with Assigned Contracts that exceed the $25,000 Cure Cap.

3242036.7

iv.  approving the Purchaser as the "stalking horse" purchaser, with certain bid protections as required by the Purchase Agreement, and approving the form of Purchase Agreement;

v.  authorizing an auction sale of the Purchased Assets, if necessary; and

vi.  setting a final hearing date (the "Sale Hearing") to approve the sale of the Purchased Assets to the bidder (the "Successful Bidder") submitting the highest or otherwise best offer (the "Successful Bid") acceptable to Alliance and HSBC Bank.

(b)  second, Alliance requests the entry of an order (the "Sale Order"):

i.  authorizing and approving the Successful Bid on substantially the terms and conditions set forth in the Purchase Agreement, or such other terms and conditions as may be acceptable to Alliance in consultation with HSBC Bank;

ii.  authorizing the sale of the Purchased Assets to the Successful Bidder;

iii.  authorizing Alliance to consummate the sale of the Purchased Assets to the Successful Bidder; and

iv.  authorizing Alliance to assume certain identified executory contracts and unexpired personal property leases (the "Assigned Contracts") and to assign such Assigned Contracts to the Successful Bidder.

## PROPOSED SALE OF THE PURCHASED ASSETS

11.  Alliance has determined that it is in the best interests of its estate, its creditors, its employees, its customers and other parties in interest to sell the Purchased Assets. Alliance's management believes that the approval of the sale is critical to preserving the value of the Purchased Assets for the benefit of all creditors, and it is necessary to inform Alliance's customers about their contracts on a go-forward basis.

### A.    The Purchase Agreement

12.  The extensive good faith negotiations of Alliance and Purchaser culminated in the Purchase Agreement, which contemplates the sale of the Purchased Assets in a single integrated

3242036.7

transaction. The salient terms of the Purchase Agreement are as follows:[6]

     (a)     <u>The Parties</u>. Alliance as "Seller" and Purchaser.

     (b)     <u>The Purchased Assets</u>. The Purchased Assets to be sold pursuant to the Purchase Agreement are listed in Section 1.1(a) and Appendix 1.1(a) of the Purchase Agreement and consist of substantially all of the assets owned by Seller, with the possible exception of the Atlanta PP&E and such other assets designated as Excluded Assets on Appendix 1.1(b) of the Purchase Agreement. Purchaser will also assume certain liabilities of Seller, as set forth in Section 1.1(b) and on Appendix 1.2 of the Purchase Agreement (the "Assumed Liabilities").

     (c)     <u>Purchase Price</u>. The aggregate purchase price for the purchase of the Purchased Assets and the assumption of the Assumed Liabilities shall be an amount determined as of the Closing pursuant to the methodology set forth on Appendix 2.1 to the Purchase Agreement, which amount includes cash equal to the Cure Cap of $25,000.

     (d)     <u>Conditions</u>. The proposed sale is subject to several conditions set forth in Article 9 of the Purchase Agreement, including, but not limited to, the following: (i) performance of covenants and agreements in the Purchase Agreement, (ii) approval by this Court pursuant to an order in form acceptable to Purchaser; and (iii) receipt of all necessary consents, approvals and permits from third parties necessary to operate the Purchased Assets and convey the Purchased Assets free and clear of all liens.

     (e)     <u>Termination</u>. The Purchase Agreement terminates under certain circumstances set forth in Section 3.4 of the Purchase Agreement, including, but not limited to, the following: (i) by mutual written consent of Seller and Purchaser; (ii) by Purchaser, if Seller shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in the Purchase Agreement; or (iii) by Seller, if Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in the Purchase Agreement.

     (f)     <u>Alternative Transaction: Breakup Fee</u>. Under certain conditions, Purchaser may be entitled to a Breakup Fee in the amount of $120,000.00, which is approximately 3% of the Purchase Price, as set forth in Section

---

[6] The following description of the terms of the Purchase Agreement is intended solely to provide the Court and interested parties with a brief overview of the terms thereof. All capitalized terms not otherwise defined herein have the meaning set forth in the Purchase Agreement. In the event of any inconsistency between the terms as described in this Motion and the Purchase Agreement, the Purchase Agreement will control.

7.4 of the Purchase Agreement.   Purchaser may also be entitled to reimbursement of expenses up to $200,000.00.

(g)    Higher and Better Offers.  As set forth in further detail below, the Sale of the Purchased Assets is subject to the submission by third parties of higher and/or better offers.

## B.    Proposed Bidding Procedures

13.    In an effort to ensure that the highest value is obtained for the Purchased Assets, Alliance proposes that the Bidding Procedures, which are intended to maximize the value of the Purchased Assets, should govern the submission of competing bids for the Purchased Assets.

14.    The salient terms of the Bidding Procedures attached hereto as **Exhibit C** may be summarized as follows:

(a)    Purchased Assets:  The Purchased Assets to be sold are substantially all of Alliance's assets, with the possible exception of the Atlanta PP&E, which are to be sold in a single, integrated transaction.

(b)    Qualified Bid / Qualified Bidders:   In order to ensure that only bidders with serious interest in purchasing the Purchased Assets participate in the bidding process, the Bidding Procedures provide for certain minimal requirements for a potential bidder to become a "Qualified Bidder" and for a bid to purchase the Purchased Assets to be a "Qualified Bid", including:

(i)    The execution of a confidentiality agreement;

(ii)    Providing Alliance with certain financial assurances regarding the bidder's ability to close a transaction;

(iii)    Submission of a purchase agreement marked to show changes from the Purchase Agreement with Purchaser;

(iv)    A purchase offer in excess of the Purchase Price by $170,000 (the amount of the Breakup Fee plus $50,000.000, as set forth in detail in the Purchase Agreement) (the "Initial Qualified Overbid");

(v)    A deposit equal to 10% of the bidder's Initial Qualified Overbid; and

(vi)    Submission of a letter to Alliance stating that (a) the potential bidder is prepared to enter into and consummate the transactions in accordance with the terms of the marked purchase agreement after the Court's approval of the Sale Order; (b) the potential bidder will

make all necessary federal, state or local filings and pay all fees associated with such filings (including the costs of expenses of Alliance); and (c) such potential bidder's offer is irrevocable until the date that is twenty (20) days after the conclusion of the Sale Hearing.

(c)     Bid Deadline:  The Bidding Procedures provide for a bid deadline of 12:00 noon (prevailing Eastern Time) on February 4, 2019 (the "Bid Deadline").

(d)     Due Diligence:  The Bidding Procedures permit all potential bidders who have signed confidentiality agreements to participate in the due diligence process between the Petition Date and the Bid Deadline.

(e)     Selection of the Qualified Bids:  As soon as practicable after the Bid Deadline, Alliance, in consultation with its professionals, HSBC Bank, and any committee appointed in this case, shall review each bid submitted and determine which bidders are qualified to participate in the Auction ("Qualified Bidders"), and shall provide notice of same to all persons submitting bids, including Purchaser.

(f)     Auction:  If one or more Qualified Bids, other than Purchaser's, are received by the Seller, an Auction shall be held on February 7, 2019 at 10:00 a.m. at the offices of Bond, Schoeneck & King, PLLC, One Lincoln Center, Syracuse, New York 13202, or such other time and/or other place as Alliance shall notify all Qualified Bidders who have submitted Qualified Bids with respect to the Purchased Assets subject to Auction.

At the Auction, Qualified Bidders, including Purchaser, will be permitted to increase their bids (such increased Qualified Bid, a "Qualified Overbid"), provided that, subject to Purchaser's Matching Rights as described in the Bidding Procedures, such Qualified Overbid(s) shall exceed the highest existing bid by at least $50,000.00.

The Auction shall not conclude until each Qualified Bidder has had the opportunity to submit (or match, in the case of Purchaser) a Qualified Overbid with full knowledge of the existing highest bid.

(g)     The Sale Hearing:  Alliance requests that the Court schedule the Sale Hearing for 11:00 a.m. on February 12, 2019.  At the Sale Hearing, Alliance will seek entry of an order, among other things, authorizing and approving the sale of the Purchased Assets to the Successful Bidder, as determined by Alliance.

3242036.7

Following the Sale Hearing, if the Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the next highest or otherwise best Qualified Bid or Qualified Overbid with respect to the Purchased Assets as disclosed at the Sale Hearing (the "Backup Bid"), shall be deemed to be the Successful Bid with respect to the Purchased Assets, and the Sellers shall effectuate such sale without further order of the Bankruptcy Court.

(h)     <u>Reservation of Rights</u>:  Alliance reserves all rights to terminate the sale process at any time if Alliance determine, in its business judgment and following consultation with its professionals, HSBC Bank and any committee appointed in this case, that the sale process will not maximize the value of its bankruptcy estate.  In addition, Alliance reserves all rights not to submit any bid which is not acceptable to Alliance and HSBC Bank for approval to the Court.  Alliance shall further have the right to amend the Bidding Procedures or impose such other terms and conditions with respect to the Bidding Procedures in consultation with HSBC Bank which Alliance determines, in its business judgment, are necessary for Alliance to fulfill its fiduciary duties, provided that (i) such modifications are not inconsistent with any Court Order, including the Bidding Procedures Order, (ii) a material modification may, under the Purchase Agreement, relieve Purchaser of any obligation to proceed with the Auction or, if it is the Successful Bidder, to close the sale of the Purchased Assets, and (iii) Purchaser's ability to terminate the Purchase Agreement in accordance with its terms is fully preserved.

## C.     <u>Assumption and Assignment of Executory Contracts and Unexpired Personal Property Leases</u>

15.     Alliance is a party to certain executory contracts and unexpired leases described in Section 1.4 of the Purchase Agreement (the "Assigned Contracts").  Alliance has evaluated each of the Assigned Contracts in the context of the Bankruptcy Code.  In the exercise of its business judgment, and due to the desire of Purchaser to operate the Purchased Assets immediately upon a closing of the sale, assumption and assignment of the Assigned Contracts to Purchaser is beneficial to Alliance's estate and creditors because it enhances the overall desirability to Purchaser of the Purchased Assets.

16.     Alliance, therefore, seeks to assume the Assigned Contracts pursuant to sections 365(a), (b) and (c) of the Bankruptcy Code and assign them to Purchaser pursuant to the terms of

3242036.7

the Purchase Agreement.[7]   Alliance intends to remain current on its obligations under the Assigned Contracts during the post-petition period until the closing of the sale to the Successful Bidder.

17.   There are various amounts of pre-petition arrears that have accrued in connection with the Assigned Contracts.  Purchaser has agreed to assume all cure obligations which must be paid to counterparties to the Assigned Contracts pursuant to section 365(b)(1) of the Bankruptcy Code, provided that cure costs up to $25,000 (as more fully described in the Purchase Agreement, the "Cure Cap") will be paid as part of the Purchase Price. Any cure costs in excess of the Cure Cap will be paid by Purchaser in addition to the Purchase Price; provided, however, that Purchaser has the right to refuse to accept any Contract if the aggregate Cure Costs exceed the Cure Cap notwithstanding Purchaser's designation of such Contract as an Assigned Contract. Accordingly, Alliance anticipates that all of the parties to the Assigned Contracts will consent to the assignment to Purchaser[8] in order to allow the continued operation of Alliance's business.

18.   This motion complies with Bankruptcy Rule 6006(e)(1) because all of the Assigned Contracts will be assigned to a single assignee, the purchaser of the Purchased Assets.

## BASIS FOR RELIEF

### A.   The Proposed Sale is in the Best Interests of Alliance, Its Creditors and Its Estate

19.   Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."   11 U.S.C. §363(b)(1).   A debtor in possession is given these rights by

---

[7] Should the sale be approved to a Successful Bidder that is not Purchaser, the Assigned Contracts will be those designated by the Successful Bidder.

[8] If the Successful Bidder is not Purchaser, the Successful Bidder will likewise be responsible for funding the cure costs associated with contracts or leases it designates as Assigned Contracts.

3242036.7

section 1107(a) of the Bankruptcy Code. *See* 11 U.S.C. §1107(a). Moreover, section 105(a) of

the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is

necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C.

§105(a).

20.    Courts have uniformly held that approval of a proposed sale of property pursuant

to section 363(b) of the Bankruptcy Code is appropriate if a court finds that the transaction

represents a reasonable business judgment on the part of the debtor. See *e.g., In re Chateaugay

Corp.,* 973 F.2d 141 (2d Cir. 1992); *Comm. of Equity Sec. Holders v. Lionel Corp (In re Lionel

Corp.).* 772 F.2d 1063, 1071 (2d Cir. 1983). *See also Official Comm. of Sub. Bondholders v.

Integrated Res., Inc. (In re Integrated Res., Inc.),* 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal

dismissed,* 3 F.3d 49 (2d Cir. 1993), quoting *Van Gorkom,* 488 A.2d 858, 872 (Del. 1985) ("the

business judgment rule 'is a presumption that in making a business decision the directors of a

corporation acted on an informed basis, in good faith and in the honest belief that the action was

in the best interest of the company'," which has continued applicability in bankruptcy).

21.    Courts generally show great deference to a debtor in possession's decisions when

applying the business judgment standard. *See In re Global Crossing, Ltd.,* 295 B.R. 726, 744

n.58 (Bankr. S.D.N.Y. 2003) ("[T]he Court does not believe that it is appropriate for a

bankruptcy court to substitute its own business judgment for that of the [d]ebtors and their

advisors, so long as they have satisfied the requirements articulated in the caselaw."). Deference

is inappropriate only if such business judgment is "so manifestly unreasonable that it could not

be based on sound business judgment, but only on bad faith, or whim or caprice." *Lubrizol

Enterprises, Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.),* 756

F.2d 1043, 1047 (4th Cir. 1985). *See also, In re Integrated Res., Inc.,* 147 B.R. at 656 (there is a

strong presumption "that in making a business decision[,] the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company").

22.     A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders.  See *e.g., In re Lionel Corp.*, 722 F.2d at 1071.  In fact, the paramount goal in any proposed sale of property is to maximize the proceeds received by the estate.  *See Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.,* 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . [debtors'] duty with respect to such sales is to obtain the highest price or greater overall benefit possible for the estate.") (quoting *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

23.     Courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales.  *See In re Montgomery Ward Holding Corp.*, Case No. 97-1409(PJW) (Bankr. D. Del. Aug. 6, 1997); *In re Fruehauf Trailer Corp.*, Case No. 96-LS63(PJW) (Bankr. D. Del. Feb. 26, 1997); *In re Integrated Res.*, 147 B.R. at 659 (such procedures are created to "encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

3242036.7

24.     Alliance submits that the proposed sale to Purchaser or any other Successful Bidder satisfies the "sound business reason test" and represents a prudent and proper exercise of its business judgment.  Alliance believes that a prompt sale of the Purchased Assets as a going concern is the only way to maximize the value of its estate, to maintain stability for customers under Assigned Contracts, and provide the greatest opportunity for Alliance's employees to seek new employment once terminated by Alliance.

25.     Alliance believes that the Bidding Procedures are the best method by which it can obtain the best price for the Purchased Assets and provide interested persons with accurate and reasonable notice of the proposed sale.  The Bidding Procedures will allow Alliance to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction, thereby increasing the likelihood that Alliance will receive the best possible consideration for the Purchased Assets. The Bidding Procedures also will enable Alliance to undertake the auction process in as expeditious a manner as possible, which Alliance believes is essential to maintaining and maximizing the value of its estate.  Alliance further submits that the price offered by Purchaser for the Purchased Assets is fair and reasonable.

26.     Finally, Alliance believes that it is in the best interests of its estate to assume and assign the Assigned Contracts to the Successful Bidder in order to enhance the ability of the Successful Bidder to service customers under the Assigned Contracts with minimal interruption, thereby enhancing the value of the assets to the Successful Bidder.  A debtor in possession may assume an executory contract where assumption is a reasonable exercise of its business judgment.  *See* 11 U.S.C. § 365(a); *see e.g., In re Stable Mews Assoc., Inc.,* 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984); *Allied Technology, Inc. v. R.B. Brunemann & Sons, Inc.,* 25 B.R. 484

3242036.7

(Bankr. S.D. Ohio 1982).  This requirement is satisfied where a debtor in possession determines in good faith that assumption of an executory contract will benefit the estate.  *See In re Gucci,* 193 B.R. 411, 414-15 (S.D.N.Y. 1996).

27.    Alliance has been attempting to locate a willing purchaser of the Purchased Assets since May 2018.  It is unlikely that any other alternative, other than the sale, will, at this time, provide a higher value for the Purchased Assets, which supports the conclusion that Alliance has exercised its good and prudent business judgment in proceeding with the proposed sale. Accordingly, the sale should be approved.  Moreover, as set forth hereinafter, accurate and reasonable notice will be provided to all parties who indicate an interest with respect to the Purchased Assets, who previously indicated an interest in the Purchased Assets, and to all creditors and other parties in interest in compliance with the Bankruptcy Code and the Bankruptcy Rules.

28.    All aspects of the proposed sale have been handled in good faith.  The Purchase Agreement is the product of detailed good faith negotiations involving Alliance, with the aid of its professionals, and Purchaser and its counsel.

**B.    The Proposed Bidding Procedures are in the Best Interests of Alliance, Its Creditors and Its Estate**

29.    The Bidding Procedures outlined herein are designed to strike a balance between inviting competitive bids and enabling Alliance to close a sale of the Purchased Assets within a reasonable time frame.  The Bidding Procedures are fair, reasonable and necessary to promote the highest or best sale price, without imposing undue obstacles to the competitive bidding process.

30.    The Bidding Procedures are a necessary tool to maximize the value of Alliance's estate and will not unduly hamper the submission of competing bids.  Rather, the Bidding

3242036.7

Procedures will insure that only parties with (a) a serious and legitimate interest in acquiring the Purchased Assets and (b) the financial means to consummate a transaction quickly, will participate in an open Auction process.

31.     For the foregoing reasons, Alliance respectfully submits that this Court should authorize and approve the Bidding Procedures pursuant to section 363(b) of the Bankruptcy Code.

## C.     The Purchase Agreement Should be Approved

32.     Section 363(f) of the Bankruptcy Code[9] permits debtors, with court approval, to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets).

33.     In the instant case, the Purchased Assets are encumbered by security interests and liens perfected by secured creditors, including those first-priority security interests and liens granted to HSBC Bank USA, National Association ("HSBC Bank") pursuant to (a) that certain Loan and Security Agreement dated October 29, 2013, securing the repayment of obligations arising thereunder totaling approximately $22 million as of the Petition Date (collectively, the "Prepetition Liens"), and (b) that certain Senior Secured Super-Priority Debtor-in-Possession

---

[9]   Section 363(f) of the Bankruptcy Code provides:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if --

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
(2)     such entity consents;
(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
(4)     such interest is in bona fide dispute; or
(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. §363(f).

3242036.7

Loan and Security Agreement securing the repayment of post-petition obligations arising thereunder (collectively, the "Postpetition Liens" and together with the Prepetition Liens, the "HSBC Liens").  The HSBC Liens shall attach to all net proceeds of the sale of the Purchased Assets.  With respect to any other party asserting a lien against the Purchased Assets, Alliance believes that it will be able to satisfy one or more of the conditions set forth in § 363(f).  In particular, Alliance believes that creditors with any interests in the Purchased Assets or the Assigned Contracts, including the secured creditors, will consent to a proposed sale free and clear of liens.  *See* 11 U.S.C. § 363(f)(2).  Alliance will continue to negotiate with secured creditors concerning their respective claims pending the Sale Hearing.  To the extent such creditors do not consent explicitly or implicitly, Alliance believes that the sale will satisfy one or more of the factors in section 363(f) and it will be permitted to sell the Purchased Assets free and clear of any interest in such property in accordance with the terms of the Purchase Agreement.

**D.** **Purchaser's Good Faith**

34.     Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *In re Chateaugay Corp.,* 1993 U.S. Dist. LEXIS 6130, at *9 (S.D.N.Y. 1993) (quoting *In re Abbotts Dairies of Penn., Inc.,* 788 F.2d 143, 147 (3d Cir. 1986)); *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 8 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985).

35.     The Purchase Agreement was negotiated in good faith, with both parties represented by their own counsel.  Alliance submits that Purchaser's proposal, as contained in the Purchase Agreement, represents the highest and best offer for the Purchased Assets received to date.

36.     Accordingly, the Sale Order should include a provision finding that Purchaser[10] is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code. Alliance believes that providing Purchaser, or the Successful Bidder, with such protection will ensure that the maximum price will be received by Alliance for the Purchased Assets and closing of the sale will occur promptly.

## PROPOSED NOTICE OF THE AUCTION AND SALE HEARING

37.     Attached hereto as **Exhibit D** is a copy of a Notice (the "Notice of Auction and Sale Hearing") that Alliance proposes to serve upon (i) counsel for Purchaser; (ii) the Office of the United States Trustee for the Northern District of New York; (iii) counsel for HSBC; (iv) all parties to the Assigned Contracts, (v) all required governmental agencies, (vi) all creditors in the Chapter 11 Cases; (vii) all persons known or reasonably believed to have asserted any lien, claim, encumbrance, or other interest in or upon any of the Purchased Assets, (viii) all parties who have expressed an interest in the Purchased Assets during the past seven months the Purchased Assets have been marketed, and (ix) all entities known by Alliance to have filed a notice of appearance or a request for receipt of chapter 11 notices and pleadings filed in the Chapter 11 Cases as of the notice date below.

38.     Alliance proposes to serve the Notice of Auction and Sale Hearing via first class mail upon all designated parties not later than two business days after entry of the Bidding Procedure Order.  Under all of the relevant facts and circumstances herein and the nature of the relief requested herein, Alliance respectfully submits that the form of the proposed Notice of Auction and Sale Hearing should be deemed adequate and sufficient notice of the sale, the Sale

---

[10] If Purchaser is not ultimately the Successful Bidder, Alliance submits that any purchaser of the Purchased Assets through the proposed sale process would also be acting in good faith, warranting designation as a "good faith" purchaser pursuant to section 363(m).

3242036.7

Hearing, the Bidding Procedures, and the Motion, and respectfully requests that the Court enter an Order approving the form and manner of the Notice of Auction and Sale Hearing.

<u>**PROPOSED NOTICE OF ASSUMPTION AND ASSIGNMENT**</u>

39.     Attached hereto as **Exhibit E** is a copy of a Notice (the "Notice of Assumption and Assignment") that Alliance proposes to serve upon (i) counsel for Purchaser; (ii) the Office of the United States Trustee for the Northern District of New York; (iii) counsel for HSBC Bank; (iv) all parties to the Assigned Contracts, (v) all required governmental agencies, (vi) all creditors in the Chapter 11 Cases; and (vii) all entities known by Alliance to have filed a notice of appearance or a request for receipt of chapter 11 notices and pleadings filed in the Chapter 11 Cases as of the notice date below.

40.     Alliance proposes to serve the Notice of Assumption and Assignment via first class mail upon all designated parties not later than two business days after entry of the Bidding Procedures Order.  Under all of the relevant facts and circumstances herein and the nature of the relief requested herein, Alliance respectfully submits that the form of the proposed Notice of Assumption and Assignment should be deemed adequate and sufficient notice of the assumption and assignment of the Assigned Contracts, and respectfully requests that the Court enter an Order approving the form and manner of the Notice of Assumption and Assignment.  No previous request for the relief sought herein has been made to this or any other Court.

**WHEREFORE,** Alliance respectfully requests that the Court (i) at the conclusion of the initial hearing, enter the Bidding Procedures Order approving the Bidding Procedures, the form and manner of the Sale Notice and schedule the Sale Hearing; (ii) at the conclusion of the Sale Hearing, enter the Sale Order to be provided Alliance authorizing the sale of the Purchased Assets to Purchaser, or to such other Successful Bidder that submits a higher and/or better offer

19

for the Purchased Assets in accordance with the Bidding Procedures; (iii) at the conclusion of the

Sale Hearing, enter an order authorizing Alliance to assume and assign the Assigned Contracts to

the Successful Bidder; and (iv) granting Alliance such other relief as the Court may deem just

and proper.

Dated:   December 21, 2018
       Syracuse, New York             BOND, SCHOENECK & KING, PLLC


By:           /s/  Camille W. Hill
              Stephen A. Donato, Bar Roll No. 101522
              Camille W. Hill, Bar Roll No. 501876
              Office and Post Office Address:
              One Lincoln Center
              Syracuse, New York 13202
              Tel: (315) 218-8000
              Fax: (315) 218-8100
              Email:  sdonato@bsk.com
                     chill@bsk.com


*Proposed Counsel to the Debtors and Debtors in Possession*

3242036.7