Hearing Date: February 28, 2019
Hearing Time: 11:30 a.m.
Hearing Location: Syracuse, NY
Objection Deadline: February 21, 2019

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Case Nos. |
| CENTERSTONE LINEN SERVICES, LLC, | ) 18-31754 (main case) |
| Atlas Health Care Linen Services Co., LLC, | ) 18-31753 |
| Alliance Laundry & Textile Service, LLC, | ) 18-31755 |
| Alliance Laundry and Textile Service of Atlanta, LLC, and | ) 18-31756 |
| Alliance LTS Winchester, LLC | ) 18-31757 |
| d/b/a Clarus Linen Systems[1], | ) |
| | ) Chapter 11 Cases |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) |
| | ) |

**DEBTORS' MOTION FOR ORDER (I) AWARDING DAMAGES AND SANCTIONS AGAINST AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC. ("AMEX") FOR VIOLATING THE AUTOMATIC STAY; (II) FINDING AMEX IN CONTEMPT OF COURT FOR VIOLATING INTERIM DIP ORDER; (III) DIRECTING AMEX TO DISGORGE UNAUTHORIZED POST-PETITION TRANSFER; AND (IV) EXTENDING AUTOMATIC STAY TO NON-DEBTOR EMPLOYEES**

The above-captioned debtors and debtors in possession (the "Debtors"), by and through their undersigned counsel, as and for their motion requesting the entry of an Order: (i) awarding damages and sanctions against AmEx for violating the automatic stay; (ii) issuing a finding of contempt against AmEx for violating this Court's Interim DIP Order (defined below); (iii) directing AmEx to disgorge an unauthorized post-petition transfer in the amount of $108,175.47;

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Centerstone Linen Services, LLC d/b/a Clarus Linen Systems (5594) ("Centerstone"); Atlas Health Care Linen Services Co., LLC d/b/a Clarus Linen Systems (2681) ("Atlas"); Alliance Laundry & Textile Service, LLC d/b/a Clarus Linen Systems (8284) ("Alliance"); Alliance Laundry and Textile Service of Atlanta, LLC d/b/a Clarus Linen Systems (4065) ("Atlanta"); and Alliance LTS Winchester, LLC d/b/a Clarus Linen Systems (0892) ("Winchester").

1

(iv) extending the automatic stay to non-debtor employees who are cardholders under the Debtors' American Express Corporate Card program; and (v) granting such other and further relief as the Court deems just and proper (the "Motion"), respectfully set forth as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334(b).

2. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (M) and (O).

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

4. The statutory bases for the relief requested are sections 105(a), 362(a)(3) and (a)(6), 363(c)(2), 542, 549(a) and 550(a) of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.*, the "Bankruptcy Code") and Rules 6001, 9014 and 9020 of the Federal Rules of Bankruptcy Procedure ("FRBP").

## BACKGROUND

5. Debtor Centerstone is a New York limited liability company and the corporate parent of four subsidiary limited liability companies (debtors Atlas, Alliance, Atlanta and Winchester), who are providers of high-quality linen rental and commercial laundry services to the healthcare industry, primarily supplying scrubs, sheets, towels, blankets, patient apparel and other linen products to hospitals and healthcare clinics via long-term contacts.

6. On December 19, 2018 (the "Petition Date"), the Debtors filed separate, voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Northern District of New York (the "Court"), commencing the Debtors' chapter 11 cases (the "Chapter 11 Cases").

7. The Debtors remain in possession of their respective assets and continue to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On January 10, 2019, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors in the Chapter 11 Cases. No request for the appointment of a trustee or examiner has been made.

8. The Debtors are currently in the process of marketing and selling their assets as going concerns. As the Court is aware, the Debtors continue to operate under interim cash collateral/DIP facility orders, and the collection and use of cash is closely monitored by all parties in these Cases to ensure that the cash is used solely for the purpose of maintaining the Debtors' operations pending the closing of asset sales.

### A. The First-Day Orders

9. The Court conducted the first-day conference in the Debtors' cases on December 20, 2018. On December 20, 2018, the Court entered a *Final Order Authorizing (I) Continued Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Cash Management System, (III) Continued Use of Existing Business Forms and (IV) Continued Intercompany Transactions* [Dkt. No. 26] (the "Cash Management Order"). The Cash Management Order authorized the Debtors and HSBC Bank USA, National Association ("HSBC Bank") to, among other things, identify and dishonor checks and payments related to pre-petition obligations.

10. Also on December 20, 2018, the Court entered a *Final Order (I) Authorizing Debtors to Pay Prepetition Wages, Salaries and Benefits, (II) Authorizing the Continuation of Employee Benefit Programs, in the Ordinary Course of Business and (III) Directing Banks to Honor Prepetition Checks for Payment of Prepetition Wage, Salary and Benefit Obligations* [Dkt. No. 24] (the "Wage Order"). Paragraph 2 of the Wage Order provides that "[t]he Debtors

3

are authorized, *but not directed*, to pay or otherwise honor the Prepetition Wages and Benefits, as described in the Motion to, or for the benefit of the employees . . . ." (emphasis added). Paragraph 10 of the Wage Order provides that "nothing herein shall create, nor is intended to create, any rights in favor of, or enhance the status of any claim held by, any party." Finally, Paragraph 14 of the Wage Order further provides that:

> Notwithstanding anything to the contrary in this Order, any payment made or to be made under this Order, and any authorization contained in this Order, shall be subject to the requirements imposed on the Debtors under any order(s) of the Court approving the Debtors' debtor-in-possession financing facility and use of cash collateral and any budget in connection therewith.

11. On December 21, 2018, the Court entered the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing on a Super-Priority, Senior Secured Basis and (B) Use Cash Collateral, (II) Granting (A) Liens and Super-Priority Claims and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* dated December 21, 2018 [Dkt. No. 33] (the "Interim DIP Order") which, among other things, authorized the Debtors to use cash collateral solely in accordance with the Budget attached thereto as Exhibit 2. The Budget identified specific approved expenses and covered the limited period of December 19, 2018 through January 11, 2019. It did not provide for any payments to AmEx.

### B. The AmEx Account

12. As set forth in paragraph 2 of the Affidavit of Marc E. Yonkers, sworn to the 7th day of February, 2019, attached hereto as **Exhibit "A"** and submitted in further support of this Motion (the "Yonkers Affidavit"), Centerstone opened a Corporate Card Account with AmEx in January 2014. Approximately twenty employees have been issued American Express credit

cards under the Corporate Card Account and they use the cards to charge business-related travel expenses incurred on behalf of the Debtors. *Id.* at ¶ 3.

13. Despite the fact that the individual cardholders receive monthly statements setting forth their charges for the preceding month, *Id.* at ¶ 9, Centerstone is designated as the party responsible for paying the amounts due under the Corporate Card Account. *Id.* at ¶¶ 4-7.

14. On December 21, 2018, Mr. Yonkers was contacted by an AmEx representative to discuss the impact of the Debtors' bankruptcy filing on the Corporate Card Account. *Id.* at ¶ 11. AmEx also placed the Corporate Card Account on hold as of December 21, 2018 and declined any additional employee charges. *Id.* at 10.

15. On December 27, 2018, AmEx received an ACH transfer of funds in the amount of $108,175.47 from the Debtors' operating account (the "Post-Petition Transfer") in payment of pre-petition charges due under the Corporate Card Account. *Id.* at ¶ 12.

16. The Post-Petition Transfer occurred during a holiday week while Centerstone was short staffed and unable to effectively identify and communicate to HSBC Bank all of the pre-petition checks and payments that should be rejected under the terms of the Cash Management Order. *Id.*

17. On January 9, 2019, Debtors' counsel sent a letter to AmEx's General Counsel requesting that AmEx return the Post-Petition Transfer. A copy of the January 9 letter is attached hereto as **Exhibit "B"**. On January 25, 2019, Debtors' counsel received a telephone call from AmEx's counsel in response to the January 9 letter. Counsel have spoken or exchanged emails on several occasions thereafter; however, AmEx has refused to return the Post-Petition Transfer and has asserted that the Transfer was an authorized reimbursement of business expenses under the Wage Motion. In addition, AmEx has asserted that it will pursue the

5

individual employees for payment if it is required to return the Post-Petition Transfer to the Debtors.

## RELIEF REQUESTED

18. By this motion, the Debtors request that the Court issue an Order: (i) pursuant to sections 105(a) and 362(a)(3) and (a)(6) of the Bankruptcy Code and FRBP 9014 and 9020, determining that AmEx violated the automatic stay when it accepted the Post-Petition Transfer while having knowledge of the Debtors' bankruptcy filings and awarding damages and sanctions as against AmEx; (ii) pursuant to sections 105(a) and 363(c)(2) of the Bankruptcy Code and FRBP 9014 and 9020, issuing a finding of contempt as against AmEx for violating the Interim DIP Order by obtaining and using the Debtors' cash collateral without the consent of the Court or HSBC Bank; (iii) pursuant to sections 542(a), 549(a) and 550(a) of the Bankruptcy Code and FRBP 6001, directing AmEx to disgorge the amount of the Post-Petition Transfer to the Debtors; and (iv) pursuant to section 105(a) of the Bankruptcy Code, extending the automatic stay to the non-debtor employees who are cardholders under the American Express Corporate Card program on a permanent basis.

## ARGUMENT

### A. AmEx Violated the Automatic Stay When It Accepted the Post-Petition Transfer From the Debtors' Operating Account

19. Section 362(a) of the Bankruptcy Code provides that "a petition filed under section 301 . . . of this title . . . operates as a stay, applicable to all entities, of

> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;
>
> . . .
>
> (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title.

6

11 U.S.C. §§ 362(a)(3) and (a)(6).

20. Section 105(a) of the Bankruptcy Code authorizes a court to issue "any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under this section, a corporation may be entitled to recover for a stay violation as a sanction for civil contempt. *Maritime Asbestosis Legal Clinic v. LTV Steel Co. (In re Chateaugay Corp.)*, 920 F.2d 183, 186-187 (2d Cir. 1990) ("contempt proceedings are the proper means of compensation and punishment for willful violations of the automatic stay"); *Ball v. A.O. Smith Corp.*, 321 B.R. 100, 108 (N.D.N.Y 2005); *Rediger Invs. Corp. v. H Granados Communs., Inc. (In re H Granados Communs., Inc.)*, 503 B.R. 726, 733 (B.A.P. 9th Cir. 2013).

21. To demonstrate contempt, the moving party must show "maliciousness or lack of a good faith argument and belief that the party's actions were not in violation of a bankruptcy stay." *Maritime* at 186-187; See also, *Ball v. A.O. Smith Corp.*, 321 B.R. 100, 108 (N.D.N.Y 2005).

22. The facts surrounding AmEx's prohibited conduct in the Debtors' cases are straight-forward. AmEx had express knowledge of the Debtors' bankruptcy filing as of December 21, 2018. Yonkers Affidavit, ¶ 10. The cash in the amount of $108,175.47 comprising the Post-Petition Transfer was property of the Debtors' estates at the time it was transferred to AmEx. Despite the fact that AmEx was aware of the Debtors' bankruptcy filings, it accepted the Post-Petition Transfer from the Debtors' operating account on December 27, 2018 in satisfaction of a pre-petition debt. By these actions, AmEx intentionally, and with knowledge of the Debtors' pending Chapter 11 Cases, violated the automatic stay by improperly (i) collecting a pre-petition debt and (ii) taking possession of the Debtors' property – their operating cash.

7

23. Based upon the foregoing, AmEx's violation of the automatic stay was intentional and a deliberately calculated attempt to extract AmEx's pre-petition claim amount due from the Debtors. The Debtors respectfully submit that this conduct, coupled with AmEx's failure to return the Post-Petition Transfer in response to the Debtors' demand, justify an award of damages and sanctions, plus the Debtors' attorneys' fees, as against AmEx in these Chapter 11 Cases.

### B. The Post-Petition Transfer Violated the Interim DIP Order and a Finding of Contempt of Court Should Be Issued Against AmEx

24. Section 363(c)(2) of the Bankruptcy Code provides that "[t]he [debtor in possession] may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless –

    (A) each entity that has an interest in such cash collateral consents, or

    (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

25. The Interim DIP Order entered by this Court authorizes the Debtors to use HSBC Bank's cash collateral for the purpose of maintaining post-petition operations under certain terms and conditions and in accordance with an attached Budget. The Budget sets forth very specific expenses which the Debtors may pay with the cash collateral during the period of December 19, 2018 through January 11, 2019. AmEx's $108,175.47 pre-petition claim is not included in the Budget.

26. By obtaining the Post-Petition Transfer of cash collateral from the Debtors' operating account without the consent of this Court or HSBC Bank, AmEx used the Debtors' cash collateral in violation of the Interim DIP Order and section 363(c)(2) of the Bankruptcy

8

Code. Consequently, AmEx should be directed to return the amount of the Post-Petition Transfer to the Debtors, or be found to be in contempt of the Court's Interim DIP Order.

27. The Bankruptcy Court has "the power, under 11 U.S.C. § 105 and Bankruptcy Rule 9020, to hear and determine a request for contempt emanating from the violation of one of its orders in a core proceeding." *MCI Worldcom Communications, Inc. et al. v. HSG/ATN, Inc. (In re Worldcom, Inc.)*, 361 B.R. 697, 721 (Bankr. S.D.N.Y. 2007) *quoting In re Hulon*, 92 B.R. 670, 675 (Bankr. D. Tex. 1988). Violations of section 363(c)(2) of the Bankruptcy Code involving impermissible uses of cash collateral can be grounds for ordering the disgorgement of post-petition transfers received by vendors. *See, In re Delco Oil, Inc.*, 599 F.3d 1255 (11th Cir. 2010).

28. AmEx's extraction of the unauthorized Post-Petition Transfer from the Debtors and its misappropriation of the Debtors' cash collateral were accomplished with full knowledge of the Debtors' pending bankruptcy cases and the first-day orders entered in the cases. AmEx's conduct in taking the subject funds, and then refusing to return them despite due demand, violated the Interim DIP Order, and should result in a finding of contempt against AmEx.

29. Finally, AmEx has attempted to justify its conduct by asserting that the Post-Petition Transfer was authorized by the Wage Order entered in these Cases. AmEx's interpretation of the Wage Order is incorrect. The Wage Order authorizes, but does not direct, the Debtors to reimburse their employees for business-related expenses; it does not authorize the Debtors to pay third parties for business-related expenses incurred by the Debtors' employees. In addition, the Wage Order prohibits any party from enhancing its position as a result of that Order, and expressly provides that the payment of amounts due under the Wage Order shall be

subject to the requirements of the Interim DIP Order "and any budget in connection therewith." Wage Order, ¶ 14.

30. Based upon the foregoing, AmEx violated the Interim DIP Order and section 363(c)(2) of the Bankruptcy Code when it obtained the Post-Petition Transfer. Consequently, a finding of contempt, and the imposition of damages and sanctions, should be issued as against AmEx and AmEx should be directed to return the Post-Petition Transfer amount to the Debtors.

### C. The Post-Petition Transfer is Recoverable by the Debtors Under Sections 542, 549 and 550 of the Bankruptcy Code and FRBP 6001

31. Section 549(a) of the Bankruptcy Code authorizes a debtor in possession to "avoid a transfer of property of the estate (1) that occurs after the commencement of the case; and (2) (A) that is authorized only under section 303(f) or 542(c) of this title; or (B) that is not authorized under this title or by the court." 11 U.S.C. § 549(a). FRBP 6001 places the burden of proving the validity of a transfer under section 549 on the transferee. Fed. R. Bankr. P. 6001.

32. In this case, the Post-Petition Transfer occurred on December 27, 2018, after the commencement of the Debtors' cases, and was not authorized by the Bankruptcy Court or this Court. The Debtors demanded that AmEx return the Post-Petition Transfer. AmEx has declined to return the Post-Petition Transfer to the Debtors.

33. Based upon the foregoing, the Debtors respectfully request that the Court issue an Order avoiding the Post-Petition Transfer under sections 549(a) and 550(a)(1) of the Bankruptcy Code and directing that AmEx disgorge $108,175.47, the amount of the Post-Petition Transfer, to the Debtors.

34. In the alternative, the Debtors respectfully request that the Court issue an Order directing AmEx to turn over the amount of the Post-Petition Transfer to the Debtors under

section 542(a) of the Bankruptcy Code, as AmEx is the initial transferee "in possession, custody or control, during the case, of property that the [debtor] may use, sell or lease under section 363 of this title . . . ." 11 U.S.C. § 542(a).

### D. The Automatic Stay Should Be Extended to the Non-Debtor Employees

35. AmEx has advised the Debtors that, in the event it is required to disgorge the Post-Petition Transfer, it will seek to recover the balances due under the individual credit cards from the Debtors' cardholder employees. AmEx takes the position that, by using the AmEx credit cards, each employee agreed to be jointly and severally liable with the Centerstone for charges incurred on his/her Corporate Card under the terms of the Corporate Card Agreement. The Debtors respectfully submit that AmEx is improperly using the threat of litigation against the Debtors' employees as leverage to force the Debtors to abandon their request for the return of the Post-Petition Transfer.

36. The Debtors disagree with AmEx's interpretation of the liability sections of the Corporate Card Agreement and respectfully submit that Centerstone is the sole party liable for the charges incurred under the Corporate Card Account, as evidenced by its selection of the "Company Payment" options on the AmEx Application and by sections 3.2(b) and 17.1 of the Corporate Card Agreement. Yonkers Affidavit, ¶¶ 2, 6-7.

37. With the exception of CEO John Giardino, none of the employees to whom the AmEx credit cards are issued are officers or directors of the Debtors. They are regular employees who, since the Petition Date, have focused their efforts on stabilizing the Debtors' commercial laundry operations and servicing the healthcare customers. They are innocent parties caught in the middle between the Debtors and AmEx who cannot afford to defend personal collection actions brought by AmEx or pay judgments in amounts of up to $44,000, in

some cases, for business expenses they were required to charge to company credit cards in order to properly perform their jobs.

38. In light of the foregoing, the Debtors respectfully request that the Court issue an Order extending the automatic stay, on a permanent basis, to the non-debtor employees in order to prevent AmEx from commencing collection actions against them or otherwise litigating the liability issue against them outside of this Court.

39. As a general rule, the automatic stay does not apply to non-debtors and no section of the Bankruptcy Code specifically authorizes that relief in chapter 11 cases. The Court, however, may use its equitable powers under section 105(a) of the Bankruptcy Code to extend the automatic stay to non-debtors "when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate." *Queenie, Ltd. v. Nygaard, Int.*, 321 F.3d 282, 287 (2d Cir. 2003).

40. When considering whether to extend the automatic stay to non-debtors under section 105(a) of the Bankruptcy Code, courts in the Second Circuit consider factors similar to those used for the imposition of injunctions: (i) whether there is the danger of imminent, irreparable harm to the estate or the debtors' ability to reorganize; (ii) whether there is a reasonable likelihood of a successful reorganization; (iii) the balance of the relative harms as between the non-debtor and the party to be stayed; and (iv) the impact upon the public interest, which requires a balancing of the public interest in successful bankruptcy reorganizations with competing societal interests." *In re United Health Care Org.*, 210 B.R. 228, 233 (S.D.N.Y. 1997).

41. In the Debtors' cases, there is the danger of imminent harm to the Debtors' businesses if the focus of approximately fourteen key employees is diverted from performing

their jobs to defending personal collection actions brought by AmEx. In addition, the psychological stress of worrying about pending litigation and the cost of defense counsel would distract the employees and could negatively impact the value of the Debtors' estate due to mistakes made by employees or a key employee's voluntary termination of his or her employment. Second, although the Debtors are not effecting an internal reorganization of their estates, they are engaged in the sales of their assets as going concerns and need to ensure that their employees devote their efforts to maintaining the going concern value of the Debtors' assets. Third, the balance of harm clearly favors the individual employees, who simply cannot afford to be sued for incurring legitimate business expenses, rather than AmEx, an international financial institution with significant resources. Finally, society's interest in protecting regular employees from being sued personally for corporate obligations, allowing those employees to fully engage in their jobs and assist the Debtors in achieving going concern sales of their businesses, is far more significant than society's interest in AmEx collecting a delinquent account.

42. The Debtors respectfully submit that, while their request for a permanent extension of the automatic stay to cover the non-debtor employees is unusual, it is not unwarranted in these Cases, and is the equitable and right thing to do under the circumstances.

43. In light of the foregoing, the Debtors respectfully submit that the Court may exercise its equitable powers under section 105(a) of the Bankruptcy Code to issue an order extending the automatic stay to all of the non-debtor employees who hold credit cards under the American Express Corporate Card program in order to prevent AmEx from commencing collection actions against them.

**WHEREFORE**, based upon the foregoing, the Debtors respectfully request that the Court issue an Order:

(a) determining that AmEx violated the automatic stay by obtaining the Post-Petition Transfer from the Debtors, imposing sanctions as against AmEx and awarding damages and attorneys' fees to the Debtors;

(b) issuing a finding of contempt as against AmEx based upon its violation of the Interim DIP Order and section 363(c)(2) of the Bankruptcy Code and imposing sanctions and damages as against AmEx;

(c) directing AmEx to disgorge the Post-Petition Transfer in the amount of $108,175.47 to the Debtors' estates;

(d) extending the automatic stay to the non-debtor employees who are cardholders under the American Express Corporate Card program; and

(e) granting such other and further relief as the Court deems just and proper.

Date: February 7, 2019
Syracuse, New York

**BOND, SCHOENECK & KING, PLLC**

By: *Camille W. Hill*
Stephen A. Donato, Esq., Bar Roll No. 101522
Camille W. Hill, Esq., Bar Roll No. 501876
Andrew S. Rivera, Bar Roll No. 700712
Office and Post Office Address:
One Lincoln Center
Syracuse, New York 13202
Tel: (315) 218-8000
Fax: (315) 218-8100
Email: sdonato@bsk.com
       chill@bsk.com
       arivera@bsk.com

*Counsel to the Debtors and Debtors in Possession*

3294763.1