**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ X
In re:   :   Chapter 11
  :  
CENTERSTONE LINEN SERVICES, LLC   :   Case No. 18-31754-MCR (Main Case)
d/b/a Clarus Linen Systems, *et al.*[1]   :   Jointly Administered
  :  
               Debtors.   :   **Hearing Date: February 13, 2019 at Noon (ET)**
------------------------------------------------------------ X   **Objection Deadline: February 12, 2019 at Noon (ET)**

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO THE MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL
ORDERS: (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION
FINANCING ON A SUPER-PRIORITY, SENIOR SECURED BASIS AND (B) USE
CASH COLLATERAL, (II) GRANTING (A) LIENS AND SUPER-PRIORITY CLAIMS
AND (B) ADEQUATE PROTECTION, (III) MODIFYING THE AUTOMATIC STAY,
(IV) SCHEDULING A FINAL HEARING AND (V) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the cases (the "Chapter 11 Cases") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through its undersigned proposed counsel, hereby objects (the "Objection") to the *Motion Of The Debtors For Entry Of Interim And Final Orders: (I) Authorizing The Debtors To (A) Obtain Postpetition Financing On A Super-Priority, Senior Secured Basis and (B) Use Cash Collateral, (II) Granting (A) Liens And Super-Priority Claims And (B) Adequate Protection, (III) Modifying The Automatic Stay, (IV) Scheduling A Final Hearing And (V) Granting Related Relief* [Docket No. 11] (the "DIP Financing Motion").[2] In support of this Objection, the Committee respectfully states as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Centerstone Linen Services, LLC d/b/a Clarus Linen Systems (5594); Atlas Health Care Linen Services Co., LLC d/b/a Clarus Linen Systems (2681); Alliance Laundry & Textile Service, LLC d/b/a Clarus Linen Systems (8284); Alliance Laundry and Textile Service of Atlanta, LLC d/b/a Clarus Linen Systems (4065); and Alliance LTS Winchester, LLC d/b/a Clarus Linen Systems (0892).

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Financing Motion.

## PRELIMINARY STATEMENT

1. The Committee has and continues to engage in extensive discussions with the Debtors and HSBC regarding a consensual resolution of this Objection and the Committee's objection to the Debtors' DIP financing, with the goal of reaching a global settlement to benefit all parties in interest. The Committee continues working very hard to achieve this goal, and remains optimistic that a global settlement will be reached in the near future. Notwithstanding that optimism, the Committee files its objections out of an abundance of caution to raise its concerns with the Court and preserve its rights in case a consensual resolution is not reached by the hearing on the DIP Financing Motion.

2. The Debtors commenced these Chapter 11 Cases to pursue separate sales of their northern operations and southern operations as going concerns. The Committee does not oppose the Debtors' entry into a fair and reasonable DIP financing arrangement that adequately funds a Chapter 11 process that facilitates and enables such sales, maximizes the value of the Debtors' assets, and provides the greatest potential to return significant value to all of the Debtors' stakeholders, including general unsecured creditors. However, significant terms of the proposed DIP Facility (defined below) appear to benefit only the Debtors' prepetition secured lender and/or are overly prejudicial to general unsecured creditors, especially in light of the unfortunate reality that there likely will be insufficient proceeds from the sale of the Debtors' businesses to pay all of the Debtors' secured debt in full, not to mention all administrative and priority claims.

3. For all of the reasons set forth herein, the DIP Facility should not be approved on a final basis (and any order approving the DIP Facility should be limited to further interim relief with a final hearing to be held after the Debtors' assets are sold), unless (a) HSBC (defined below) and/or other Secured Lenders (defined below) agree to carve-out from their collateral

sufficient funding to pay all administrative expense claims (including section 503(b)(9) claims and any landlord stub rent claims) that will accrue or be asserted during the pendency of these Chapter 11 Cases, and (b) certain terms of the financing that are prejudicial to unsecured creditors are modified to address the Committee's concerns set forth herein.  Of particular concern to the Committee is HSBC's demand for this Court to grant final relief, including the immediate turnover of sale proceeds to HSBC, while simultaneously proposing a budget that fails to extend through the sale of the Debtors' northern assets, much less the full administration of the Debtors' cases.  Until the Debtors and HSBC can ensure – at a bare minimum – administrative solvency and a plan for some benefit to inure to general unsecured creditors, no final relief should be granted and all sale proceeds should be escrowed pending further adjudication by the Court.

4.Alternatively, if the Court determines that the DIP Financing Motion should be considered on a final basis (and not limited to interim relief), the Committee requests that the Court adjourn the final hearing and grant the Committee authority to conduct discovery concerning the deficiencies in the DIP Facility as the Debtors have produced little or no evidence regarding its reasonableness.

## BACKGROUND

5.On December 19, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").  No trustee or examiner has been appointed in the Chapter 11 Cases.

6.Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their properties as debtors-in-possession.

3

7. On January 10, 2019, the Office of the United States Trustee appointed the Committee pursuant to sections 1102(a) and (b) of the Bankruptcy Code. [Docket No. 107]. On January 14, 2019, the Committee selected CKR Law LLP to serve as its counsel, subject to the Court's approval. To date, the Committee has yet to retain a financial advisor because it is unclear whether there are sufficient funds in the professional fee carve-out to cover the cost.

8. On the Petition Date, the Debtors filed the DIP Financing Motion. Through the DIP Financing Motion, the Debtors seeks approval of postpetition revolving line of credit facility (the "DIP Financing") from HSBC Bank USA, National Association ("HSBC" or the "DIP Lender"), the Debtors' prepetition first-lien lender, in an amount up to $1,580,000.

9. On December 21, 2018, the Court entered an order approving the DIP Financing Motion on an interim basis [Docket No. 33] (the "First Interim DIP Order"), which authorized the Debtors to borrow up to $500,000 under the DIP Financing. *See* First Interim DIP Order at ¶ (iii)(1). On January 11, 2019, the Court entered a second order approving the DIP Financing Motion on an interim basis [Docket No. 125]. On January 25, 2019, the Court entered a third order approving the DIP Financing Motion on an interim basis [Docket No. 158]. On February 4, 2019, the Court entered a fourth order approving the DIP Financing Motion on an interim basis [Docket No. 175] (the "Fourth Interim DIP Order").

10. Pursuant to the Fourth Interim DIP Order, the hearing to consider approval of the DIP Financing Motion on a final basis is scheduled for February 13, 2019 at Noon (ET).

11. To date the Committee still requires additional information (a) to assure that sufficient funding is available to cover all administrative expenses and priority claims, including those arising under section 503(b)(9) of the Bankruptcy Code, which must be paid to ensure that the Debtors' estates are administratively solvent; (b) regarding the exact amount that the stalking

horse purchaser has offered to purchase the Debtors' southern assets (which is uncertain due to purchase price adjustments in the stalking horse purchase agreement); (c) the estimated value of the northern assets and (d) the estimated value of avoidance actions.

## OBJECTION

12. The Debtors commenced these Chapter 11 Cases to pursue the sales of their businesses as going concerns. *See* DIP Financing Motion at ¶ 11. With little evidentiary support, the Debtors claim that, in their business judgment, the proposed DIP financing addresses the Debtors' operational needs while the Debtors pursue the sales of their businesses. *See* DIP Financing Motion at ¶¶ 12-19.

13. While the Committee is mindful of the Debtors' financial condition and needs, the Court's decision to approve the DIP Financing Motion should balance the interests of the Debtors and the DIP Lender with those of general unsecured creditors. Striking this balance requires that the Debtors demonstrate that the proposed financing comports with basic notions of fairness and equity and that it will ultimately inure to the benefit of the Debtors' estates. *See In re Aqua Associates*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); *In re Ames Department Stores, Inc.*, 115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990). The Debtors, for the sake of obtaining postpetition financing, cannot abrogate their fiduciary duties to their estates and creditors. *See Ames Department Stores*, 115 B.R. at 38.

14. Section 364 of the Bankruptcy Code is not a "secured lenders act" allowing a creditor to undo the more level "playing field" contemplated by the Bankruptcy Code. The Court in *Ames Department Stores* stated:

> Acknowledging that Congress, in Chapter 11, delicately balanced the hope of debtors to reorganize and the expectations of creditors for payment, the courts have focused their attention on proposed terms that would tilt the conduct of the bankruptcy case; prejudice,

5

> at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors; or leverage the Chapter 11 process by preventing motions by parties-in-interest from being decided on their merits.

*Ames Department Stores* 115 B.R. at 37.

15. In these Chapter 11 Cases, the Debtors and their estates appear very likely to be rendered administratively insolvent at the conclusion of the proposed sales, which, based on the limited information known to date, likely will only benefit the Secured Lenders to the detriment of administrative, priority and general unsecured creditors. Accordingly, the DIP Financing Motion should be denied on a final basis unless and until any final order approving the financing (the "Final DIP Order") modifies the terms of the proposed DIP Financing that are prejudicial to unsecured creditors in order to strike an appropriate balance among the interests of the Debtors, the Secured Lenders and the Debtors' unsecured creditors.

### A. The DIP Lender Must Provide for Administrative Solvency of the Estates – And Should Receive No Sale Proceeds Until It Does

16. As a preliminary matter, the Committee is concerned that the estates will be rendered administratively insolvent by virtue of the sale of the Debtors' assets. The DIP Lender (which is also the Debtors' first-lien prepetition lender) will benefit from the proposed sale by receiving at least a significant payment on account of its prepetition and postpetition claims, while leaving administrative, priority and general unsecured creditors of the estate unpaid. The DIP financing should not be approved on a final basis (nor should the proposed sale be approved) unless the DIP Lender agrees to carve-out from its collateral sufficient funding to pay all administrative expenses and priority claims that have accrued and will continue to accrue in these Chapter 11 Cases. If the DIP Lender seeks to benefit from the chapter 11 process, it must "pay the freight."

6

17. Moreover, where administrative insolvency is likely, it is premature and inappropriate for the proposed DIP financing Order to require the immediate turnover of sale proceeds to the Secured Lenders. As currently proposed, the DIP financing budget

18. A chapter 11 case should not be administered, and DIP financing procured, for the sole benefit of secured lenders. *In re Ames Department Stores, Inc.*, 115 B.R. at 37 ("[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate."); *In re Tenney Village Co., Inc.,* 104 B.R. 562, 568 (Bankr. D. N.H. 1989) (debtor-in-possession financing terms must not "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the [secured lender]").

19. Accordingly, courts have concluded that administrative expenses must be paid in full before debtor-in-possession financing can be approved. Recently, this Court in *In re Auburn Armature, et al.* required a lender to budget for all estimated administrative expense claims, including $395,000 of section 503(b) (9) claims, in the context of a contested DIP financing hearing. *See Amended Final Order Approving the Debtors' Emergency Motion For Order Authorizing the Debtors to Incur Post-Petition Senior Secured, Super Priority Indebtedness, And Providing Adequate Protection All Pursuant to Sections 361, 363, And 364 of The Bankruptcy Code* [Docket No. 128], entered on June 30, 2017, *In re Auburn Armature, Inc.*, et al., No. 17-30743-MCR, United States Bankruptcy Court Northern District of New York (Syracuse Division). Similarly, in *In re Townsends, Inc.*, when the Debtors proposed DIP financing that would pay most administrative claims but leave the section 503(b)(9) claims behind, Judge Sontchi stated, "if it appears that the case is administratively insolvent, I would be inclined to . . . either convert or dismiss the case . . . . " *In re Townsends, Inc., et al.*, Case No. 10-14092

7

(Bankr. D. Del. January 21, 2011) Tr. at 23:25-24:22. *See, e.g.*, *In re NEC Holdings Corp., et al.*, Case No. 10-10890 (Bankr. D. Del. July 13, 2010) Tr. at 100:17-20; *In re Family Christian, LLC et al.*, Case No. 15-00643 (Bankr. W.D. Mich. April 14, 2015) Tr. at 9:23-12:22 ("I will put everyone on notice now that we're going to have a big problem at the sale hearing if in fact it turns out that the estates are administratively insolvent . . ."). As a result of the *Townsends* Court's refusal to approve DIP financing that did not provide for payment in full of the section 503(b)(9) claims, and after an evidentiary hearing on the matter, the court approved the DIP financing based on a revised budget that included a carve-out with sufficient funds to pay the section 503(b)(9) claims in full. *See Final Order Authorizing the Debtors (A) to Obtain First-Priority Secured Postpetition Financing, and (B) to use Cash Collateral of Secured Lenders and Providing Related Adequate Protection* [D.I. 227], entered on January 28, 2011, *In re Townsends, Inc., et al.,* No. 10-14092. *See Exhibit A*.

20.    The Committee is concerned that the budgets it has been provided to date will not be sufficient to pay all administrative expenses that have accrued and will continue to accrue in these Chapter 11 Cases before and after the sales close.  The Committee's concern is exacerbated by the fact that it is unclear exactly how much the stalking horse purchase price for the Debtors' southern assets actually is (due to various purchase price adjustments in the stalking horse purchase agreement), or how much potential purchasers will be willing to bid for the Debtors' northern assets.  Therefore, the DIP Financing Motion should be denied unless the DIP Lender agrees to carve-out from its alleged liens funds sufficient to (a) satisfy all chapter 11 administrative expenses, including professional fees, and priority claims not assumed in any sale transactions, and (b) provide sufficient funding for the expenses that will accrue during the post-sale(s) wind-down period and a Chapter 11 plan process.

8

**B. Other Terms of the Proposed DIP Financing are Overly Prejudicial to General Unsecured Creditors and Must be Modified**

21. The Debtors' proposed DIP Facility contains other terms that are overly prejudicial to general unsecured creditors, especially in light of the unfortunate reality that, based on the information known to date, there likely will be insufficient proceeds from the sales of the Debtors' businesses to pay the Debtors' secured debt in full and also pay all administrative expenses and priority claims. Therefore, the Committee requests that any Final DIP Order be modified to address the Committee's following concerns:

(a) **No Liens on or Superpriorty Claims Payable From Avoidance Actions** – The Debtors should not be permitted to grant HSBC (a) liens on avoidance actions or other causes of action (or such commercial tort claims for which HSBC does not already have valid and perfected liens) or the proceeds thereof; or (b) superpriority administrative expense claims payable from the proceeds of avoidance actions or other causes of action. Avoidance actions, a distinct creature of bankruptcy law designed to facilitate equality of distribution among a debtor's general unsecured creditors, are not truly property of a debtor's estate, but instead are rights that the estate holds in trust for the benefit of creditors. *See Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*, 330 F.3d 548, 567 (3d Cir. 2000) (noting that the underlying intent of the avoidance powers is the recovery of valuable assets for the benefit of a debtor's estate); *In re Sweetwater*, 884 F.2d 1323, 1328 (10th Cir. 1989) ("[P]ost-petition avoidance actions should be pursued in a manner that will satisfy the basic bankruptcy purpose of treating all similarly situated creditors alike . . . ."); *Bear Stearns Sec. Corp. v. Gredd*, 275 B.R. 190, 194 (S.D.N.Y. 2002) ("[T]he purpose of § 547 is to ensure fair distribution between creditors, while the purpose of § 548 is to protect the estate itself for the benefit of all creditors."); *United Capital Corp. v. Sapolin Paints, Inc. (In re Sapolin Paints, Inc.)*, 11 B.R. 930, 937 (Bankr. E.D.N.Y. 1981) (recognizing "the well-settled principle that neither a trustee . . . nor a debtor-in-possession, can assign, sell, or otherwise transfer the right to maintain a suit to avoid a preference."). Accordingly, avoidance actions and their proceeds should not be subject to HSBC's post-petition, replacement or adequate protection liens, and HSBC's superpriority administrative expense claims should not be payable from proceeds of avoidance actions.

(b) **Proscribed Actions are Overbroad** – Pursuant to ¶ 37 of the First Interim DIP Order, the list of "Proscribed Actions" which the Debtors and Committee are prohibited from doing are unnecessary and prejudicially

9

        overbroad, and should be carved back so as to not inhibit the Committee from being able to satisfy its statutory obligations to general unsecured creditors. The only Proscribed Actions should be asserting a Chapter 5 or lien avoidance claim against HSBC.

(c) **Length of Investigation Period and Budget** – Pursuant to the First Interim DIP Order, the Committee's current deadline to investigate the validity of HSBC's prepetition liens, security interests and claims is sixty (60) days after entry of a final order on the DIP Financing Motion (the "Investigation Termination Date"). *See* First Interim DIP Order at ¶ 38(a). If the Committee does not commence a challenge against HSBC before the Investigation Termination Date, the Committee will be bound to the Debtors' stipulations regarding the validity of HSBC's liens, security interests and claims, which will effectively grant HSBC a waiver from all claims and causes of action relating to its prepetition loans. *Id*. In light of the broad relief HSBC is requesting, the Investigation Termination Date should be extended to 90 days from entry of a final order on the DIP Financing Motion. This short but meaningful extension is necessary to allow the Committee to complete a comprehensive investigation of HSBC's liens, claims and any other potential money damage causes of action. In addition, the Interim DIP Order provides that the Committee may use up to only $15,000 from the professional fee carve-out in connection with its investigation. *Id*. This amount is insufficient (and likely an attempt to stifle the Committee's investigation) and should not be capped.

(d) **Automatic Committee Standing** – Any Final DIP Order should grant the Committee automatic standing to pursue any claims related to the Debtors' obligations to its prepetition Secured Lenders. This will avoid the need for the Committee to incur costs to seek standing from the Court.[3]

(e) **No Roll Up** – The financing should be used for postpetition operations and expenses, not for converting HSBC's prepetition debt into postpetition debt. To the extent any roll-up is allowed, the Committee's ability to challenge HSBC's prepetition liens, security interests and claims must not expire upon repayment of HSBC's prepetition debt, regardless of this rollup. Thus, any Final DIP Order must provide that in the event it is

---

[3] Courts have routinely approved DIP financing agreements that grant standing to the creditors' committee without the need for a standing motion. *See, e.g.*, *In re Quebecor World (USA) Inc.*, Case No. 08-10152 (Bankr. S.D.N.Y. Apr. 1, 2008); *In re Dana Corp.*, Case No. 06-10354 (Bankr. S.D.N.Y. Mar. 29, 2006); *In re Prestige Industries LLC*, Case No. 17-10186 (Bankr. D. Del. Mar. 13, 2017); *In re American Safety Razor, LLC*, Case No. 10-12351 (Bankr. D. Del. Aug. 27, 2010); *In re PCAA Parent LLC*, Case No. 10-10250 (Bankr. D. Del. Mar. 2, 2010); *In re Pliant Corp.*, Case No. 09-10443 (Bankr. D. Del. Mar. 20, 2009). Alternatively, courts also frequently approve DIP financing orders providing that the Committee's filing of a standing motion satisfies the requirement of commencing an adversary proceeding within a specified time period. *See, e.g.*, *In re Lyondell Chemical Company*, Case No. 09-10023 (Bankr. S.D.N.Y. Mar. 1, 2009); *In re Delta Air Lines, Inc.,* Case No. 05-17923 (Bankr. S.D.N.Y. Oct. 6, 2005).

determined that HSBC's liens or claims are not valid, the rollup of HSBC's prepetition debt should not be given any effect and should be entirely unwound and any payment HSBC received must be returned to the Debtors' estate.

(f) **Adequate Protection Payments Only for Diminution in Value** – Any Final DIP Order should clarify, in accordance with section 361 of the Bankruptcy Code, that all such adequate protection payments are limited to the diminution in value of HSBC's prepetition collateral, which diminution HSBC must demonstrate before receiving such adequate protection payments.

(g) **No Payment of Lender Fees and Expenses when Undersecured** – Any Final DIP Order must provide that if it is ultimately determined that the Debtors' prepetition Secured Lenders are undersecured, any postpetition payments of interest, fees (including professional fees), costs, etc. must be recharacterized as payments of principal and/or disgorged, or limited to adequate protection for postpetition diminution of value of prepetition collateral.

(h) **Preservation of Challenge Rights Notwithstanding Credit Bid** – Any Final DIP Order must ensure that the Committee's challenge rights are preserved in the event that there is a credit bid for purchase of the Debtors' businesses. The Final DIP Order must require that if the Secured Lenders wish to credit bid, then the Secured Lenders must disgorge cash in the event of a successful lien or other challenge. Moreover, if a credit bid is allowed, the proposed Final DIP Order must make clear that the Secured Lenders' alleged liens and security interests are not *ipso facto* found valid by the entry of a Final DIP Order. According to *In re Radnor Holdings Corp.*, 353 B.R. 820 (Bankr. D. Del. 2006), unless this Court expressly reserves the Committee's rights, the entry of an order permitting a credit bid may be tantamount to an order approving the nature, extent and validity of their liens and also prevents a lien challenge.

(i) **Amount and Allocation of Professional Fee Carve-Out** – the current DIP financing budget proposed to the Committee is inadequate to cover the reasonable fees of Committee professionals and must be significantly increased to allow the Committee to properly exercise its statutory and fiduciary duties.

(j) **No Waiver of Surcharge Rights, Equities of the Case Doctrine, or Marshaling** – Waiver of sections 506(c) is inappropriate in the Chapter 11 Cases because it is unlikely that there will be sufficient sale proceeds to pay all administrative expenses in full. *See* Interim DIP Order at ¶ 11.[4]

---

[4] The DIP financing package proposed in *Sports Authority Holdings, Inc., et. al.* illustrates courts' reluctance to grant a Bankruptcy Code section 506(c) surcharge waiver in situations where a case may be administratively

Thus, any Final DIP Order must clearly provide that the Debtors are not waiving their rights to surcharge the Secured Lenders' collateral under section 506(c). Any Final DIP Order should also provide that the Debtors are not waiving their rights to seek an order: (i) excluding postpetition proceeds from the prepetition collateral based on the equities of the case under section 552(b) of the Bankruptcy Code, or (ii) marshaling assets.

(k) **Notice to Committee and Right to Inspect Records** – Any Final DIP Order should require that the Committee be provided simultaneous copies of any notices or reports between the Debtors and HSBC regarding the DIP Facility, and that the Committee should have the same rights to inspect the Debtors' books and records as those afforded HSBC.

(l) **Fees and Interest Rates** – The Committee is currently investigating the reasonableness of the DIP Financing's various fees and interest rates, which may be excessive. The Committee reserves all rights to object to such fees and rates if it determines that they are unreasonable.

## RESERVATION OF RIGHTS

The Committee reserves all rights with respect to the DIP Financing Motion, including the right to supplement this Objection and seek discovery in connection with terms and reasonableness of the proposed DIP Facility through document requests and depositions due to

---

insolvent. In *Sports Authority,* Judge Walrath refused to approve a Bankruptcy Code section 506(c) waiver in connection with the debtors' DIP financing facility, reasoning that to the extent administrative claims remained unpaid at the end of the cases, there would be a claim against the lenders for those costs under Bankruptcy Code section 506(c) to the extent necessary for the preservation or realization of the lenders' collateral. In pertinent part, the Court ruled:

> And it's clear, I think, in all my prior rulings, that if a case is being run for the benefit of the lenders in order to foreclose upon their collateral, the lenders are going to have to pay the cost of that. And that includes all administrative. It includes the rent. It includes professional fees.
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
> The debtor is correct under Montgomery Ward, you don't have to pay the stub rent on the first day of the case. But in a case where the landlords and other administrative claims are clearly not budgeted or being paid while the landlord – excuse me, while the secured lenders' collateral is being liquidated and their secured claim is being paid, I have a serious problem with that.
> I think the fix is no 506(c) waiver for anybody. And to the extent that administrative claims are not paid at the end of this case, there will be a claim against the lenders for those costs under 506(c) to the extent they were necessary for the preservation or realization of their collateral.
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
> If the lenders won't agree, then I'm prepared to convert the case today because I just -- they can go to State Court and liquidate their collateral, but you can't do it in bankruptcy without paying the freight, as was argued.

See Tr. of DIP Hr'g at 194-96, *In re Sports Authority Holdings, Inc., et al.*, No. 16-10527 (MFW) (Bankr. D. Del. April 26, 2016). *See Exhibit B*.

the fact that the Debtors have not provided any evidence concerning the reasonableness of the DIP Facility. Nothing contained in, or omitted from, this Objection constitutes an admission or stipulation by the Committee, any member of the Committee, or any other party with respect to any alleged claims against the Debtors or any Secured Lender, including but not limited to the amount, validity, or enforceability of any alleged claims against the Debtors or the extent, validity, priority, or perfection of any alleged liens and security interests in the Debtors' assets.

**WHEREFORE**, the Committee respectfully requests that the Court (a) limit any order approving the DIP Financing Motion to further interim relief only (and not be granted on a final basis), unless it is modified to address the Committee's concerns set forth herein; or, in the alternative, and (b) grant the Committee such other and further relief as the Court deems just and appropriate.

Dated: February 12, 2019
      New York, New York

**CKR LAW LLP**

*/s/ David M. Banker*
David M. Banker, Esq.
Gilbert R. Saydah Jr., Esq.
1330 Avenue of the Americas, 14th Floor
New York, New York 10019
Telephone:   (212) 259-7300
Facsimile:    (212) 259-8200
Email: dbanker@ckrlaw.com
       gsaydah@ckrlaw.com

*Counsel to the Official
Committee of Unsecured Creditors*