UNITED STATES BANKRUPTCY COURT
<u>NORTHERN DISTRICT OF NEW YORK</u>

In Re

    CENTERSTONE LINEN SERVICES, LLC
    d/b/a CLARUS LINEN SYSTEMS, et al

               Debtors.

Case No. 18-31754-5-MCR
Main Case
Chapter 11 Cases
Jointly Administered

In Re

    ATLAS HEALTH CARE LINEN
    SERVICES, CO., LLC
    d/b/a CLARUS LINEN SYSTEMS,

               Debtor.

Case No. 18-31753-5-MCR
Chapter 11 Case
Jointly Administered

**MOTION OF ALTUS MANAGEMENT, LLC FOR: (a) AN ORDER PURSUANT TO 11 U.S.C. SECTION 365 REQUIRING ATLAS HEALTH CARE LINEN SERVICES, CO. LLC d/b/a "CLARUS LINEN SYSTEMS" TO REJECT IMMEDIATELY THE "LINEN SERVICES AGREEMENT" DATED AS OF AUGUST 13, 2010 OR ALTERNATIVELY REQUIRING ATLAS HEALTH CARE LINEN SERVICES CO. LLC TO FILE A MOTION WITHIN THRITY (30) DAYS FOR THE ASSUMPTION OR REJECTION OF SAID LINEN SERVICES AGREEMENT AND (b) AN ORDER PURSUANT TO 11. U.S.C. SECTION 1104(a)(2) APPOINTING AN OPERATING TRUSTEE IN THE CASE OF <u>ATLAS HEALTH CARE LINEN SERVICES CO., LLC</u>**

       Altus Management, LLC ("Altus"), successor by name change to Western New York Purchasing Alliance ("WNYPA"), by its attorneys, Rupp Baase Pfalzgraf Cunningham LLC, hereby moves pursuant to 11 U.S.C. Section 365(d)(2) for an order to shorten time for Atlas Health Care Linen Services Co., LLC d/b/a Clarus Linen Systems ("Atlas"), as assignee of Sodexo Laundry Services, Inc. ("Sodexo") to assume or reject the executory contract between Altus and Atlas. In support of its motion, Altus hereby states:

## JURISDICTION

1.  This Court has jurisdiction of this matter pursuant to 28 U.S.C. Sections 157 and 1334. Venue of this motion in this district is proper pursuant to 28 U.S.C. Sections 1408 and 1409.

2.  This is a core proceeding under 28 U.S.C. Sections 157(b)(2)(A), (G), and (O).

3.  Each of the Debtors continue to operate their businesses and manage their assets as debtors-in-possession.

4.  The statutory base for the relief requested in this motion is 11 U.S.C. Section 365(d)(2).

## FACTS

5.  On December 19, 2018 (the "Petition Date"), the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

6.  At the time it filed its bankruptcy petition and presently, Atlas, as assignee of Sodexo, was a party to a written contract with Altus entitled "Linen Service Agreement," dated August 13, 2010 (the "Altus Contract"), pursuant to an assignment and assumption

agreement dated April 11, 2013 (the "Assignment"). Copies of the Linen Service Agreement and Assignment are attached hereto as Exhibits A and B, respectively.

7. For purposes of the Altus Contract, Altus acts as Client on behalf of certain participating hospitals. Each participating hospital is party to a Participation Agreement attached as Exhibit 1 to the Altus Contract and agreed to be bound by the terms of the Altus Contract. *See* Exhibit A.

8. In consideration for acting as the coordinating agent for all participating hospitals, Altus is entitled to compensation pursuant to Sections 4.2(a) and (b) of the Altus Contract.

9. Under the Altus Contract, Atlas is required to manage and operate professional laundry services for all of the facilities owned, operated or controlled by the participating hospitals.

10. In exchange for professional laundry services, the participating hospitals are required under the Altus Contract to pay Atlas for professional laundry services within 30 days after the date of invoice.

11. Although the participating hospitals continue to make timely payment under the Altus Contract, Atlas has failed or refused to compensate Altus for its role as coordinating agent.

12. Atlas has failed or refused to remit payment pursuant to Sections 4.2(a) and (b) of the Altus Contract. The outstanding payment due to Altus is excess of $542,454.00.

13. Although the participating hospitals continue to make timely payment under the Altus Contract, Atlas has failed or refused to provide the required pre-petition and post-petition laundry services to the participating hospitals.

14. On or about February 22, 2018, Altus served a notice of default on Atlas which set forth a detailed list of Atlas' defaults under the Altus Contract. A copy the February 22, 2018 notice of default letter is attached hereto as Exhibit C.

15. Pursuant to Section 6.4 of the Altus Contract, Atlas had sixty (60) days to cure the defaults set forth in the February 22, 2018 notice of default. Atlas has failed or refused to cure these defaults, instead opting to obtain bankruptcy relief.

16. Atlas' ongoing default has severely impacted the ability of Altus and its participating hospitals to run their businesses in a safe and efficient manner. Further, Atlas'

- 5 -

continuing breach of the Altus Contract has had a detrimental impact on the healthcare services provided by the participating hospitals.

A. Linen Shortage / Non-Delivery of Linen

17. Since the assignment of the Altus Contract from Sodexo to Atlas, the participating hospitals have experienced a near daily shortage of linen. Despite due demand for Atlas to comply with its contractual obligation, Atlas has failed or refused to timely deliver appropriate linens. When linen is delivered timely, Atlas does not provide the required quantity or quality of linen. Atlas has made its own determinations regarding sufficient inventory of linens, despite repeated objections from the participating hospitals. Atlas also fails to comply with the necessary segregation and decontamination processes necessary to ensure production of linen free from bacteria.

18. The shortage of linens experienced by the participating hospitals is broad and a long-standing problem. Problems are not limited to general bedding or bathing linens, but also include the healthcare specific linens such as patient and surgical gowns, anti-ligature linens, and procedural linens. In the absence of gowns, dressing, blankets, towels, and other linens, the participating hospitals are not able to efficiently protect their staff and, more importantly, provide the necessary healthcare services to their patients.

B. Purchase of Linen

19. In order to ensure that patients received the highest quality of care, in light of the deficient service provided by Atlas, the participating hospitals have undertaken the purchase of additional linens in an effort to assist Atlas in meeting the needs of each participating hospital.

20. Erie County Medical Center Corporation ("ECMCC") and Kaleida Health ("Kaleida"), two of the participating hospitals, have purchased additional linens on two separate occasions in an attempt to increase the quantity of linen in circulation for the participating hospitals.

21. In the first linen purchase, ECMCC and Kaleida spent $600,000 ($400,000 by ECMCC and $200,000 by Kaleida) to purchase additional linen. In the second linen purchase, Kaleida spent $200,000 to purchase additional linen.

22. In addition, Catholic Health has been required to acquire an emergency linen inventory to mitigate the disastrous effects of linen shortages imposed by the Atlas. The cost of the emergency linens and bins purchased for each Catholic Health facility is set forth in the table below and is expected to continue to rise as additional emergency linens remain necessary to meet required inventory levels.

Linen Cost

| BMH | $43,023 |
|---|---|
| SOC | $35,060 |
| KMH | $22,461 |
| SJC | $10,224 |
| MSM | $11,595 |
| Total: | $122,363 |

Bin Cost

| BMH | $12,396 |
|---|---|
| SOC | $10,142 |
| KMH | $6,198 |
| SJC | $2,817 |
| MSM | $3,381 |
| Total: | $34,934 |

23.     The purchased linen would enter the soiled linen stream of the Debtors and would be transferred to the Debtors during this process. This would result in a one-time use of the linen, at a significant cost to each participating hospital.

24.     Despite the expensive capital outlays to purchase additional linens, the linen shortages remain unaddressed at all of the participating hospitals.

C. Purchase of Disposable Linens

25.     Pursuant to Section 2.2 of the Altus Contract, Atlas is the "exclusive provider of Laundry Services. . . ." Due to the contract restriction, the participating hospitals are unable to solicit a new provider of laundry services. As a result, the participating hospitals have been forced to purchase one-time use (paper) products at a significantly higher cost than traditional linen and in contravention of the participating hospitals' cost-saving and green initiatives.

26. Catholic Health has incurred an enormous cost to obtain paper disposable products. To date, Catholic Health has spent $6,351.91 for scrub jackets and $667,205.00 for additional linen that should have otherwise come from Debtors, but was not provided.

27. Likewise, Niagara Falls Memorial Medical Center has been forced to purchase surgical scrubs at a cost of over $7,000.00, which Debtors should have provided, in order to limit the need to cancel or postpone surgeries caused by linen shortages.

28. In addition to the traditional linen purchased above by Erie County Medical Center Corporation, ECMCC has incurred costs of $1,185 for disposable gowns and blankets.

D. Impact

29. Atlas' failure to provide adequate linens to the participating hospitals has had a detrimental impact on the operations of the participating hospitals. The absence of the necessary linens and remedial measures have resulted in significant losses in terms of time, costs, and expenses to the participating hospitals. Additionally, the linen shortage has impacted staff performance and patient care.

30. Linen shortages have had a direct impact on patient care. The participating hospitals have had to cancel, postpone, or otherwise move medical procedures as a direct result of not having a sufficient linen supply to safely complete the scheduled procedure.

31. In an effort to mitigate the impact of the linen shortages on a day-to-day basis, the participating hospitals have been forced to move linens between units and floors within the same facility, as well as their other facilities. As a result the participating hospitals have incurred additional administration and transportation costs.

32. Staff members from the participating hospitals have encountered overfilled soiled linen bins, to the point that they impeded access to the linen rooms. On numerous occasions, staff members have been required to empty the soiled linen bins and wash the soiled linen in their own facility washing machines due to inadequate supply of clean linen. Pickup and delivery of linens have been routinely missed or delayed by several days.

33. When linens were delivered, they frequently arrived at the participating hospitals outside of standard delivery hours. As a result, housekeeping and nursing staff are required to shift day-time staff members from their normal duties to sort linen, a task which is more efficiently done by housekeeping staff at night.

34. In the absence of appropriate linen supplies, staff members frequently are forced to use certain linens for purposes other than which they are intended. For example, in the

absence of towels, staff members continue to use blankets and pillowcases to perform patient care. Staff members and patients have forced to endure using scrubs and gowns that are woefully inappropriate in size.

35. As a result of the linen shortages and non-delivery of linen, the participating hospitals, some of which include nursing home facilities, are faced with the potential of violating Section 415.29 of the New York State Department of Health Regulation, which states that to "provide a sufficient quantity of clean linen to meet the requirements of residents; nursing homes shall maintain a linen inventory equal to at least three times the average daily census, and of this one-third shall be in use, one-third in laundry and one-third in reserve."

## LEGAL GROUNDS FOR THE REQUESTED RELIEF

Under Section 365(d)(2) of the Bankruptcy Code, the Court Should Shorten the Period for Atlas to Decide Whether to Assume or Reject the Altus Contract.

36. Section 365(d)(2) of the Bankruptcy Code provides the Court with the power to compel a debtor to assume or reject an executory contract within a specified period of time:

> In a case under chapter . . . 11 . . . of this title, the trustee may assume or reject an executory contract...of the debtor at any time before the confirmation of a plan *but the court, on the request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract* . . .

11 U.S.C. Section365(d)(2) (emphasis added); 11 U.S.C. Section1107(a).

- 10 -

37. Although the Bankruptcy Code provides Chapter 11 debtors with a "breathing space" within which to determine whether a particular executory contract should be assumed or rejected, such "breathing space . . . is not without limits." *In re Enron Corp.*, 279 B.R. 695, 702 (Bankr. S.D.N.Y. 2002). The limit placed on the time for the debtor's assumption/rejection determination by case law and commentators is "reasonableness." *See, e.g., Dallas-Fort Worth Regional Airport Bd. v. Braniff Airways, Inc.*, 26 B.R. 628, 636 (N.D. Tex. 1982). The determination of what constitutes a reasonable time to assume or reject a particular executory contract is within the bankruptcy court's discretion and has to be decided in light of the particular facts of each case. *See, e.g., S. St. Seaport L.P. v. Burger Boys, Inc. (In re Burger Boys, Inc.)*, 94 F.3d 755, 760 (2d Cir. 1996); *Theatre Holding Corp. v. Mauro (In re Theatre Holding Corp.)*, 681 F.2d 102, 105 (2d Cir. 1982); *Dallas-Fort Worth, supra.*; *In re Adelphia Commc'ns Corp.*, 291 B.R. 283, 292 (Bankr. S.D.N.Y. 2003).

38. Among the factors courts have considered in applying this discretion are:
   a) the nature of the interests at stake;
   b) the balance of the hurt to the litigants;
   c) the good to be achieved;
   d) the safeguards afforded to the litigants;
   e) whether the action to be taken is so in derogation of Congress' scheme that the court may be said to be arbitrary;
   f) the debtor's failure or ability to satisfy post-petition obligations;
   g) the damage any non-debtor will suffer beyond the compensation available under the Bankruptcy Code;
   h) the importance of the contract to the debtor's business and reorganization;
   i) whether the debtor has had sufficient time to appraise its financial situation and the potential value of its assets in formulating a plan of reorganization;
   j) whether there is a need for judicial determination as to whether an executory contract exists;

- 12 -

      k)    whether exclusivity has been terminated; and
      l)    the purpose of Chapter 11, which is to permit successful rehabilitation of debtors.

*In re Adelphia Comm. Corp.*, 291 B.R. at 293 (quotations omitted).

39.    In considering the factors regarding whether to expedite the time for the Atlas to assume or reject the Altus Contract, the following factors are particularly instructive: (a) the debtor's failure or ability to satisfy post-petition obligations; (b) whether the debtor has had sufficient time to appraise its financial situation and the potential value of its assets in formulating a plan of reorganization; and (c) the balance of the hurt to the parties, and the good to be achieved.

40.    The first criteria to consider, the debtor's failure or ability to satisfy post-petition obligations, favors determination that Atlas should be compelled to decide whether to assume or reject the Altus Contract.

41.    Debtors have an obligation to timely perform all obligations under the Altus Contract arising after the Petition Date until the contract is rejected. This includes Atlas' obligation under the Altus Contract to operate and manage professional laundry services for each of the participating hospitals.

42.    As set forth in detail above, Atlas has exhibited a remarkable inability to perform its post-petition obligations. Debtors have provided no assurance that its ability to

perform the post-petition obligations will increase. In fact, to the contrary, Atlas has demonstrated a decreased ability post-petition to perform its required obligations.

43.    Likewise, Atlas is unable to cure its monetary default under the Altus Contract.

44.    The second criteria to consider, whether Atlas has had sufficient time to appraise its financial situation and the potential value of its assets in formulating a plan of reorganization. Consideration of this criterion favors granting of the motion.

45.    In the present case, Atlas' bankruptcy case has been pending for nearly eight weeks. Atlas's exclusive period is currently set to expire on April 17, 2019. Allowing Atlas to delay this decision can only serve to prejudice Altus, especially in light of Atlas' inability to cure its default and assume the Altus Contract.

46.    The third criteria to consider is the balance of hurt to the parties. Again, consideration of this factor favors granting the motion. While the Debtors have until Plan confirmation to determine whether to assume or reject an executory contract, waiting until Plan confirmation for the Debtors to decide whether to assume or reject the Altus Contract will cause significant harm and prejudice to Altus and its participating hospitals if Altus continues to wait to reject the Altus Contract because the participating hospitals that constitute Altus are obliged to pay for services that not being rendered during the interim, and incurring significant time, cost, and

expense to obtain supplemental or replacement services. It is better for all parties involved in the reorganization process to determine in an expedited manner whether Atlas intends to assume or reject the Altus Contracts so that the parties may take the appropriate actions to protect their respective rights.

47. In a Chapter 11 case like this, the debtor's accepting the benefits of an executory contract post-petition without providing the required services is grounds for the court to order the debtor to determine within a specified period of time to assume or reject such contract. *In re Travelot Co.*, 286 B.R. 462, 469 (Bankr. S.D. Ga. 2002) (debtor ordered to file motion to assume or reject executory contract and to deposit $1 million amount necessary to cure pre-petition and post-petition defaults with the Court within 15 days); *In re Taber Farm Associates*, 115 B.R. 455, 457 (Bankr. S.D. N.Y. 1990) (debtor order to assume or reject its land contract within 120-day exclusive period where debtor was not meeting its post-petition obligations under the contract).

48. Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract or lease, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default. 11 U.S.C. Section 365(b)(1). Altus is not able to cure the monetary default or provide adequate assurance that it will promptly cure the non-monetary defaults.

49. The Court should exercise its discretion to issue: (a) an Order pursuant to 11 U.S.C. Section 365 requiring Atlas to reject the Altus Contract; or alternatively requiring Atlas to file a motion within thirty (30) days for the assumption or rejection of the Altus

Contract, and (b) for an Order pursuant to 11 U.S.C. Section 1104(a)(2) appointing an operating trustee in the Chapter 11 case of Clarus if such becomes necessary to aid in the transition to a new vendor after rejection of the Altus Contract.

50. Upon the rejection of the Altus Contract and Participation Agreement, Altus and the participating hospitals shall and hereby do reserve their rights under applicable non-bankruptcy law to: (a) procure or "cover" all their laundry and linen requirements from a vendor other than Clarus, and (b) require Clarus to continue service under the Altus Contract and Participation Agreement on a limited phase-out or wind-down basis lasting perhaps one to four months until Altus and the participating hospitals have been able to achieve a complete transition to such other vendor, including the completion of such other vendor's preparation or "ramp-up" requirements.

51. It is respectfully submitted that if Clarus is unable or unwilling to attempt to continue service under the rejected Altus Contract and Participation Agreement during the aforesaid phase-out or wind-down interval, or if Clarus has indicated its desire to convert its case to one under Chapter 7, then this Court should issue an Order pursuant to 11 USC Section 1104 appointing an operating trustee to operate the business of Clarus during such limited interval. In this regard it is respectfully urged to the Court that the maintenance of laundry and linen services is very important to the health, safety and welfare of the patients of the participating hospitals. Accordingly, if Clarus is unable or unwilling to attempt to service these hospitals during the

- 16 -

aforesaid phase-out or wind-down interval, the appointment of an operating trustee would greatly assist the participating hospitals in maintaining the care of their patients.

52.     No prior application has been considered by the Court for the relief requested herein.

53.     As set forth herein, the participating hospitals have and will continue to suffer severe economic harm if it is unable to obtain prompt relief. Further, absent prompt relief, the health, safety, and welfare of numerous patients and employees of the participating hospitals will continue to be at risk of compromise.

**WHEREFORE**, for the reasons state above, Altus respectfully requests that the Court enter an order (a) pursuant to 11 U.S.C. Section 365 requiring Atlas Health Care Linen Services Co., LLC d/b/a "Clarus Linen Systems" to reject the Altus Contract and the Participation Agreements immediately, or alternatively requiring Atlas Health Care Linen Services Co., LLC d/b/a "Clarus Linen Systems" to file a motion within thirty (30) days for the assumption or rejection of the Altus Contract and the Participation Agreements, (b) an Order pursuant to 11 U.S.C. Section 1104(a)(2) appointing an operating trustee in the case of Atlas Health Care Linen Services Co., LLC d/b/a "Clarus Linen Systems" if such becomes necessary to aid in the transition to a new vendor after rejection of the Altus Contract; and (c) an Order granting Altus such other and further relief as the Court deems just and proper.

Dated:   Buffalo, New York
         February 13, 2019

                          **RUPP BAASE PFALZGRAF CUNNINGHAM LLC**
                          Attorneys for Altus Management, LLC


                          By:     /s/ Kyle C. DiDone
                                 Kyle C. DiDone, Esq.
                          1600 Liberty Building
                          Buffalo, New York 14202
                          (716) 854-3400
                          didone@ruppbaase.com