**EXHIBIT "A"**

**Constellation.**
An Exelon Company

## MASTER RETAIL NATURAL GAS SUPPLY AGREEMENT

This Master Retail Natural Gas Supply Agreement ("**Master Agreement**") is entered into as of **March 23, 2015** ("**Effective Date**") by and between **Clarus Linen Systems** ("**Customer**") and Constellation NewEnergy – Gas Division, LLC ("**CNEG**"). CNEG and Customer are sometimes referred to individually as a "**Party**" and collectively as the "**Parties**."

This Master Agreement sets forth the general terms and conditions governing transactions for the purchase and sale of natural gas and related products and services (each a "**Transaction**") to one or more of Customer's accounts or facilities (each a "**Facility**") as agreed to from time to time. Each Transaction shall be evidenced by a transaction confirmation (each a "**TC**"). The Parties may further agree to implement certain strategies or related services, the specifics of which will be set forth in a rider executed by the Parties (each a "**Rider**"). Each TC and Rider shall constitute part of and shall be subject to this Master Agreement. This Master Agreement and each TC and Rider shall constitute a single integrated agreement between the Parties (collectively referred to as the "**Agreement**"). In the event of a conflict between (i) a TC, (ii) a Rider, (iii) the terms and conditions of this Master Agreement, and (iv) any oral agreement of the Parties as to a Transaction, the terms shall govern in the priority listed in this sentence.

The Parties intend that they are legally bound by the terms of each Transaction from the moment each Party agrees to those terms, whether (i) via electronic transmission, (ii) written record, or (iii) orally. Nothing in this Agreement obligates either Party to enter into a Transaction at any time. Any applicable requirement that a Transaction be "in writing" and "signed" shall be deemed to have been satisfied by this Master Agreement, by the Parties' signatures below and their express agreement to these procedures. CNEG shall have the exclusive right to confirm any Transaction by sending Customer a written TC, substantially in the form attached hereto as Exhibit A or otherwise, by facsimile, e-mail or other means. Notwithstanding any provision to the contrary in this Master Agreement, failure to send a TC shall not invalidate a Transaction agreed to by the Parties. If CNEG sends a TC and Customer fails to object in writing to any term in the TC within two (2) Business Days, the TC shall constitute the definitive written expression of the Transaction. "**Business Day**" means any day except a Saturday, Sunday, or a Federal Reserve Bank holiday and shall open at 8:00 a.m. and close at 5:00 p.m. Eastern Prevailing Time.

1. **CNEG and Customer Obligations.**

   **Natural Gas Supply.** CNEG shall sell and supply, and Customer shall purchase and receive, the Contract Quantity for each Facility identified in a TC or Rider. "**Contract Quantity**" means the quantity of gas to be delivered and received pursuant to a TC. Such deliveries and receipts of natural gas shall be on a Primary Firm, Firm, Secondary Firm or Interruptible basis. "**Primary Firm**" means deliveries and receipts may not be interrupted without liability except for reasons of Force Majeure and CNEG will utilize primary firm capacity to receive such gas. "**Firm**" means deliveries and receipts may not be interrupted without liability except for reasons of Force Majeure regardless of the capacity type CNEG uses to receive such gas. "**Secondary Firm**" means deliveries and receipts will be on a best-efforts basis up to Customer's maximum daily quantity and performance may be interrupted without liability to the extent that one or more of the following conditions are present: (i) Force Majeure; (ii) curtailment by the local distribution company owning and/or controlling and maintaining the distribution system required for delivery of gas to the Facility(ies) (the "**Utility**"); (iii) curtailment of supply by a natural gas supplier; (iv) curtailment of storage by a storage provider; (v) curtailment of transportation by a gas gathering or pipeline company, or Utility (each a "**Transporter**"), transporting gas for CNEG or Customer downstream or upstream of the Delivery Point(s), including, but not limited to, transportation between secondary firm points; (vi) recall of transportation capacity release by its releaser; or (vii) curtailment of gas production behind a specific meter. "**Interruptible**" means deliveries and receipts may be interrupted at any time for any reason except for Customer's obligation to take and pay for gas it nominates and CNEG's obligation to honor the price set forth in the TC. The terms of any Transaction between CNEG and Customer shall be as set forth on the applicable TC, but CNEG will procure gas from its suppliers on terms CNEG deems appropriate. CNEG holds title to the gas and has the sole responsibility to deliver, or cause to be delivered, the natural gas to the applicable Delivery Point. Title shall pass to Customer at the Delivery Point and Customer shall have the sole responsibility for transporting the gas from the Delivery Point. "**Delivery Point**" means the city gate interconnection between the Utility and the upstream Transporter or such other delivery point(s) as are agreed in a TC. However, to the extent that Customer owned transportation capacity is used to deliver natural gas to the Customer, the Delivery Point shall be the receipt point of such capacity.

   **Failure to Deliver or Receive.** The sole and exclusive remedy of the Parties in the event of a breach of an obligation to deliver or receive Primary Firm, Firm or Secondary Firm gas shall be the following: (a) If CNEG fails to deliver Primary Firm, Firm or Secondary Firm gas for a reason other than Customer's breach, CNEG shall pay Customer the "**Replacement Cost**," which is the amount Customer actually pays to replace the undelivered Contract Quantity less the amount Customer would have paid under this Agreement for such Contract Quantity. (b) If Customer fails to receive Primary Firm, Firm or Secondary Firm gas for a reason other than CNEG's breach, Customer shall pay CNEG the "**Revenue Loss**," which is the amount that CNEG would have received for the sale of the unreceived Contract Quantity pursuant to this Agreement less (i) the amount actually received by CNEG in an alternate sale, plus any incremental costs, or (ii) if no alternate sale takes place, the amount CNEG would have received by reselling such Contract Quantity at spot market prices at or near the Delivery Point(s), as determined by CNEG in a commercially reasonable manner. CNEG and Customer shall exercise commercially reasonable efforts to mitigate any Revenue Loss or Replacement Cost, respectively. If the calculation of the Replacement Cost or Revenue Loss results in a negative number, then the amount shall be deemed to equal zero.

   **Nominations.** The Parties shall coordinate nomination activities, giving sufficient time to meet the deadlines of the affected Transporter(s). If Customer or the Utility fails to provide CNEG with a usage nomination for any month in a timely manner, CNEG (i) may establish a nomination for such month in a commercially reasonable manner based on Customer's historical usage data available to CNEG, and (ii) shall have the right to use and rely on such nomination unless notified otherwise by Customer or the Utility. If a Party becomes aware that actual deliveries are greater or lesser than the quantity of gas confirmed by a Transporter for movement, transportation or management, the Party shall promptly notify the other Party. Usage nominations may be made orally, in writing, by facsimile or by electronic means.

   **Imbalances.** The Parties shall use commercially reasonable efforts to avoid imposition of any fees, penalties, cash-outs, costs or charges (in cash or in kind) assessed by a Transporter for failure to satisfy balancing and/or nomination requirements ("**Imbalance Charges**"). If either Party receives an invoice from a Transporter that includes Imbalance Charges, the Parties shall determine the validity and cause of such Imbalance Charges. The Party causing the imposition of the Imbalance Charges will be responsible to pay such Imbalance Charges.

   **Operational Flow Orders.** If either Party receives an operational flow order or any other usage or operating instructions or similar notice (each an "**OFO**") from a Transporter requiring action to be taken in connection with the flow and/or consumption of gas covered by this Agreement, such Party will use commercially reasonable efforts to give notice to the other Party of such event in a timely manner. Each Party will take all commercially reasonable actions required by the OFO within the time prescribed. If OFO penalties, charges, fees, costs or expenses result from the actions or inactions of one Party, then such Party shall be solely responsible for any such penalties, charges, fees, costs or expenses. If CNEG is responsible for nominations and balancing on a Transporter imposing an OFO or similar restriction,

**Constellation**
An Exelon Company

## MASTER RETAIL NATURAL GAS SUPPLY AGREEMENT

CNEG may (but is not required to) increase or decrease nominations, as appropriate, to avoid penalties.

2. **Term of Master Agreement.** The term of this Master Agreement will commence on the Effective Date and, unless terminated earlier as provided in this Master Agreement, will continue until terminated by either Party upon thirty (30) days prior written notice to the other Party; provided any TC or Rider will continue to be governed by this Master Agreement until the TC or Rider has been separately terminated or expired.

   **Term of TC.** Each TC or Rider shall set forth the applicable "**Delivery Period**" or term during which deliveries of natural gas are to be made and/or services are to be provided. CNEG shall not be liable for any failure to enroll or drop a Facility by any applicable start and end date(s) set forth in the TC or Rider due to circumstances beyond its control.

3. **Information and Authorization.** Customer hereby authorizes CNEG to take such actions CNEG deems necessary to enroll each Facility with the Utility and to be served by CNEG and to otherwise meet CNEG's obligations under the Agreement, including executing on Customer's behalf any documents necessary to effectuate any Facility enrollment or election, undertaking the management of any storage or transportation capacity allocated to Customer by the Utility or other transporters, disposing of storage balances, adding or deleting Facility(ies) as necessary, receiving usage nominations from the Utility relating to Customer's natural gas requirements, and other similar documents. Customer's signature on this Master Agreement constitutes Customer's written authorization for CNEG to obtain from time to time from the applicable Utility all current and historical natural gas billing, usage data and other related information. Customer shall take any actions, execute any documents and shall provide to CNEG any information as CNEG may reasonably require.

4. **Billing and Payment.**

   **Billing.** Customer will be billed for natural gas usage and related products and services supplied under the Agreement in one of the following ways based on availability and eligibility of each Facility, which may change from time to time: (a) Dual Billing: Customer will receive two invoices, one from CNEG for the natural gas supply and one from the Utility for the amounts payable by Customer for services provided by the Utility ("**Delivery Charges**"); (b) CNEG Consolidated Billing: Customer will receive one invoice from CNEG that includes both the natural gas supply charges and the Delivery Charges. In the case of CNEG Consolidated Billing, Customer agrees that (i) Customer remains exclusively liable to the Utility for all Delivery Charges, (ii) CNEG has no obligation to review Delivery Charges for accuracy, (iii) should Customer dispute Delivery Charges, that is a matter for Customer and the Utility to resolve without any involvement or obligation on the part of CNEG, and (iv) CNEG may withhold any payments due to the Utility if Customer fails to pay CNEG invoices in accordance with this Master Agreement.

   **Taxes.** Customer shall pay all federal, state, municipal and local taxes, duties, fees, levies, premiums or other charges imposed by any governmental authority, directly or indirectly, on or with respect to the natural gas and related products and services provided under the Agreement, including without limitation any production, severance or ad valorem taxes, and including any taxes enacted after the Effective Date (collectively, "**Taxes**"). The term "Taxes" shall include any amounts imposed on Customer directly or on CNEG in its function as Customer's supplier, and that are associated with the supply of gas to Customer (in which case the Customer shall be responsible to reimburse CNEG for such amounts). If Customer is exempt from any Taxes, Customer shall provide CNEG with any state and/or local exemption certificate prior to the issue date of Customer's first invoice. All Taxes invoiced to Customer under this Agreement will be included on the invoice or in the applicable fixed price as allowed by Law.

   **Estimates.** CNEG's ability to invoice Customer is dependent on the Transporter's ability to furnish CNEG with all necessary information, including Customer's metered usage. When there is a delay in receiving information from the Transporter, CNEG will, to the extent necessary, estimate charges and credits for a billing period and reconcile such estimates against actual charges and credits in a future invoice(s). Each invoice is also subject to adjustment for errors in arithmetic, computation, meter readings or other errors. Interest shall not accrue on such adjustments.

   **Payment.** All amounts set forth in an invoice are payable to the Party issuing the invoice and will include, in addition to the natural gas supply charges, Delivery Charges, and Taxes, all other amounts related to the purchase and delivery of natural gas. CNEG's invoices will be sent to Customer in accordance with CNEG's normal billing cycle, as adjusted from time to time. CNEG's invoices are due and payable on the fifteenth (15th) day after the date of invoice, or such other date as set forth in a Rider (the "**Payment Date**") without offset or reduction of any kind, to the address set forth on the invoice. Invoices not paid on or before the Payment Date will accrue interest daily on outstanding amounts from the Payment Date until paid in full, at the lesser of 1.5% per month or the highest rate permitted by law.

   **Pricing Structures.** "**Contract Price**" means the price for gas as set forth in the applicable TC or Rider. To the extent (a) there are beginning of the month nominated volumes where the price is not fixed, (b) a Facility requires additional natural gas quantities in excess of the nominated or fixed quantities set forth in a TC or Rider, or (c) a Facility continues to receive natural gas from CNEG beyond the Delivery Period (where such deliveries will be considered month to month), all such natural gas will be priced at Market Price unless otherwise set forth in a TC or Rider. "**Market Price**" means a price comprised of (i) the spot commodity cost of gas as determined by CNEG in its reasonable discretion, (ii) all related interstate and intrastate pipeline charges required to deliver gas to the Delivery Point, and (iii) a reasonable market based margin. Market Price does not include any applicable Utility charges, including but not limited to Utility or pipeline balancing charges, unless otherwise agreed upon.

   **Market Disruption.** If the Contract Price is based in whole or in part upon a specified index and a Market Disruption Event occurs on a day on which the relevant source published or was to publish the relevant price, then the Parties shall negotiate in good faith to agree on an alternative method of determining the Contract Price. A "**Market Disruption Event**" is any one of the following: (a) failure of the specified index to announce or publish information necessary for determining the Contract Price; (b) the failure of trading to commence or the permanent discontinuation or material suspension of trading in the relevant options contract or commodity on the exchange or market acting as the specified index; (c) the temporary or permanent discontinuance or unavailability of the index; (d) the temporary or permanent closing of any exchange acting as the specified index; or (e) a material change in the formula for or the method of determining the relevant price component.

   **Price Locks.** Unless otherwise set forth in a TC or a Rider, Customer can request to lock in the commodity price for any month(s) at any time during the Delivery Period, prior to 12:00 p.m. EST/EDT on the final day of NYMEX last day settlement for each applicable delivery month. Commodity purchase/sale prices exclude pipeline and Utility distribution charges. Customer also has the right to lock basis at a fixed price and at predetermined volumes. Basis includes interstate and intrastate pipeline transportation but does not include the commodity cost or the Delivery Charges.

**Constellation**
An Exelon Company

## MASTER RETAIL NATURAL GAS SUPPLY AGREEMENT

5. **Adequate Assurance.** If CNEG has reasonable grounds: (i) to believe that Customer's creditworthiness has become unsatisfactory; or (ii) for insecurity with respect to Customer's performance under the Agreement, CNEG may demand, in writing, adequate assurance of future performance from Customer in an amount equal to two (2) times the cost of the highest projected monthly usage for each of Customer's Facility(ies) during the twelve (12) months immediately following CNEG's demand as determined by CNEG (collectively, the "**Assurance Amount**"). To satisfy a demand for adequate assurance, Customer shall provide the Assurance Amount in the form of a prepayment, a cash deposit, a standby letter of credit or a parental guaranty in form and substance, and from an entity, reasonably satisfactory to CNEG within three (3) Business Days of the date of the written demand for the Assurance Amount. If at any time CNEG requires Customer to prepay for gas, then (i) CNEG shall be under no obligation to deliver gas if Customer fails to pay any prepayment by its due date, and (ii) in the event the aggregate cost of any quantities of gas required by Customer in a month in excess of the scheduled nominated quantities exceeds $15,000.00, Customer shall pay CNEG the aggregate cost of such quantities within three (3) Business Days of CNEG's request for payment.

6. **Event of Default.** An "**Event of Default**" means any one of the following: (a) Customer's failure to make, when due, any payment required under the Agreement if not paid within five (5) Business Days (or such longer period required by applicable law) following written notice to Customer that a payment is past due; (b) any representation or warranty made by a Party in the Agreement is false or misleading in any material respect when made or ceases to remain true in all material respects during the term of the Agreement, if not cured within five (5) Business Days after written notice from the other Party; (c) Customer fails to provide the Assurance Amount as provided in this Agreement; (d) the failure by a Party to perform any material obligation set forth in this Agreement (other than the events that are otherwise specifically covered as a separate Event of Default hereunder or a failure to deliver or receive gas) which is not cured within five (5) Business Days after receipt of written notice thereof; or (e) a Party: (i) makes an assignment or any general arrangement for the benefit of creditors; (ii) has a liquidator, administrator, receiver, trustee, conservator or similar official appointed for it or any substantial portion of its property or assets (iii) files a petition or otherwise commences, authorizes or acquiesces in the commencement of a proceeding or cause of action under any bankruptcy, insolvency, reorganization or similar law for the protection of creditors, or has such petition filed against it; (iv) otherwise becomes bankrupt or insolvent (however evidenced); (v) is unable to pay its debts as they fall due; or (vi) is dissolved (other than pursuant to a consolidation, amalgamation or merger).

7. **Remedies Upon Event of Default.** If an Event of Default occurs with respect to a Party (the "**Defaulting Party**"), the other Party (the "**Non-Defaulting Party**") may in addition to all remedies available to it at law or in equity, in its discretion, at any time, (i) withhold any payments or suspend any deliveries hereunder and/or (ii) terminate the Agreement in whole or solely with respect to those Facility(ies) adversely affected by such Event of Default, upon written notice to the Defaulting Party setting forth the effective date of termination (the "**Early Termination Date**"). The Early Termination Date for any Facility located in New Jersey shall be no less than thirty (30) calendar days from the date of written notice of termination. Further, if Customer is the Defaulting Party, then CNEG may, without waiving any rights or remedies it may have, to the extent applicable, remove Customer from CNEG's managed balancing and/or storage pools and/or apply any storage balance at prevailing market prices as an offset against the amount owed to CNEG by Customer. If this Agreement is terminated, the Non-Defaulting Party will in good faith calculate a termination payment as set forth below and the owing Party shall pay such amount within three (3) Business Days of receipt of notice of the amount due. The Parties acknowledge and agree that any termination payment under the Agreement constitutes a reasonable approximation of harm or loss, and is not a penalty or punitive in any respect.

As of the Early Termination Date, the Non-Defaulting Party shall determine: (i) the difference between the Contract Value and the Market Value, such that the difference shall be due to the Customer if the Market Value exceeds the Contract Value and to CNEG if the opposite is the case; (ii) the Non-Defaulting Party's Costs; and (iii) the amount owed (whether or not then due) by each Party with respect to all gas delivered and received. The Non-Defaulting Party shall net or aggregate, as appropriate, any and all amounts owing between the Parties under this Section, so that all such amounts are netted or aggregated to a single liquidated amount payable by one Party to the other.

"**Costs**" means, with respect to the Non-Defaulting Party, brokerage fees, commissions and other similar transaction costs and expenses reasonably incurred by such Party as a result of the Event of Default. The "**Contract Value**" shall be the Contract Price multiplied by the amount of gas, as determined by the Non-Defaulting Party, that would have been delivered under each terminated Rider or TC, had it not been terminated early (the "**Terminated Volumes**"). The "**Market Value**" shall be the amount, as of the Early Termination Date, a third party would pay for the Terminated Volumes at the Delivery Point(s) at current market prices. The Non-Defaulting Party may determine the Market Value of a terminated transaction by reference to information either available to it internally or supplied by one or more third parties including, without limitation, any or all of the settlement prices of NYMEX gas futures contracts, quotations from leading dealers, energy swap agreements or physical gas trading markets, similar sales or purchases, and any other bona fide offers from either third parties or affiliates of the Party, all as commercially available to the Party and adjusted for the length of the term and differences in transportation costs and other factors, as the Party reasonably determines. The Non-Defaulting Party shall not be required to enter into a replacement transaction in order to determine or be entitled to a termination payment.

8. **Change in Law.** CNEG may pass through or allocate, as the case may be, to Customer any increase or decrease in CNEG's costs related to the natural gas and related products and services sold to Customer that results from the implementation of new, or changes (including changes to transportation rates) to existing, Laws, or other requirements or changes in administration or interpretation of Laws or other requirements. "**Law**" means any law, rule, regulation, ordinance, statute, judicial decision, administrative order, Transporter business practices or protocol, Transporter tariff, or rule of any commission or agency with jurisdiction in the state in which the Facility(ies) is located. Such adjusted amounts will be included in subsequent invoices to Customer.

9. **Representations and Warranties.** Each Party warrants and represents to the other (now and deemed repeated by each Party on each date on which a TC or Rider is executed or deemed accepted) that: (i) it is duly organized, validly operating and in good standing under the laws of the jurisdiction of its formation; (ii) it is authorized and qualified to do business in the jurisdictions necessary to perform under the Agreement; (iii) execution, delivery and performance of the Agreement are duly authorized and do not violate any governing documents or any of its contracts or any applicable Law; (iv) there is no material event(s) or agreement(s) which would impair that Party's right, authority or ability to execute the Agreement and otherwise perform under the Agreement; and (v) it has the knowledge and experience to evaluate the merits and risks associated with the Agreement.

Furthermore, Customer warrants, represents and covenants that: (i) the data given and representations made concerning its Facility(ies) are true and correct; (ii) it is entering into this Agreement to purchase its natural gas requirements only and not for speculative or resale purposes; and that the natural gas purchased under this Agreement will be consumed at the Facility(ies); (iii) it is the party of record of the Facility(ies), or if it is not the party of record, it has the authority to enter into and bind its principal to the Agreement; (iv) if any Transaction



## MASTER RETAIL NATURAL GAS SUPPLY AGREEMENT

hereunder gives Customer the right to adjust the Contract Quantity, or to require CNEG to provide some other quantity of gas, Customer's election to exercise such right is based predominantly on supply and demand factors related to Customer's business; and (v) if Customer is a Governmental Entity, it will not claim immunity on grounds of sovereignty or similar grounds from enforcement of the Agreement. If it is a Governmental Entity, Customer covenants to obtain all necessary budgetary approvals, appropriations and funding for all of its obligations under this Agreement, the failure of which shall not be an excuse for Governmental Entity's performance or failure to perform hereunder and upon request will provide proof of such authority. "**Governmental Entity**" means a municipality, county, governmental board, governmental department, commission, agency, bureau, administrative body, joint action agency, court or other similar political subdivision (including public school districts or special purpose district or authority), or public entity or instrumentality of the United States or one state.

10. **Force Majeure.** Notwithstanding any other provision of this Agreement, where a Party is unable to carry out any obligation under the Agreement due to a Force Majeure event (other than a payment obligation, which will not be excused for Force Majeure), the Agreement will remain in effect but such obligation will be suspended for the period necessary as a result of the Force Majeure, provided that: (i) the Claiming Party gives the other Party, as soon as possible, written notice describing the particulars of the Force Majeure; (ii) the suspension of performance is of no greater scope and of no longer duration than is required by the Force Majeure; and (iii) the Claiming Party uses commercially reasonable efforts to remedy its inability to perform. "**Force Majeure**" means an event that is not within the reasonable control of the Party claiming Force Majeure ("**Claiming Party**"), and that by the exercise of due diligence, the Claiming Party is unable to overcome the event in a commercially reasonable manner, and such event will not be deemed a breach or default under the Agreement. Force Majeure includes, but is not limited to, acts of God; fire; war; terrorism; flood; earthquake; civil disturbance; sabotage; facility failure; strike; curtailment, disruption or interruption of supply by a supplier or distribution or transportation by a Transporter (including without limitation as the result of an OFO); declaration of emergency by a Transporter(s); regulatory, administrative, or legislative action, or action or restraint by court order or governmental authority; or any act or omission of a third party not under the control of the Claiming Party (including without limitation the Utility).

11. **Indemnification; Limitations.** Before title passes to Customer at the Delivery Point CNEG shall, and after title passes at the Delivery Point Customer shall, defend, indemnify and hold harmless the other Party and all its affiliates, and all of their respective officers, directors, shareholders, associates, employees, agents, representatives, successors and assigns, from and against all claims, losses, expenses (including reasonable attorneys' fees and court costs), damages, demands, judgments, causes of action or suits of any kind, including but not limited to, claims for personal injury, death, or property damage, to the extent arising out of or related to this Agreement ("**Claims**"). NOTWITHSTANDING ANY OTHER PROVISION OF THE AGREEMENT TO THE CONTRARY, THE ENTIRE LIABILITY OF EACH PARTY FOR ANY AND ALL CLAIMS WILL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY, SUBJECT IN ALL CASES TO AN AFFIRMATIVE OBLIGATION ON THE PART OF EACH PARTY TO MITIGATE ITS DAMAGES, AND NEITHER PARTY WILL BE LIABLE FOR ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES, INCLUDING, WITHOUT LIMITATION, LOST OPPORTUNITIES OR LOST PROFITS NOT CONTEMPLATED BY SECTION 7 ABOVE. Customer acknowledges and agrees that the Utility is exclusively responsible for the gas distribution and delivery system, that CNEG has no independent control over their systems and will have no liability for any of their acts or omissions.

12. **DISCLAIMER.** CUSTOMER ACKNOWLEDGES AND AGREES THAT NO WARRANTY, DUTY, OR REMEDY, WHETHER EXPRESSED, IMPLIED, OR STATUTORY, IS GIVEN OR INTENDED TO ARISE OUT OF THIS AGREEMENT EXCEPT AS OTHERWISE EXPRESSLY STATED HEREIN, AND CNEG SPECIFICALLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE.

13. **Waiver and Severability.** Failure to provide notice of, or object to, any default under this Agreement will not operate or be construed as a waiver of any future default, whether like or different in character. If any portion of this Agreement, or application thereof to any person or circumstance, is held legally invalid, the remainder will not be affected and will be valid and enforced to the fullest extent permitted by law and equity, and there will be deemed substituted for the invalid provisions such provisions as will most nearly carry out the mutual intent of the Parties as expressed in this Agreement to the fullest extent permitted by applicable Law; provided, however, that this severability provision will not be applicable if any provision of Sections 6 and 7 of this Master Agreement (or any definition or provision in this Agreement to the extent it relates to, or is used in connection with, such sections) is held invalid or unenforceable.

14. **Assignment.** Customer may assign all its rights and obligations under this Agreement; *provided* (a) it gives CNEG forty-five (45) days prior written notice of its intent to do so; (b) the assignee satisfies in full CNEG's credit requirements; (c) the assignee assumes in writing all of Customer's obligations under the Agreement; and (d) Customer continues to be liable for performance, including payment for goods and services received, prior to the assignment date. CNEG may assign, sell, pledge, transfer, or encumber any of its rights and obligations under this Agreement or the accounts, revenues, or proceeds hereof to: (a) a bank, insurer or other financial institution; or (b) any person or entity (i) succeeding to all or substantially all of CNEG's assets or business or the division or region of CNEG to which this Agreement relates or (ii) into which CNEG is merged or otherwise combined or reorganized; provided (with respect to this clause (b)) the succeeding entity agrees to be bound to the Agreement; or (c) any affiliate of CNEG.

15. **Confidentiality.** Each Party agrees to keep all terms and provisions of this Agreement and all communication provided in connection with this Agreement, including the pricing offered to Customer, confidential to the extent not otherwise publicly available and not to disclose them to any third parties without the prior written consent of the other Party, except as necessary to perform its obligations under this Agreement or as otherwise required by Law. Each Party may disclose such information to its affiliates and to its affiliates' employees, agents, advisors, and on a need to know basis, to its independent contractors, provided each such recipient agrees to hold such information in the strictest confidence. CNEG may disclose information respecting Customer to third parties that are representing Customer in the purchase of gas or related services. Furthermore, CNEG may make such other disclosures to third parties of information, including aggregate consumption data, provided they are in a manner that cannot be reasonably expected to specifically identify Customer. If disclosure of confidential information is sought through a court, or a state or federal regulatory agency or other legal compulsion, the Party receiving such request will notify the other Party immediately to afford it the opportunity to oppose such disclosure via a protective order or other relief as may be available and will provide reasonable support.

16. **Choice of Law, Venue, Attorney Fees and Expenses.** This Agreement will be governed and interpreted in accordance with the laws of the State of New York, without giving effect to conflict of law principles. TO THE EXTENT ALLOWED BY APPLICABLE LAW, EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY OR TO INITIATE OR BECOME A PARTY TO ANY CLASS ACTION CLAIMS IN RESPECT OF ANY ACTION, SUIT OR PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY



## MASTER RETAIL NATURAL GAS SUPPLY AGREEMENT

THIS AGREEMENT. If either Party pursues court action to enforce its rights under this Agreement, the non-prevailing Party shall promptly reimburse the prevailing Party for all its reasonable attorney fees, expenses and costs.

17. **Notices.** To be effective, all notices must be in writing delivered by hand, by certified mail return receipt requested, by first class mail, or express carrier to the addresses provided in this Agreement. CNEG shall send invoices and TCs to the notice address provided herein unless otherwise directed by Customer. Notice by hand delivery shall be effective on the date it is delivered. Notice by certified mail, return receipt requested, by first class mail, or express carrier shall be effective on the date that mail is delivered or its delivery is attempted. A Party may change its address by providing notice of change in accordance herewith or by other means agreed by the Parties.

18. **Miscellaneous.** The Agreement embodies the Parties' entire agreement and understanding and may not be contradicted by any prior or contemporaneous oral or written agreement. Notwithstanding any provision to the contrary in a prior agreement, the Parties agree that this Master Agreement shall supersede and replace all prior written and oral agreements or arrangements between the Parties with respect to the purchase and sale of gas and related services and that all transactions under any such prior agreement(s) are, as of the Effective Date, now governed solely by the terms of this Master Agreement and shall be Transactions hereunder and a part of the single integrated agreement between the Parties. A facsimile or e-mailed copy of either Party's signature will be considered an original for all purposes under this Agreement, and each Party will provide its original signature upon request. No purchase order, or any amendment or edit to this Agreement, will be valid or given any effect unless signed by both Parties or expressly contained in a TC deemed accepted pursuant to the procedures set forth herein. The applicable provisions of this Agreement will continue in effect after termination or expiration hereof to the extent necessary, including but not limited to providing for final billing, billing adjustments and payments, limitations of liability, the forum and manner of dispute resolution, and with respect to any indemnification obligations under the Agreement. The section headings used in this Master Agreement are for reference purposes only and will in no way affect the meaning of the provisions of the Master Agreement. The Parties acknowledge that any document generated by the Parties with respect to this Agreement, including this Agreement, may be imaged and stored electronically and such imaged documents may be introduced as evidence in any proceeding as if such were original business records and neither Party shall contest their admissibility as evidence in any proceeding. The rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by Law. CNEG shall have the right to set-off and net against any amounts owed to it under the Agreement, including without limitation any early termination payment, any amounts owed by CNEG to Customer under the Agreement or any other agreement between the Parties, including without limitation any Assurance Amounts. Except for Section 11 above, no third party will have any rights under this Agreement whatsoever and Customer will be fully responsible for any compensation owing any third party representing Customer in connection with this Agreement and will indemnify, defend and hold harmless CNEG from all related Claims. Customer further authorizes CNEG to utilize Customer's name for publicity and marketing purposes.

19. **Affirmation; Acknowledgements.** Customer affirms that it has read this Agreement in its entirety and it agrees to the terms and conditions contained herein. Any ambiguity or question of intent or interpretation under this Agreement will be construed as if drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring either Party by virtue of the authorship of any of the provisions of this Agreement. The Parties acknowledge and agree that: (i) CNEG is an independent contractor under this Agreement and except as otherwise explicitly provided in this Agreement, neither Party has the authority to execute documents that purport to bind the other, and nothing in this Agreement will be construed to constitute a joint venture, fiduciary relationship, partnership or other joint undertaking; (ii) TCs and Riders entered into hereunder will constitute "forward contracts" and/or "swap agreements" under the U.S. Bankruptcy Code, as amended, the rights of the Parties under Section 7 above will constitute contractual rights to liquidate them, and the Parties are entities entitled to the rights and protections afforded to "forward contracts" and "swap agreements" by the U.S. Bankruptcy Code; (iii) CNEG is not Customer's consultant or advisor for any purpose including advice regarding the value or advisability of trading in "commodity interests" as defined in the Commodity Exchange Act, 7 U.S.C. §§ 1-25, et seq., as amended (the "CEA"), including futures contracts and commodity options or any other activity which would cause CNEG or any of its affiliates to be considered a commodity trading advisor under the CEA; (iv) each Party is an "eligible contract participant" as that term is defined in the CEA; and (v) Customer is making its own decisions based solely upon its own analysis and the advice of its own advisors, if any.

IN WITNESS WHEREOF, the Parties have executed this Master Agreement through their duly authorized representatives as of the date set forth above.

| Constellation NewEnergy – Gas Division, LLC | Clarus Linen Systems |
|---|---|
| By: *(signed)* | By: *(signed)* |
| Name: Daniel Marks | Name: KEVIN NOWAK |
| Title: Director, Retail Gas Operations | Title: OPERATIONS MGR |

Notice Information
9960 Corporate Campus Drive, Suite 2000
Louisville, KY 40223
Phone: (502) 426-4500
Facsimile: (502) 214-6381

Notice Information
Attention: Rick Swantner    Title: Account Manager
Address: 811 Town & Country Blvd, Suite 300, Houston, TX 77024-3997
Phone: (832) 431-3063    Facsimile: (832) 431-3070
Email: rswantner@gmail.com

For Invoices (if different from Notice Information)
Attention:    Title:
Address:
Phone:    Facsimile:
Email:

For Transaction Confirmations (if different from Notice Information)
Attention:    Title:
Address:
Phone:    Facsimile:
Email:

**MASTER RETAIL NATURAL GAS SUPPLY AGREEMENT**



### EXHIBIT A – FORM OF TRANSACTION CONFIRMATION*

*The actual Transaction Confirmation entered into between Customer and CNEG may differ from this form to reflect state regulatory and other local requirements and terms applicable to the Facility. This Form of Transaction Confirmation is for illustrative purposes only and CNEG reserves the right to alter its form of Transaction Confirmation at any time.

This Transaction Confirmation is delivered pursuant to and in accordance with a Master Retail Natural Gas Supply Agreement effective _____, 20\_\_ (the "Master Agreement"), by and between Constellation NewEnergy – Gas Division, LLC ("CNEG") and _____ ("Customer"), and is subject to and made part of the terms and conditions of such Master Agreement. Capitalized terms used herein but not defined will have the meanings ascribed to them in the Master Agreement.

Trade Date:

Facility Name:

Delivery Period:

Deal Type:

Nature of Parties' Obligation:

Contract Quantity/Price:

| Month/Yr | Contract Quantity (in MMBtu) | Contract Price |
|---|---|---|
|   |   |   |
|   |   |   |

US$ Rounded to four decimal places
Plus applicable taxes

Incremental Pricing:

Delivery Point(s):

Utility:

Default Service: To the extent a Facility continues to receive gas from CNEG beyond the Delivery Period, all such gas will be considered month to month purchases and will be priced at the Market Price.

Special Provisions:


This Transaction Confirmation documents a Transaction previously reached by authorized representatives of the Parties. It is binding and shall be deemed accepted as the definitive expression of the Transaction unless disputed by Customer in writing within two (2) business days of CNEG's execution date.

| CONSTELLATION NEWENERGY – GAS DIVISION, LLC | CUSTOMER |
|---|---|
| By: _____ | By: \_\_\_\_SAMPLE_____ |
| Name: _____ | Name: \_\_NOT FOR EXECUTION_____ |
| Title _____ | Title _____ |
| Date: _____ | Date: _____ |

DocuSign Envelope ID: 2C9B6DE5-4C72-4A48-9ADF-AE2D088EBB28



## Constellation
An Exelon Company

| Account Manager: | Gibler, Jordanne<br>(712) 256-0528<br>jordanne.gibler@constellation.com | DEAL NO. 734585 |

### Transaction Confirmation

This Transaction Confirmation is delivered pursuant to and in accordance with a gas supply agreement ("Gas Supply Agreement"), effective **3/23/2015**, by and between Constellation NewEnergy-Gas Division, LLC ("Constellation") and Clarus Linen Systems ("Customer"), and is subject to and made part of the terms and conditions of such Gas Supply Agreement.

**Trade Date:** 11/19/2018

**Buyer:** Clarus Linen Systems

**Seller:** Constellation NewEnergy - Gas Division, LLC (CNEGAS)

**Facility Name:** Clarus Linen Systems - SC 1124985001 SC

**Delivery Period:** 1/1/2019 - 12/31/2019 (inclusive)

**Nature of Obligation:** Firm - "Firm" means deliveries and receipts may not be interrupted without liability except for reasons of Force Majeure regardless of the capacity type Constellation uses to receive such gas.

**Deal Type:** Physical Basis

**Contract Quantity/Price:**

Year 2019

| Contract Month | Fixed Amount (MMBtu) | Price |
|---|---|---|
| January | 6,161.0 | $1.25000 |
| February | 5,524.0 | $1.25000 |
| March | 5,671.0 | $1.25000 |
| April | 5,273.0 | $1.25000 |
| May | 5,136.0 | $1.25000 |
| June | 4,532.0 | $1.25000 |
| July | 4,597.0 | $1.25000 |
| August | 4,801.0 | $1.25000 |
| September | 4,324.0 | $1.25000 |
| October | 5,152.0 | $1.25000 |
| November | 5,908.0 | $1.25000 |
| December | 6,131.0 | $1.25000 |

US$ Rounded to five decimal places
Plus applicable taxes

The price referenced herein is inclusive of fuel to the delivery point.

The price referenced herein represents basis only and does not include any applicable commodity price. For the fixed quantities and Delivery Period shown herein, if Customer has not otherwise locked the commodity price for a specific month, the commodity price shall be the NYMEX last day settle price for that month.

© 2018 Constellation Energy Resources, LLC. The offerings described herein are those of either Constellation NewEnergy-Gas Division, LLC or Constellation NewEnergy, Inc., affiliates of each other and ultimate subsidiaries of Exelon Corporation. Brand names and product names are trademarks or service marks of their respective holders. All rights reserved. Errors and omissions excepted.

## Constellation
An Exelon Company

**Incremental Pricing:** For all additional quantities required by Customer, in excess of the fixed quantities listed herein in combination with any other nominated quantities each month, the price shall be based on the monthly arithmetic average of the Platts Gas Daily "Final Daily Price Survey" Midpoint for the applicable index plus $0.29000/MMBtu.

For any gas quantities bought back from Customer by Constellation due to Customer's requirements being less than the fixed quantities listed herein in combination with any other nominated quantities, the price shall be based on the monthly arithmetic average of the Platts Gas Daily "Final Daily Price Survey" Midpoint for the applicable index minus $-0.08000/MMBtu.

Applicable Platts Gas Daily Index = Transco, zone 5 del. (Monthly Average)

Should an operational flow order, or other utility or pipeline restrictions occur, Constellation will attempt to adjust Customer's daily nomination to match expected usage as determined by Constellation. The pricing of incremental volumes associated with the nomination adjustment will be based on then current spot market price, as determined by Constellation in its reasonable discretion.

If Constellation and Customer have previously entered into any commodity transaction(s) for the Facility (the "Previous Transaction") that overlap one or more of the delivery months covered in this Transaction Confirmation (the "Overlapping Month(s)"), the incremental gas pricing in this Transaction Confirmation shall apply to the Overlapping Months instead of any conflicting incremental gas pricing associated with the Previous Transaction.

**Pipeline:** TRANSCO

**Delivery Point(s):** PNG SC

**Utility:** PIEDMONT

**LDC Account No(s):** 4-0011-2498-5001

Seller's planned billing method for this facility is to bill Buyer based on: Actual Consumption

**Default Service :** Should Constellation continue to deliver to Customer beyond the term of this Transaction Confirmation, said deliveries will be made for successive 12 month terms (each an "Extension Term"), until terminated by either party by giving written notice of termination not less than 30 days prior to the expiration of the then-current Extension Term. Each month, the default price (the "Evergreen Price") will equal the applicable published index, plus transportation, fuel and any other charges associated with the delivery of gas to the Delivery Point. Unless otherwise provided by Customer, Constellation will determine Customer's monthly nomination in a commercially reasonable manner based upon Customer's historical usage data.

(SIGNATURE BLOCKS FOLLOW ON NEXT PAGE)

© 2018 Constellation Energy Resources, LLC. The offerings described herein are those of either Constellation NewEnergy-Gas Division, LLC or Constellation NewEnergy, Inc., affiliates of each other and ultimate subsidiaries of Exelon Corporation. Brand names and product names are trademarks or service marks of their respective holders. All rights reserved. Errors and omissions excepted.

DocuSign Envelope ID: 2C9B6DE5-4C72-4A48-9ADF-AE2D088EBB28

# Constellation
An Exelon Company

This Transaction Confirmation documents an agreement previously reached by authorized representatives of the parties. Unless disputed by Customer in writing within two (2) business days of Constellation's execution date, or such other time frame as specified in the Gas Supply Agreement, it is binding and shall be deemed accepted.

Please return via the DocuSign E-Signature process or email to CNEGTransactionConfirmations@Constellation.com.

| Constellation NewEnergy-Gas Division, LLC | Clarus Linen Systems |
|---|---|
| By: *David T Donat* (signature) | By: *(signature)* |
| Name: David T. Donat | Name: JOHN REDIND |
| Title: Vice President | Title: CEO |
| Date: 11/26/2018 1:12:09 PM | Date: 11/20/18 |

Customer ID RG-213974
Contract No. CNEG17235
Deal No. 734585

© 2018 Constellation Energy Resources, LLC. The offerings described herein are those of either Constellation NewEnergy-Gas Division, LLC or Constellation NewEnergy, Inc., affiliates of each other and ultimate subsidiaries of Exelon Corporation. Brand names and product names are trademarks or service marks of their respective holders. All rights reserved. Errors and omissions excepted.