Date of Hearing to Approve Bid Procedures: March 18, 2019
Hearing Time: 1:00 p.m.
Hearing Place: Syracuse, New York
Objection Deadline: March 18, 2019

Date of Hearing to Approve Sale: April 17, 2019
Hearing Time: 1:00 p.m.
Hearing Place: Syracuse, New York
Objection Deadline: April 16, 2019; 12:00 p.m.

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case Nos. |
| CENTERSTONE LINEN SERVICES, LLC, | 18-31754 (main case) |
| ATLAS HEALTH CARE LINEN SERVICES CO., LLC, | 18-31753 |
| ALLIANCE LAUNDRY & TEXTILE SERVICE, LLC, | 18-31755 |
| ALLIANCE LAUNDRY AND TEXTILE SERVICE OF | 18-31756 |
| ATLANTA, LLC, and | |
| ALLIANCE LTS WINCHESTER, LLC | 18-31757 |
| *d/b/a Clarus Linen Systems*[1], | |
| | Chapter 11 Cases |
| Debtors. | Jointly Administered |

**MOTION BY DEBTORS CENTERSTONE LINEN SERVICES, LLC d/b/a CLARUS
LINEN SYSTEMS AND ATLAS HEALTH CARE LINEN SERVICES CO., LLC d/b/a
CLARUS LINEN SYSTEMS FOR ORDERS (A) (I) AUTHORIZING THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL
LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, SUBJECT TO THE TERMS
OF THE ASSET PURCHASE AGREEMENT AND SUBJECT TO HIGHER AND/OR
BETTER OFFERS; (II) AUTHORIZING AND APPROVING THE FORM OF CERTAIN
ASSET PURCHASE AGREEMENT WITH LINEN NEWCO LLC; AND (III)
AUTHORIZING THE DEBTORS TO CONSUMMATE ALL TRANSACTIONS
RELATED TO THE PROPOSED SALE; (B) APPROVING BIDDING PROCEDURES
AND OTHER RELATED RELIEF; AND (C) AUTHORIZING THE DEBTORS TO
ASSUME CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND
ASSIGN SUCH CONTRACTS AND LEASES TO PURCHASER LINEN NEWCO LLC**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Centerstone Linen Services, LLC d/b/a Clarus Linen Systems (5594) ("Centerstone"); Atlas Health Care Linen Services Co., LLC d/b/a Clarus Linen Systems (2681) ("Atlas"); Alliance Laundry & Textile Service, LLC d/b/a Clarus Linen Systems (8284) ("Alliance"); Alliance Laundry and Textile Service of Atlanta, LLC d/b/a Clarus Linen Systems (4065) ("Atlanta"); and Alliance LTS Winchester, LLC d/b/a Clarus Linen Systems (0892) ("Winchester").

Debtors Centerstone Linen Services, LLC d/b/a Clarus Linen Systems ("Centerstone") and Atlas Health Care Linen Services Co., LLC d/b/a Clarus Linen Systems ("Atlas"), debtors and debtors in possession (the "Debtors") in the above-referenced cases, by and through their undersigned counsel, hereby move this Court (this "Motion") for entry of Orders pursuant to sections 105, 363 and 365 of title 11 of the United States Code (as amended, the "Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"): (A)(i) authorizing the sale of substantially all of the Debtors' assets, as set forth herein, to Linen Newco LLC ("Purchaser"), free and clear of all liens, claims, interests and encumbrances, subject to the terms of that certain Asset Purchase Agreement dated as of March__, 2019, which is attached hereto as **Exhibit A** (the "Purchase Agreement"), and subject to higher and better offers; (ii) authorizing and approving the Purchase Agreement; and (iii) authorizing the Debtors to consummate all transactions related to the proposed sale; (B) approving the Bidding Procedures and granting other relief; and (C) authorizing the Debtors to assume certain executory contracts and unexpired leases and to assign such contracts and leases to the Purchaser pursuant to sections 365(a), (b) and (c) of the Bankruptcy Code and Bankruptcy Rule 6006(e)(1). In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2. The statutory and rule-based predicates for the relief requested herein are sections 105, 363 and 365 of the Bankruptcy Code and Rule 6004 of the Bankruptcy Rules.

3296290.2

## BACKGROUND[2]

3.        On December 19, 2018 (the "Petition Date"), Atlas and its affiliates, Centerstone

Linen Service, LLC, d/b/a Clarus Linen Systems, Alliance Laundry & Textile Service, LLC,

d/b/a Clarus Linen Systems, Alliance Laundry and Textile Service of Atlanta, LLC d/b/a Clarus

Linen Systems and Alliance LTS Winchester, LLC d/b/a Clarus Linen Systems filed separate,

voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the Court,

commencing chapter 11 cases (the "Chapter 11 Cases").  The Debtors remain in possession of

their respective assets and continue to operate their businesses as debtors in possession pursuant

to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a

trustee or examiner has been made in these Chapter 11 Cases.

4.        On December 20, 2018, the Court entered Orders directing the joint

administration of the Chapter 11 Cases pursuant to Rule 1015(b) of the Bankruptcy Rules.

5.        On January 10, 2019, the Office of United States Trustee appointed an Official

Committee of Unsecured Creditors (the "Committee")  pursuant to 11 U.S.C. §§ 1102(a) and (b).

6.        Centerstone is a closely-held Delaware limited liability company with a principal

office and place of business located at 60 Grider Street, Buffalo, New York 14215.  It is the

corporate parent of four subsidiary corporations:  Atlas, Alliance, Atlanta and Winchester.

Centerstone provides back-office and administrative support for its subsidiaries and is the entity

into whose bank account all accounts receivable collected by the Debtors are deposited and from

which all operating cash is disbursed to the operating subsidiaries.

---

[2] A more detailed factual background relating to the commencement of these Chapter 11 Cases is set forth in the Affidavit of John J. Giardino in Support of Chapter 11 Petitions and First Day Motions sworn to on the 19th day of December, 2018 [Dkt. No. 12] (the "Giardino Affidavit") filed in these Chapter 11 Cases and incorporated herein by reference. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Giardino Affidavit.

3296290.2

7.    Atlas is a Delaware limited liability company that currently operates two linen rental and commercial laundry facilities at the following locations:   (i) 414 Taylor Street, Syracuse, New York 13202 (the "Syracuse Facility") and (ii) 60 Grider Street, Buffalo, New York 14215 (the "Buffalo Facility").  Atlas previously operated two other facilities located at (i) 3 East Industrial Parkway, Troy, New York 12180 that ceased operating on December 14, 2018 and (ii) 304 Jumonville Street, Pittsburgh, Pennsylvania 15219 that closed in December 2017.

8.    The Syracuse Facility consists of a 75,000 square foot plant with a current capacity of 400,000 pounds of linen per week that services numerous regional customers including six major customers (five hospitals and a rehabilitation center) that accounted for approximately $4.3 million in revenue in 2017.   The gross revenue earned at the Syracuse Facility totaled $12,586,000.00 in 2017.  This Facility has approximately 157 active employees, and approximately 149 are hourly wage earners and the remaining 8 are salaried personnel.  The workforce at the Syracuse Facility is unionized and Atlas is a party to three Collective Bargaining Agreements covering the Syracuse employees:  (i) the Rochester Regional Joint Board, Local 2607 (101 production employees – Agreement is currently under extension); (ii) the Teamsters, Local Union 182 (8 engineering/maintenance employees – Agreement expired on June 30, 2018); and (iii) the Teamsters, Local Union 294 (21 drivers – Agreement expires on September 30, 2019).  Atlas is also a member of the respective Multi-Employer Pension Plans for those three unions.  Atlas owns all of the personal property assets located at the Syracuse Facility; however, the Syracuse Facility is leased from landlord ACN Companies, LLC ("ACN Companies"). All of the Purchased Assets located at the Syracuse Facility are the "Syracuse Assets".

4

9.    The Buffalo Facility consists of a 56,445 square foot plant with a current capacity of 450,000 pounds of linen per week that services numerous regional customers including five major customers (three hospitals and two regional medical centers) that accounted for approximately $5.5 million in revenue in 2017.  The gross revenue earned at the Buffalo Facility totaled $11,531,000.00 in 2017.  This Facility has approximately 150 active employees, and approximately 141 are hourly wage earners and the remaining 9 are salaried personnel.  The workforce at the Buffalo Facility is unionized and Atlas is a party to two Collective Bargaining Agreements covering the Buffalo employees:   (i) the International Union of Operating Engineers, Local 17-17S AFL-CIO (6 engineering/maintenance employees – Agreement expires on April 12, 2019) and (ii) the Rochester Regional Joint Board, Local 51 (96 production employees – Agreement expires on October 31, 2019).  Atlas is also a member of the respective Multi-Employer Pension Plans for those two unions.

10.    Nearly all of the operating equipment located at the Buffalo Facility is leased by Centerstone and Atlas from lessor 60 Grider, LLC[3] pursuant to a lease dated July , 2013 (the "Buffalo Equipment Lease").  The Buffalo Equipment Lease expires on December 31, 2020. Centerstone and Atlas also lease the Buffalo Facility from 60 Grider, LLC pursuant to a lease agreement dated December 1, 2013 that expires December 31, 2023 (the "Buffalo Facility Lease"). The Purchased Assets owned by Atlas, and not leased from 60 Grider, LLC, located at the Buffalo Facility are the "Buffalo Assets".

11.    Centerstone owns certain office furniture, fixtures and equipment located at its administrative offices at 60 Grider Street, Buffalo, New York 14215. These assets are included in the Purchased Assets as the "Office Assets".

---

[3] Chief Executive Officer John J Giordino owns a 100% membership interest in 60 Grider, LLC.

3296290.2

12.     The Debtors sought relief under chapter 11 of the Bankruptcy Code to implement the sale of their businesses as going concerns pursuant to section 363 of the Bankruptcy Code. The Debtors seek this relief in light of their financial inability to continue operating their businesses, and their desire to sell their businesses to a qualified purchaser as going concerns for the benefit of their creditors.

13.     In furtherance of this goal, on March 13, 2019, the Debtors entered into the Purchase Agreement with the Purchaser, pursuant to which the Purchaser proposes (i) to purchase substantially all of the Debtors' assets, with the possible exception of such other assets designated as Excluded Assets in Section 2.3 and on Schedule 2.3(i) of the Purchase Agreement, (the "Purchased Assets"), free and clear of all liens, claims, interests and encumbrances[4], and (ii) to assume certain liabilities, including cure obligations listed on Schedule 2.4(c) that are owed under the Assigned Contracts (defined below in Paragraph 14(b)(iv)) pursuant to section 365(b)(1) of the Bankruptcy Code, in exchange for the payment of an aggregate purchase price of $5,150,000.00, comprising (i) Cash at Closing in the amount of $3,000,000.00, (ii) a subordinated note payable to HSBC Bank USA, National Association ("HSBC Bank") in the amount of $1,000,000.00 secured by a second priority lien on Purchaser's machinery, general equipment and linen inventory, and (iii) $1,150,000.00 of accounts receivable collections, payable by (a) a promissory note payable to HSBC Bank in the amount of $700,000.00 irrespective of actual accounts receivable collected, and (b) $450,000.00 payable to HSBC Bank from the collection of accounts receivable using the Purchaser's best collection efforts. The

---

[4] The Purchased Assets and Excluded Assets are more specifically defined in Sections 2.1 and 2.3 of the Purchase Agreement, respectively, and the corresponding Schedules thereto.

3296290.2

Purchase Agreement also contemplates the assumption and assignment of Assigned Contracts to

the Purchaser, and is subject to higher and better offers and to the approval of this Court.

**RELIEF REQUESTED**

14.    By this Motion, the Debtors seek the entry by this Court of two orders:

    (a)    first, an order (the "<u>Bidding Procedures Order</u>"), a proposed form of which (without exhibits) is attached hereto as **Exhibit B**:

        i.    providing a process for interested bidders to submit competing offers with respect to the Purchased Assets;

        ii.    approving the form and manner of the Notice of Auction and Sale Hearing (as defined below) and the Notice of Assumption and Assignment (as defined below);

        iii.    setting a deadline and approving requirements and procedures for interested parties to submit any competing bids for the Purchased Assets (the "Bidding Procedures");

        iv.    approving the Purchaser as the "stalking horse" purchaser, with certain bid protections as required by the Purchase Agreement, and approving the form of Purchase Agreement;

        v.    authorizing an auction sale of the Purchased Assets, if necessary; and

        vi.    setting a final hearing date (the "<u>Sale Hearing</u>") to approve the sale of the Purchased Assets to the bidder (the "<u>Successful Bidder</u>") submitting the highest or otherwise best offer (the "<u>Successful Bid</u>") acceptable to the Debtors, HSBC Bank, and the Committee.

    (b)    second, the Debtors request the entry of an order (the "<u>Sale Order</u>"):

        i.    authorizing and approving the Successful Bid on substantially the terms and conditions set forth in the Purchase Agreement, or such other terms and conditions as may be acceptable to the Debtors in consultation with HSBC Bank and the Committee;

        ii.    authorizing the sale of the Purchased Assets to the Successful Bidder;

        iii.    authorizing the Debtors to consummate the sale of the Purchased Assets to the Successful Bidder; and

3296290.2

iv.    authorizing the Debtors to assume certain identified executory contracts and unexpired personal property leases (the "<u>Assigned Contracts</u>") and to assign such Assigned Contracts to the Successful Bidder.

## PROPOSED SALE OF THE PURCHASED ASSETS

15.    The Debtors have determined that it is in the best interests of their estates, their creditors, their employees, their customers and other parties in interest to sell the Purchased Assets. The Debtors' management believes that the approval of the sale is critical to preserving the value of the Purchased Assets for the benefit of all creditors, and it is necessary to inform the Debtors' customers about their contracts on a go-forward basis.

## A.    The Purchase Agreement

16.    The extensive good faith negotiations between the Debtors and the Purchaser culminated in the Purchase Agreement, which contemplates the sale of the Purchased Assets in a single integrated transaction. The salient terms of the Purchase Agreement are as follows:[5]

(a)    <u>The Parties</u>. The Debtors as "<u>Seller</u>" and Linen Newco, LLC as "<u>Purchaser</u>."

(b)    <u>The Purchased Assets</u>. The Purchased Assets to be sold pursuant to the Purchase Agreement are listed in Section 2.1 and Schedule 2.1(a) of the Purchase Agreement and consist of substantially all of the assets owned by the Seller, with the exception of the assets designated as Excluded Assets in Section 2.3 of the Purchase Agreement. The Purchaser will also assume certain liabilities of the Seller, as set forth in Section 2.4 and on Schedule 2.4(c) of the Purchase Agreement (the "<u>Assumed Liabilities</u>").

(c)    <u>Purchase Price</u>. The aggregate purchase price for the Purchased Assets shall be $5,150,000.00, comprising of (i) Cash at Closing in the amount of $3,000,000.00, (ii) a subordinated note payable to HSBC Bank in the amount of $1,000,000.00 secured by a second priority lien on Purchaser's machinery, general equipment and linen inventory, and (iii) $1,150,000.00 of accounts receivable collections, payable by (a) a promissory note

---

[5] The following description of the terms of the Purchase Agreement is intended solely to provide the Court and interested parties with a brief overview of the terms thereof. All capitalized terms not otherwise defined herein have the meaning set forth in the Purchase Agreement. In the event of any inconsistency between the terms as described in this Motion and the Purchase Agreement, the Purchase Agreement will control.

3296290.2

payable to HSBC Bank in the amount of $700,000.00 irrespective of actual accounts receivable collected, and (b) $450,000.00 payable to HSBC Bank from the collection of accounts receivable using the Purchaser's best collection efforts.

(d)    Expense Reimbursement. In the event that the Court approves, and the Seller consummates, a sale of the Purchased Assets to a competing bidder, Seller shall pay to the Purchaser an expense reimbursement (the "Expense Reimbursement") of up to $50,000.00 from the sale proceeds.

(e)    Conditions. The proposed sale is subject to several conditions set forth in Article VIII of the Purchase Agreement, including, but not limited to, the following: (i) the Purchaser obtaining a commitment for a bridge and working capital loan at market rates and terms in the aggregate amount necessary no later than two days prior to the Bid Deadline (defined below); (ii) the negotiation of a lease for the Syracuse Facility no later than two days prior to the Bid Deadline; (iii) the completion of due diligence in accordance with Paragraph 6.8 of the Purchase Agreement; (iv) performance of covenants and agreements in the Purchase Agreement; (v) approval by this Court pursuant to an order in form acceptable to Purchaser; and (vi) receipt of all necessary consents, approvals and permits from third parties necessary to operate the Purchased Assets and convey the Purchased Assets free and clear of all liens.

(f)    Termination.    The Purchase Agreement terminates under certain circumstances set forth in Section 12.1 of the Purchase Agreement, including, but not limited to, the following: (i) by mutual written consent of Seller, Purchaser, and HSBC Bank; (ii) by either party, based upon a material breach by another party; (iii) by Purchaser, if Seller shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in the Purchase Agreement; or (iv) by Seller, if Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in the Purchase Agreement.

(g)    Higher and Better Offers. As set forth in further detail below, the Sale of the Purchased Assets is subject to the submission by third parties of higher or better offers.

## B.    Proposed Bidding Procedures

17.    In an effort to ensure that the highest value is obtained for the Purchased Assets, the Debtors propose that the Bidding Procedures, which are intended to maximize the value of the Purchased Assets, should govern the submission of competing bids for the Purchased Assets.

3296290.2

18.    The salient terms of the Bidding Procedures attached hereto as **Exhibit C** may be

summarized as follows:

(a)    Purchased Assets:  The Purchased Assets to be sold are substantially all of the Debtors' assets, with the exception of the assets designated as Excluded Assets in Section 2.3 of the Purchase Agreement.  The Purchased Assets will be offered for sale, (i) as a single integrated transaction, and (ii) in two separate lots of either (a) the Buffalo Assets and the Office Assets, or (b) the Syracuse Assets.  The highest and best aggregate bid for the Purchased Assets will be deemed the Successful Bid.

(b)    Qualified Bid / Qualified Bidders:  In order to ensure that only bidders with serious interest in purchasing the Purchased Assets participate in the bidding process, the Bidding Procedures provide for certain minimal requirements for a potential bidder to become a "Qualified Bidder" and for a bid to purchase the Purchased Assets to be a "Qualified Bid", including:

(i)    The execution of a confidentiality agreement;

(ii)    Providing the Debtors with certain financial assurances regarding the bidder's ability to close a transaction;

(iii)    Submission of a purchase agreement marked to show changes from the Purchase Agreement with Purchaser;

(iv)    A purchase offer in excess of the Purchase Price by $100,000.00, the amount of the Expense Reimbursement plus $50,000.000 (the "Initial Qualified Overbid");

(v)    A deposit equal to 10% of the bidder's Initial Qualified Overbid; and

(vi)    Submission of a letter to the Debtors stating that (a) the potential bidder is prepared to enter into and consummate the transaction in accordance with the terms of the marked purchase agreement after the Court's approval of the Sale Order; (b) the potential bidder will make all necessary federal, state or local filings and pay all fees associated with such filings (including the costs of expenses of the Debtors); and (c) such potential bidder's offer is irrevocable until the date that is twenty (20) days after the conclusion of the Sale Hearing, unless such bidder is designated as the Backup Bidder, and then the offer shall remain irrevocable until closing of the sale of the Purchased Assets.

(c)    Bid Deadline:  The Bidding Procedures provide for a bid deadline of 4:00 p.m. (prevailing Eastern Time) on April 11, 2019 (the "Bid Deadline").

3296290.2

(d)    <u>Due Diligence</u>:  The Bidding Procedures permit all potential bidders who have signed confidentiality agreements to participate in the due diligence process between the Petition Date and the Bid Deadline.

(e)    <u>Selection of the Qualified Bids</u>:  As soon as practicable after the Bid Deadline, the Debtors, in consultation with their professionals, HSBC Bank, and the Committee, shall review each bid submitted and determine which bidders are qualified to participate in the Auction ("<u>Qualified Bidders</u>"), and shall provide notice of same to all persons submitting bids, including the Purchaser.

(f)    <u>Auction</u>:  If one or more Qualified Bids, other than Purchaser's, are received by the Debtors, an Auction shall be held on April 15, 2019 at 10:00 a.m. at the offices of Bond, Schoeneck & King, PLLC, One Lincoln Center, Syracuse, New York 13202, or such other time and/or other place as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids with respect to the Purchased Assets. All qualified Bidders desiring to participate at the Auction must appear and participate in person.

At the Auction, Qualified Bidders, including the Purchaser, will be permitted to increase their Initial Qualified Overbids (such increased Qualified Bid, a "<u>Qualified Overbid</u>"), by at least $50,000.00.

The Auction shall not conclude until each Qualified Bidder has had the opportunity to submit (or match, in the case of Purchaser) a Qualified Overbid with full knowledge of the existing highest bid.

(g)    <u>The Sale Hearing</u>:  The Debtors request that the Court schedule the Sale Hearing for 1:00 p.m. on April 17, 2019.  At the Sale Hearing, the Debtors will seek entry of an order, among other things, authorizing and approving the sale of the Purchased Assets to the Successful Bidder, as determined by the Debtors, in consultation with HSBC Bank, and the Committee.

Following the Sale Hearing, if the Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the next highest or otherwise best Qualified Bid or Qualified Overbid with respect to the Purchased Assets as disclosed at the Sale Hearing (the "<u>Backup Bid</u>"), shall be deemed to be the Successful Bid with respect to the Purchased Assets, and the Debtors shall effectuate such sale without further order of the Bankruptcy Court.

(h)    <u>Reservation of Rights</u>:  The Debtors reserve all rights to terminate the sale process at any time if the Debtors determine, in their business judgment and following consultation with their professionals, HSBC Bank and the Committee, that the sale process will not maximize the value of their bankruptcy estates.  In addition, the Debtors reserve all rights not to

3296290.2

submit any bid which is not acceptable to the Debtors, HSBC Bank and the Committee for approval to the Court. The Debtors shall further have the right to amend the Bidding Procedures or impose such other terms and conditions with respect to the Bidding Procedures in consultation with HSBC Bank and the Committee which the Debtors determine, in their business judgment, are necessary for the Debtors to fulfill their fiduciary duties, provided that (i) such modifications are not inconsistent with any Court Order, including the Bidding Procedures Order, (ii) a material modification may, under the Purchase Agreement, relieve Purchaser of any obligation to proceed with the Auction or, if it is the Successful Bidder, to close the sale of the Purchased Assets, and (iii) Purchaser's ability to terminate the Purchase Agreement in accordance with its terms is fully preserved.

## C.    <u>Assumption and Assignment of Executory Contracts and Unexpired Leases</u>

19.    The Assigned Contracts to which the Debtors are parties are described in Section 2.2 and Schedule 2.2 of the Purchase Agreement. The Debtors have evaluated each of the Assigned Contracts in the context of the Bankruptcy Code. In the exercise of their business judgment, and due to the desire of the Purchaser to operate the Purchased Assets immediately upon a closing of the sale, assumption and assignment of the Assigned Contracts to the Purchaser is beneficial to the Debtors' estates and creditors because it enhances the overall desirability to the Purchaser of the Purchased Assets.

20.    The Debtors, therefore, seek to assume the Assigned Contracts pursuant to sections 365(a), (b) and (c) of the Bankruptcy Code, and assign them to Purchaser pursuant to the terms of the Purchase Agreement.[6] The Debtors intend to remain current on their obligations under the Assigned Contracts during the post-petition period until the closing of the sale to the Successful Bidder.

---

[6] Should the sale be approved to a Successful Bidder that is not Purchaser, the Assigned Contracts will be those designated by the Successful Bidder.

3296290.2

21.     There are various amounts of pre-petition arrears that have accrued in connection with the Assigned Contracts.  Purchaser has agreed to assume all cure obligations which must be paid to counterparties to the Assigned Contracts pursuant to section 365(b)(1) of the Bankruptcy Code, in addition to the Purchase Price.  Accordingly, the Debtors anticipate that all of the parties to the Assigned Contracts will consent to the assignment to Purchaser[7] in order to allow the continued operation of the Debtors' businesses.

22.     This motion complies with Bankruptcy Rule 6006(e)(1) because all of the Assigned Contracts will be assigned to a single assignee, the purchaser of the Purchased Assets.

### BASIS FOR RELIEF

**A.    The Proposed Sale is in the Best Interests of the Debtors, Their Creditors and Their Estates**

23.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. §363(b)(1).  A debtor in possession is given these rights by section 1107(a) of the Bankruptcy Code.  *See* 11 U.S.C. §1107(a).  Moreover, section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. §105(a).

24.     Courts have uniformly held that approval of a proposed sale of property pursuant to section 363(b) of the Bankruptcy Code is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the debtor.  See *e.g., In re Chateaugay Corp.,* 973 F.2d 141 (2d Cir. 1992); *Comm. of Equity Sec. Holders v. Lionel Corp (In re Lionel*

---

[7] If the Successful Bidder is not Purchaser, the Successful Bidder will likewise be responsible for funding the cure costs associated with contracts or leases it designates as Assigned Contracts.

3296290.2

*Corp.). 772 F.2d 1063, 1071 (2d Cir. 1983). See also Official Comm. of Sub. Bondholders v.*
*Integrated Res., Inc. (In re Integrated Res., Inc.),* 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal*
*dismissed,* 3 F.3d 49 (2d Cir. 1993), quoting *Van Gorkom,* 488 A.2d 858, 872 (Del. 1985) ("the
business judgment rule 'is a presumption that in making a business decision the directors of a
corporation acted on an informed basis, in good faith and in the honest belief that the action was
in the best interest of the company'," which has continued applicability in bankruptcy).

25.     Courts generally show great deference to a debtor in possession's decisions when
applying the business judgment standard. *See In re Global Crossing, Ltd.,* 295 B.R. 726, 744
n.58 (Bankr. S.D.N.Y. 2003) ("[T]he Court does not believe that it is appropriate for a
bankruptcy court to substitute its own business judgment for that of the [d]ebtors and their
advisors, so long as they have satisfied the requirements articulated in the caselaw."). Deference
is inappropriate only if such business judgment is "so manifestly unreasonable that it could not
be based on sound business judgment, but only on bad faith, or whim or caprice." *Lubrizol*
*Enterprises, Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.),* 756
F.2d 1043, 1047 (4th Cir. 1985). *See also, In re Integrated Res., Inc.,* 147 B.R. at 656 (there is a
strong presumption "that in making a business decision[,] the directors of a corporation acted on
an informed basis, in good faith and in the honest belief that the action taken was in the best
interests of the company").

26.     A sound business purpose for the sale of a debtor's assets outside the ordinary
course of business may be found where such a sale is necessary to preserve the value of assets
for the estate, its creditors or interest holders. See *e.g., In re Lionel Corp.*, 722 F.2d at 1071. In
fact, the paramount goal in any proposed sale of property is to maximize the proceeds received
by the estate. *See Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.),* 107

3296290.2

F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.,* 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . [debtors'] duty with respect to such sales is to obtain the highest price or greater overall benefit possible for the estate.") (quoting *In re Atlanta Packaging Prods., Inc.,* 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

27.     Courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. *See In re Montgomery Ward Holding Corp.,* Case No. 97-1409(PJW) (Bankr. D. Del. Aug. 6, 1997); *In re Fruehauf Trailer Corp.,* Case No. 96-LS63(PJW) (Bankr. D. Del. Feb. 26, 1997); *In re Integrated Res.,* 147 B.R. at 659 (such procedures are created to "encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.,* 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

28.     The Debtors submit that the proposed sale to the Purchaser or any other Successful Bidder satisfies the "sound business reason test" and represents a prudent and proper exercise of their business judgment.  The Debtors believe that a prompt sale of the Purchased Assets as a going concern is the only way to maximize the value of their estates, to maintain stability for customers under Assigned Contracts, and provide the greatest opportunity for the Debtors' employees to seek new employment, if they are not re-hired by the Purchaser or any other Successful Bidder.

29.     The Debtors believe that the Bidding Procedures are the best method by which they can obtain the best price for the Purchased Assets and provide interested persons with

3296290.2

accurate and reasonable notice of the proposed sale. The Bidding Procedures will allow the

Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage

participation by financially capable bidders who demonstrate the ability to close a transaction,

thereby increasing the likelihood that the Debtors will receive the best possible consideration for

the Purchased Assets. The Bidding Procedures also will enable the Debtors to undertake the

auction process in as expeditious a manner as possible, which the Debtors believe is essential to

maintaining and maximizing the value of their estates. The Debtors further submit that the price

offered by the Purchaser for the Purchased Assets is fair and reasonable.

30.    Finally, the Debtors believe that it is in the best interests of their estates to assume

and assign the Assigned Contracts to the Successful Bidder in order to enhance the ability of the

Successful Bidder to service customers under the Assigned Contracts with minimal interruption,

thereby enhancing the value of the assets to the Successful Bidder. A debtor in possession may

assume an executory contract where assumption is a reasonable exercise of its business

judgment. *See* 11 U.S.C. § 365(a); *see e.g., In re Stable Mews Assoc., Inc.,* 41 B.R. 594, 596

(Bankr. S.D.N.Y. 1984); *Allied Technology, Inc. v. R.B. Brunemann & Sons, Inc.,* 25 B.R. 484

(Bankr. S.D. Ohio 1982). This requirement is satisfied where a debtor in possession determines

in good faith that assumption of an executory contract will benefit the estate. *See In re Gucci,*

193 B.R. 411, 414-15 (S.D.N.Y. 1996).

31.    The Debtors have been attempting to locate a willing purchaser of the Purchased

Assets since May 2018. It is unlikely that any other alternative, other than the sale, will, at this

time, provide a higher value for the Purchased Assets, which supports the conclusion that the

Debtors have exercised their good and prudent business judgment in proceeding with the

proposed sale. Accordingly, the sale should be approved. Moreover, as set forth hereinafter,

16

accurate and reasonable notice will be provided to all parties who indicate an interest with respect to the Purchased Assets, who previously indicated an interest in the Purchased Assets, and to all creditors and other parties in interest in compliance with the Bankruptcy Code and the Bankruptcy Rules.

32.    All aspects of the proposed sale have been handled in good faith.  The Purchase Agreement is the product of detailed good faith negotiations involving the Debtors, with the aid of their professionals, HSBC Bank and its counsel, and the Purchaser and its counsel.

**B.**    **The Proposed Bidding Procedures are in the Best Interests of the Debtors, Their Creditors and Their Estates**

33.    The Bidding Procedures outlined herein are designed to strike a balance between inviting competitive bids and enabling the Debtors to close a sale of the Purchased Assets within a reasonable time frame.  The Bidding Procedures are fair, reasonable and necessary to promote the highest or best sale price, without imposing undue obstacles to the competitive bidding process.

34.    The Bidding Procedures are a necessary tool to maximize the value of the Debtors' estates and will not unduly hamper the submission of competing bids.  Rather, the Bidding Procedures will insure that only parties with (a) a serious and legitimate interest in acquiring the Purchased Assets and (b) the financial means to consummate a transaction quickly, will participate in an open Auction process.

35.    For the foregoing reasons, the Debtors respectfully submit that this Court should authorize and approve the Bidding Procedures pursuant to section 363(b) of the Bankruptcy Code.

3296290.2

## C.    The Purchase Agreement Should be Approved

36.    Section 363(f) of the Bankruptcy Code[8] permits debtors, with court approval, to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets).

37.    In the instant case, the Purchased Assets are encumbered by security interests and liens perfected by secured creditors, including those first-priority security interests and liens granted to HSBC Bank pursuant to (a) that certain Loan and Security Agreement dated October 29, 2013, securing the repayment of obligations arising thereunder totaling approximately $22 million as of the Petition Date (collectively, the "Prepetition Liens"), and (b) that certain Senior Secured Super-Priority Debtor-in-Possession Loan and Security Agreement securing the repayment of post-petition obligations arising thereunder (collectively, the "Postpetition Liens" and together with the Prepetition Liens, the "HSBC Liens"). The HSBC Liens shall attach to all net proceeds of the sale of the Purchased Assets. With respect to any other party asserting a lien against the Purchased Assets, the Debtors believe that they will be able to satisfy one or more of the conditions set forth in § 363(f). In particular, the Debtors believe that creditors with any interests in the Purchased Assets or the Assigned Contracts, including the secured creditors, will

---

[8]  Section 363(f) of the Bankruptcy Code provides:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if --

(1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;
(2)    such entity consents;
(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
(4)    such interest is in bona fide dispute; or
(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. §363(f).

3296290.2

consent to a proposed sale free and clear of liens.  *See* 11 U.S.C. § 363(f)(2).  The Debtors will

continue to negotiate with secured creditors concerning their respective claims pending the Sale

Hearing.  To the extent such creditors do not consent explicitly or implicitly, the Debtors believe

that the sale will satisfy one or more of the factors in section 363(f) and they will be permitted to

sell the Purchased Assets free and clear of any interest in such property in accordance with the

terms of the Purchase Agreement.

**D.    Purchaser's Good Faith**

38.    Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one

who purchases assets for value, in good faith, and without notice of adverse claims.  *In re*

*Chateaugay Corp.,* 1993 U.S. Dist. LEXIS 6130, at *9 (S.D.N.Y. 1993) (quoting *In re Abbotts*

*Dairies of Penn., Inc.,* 788 F.2d 143, 147 (3d Cir. 1986)); *In re Mark Bell Furniture Warehouse,*

*Inc.*, 992 F.2d 7, 8 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985).

39.    The Purchase Agreement was negotiated in good faith, with all parties represented

by their own counsel.  The Debtors submit that the Purchaser's proposal, as contained in the

Purchase Agreement, represents the highest and best offer for the Purchased Assets received to

date.

40.    Accordingly, the Sale Order should include a provision finding that Purchaser[9] is

a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code.  The

Debtors believe that providing the Purchaser, or the Successful Bidder, with such protection will

ensure that the maximum price will be received by the Debtors for the Purchased Assets and

closing of the sale will occur promptly.

---

[9] If Purchaser is not ultimately the Successful Bidder, the Debtors submit that any purchaser of the Purchased Assets through the proposed sale process would also be acting in good faith, warranting designation as a "good faith" purchaser pursuant to section 363(m).

3296290.2

**PROPOSED NOTICE OF THE AUCTION AND SALE HEARING**

41.     Attached hereto as **Exhibit D** is a copy of a Notice (the "Notice of Auction and Sale Hearing") that the Debtors propose to serve upon (i) counsel for the Purchaser; (ii) the Office of the United States Trustee for the Northern District of New York; (iii) counsel for HSBC Bank; (iv) counsel for the Committee; (v) all parties to the Assigned Contracts, (vi) all required governmental agencies, (vii) all creditors in the Chapter 11 Cases; (viii) all persons known or reasonably believed to have asserted any lien, claim, encumbrance, or other interest in or upon any of the Purchased Assets, (ix) all parties who have expressed an interest in the Purchased Assets during the past ten months the Purchased Assets have been marketed, and (x) all entities known by the Debtors to have filed a notice of appearance or a request for receipt of chapter 11 notices and pleadings filed in the Chapter 11 Cases as of the notice date below.

42.     The Debtors propose to serve the Notice of Auction and Sale Hearing via first class mail upon all designated parties not later than two business days after entry of the Bidding Procedure Order.  Under all of the relevant facts and circumstances herein and the nature of the relief requested herein, the Debtors respectfully submit that the form of the proposed Notice of Auction and Sale Hearing should be deemed adequate and sufficient notice of the sale, the Sale Hearing, the Bidding Procedures, and the Motion, and respectfully request that the Court enter an Order approving the form and manner of the Notice of Auction and Sale Hearing.

**PROPOSED NOTICE OF ASSUMPTION AND ASSIGNMENT**

43.     Attached hereto as **Exhibit E** is a copy of a Notice (the "Notice of Assumption and Assignment") that the Debtors propose to serve upon (i) counsel for the Purchaser; (ii) the Office of the United States Trustee for the Northern District of New York; (iii) counsel for HSBC Bank; (iv) counsel for the Committee; (v) all parties to the Assigned Contracts, (vi) all

3296290.2

required governmental agencies, (vii) all creditors in the Chapter 11 Cases; and (viii) all entities
known by the Debtors to have filed a notice of appearance or a request for receipt of chapter 11
notices and pleadings filed in the Chapter 11 Cases as of the notice date below.

44.    The Debtors propose to serve the Notice of Assumption and Assignment via first
class mail upon all designated parties not later than two business days after entry of the Bidding
Procedures Order.  Under all of the relevant facts and circumstances herein and the nature of the
relief requested herein, the Debtors respectfully submit that the form of the proposed Notice of
Assumption and Assignment should be deemed adequate and sufficient notice of the assumption
and assignment of the Assigned Contracts, and respectfully request that the Court enter an Order
approving the form and manner of the Notice of Assumption and Assignment.  No previous
request for the relief sought herein has been made to this or any other Court.

**WHEREFORE,** the Debtors respectfully request that the Court (i) at the conclusion of
the initial hearing, enter the Bidding Procedures Order (a) designating the Purchaser as the
Stalking horse bidder for the Purchased Assets, and (b) approving the Bidding Procedures, the
form of the Purchase Agreement, the form and manner of the Notice of Auction and Sale
Hearing and the Notice of Assumption and Assignment, and scheduling the Sale Hearing; (ii) at
the conclusion of the Sale Hearing, enter the Sale Order to be provided authorizing the sale of the
Purchased Assets to the Purchaser, or to such other Successful Bidder that submits a higher and
better offer for the Purchased Assets in accordance with the Bidding Procedures; (iii) at the
conclusion of the Sale Hearing, enter an order authorizing the Debtors to assume and assign the
Assigned Contracts to the Successful Bidder; and (iv) granting the Debtors such other relief as
the Court may deem just and proper.

3296290.2

Dated: March 13, 2019
      Syracuse, New York

BOND, SCHOENECK & KING, PLLC

By: *Camille W. Hill*

Stephen A. Donato, Bar Roll No. 101522
Camille W. Hill, Bar Roll No. 501876
Andrew S. Rivera, Bar Roll No. 700712
Office and Post Office Address:
One Lincoln Center
Syracuse, New York 13202
Tel: (315) 218-8000
Fax: (315) 218-8100
Email:  sdonato@bsk.com
        chill@bsk.com
        arivera@Bsk.com

*Counsel to the Debtors and Debtors in Possession*

3296290.2