# EXHIBIT "A"

## Asset Purchase Agreement

**Execution Version**

ASSET PURCHASE AGREEMENT

between

CENTERSTONE LINEN SERVICES, LLC
ATLAS HEALTH CARE LINEN SERVICES CO., LLC

and

LINEN NEWCO LLC

March 13, 2019

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT is made and entered into as of March 13, 2019 between Centerstone Linen Services, LLC and Atlas Health Care Linen Services Co., LLC, Delaware limited liability companies d/b/a Clarus Linen Systems (collectively, the "Seller"), with their principal corporate offices at 60 Grider Street, Buffalo, New York 14215 and Linen Newco LLC, a Delaware limited liability company, with its principal corporate offices at 50 Fountain Plaza, Suite 1700, Buffalo, New York 14202 (the "Buyer").

## BACKGROUND

A.     Seller is engaged in the business of providing linen rental and commercial laundry services to the healthcare industry in upstate New York (the "Business"), including at the Buffalo Property and the Syracuse Property (as defined below).

B.     On December 19, 2018 (the "Petition Date"), Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (11 U.S. C. § 101 *et seq.*, the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of New York (the "Bankruptcy Court") commencing Seller's bankruptcy case (Case No. 18-31754, the "Bankruptcy Case"). As of the date of this Agreement, Seller continues to operate its Business and manage its properties and affairs as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

C.     Buyer desires to purchase, and Seller desires to sell, convey, assign and transfer to Buyer, the Purchased Assets (as defined below), subject to the terms and conditions set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, covenants and agreements herein contained, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

For the purposes of this Agreement, in addition to those capitalized terms defined elsewhere throughout this Agreement, the following capitalized terms shall have the meanings set forth below:

"Accounts Receivable" shall mean all accounts receivable or other rights to payment of Seller of any kind or nature including work and services in process.

"Affiliate" shall mean, with respect to any specified Person, any other Person who, directly or indirectly, owns or controls, is under common ownership or control with, or is owned or controlled by, such specified Person. Without limiting the generality of the foregoing, a Person shall be deemed to "own" another Person if it owns, directly or indirectly, fifty (50%) or more of the capital stock, membership interest, or other equity interest of such other Person generally entitled to

1

vote, without regard to specified contingencies, for the election of directors or equivalent governing body of such other Person.

"Agreement" shall mean this Asset Purchase Agreement, including all exhibits and schedules hereto, as may be amended.

"Assigned Contracts" as defined in Section 2.2.

"Auction" shall mean the auction held pursuant to the Bid Procedures Order (as defined in Section 6.1(b) hereunder) for the sale of the Purchased Assets (as defined in Section 2.1 hereunder) in the event Seller has one or more offers from Alternate Bidders to purchase the Purchased Assets.

"Auction Date" means the date on which the Auction is held.

"Avoidance Actions" means any and all rights, claims, causes of action and rights to recover or avoid transfers or to avoid any lien or interest that Seller may have under Chapter 5 of the Bankruptcy Code or otherwise, including, but not limited to, sections 506, 510, 522, 541, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code or applicable non-bankruptcy law or state law, and the proceeds thereof, or otherwise to exercise the avoidance powers provided under the Bankruptcy Code.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure, the local rules of the Bankruptcy Court, and any Orders of the Bankruptcy Court, as in effect from time to time.

"Breach" means, with respect to any representation, warranty, covenant, or obligation, any material misstatement or inaccuracy in, or any material failure to perform or comply with, the representation, warranty, covenant, or obligation within any applicable cure period.

"Buffalo Landlord" shall mean 60 Grider, LLC, with respect to the Buffalo Property, and any successor owner of that property.

"Buffalo Property" shall mean the facility owned by 60 Grider, LLC, and leased to Seller that is located at 60 Grider Street, Buffalo, NY 14215.

"Business" as defined in Section A of the "Background" paragraph of this Agreement.

"Business Day" shall mean any day of the year other than: (i) any Saturday or Sunday; or (ii) any other day on which banks located in Syracuse, New York, are closed for business.

"Cash" shall mean all cash, certificates of deposit, bank accounts and other cash equivalents or short-term investments, together with all accrued but unpaid interest thereon.

"Closing" as defined in Section 11.1.

"Closing Date" as defined in Section 11.1.

3292141.11

"Contract" shall mean any contract, lease, easement, license, sales order, purchase order, supply agreement, or any other agreement, commitment or understanding whether oral or written, other than Permits.

"Cure Obligations" shall mean all obligations to counterparties to the Assigned Contracts which must be satisfied in order to effectuate, pursuant to section 365(b)(1) of the Bankruptcy Code, the assumption by Seller and assignment to Buyer of the Assigned Contracts under Section 2.2 of this Agreement.

"Dollars" or numbers preceded by the symbol "$" shall mean amounts in United States Dollars.

"Encumbrance" shall mean any charge, claim, condition, equitable interest, lien (including without limitation any lien held or asserted by any Governmental Authority), option, pledge, security interest, mortgage, right of way, easement, encroachment, servitudes, right of first option, right of first refusal, or similar restriction, including restrictions of use, voting (in the case of any security or equity interest), transfer, receipt of income or exercise of any attribute of ownership, or other encumbrance, option or defect in title of every type and description, whether imposed by law, agreement, understanding or otherwise.

"Excluded Liabilities" shall mean all obligations and liabilities of Seller that are not included in the Assumed Liabilities.

"Final Order" shall mean an Order as to which there is no appeal, motion for reconsideration, stay or similar request for relief pending, and as to which the time period to seek or file any such appeal, motion for reconsideration, stay or similar request for relief has expired.

"Governmental Authority" shall mean the government of the United States, or any other foreign country or any state, provincial or political subdivision thereof and any entity, body or authority exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"HSBC Bank" shall mean HSBC Bank USA, National Association.

"Intellectual Property" shall mean intellectual property of every kind and nature, including, without limitation, all inventions, information, data, customer lists and related information, samples, specifications, plans, drawings, blue prints, compositions, processes, designs, formulas, technical and business information, and know-how, including confidential information and trade secrets (whether or not patentable or reduced to practice), all United States and foreign patents and petty patents (including continuations, continuations-in-part, divisions, reissues, re-examinations, extensions and renewals thereof) and patent applications, all United States and foreign registered and unregistered, brand names, trademarks, and service marks, logos and designs (and registrations and applications for registration of the same), domain names and all goodwill symbolized thereby or associated therewith, and copyrights and copyright registrations (and applications for the same) relating thereto, including computer software and mask works, and all extensions or renewals thereof, United States and foreign registrations and applications to register copyrights, technical manuals and documentation made or used in connection with any of the foregoing.

3292141.11

"Knowledge," when used with respect to Seller, shall mean the actual knowledge of John J. Giardino or Ronald Teplitsky.

"Law" shall mean any law, statute, code, regulation, ordinance, or rule enacted or promulgated by any Governmental Authority.

"Loss" or "Losses" shall mean any and all damages (but excluding consequential, punitive and treble damages), losses, actions, proceedings, causes of action, obligations, liabilities, responsibilities, claims, encumbrances, penalties, demands, assessments, judgments, costs and expenses including, without limitation, court costs and reasonable attorneys', experts' and consultants' fees and disbursements.

"Material Adverse Effect" means a state of facts, events, change or effect with respect to Seller that results in a material adverse effect on the Purchased Assets taken as a whole, including without limitation, the loss of any single customer/client for whom the Seller realized revenues of One Million Dollars ($1,000,000.00) or more during the preceding twelve months and/or the loss of one or more customers/clients which in the aggregate results in a decrease in annual revenues of ten percent (10%) or more during the preceding twelve months; but excluding any state of facts, event, change or effect caused by, attributable or relating to: (i) changes or conditions affecting Seller's industry generally; (ii) changes in economic, regulatory or political conditions generally; (iii) the filing and administration of the Bankruptcy Case (except for the conversion of the Bankruptcy Case to a proceeding under chapter 7); or (iv) the announcement of this Agreement.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award.

"Ordinary Course of Business" means an action taken or omitted to be taken by a Person only if that action or omission is consistent with the past practices of such Person.

"Parties" shall mean both Seller and Buyer, each of whom individually may be referred to as a "Party."

"Permits" shall mean permits, tariffs, authorizations, licenses, certificates, variances, interim permits, approvals, franchises and rights under any Law or otherwise issued or required by any Governmental Authority and any applications for the foregoing which are currently used or otherwise necessary for Seller to engage in the operation of the Business as currently conducted.

"Permitted Encumbrances" shall mean any and all Encumbrances arising from or related to any Assumed Liabilities, including, without limitation, any Encumbrances in favor of HSBC Bank.

"Person" shall mean any individual, corporation, business trust, proprietorship, firm, partnership, limited partnership, limited liability partnership, limited liability company, trust, association, joint venture, Governmental Authority or other entity.

"Purchased Asset(s)" as defined in Section 2.1 hereof.

"Sale Order" shall mean an Order of the Bankruptcy Court that, among other things approves, pursuant to Sections 363 and 365 of the Bankruptcy Code, with findings that the Buyer

3292141.11

acted in good faith and is afforded the benefits of Section 363(m) of the Bankruptcy Code: (i) the execution, delivery and performance by Seller of this Agreement, and the other instruments and agreements contemplated hereby; (ii) the sale of the Purchased Assets to Buyer on the terms set forth herein; and (iii) the performance by Seller of its obligations under this Agreement, including, without limitation, the assumption and assignment of the Assigned Contracts.

"Syracuse Landlord" shall mean ACN Companies, LLC, with respect to the Syracuse Property, and any successor owner of that property.

"Syracuse Property" shall mean the facility that is owned by ACN Companies, LLC, and leased to Seller that is located at is located at 414 West Taylor Street, Syracuse, NY 13202.

"Tax" (and, with correlative meaning, "Taxes" and "Taxable") shall mean any federal, state, provincial, county, local or foreign taxes, charges, fees, duties (including customs duties), levies or other assessments, including income, gross receipts, net proceeds, ad valorem, turnover, real and personal property (tangible and intangible), sales, use, franchise, excise, value added, alternative, add-on minimum, stamp, leasing, lease, user, transfer, fuel, excess profits, occupational, interest equalization, windfall profits, license, payroll, environmental, capital stock, disability, severance, employee's income withholding, other withholding, unemployment and Social Security Taxes, which are imposed by any Governmental Authority, and such term shall include any interest, penalties, fines or additions to tax attributable thereto or associated therewith, and shall include any transferee or successor liability in respect of Taxes (whether by contract or otherwise).

"Tax Code" shall mean the Internal Revenue Code of 1986, as amended, and the temporary and final regulations promulgated thereunder.

"Tax Return" shall mean any report, return, statement, notice, form, declaration, claim for refund or other document or information filed, submitted to, or required to be supplied to a Governmental Authority in connection with the determination, assessment, collection or payment of any Tax, including any schedule or attachment thereto, and including any amendment thereof.

"Third Party" shall mean a Person other than Buyer, Seller, or their respective Affiliates.

"Transferred Employees" shall have the meaning set forth in Section 10.1(b).

## ARTICLE II
## PURCHASE AND SALE OF PURCHASED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

2.1    Purchased Assets.  Subject to and upon the terms and conditions set forth in this Agreement, at the Closing, Seller shall sell, assign, convey, transfer and deliver to Buyer, and Buyer shall purchase, acquire and take assignment and delivery of, all of Seller's right, title and interest in and to the following assets, properties and rights, as they exist at the time of the Closing:

(a)    Equipment and Fixed Assets.  All fixtures, machinery, equipment, fixed assets, furniture, tools, maintenance equipment, mobile equipment, electrical, mechanical, electronic, computers, software, telecommunications, servers, and other equipment and fixed assets of every kind owned by Seller located at the Buffalo Property or the Syracuse Property or wherever located

3292141.11

(the "Equipment and Fixed Assets"), including without limitation, the Equipment and Fixed Assets set forth on Schedule 2.1(a);

(b)     Inventory.  All linen, supplies, raw materials, chemicals, spares, spare parts, packaging materials, finished goods, and other consumables and inventories owned by Seller and used, or intended to be used, in the operation of the Business (collectively, the "Inventory");

(c)     Information and Records.  To the extent legally transferable, all books and records used in the operation of the Business ("Books and Records") that are in Seller's care, custody or control, including, without limitation, customer lists, safety and training records, equipment manuals, drawings, engineering materials, and operating data;

(d)     Permits.  To the extent legally transferable, without cost to Seller, all Permits and applications for Permits that are necessary to the operation of the Business as presently operated and conducted.  Buyer shall pay any fees required to transfer such Permits; and

(e)     Intellectual Property.  The Intellectual Property listed on Schedule 2.1(f) and all goodwill, if any, relating to the Business.

(f)     Accounts Receivable.  The Seller's Accounts Receivable including any unbilled invoices for services, goods or products up to the Closing Date.

(g)     Other Assets.  All other scheduled assets of the Seller not specifically excluded in Section 2.3 below.

All of the foregoing assets described in this Section 2.1, together with the Assigned Contracts described in Section 2.2 are referred to herein collectively as the "Purchased Asset(s)".

2.2     Assignment of Contracts.  Subject to the terms and conditions of this Agreement and the need to obtain any required consent or modifications required by Buyer from any Third Party, at the Closing Seller shall assume and assign and transfer to Buyer, all of its right, title and interest in and to the Contracts listed on Schedule 2.2 (collectively, the "Assigned Contracts").

2.3     Excluded Assets.  Notwithstanding anything contained in this Agreement to the contrary, the Purchased Assets shall not include and Seller shall retain all of its right title and interest in and to the following (collectively, the "Excluded Assets"):

(a)     Cash;

(b)     Any asset of Seller that otherwise would constitute a Purchased Asset, but for the fact that such asset has been conveyed, leased or otherwise disposed of prior to the Closing in Seller's Ordinary Course of Business;

(c)     Avoidance Actions;

(d)     Personnel, business and other records that Seller is required by Law to retain in its possession, or which relate to the Avoidance Actions, and all corporate seals, minute books, charter documents, stock transfer records, record books, original Tax and financial records and such

other files, books and records relating to the Excluded Assets or to the organization, existence or capitalization of Seller;

(e)     Any asset in which Seller first acquires a transferable interest following the Closing;

(f)     Seller's rights under this Agreement;

(g)     Any rights to refunds or recoveries from any insurance policies and/or indemnification claims;

(h)     Any rights to tax refunds;

(i)     Any other asset specifically designated by Buyer as an Excluded Asset prior to Closing, including those assets listed on Schedule 2.3(i); and

(j)     Stock and membership interests.

2.4     Assumed Liabilities.  At the Closing, Buyer shall assume, and shall agree to pay, perform and discharge, the following obligations of Seller as and when they become due (the "Assumed Liabilities"):

(a)     All obligations related to normal course accrued liabilities, including employee wages, salaries and benefits arising on or after the Closing Date;

(b)     All liabilities for taxes arising from or relating to the Purchased Assets for any time period after Closing; and

(c)     All liabilities specifically designated as an Assumed Liability and Cure Obligations on Schedule 2.4(c).

**ARTICLE III**
**PURCHASE PRICE AND PAYMENT**

3.1     Purchase Price.  The aggregate consideration for the sale, transfer, assignment and conveyance of the Purchased Assets will be Five Million One Hundred Fifty Thousand Dollars ($5,150,000.00) (the "Purchase Price") to be paid as follows:

| | | |
|---|---|---|
| (a) | Cash at Closing: | $3,000,000 |
| (b) | Subordinated Note: | $1,000,000 |
| (c) | A/R Collection & AR Note: | $1,150,000 |
| | Total: | $5,150,000 |

plus the assumption by Buyer of the Assumed Liabilities (the Purchase Price, together with the assumption of the Assumed Liabilities, the "Total Consideration").

7

3292141.11

3.2    <u>Payment of Purchase Price.</u>

(a)    Within three (3) days after the execution of this Agreement, Buyer shall deliver to Seller's attorneys, Bond, Schoeneck & King, PLLC ("<u>Bond</u>"), a good faith Cash deposit in an amount equal to Two Hundred Thousand and no/100 Dollars ($200,000.00) plus a Cash deposit equal to Three Hundred Fifteen Thousand and no/100 Dollars ($315,000.00) at the conclusion of the due diligence period provided in paragraph 6.8 herein (collectively, the "<u>Deposit</u>") to be held by Bond in escrow in its client trust account. The Deposit shall be applied toward the Purchase Price at Closing.

i.    Subject to the conditions precedent as set forth in Article 8, if this Agreement is terminated as a result of Buyer's Breach of its obligations hereunder, Seller shall retain the Deposit as liquidated damages without further liability.

ii.    The Deposit shall be returned to Buyer within three (3) business days following the entry of an order by the Bankruptcy Court (y) denying the Seller's motion to sell the Purchased Assets to the Buyer or (z) authorizing the sale of all or substantially all of the Purchased Assets to another bidder, *provided, however*, that if an auction is held and the Buyer is determined to be the backup bidder in accordance with the Bidding Procedures approved by the Bankruptcy Court, the Deposit will be returned in accordance with the requirements of the Bidding Procedures.

(b)    At the Closing, Buyer shall pay to Seller, by wire transfer of immediately available funds, a Cash payment in the amount of Two Million Four Hundred Eight-Five Thousand and no/100 Dollars ($2,485,000.00) (the "<u>Closing Payment</u>"). The Closing Payment obligation shall be absolute and unconditional and shall not be subject to any abatement, counterclaim, deduction or reduction for any reason whatsoever.

(c)    Along with the Closing Payment, at Closing, Buyer shall execute and deliver to HSBC Bank a promissory note (the "<u>Subordinated Note</u>") in the amount of One Million Dollars ($1,000,000.00), which shall be substantially in the form attached as Exhibit 3.2(c)(i) and acceptable to HSBC Bank. The Subordinated Note shall be amortized over a period of three years at an annual interest rate of eight percent (8.00%). The Subordinated Note shall be secured by a second position lien and security interest covering Buyer's machinery, general equipment and linen inventory. Buyer shall execute and deliver to HSBC Bank a security agreement substantially in the form attached as Exhibit 3.2(c)(ii) on the Closing Date ("<u>Security Agreement</u>") and acceptable to HSBC Bank.

(d)    Buyer shall collect and remit to HSBC Bank the Accounts Receivable purchased by Buyer hereunder in the amount of One Million One Hundred Fifty Thousand and no/100 Dollars ($1,150,000.00) (the "<u>AR Payment</u>") as follows:

i.    Seven Hundred Thousand Dollars ($700,000.00) of the AR Payment shall be paid by Buyer directly to HSBC Bank, irrespective of actual Accounts Receivable collections, pursuant to a promissory note (the "<u>AR Note</u>"), which shall be substantially in the form attached as Exhibit 3.2(d)(i) and acceptable to HSBC Bank. The AR Note shall have a ten (10) week term, payable in weekly installments of not

3292141.11

less than Seventy Thousand Dollars ($70,000.00) per week commencing one (1) week after the Closing.

ii.    The remaining AR Payment of Four Hundred Fifty Thousand Dollars ($450,000.00) shall be remitted by the Buyer to HSBC Bank from the collection of Accounts Receivable using the Buyer's best collection efforts as set forth in a letter agreement substantially in the form attached as Exhibit 3.2(d)(ii) ("Letter Agreement") and acceptable to HSBC Bank. The Letter Agreement will provide in pertinent part that Seller will provide HSBC Bank a detailed list of Accounts Receivable with contact information for all account debtors at Closing, Buyer will provide HSBC Bank weekly reporting on the status of collection of the Accounts Receivable, and HSBC Bank shall be permitted, in its discretion, to take over collection of open Accounts Receivable that remain unpaid ten weeks after the Closing.

iii.    Any payments Buyer receives from any Person that is an account debtor of both Buyer and Seller and which fails to identify the specific invoice or account to which payment is to be applied, shall be applied as may be reasonably determined by Buyer after making commercially reasonable inquiry to determine the specific invoice or account to which payment is to be applied, and if no such determination can be made, shall be applied first to Seller's Accounts Receivable in chronological order from oldest to newest, with any remainder then applied to satisfy any accounts of Buyer. Buyer agrees that it shall not take any action to influence any such Person to pay amounts owing to Buyer in preference to Seller's Accounts Receivable, including, without limitation, by instructing any such Persons to identify payments as being in satisfaction of Buyer's invoices rather than Seller's invoices.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants as of the date hereof and as of the Closing Date as follows:

4.1    Existence, Good Standing. Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. Seller has all requisite limited liability company power and authority to own its properties and assets and to conduct its businesses as presently conducted.

4.2    Authorization and Validity. Seller has all requisite corporate power and authority to enter into this Agreement and any related agreements to which Seller is or will become a party and, subject only to the Bankruptcy Court's entry of the Sale Order, the execution and delivery of this Agreement and any related agreements to which Seller is or will become a party and the performance of Seller's obligations hereunder and thereunder have been, or on the Closing Date will be, duly authorized by all necessary corporate action and no other corporate proceedings on the part of Seller are necessary to authorize such execution, delivery and performance. This Agreement and any related agreements to which Seller is or will become a party have been, or on the Closing Date will be, duly executed by Seller and, subject only to the Bankruptcy Court's entry of the Sale Order, constitute, or will when executed and delivered constitute, Seller's valid and binding obligation, enforceable against Seller in accordance with their terms.

9

4.3     Consents. Subject to the entry of the Sale Order and satisfaction of the terms set forth herein, and except as set forth on Schedule 4.3, no consent of any Person not a party to this Agreement or any Governmental Authority (other than in connection with Seller's assignment of Permits) is required in connection with the execution, delivery and performance of this Agreement by Seller, or the consummation of the transactions contemplated hereby.

4.4     No Conflict or Violation. Subject only to the Bankruptcy Court's entry of the Sale Order and receipt of any required consents, the execution, delivery and performance by Seller of this Agreement do not and will not, to Seller's Knowledge, (a) violate or conflict with any provision of Seller's organizational documents, (b) violate any provision of Law, or any Order, judgment or decree of any Government applicable to Seller, (c) result in or require the creation or imposition of any Encumbrances on any of the Purchased Assets; or (d) violate or result in a Breach of or constitute (with due notice or lapse of time or both) a default under any Contract to which Seller is a party or by which Seller is bound or to which the any of Seller's properties or assets is subject.

4.5     Title to Purchased Assets. Subject only to the entry of the Sale Order, at the Closing, Seller will have good and marketable title to the Purchased Assets which shall be transferred to Buyer free and clear of all Encumbrances except for the Permitted Encumbrances.

4.6     Permits. Schedule 4.6 sets forth a list of all Permits held by Seller which are necessary to conduct the Business as currently conducted.

4.7     Litigation. To Seller's Knowledge, except for those matters described on Schedule 4.7 and except for amounts listed on Seller's bankruptcy schedules and claims or pleadings filed with the Bankruptcy Court, there is no legal, administrative or arbitration proceeding, suit, action of any nature or Order, judgment, writ, injunction, award, or decree, claim, investigation or inquiry ("Litigation") relating to any Purchased Assets or the transactions contemplated by this Agreement, pending or asserted against Seller, by or before any Governmental Authority or by or on behalf of any Third Party.

4.8     Brokers. Except for SSG Advisors, LLC, Seller has not used any broker or finder in connection with the transactions contemplated hereby.

4.9     Employees. Schedule 4.9 sets forth a true and complete list of individuals that are currently employed by Seller in the Business and all individuals that are on temporary or permanent lay-off or furlough status, including name, title, date of hire, former or current base salary or wage rate, position, title, and whether such employee is out on disability or other permitted leaves of absence and/or is on temporary or permanent lay-off or furlough status. Schedule 4.9 sets forth any labor or collective bargaining agreements that Seller is a party to.

4.10     Exclusivity and Survival of Representations. The representations and warranties made by Seller in this Article IV are in lieu of, and are exclusive of, all other representations and warranties by Seller, including but not limited to any warranty or representation as to the condition or suitability of the Purchased Assets, which are being conveyed on an "AS IS, WHERE IS" basis. Seller hereby disclaims any representations or warranties, express or implied, not set forth in this Article IV or in any document to be delivered by Seller at Closing. All of the representations and

3292141.11

warranties made by Seller in this Article IV shall terminate as of Closing. No claim for a breach of any such representations or warranty may be made by Buyer against Seller after the Closing Date.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants as of the date hereof and as of the Closing Date:

5.1    Existence and Good Standing. Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer is duly qualified to transact business as a foreign corporation and is in good standing in the state of New York and in each other jurisdiction in which the nature of the assets owned, leased or operated by Buyer or the conduct of its business makes such qualification necessary.

5.2    Authorization and Validity. Buyer has all requisite power and authority to enter into this Agreement and any related agreements to which Buyer is or will become a party and the execution and delivery of this Agreement and any related agreements to which Buyer is or will become a party and the performance of Buyer's obligations hereunder and thereunder have been, or on the Closing Date will be, duly authorized by all necessary corporate action and no other proceedings on the part of Buyer are necessary to authorize such execution, delivery and performance. This Agreement and any related agreements to which Buyer is or will become a party have been, or on the Closing Date will be, duly executed by Buyer and constitute, or will when executed and delivered constitute, Buyer's valid and binding obligation, enforceable against Buyer in accordance with their terms.

5.3    Consents. No consent of any Person not a Party to this Agreement or any Governmental Authority (other than in connection with Seller's assignment of Permits) is required in connection with the execution, delivery and performance of this Agreement by Buyer, or the consummation of the transactions contemplated hereby.

5.4    No Conflict or Violation. The execution, delivery and performance by Buyer of this Agreement does not: (i) violate or conflict with any provision of Buyer's organizational documents; (ii) violate any provision of Law, or any Order, judgment or decree of any court or Government applicable to Buyer; or (iii) violate or result in a Breach of or constitute (with due notice or lapse of time or both) a default under any Contract to which Buyer is party or by which Buyer is bound or to which any of Buyer's properties or assets is subject.

5.5    Litigation. There is no Litigation of any nature pending or asserted against Buyer by or before any Governmental Authority or by or on behalf of any Person which questions or challenges the validity of this Agreement or any of the transactions contemplated hereby or which, if adversely determined, would adversely affect the ability of Buyer to consummate the transactions contemplated hereby.

5.6    Brokers. Buyer has not used any broker or finder in connection with the transactions contemplated hereby.

3292141.11

5.7     Adequate Assurances Regarding Assigned Contracts. Buyer is capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assigned Contracts.

5.8     Financial Capability.  At the Closing, the Buyer (i) subject to having financing commitments and arrangements will have sufficient funds available to pay the Purchase Price and any expenses incurred by Buyer in connection with the transactions contemplated by this Agreement; (ii) will have the resources and capabilities (financial or otherwise) to pay, discharge and perform the Assumed Liabilities and all of its other obligations hereunder; and (iii) has not incurred, and will not incur, any obligation, commitment, restriction or liability of any kind, which would impair or adversely affect such resources and capabilities.

## ARTICLE VI
## PRE-CLOSING COVENANTS AND OTHER AGREEMENTS

6.1     Bankruptcy Court Approval.

(a)     This Agreement and the transactions contemplated hereby are contingent upon the approval and authorization of the Bankruptcy Court. Except as expressly set forth herein, Seller and Buyer shall have no liability under this Agreement unless and until it is approved by the Bankruptcy Court and shall have no obligation to consummate the transactions contemplated herein unless and until the Bankruptcy Court enters the Sale Order.

(b)     By March 14, 2019, Seller shall prepare and file a motion with the Bankruptcy Court (the "Sale Motion") requesting: (i) the entry of an Order (the "Bid Procedures Order") (x) approving the terms of this Agreement, (y) establishing procedures for Seller's solicitation of competing offers from Third Parties for the sale of the Purchased Assets (each, a "Competing Bidder") and (z) establishing procedures for an Auction to determine the highest or otherwise best offer for the Purchased Assets; and (ii) the entry of the Sale Order.  The Sale Motion shall request that the Bankruptcy Court hold a hearing to consider entry of the Bid Procedures Order by March 18, 2019, and, schedule an Auction, if necessary, to be held as soon as permitted by the Bankruptcy Court, but no later than April 15, 2019, with a hearing to consider entry of the Sale Order approving the sale to Buyer (or in the event an Auction is held, the prevailing bidder at auction) on or around April 17, 2019, subject to the Bankruptcy Court's availability.

(c)     Among other things, the Sale Motion will request that the Bid Procedures Order be in form and content acceptable to Buyer, Seller and HSBC Bank and provide that:

  i.     in the event the Bankruptcy Court approves and Seller consummates a sale of the Purchased Assets to a Competing Bidder, Seller shall be required to pay to Buyer an expense reimbursement of up to Fifty Thousand and 00/100 Dollars ($50,000.00) (the "Expense Reimbursement") to be paid out of sale proceeds free and clear of all liens, claims and encumbrances;

  ii.    the minimum bid increment shall be Fifty Thousand Dollars and no/100 ($50,000.00); provided that the initial overbid at the Auction must also include an amount sufficient to pay any Expense Reimbursement that would

3292141.11

be payable to Buyer in the event of a sale of the Purchased Assets to a Competing Bidder; and

    iii.    qualified bids shall: (w) be accompanied by a cash deposit in the amount of ten percent (10%) of the proposed purchase price; (x) reflect terms substantially similar or superior to this Agreement; (y) be submitted no later than 4:00 p.m. on April 11, 2019 (the "Bid Deadline"); and (z) not include any financing or due diligence contingencies.

    (d)    Among other things, the Sale Order will be in form and content acceptable to Buyer, Seller and HSBC Bank and provide that:

    i.    this Agreement is approved;

    ii.    Buyer shall have no successor liability except for the Assumed Liabilities;

    iii.    findings of fact and conclusions of law that the transactions are arms-length, without collusion, and that Buyer has acted in good faith pursuant to Section 363(m) of the Bankruptcy Code, and that the transfers are for adequate consideration;

    iv.    HSBC Bank's liens on the Purchased Assets shall attach to the Purchase Price;

    v.    the Purchase Price will be distributed in accordance with the terms of the final order approving the Seller's post-petition financing at Docket No. 234 in the Bankruptcy Case and the Budget annexed thereto and defined therein ("Final DIP Order"); and

    vi.    a finding that the Buyer is a good faith purchaser of the assets and entitled to the protections of Section 363(m) of the Bankruptcy Code.

    6.2    Cooperation. Each of Buyer and Seller shall use commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective as soon as possible the transactions contemplated hereby. Buyer shall promptly take such actions as may be reasonably requested by Seller to assist Seller in obtaining the Bankruptcy Court's entry of the Sale Order and any other Order of the Bankruptcy Court reasonably necessary to consummate the transactions contemplated by this Agreement.

    6.3    Conduct of Business. Unless otherwise agreed by Seller and Buyer, as contemplated in this Agreement, or as required by the Bankruptcy Code or an Order of the Bankruptcy Court, from the date hereof through the Closing Date, Seller shall conduct the Business in all material respects in the Ordinary Course of Business and will not sell or dispose of any of the Purchased Assets or make payments or enter into any contractual commitments to any employee of the Seller other than payments of salary and wages and other benefits and the reimbursement of reasonable documented business expenses, in each case, in the Ordinary Course of Business consistent with past practice and

3292141.11

the authority granted in the Final DIP Order and any cash management orders entered in the Bankruptcy Case.

6.4    <u>Adequate Assurances Regarding Assigned Contracts</u>. On or before the Bid Deadline, Buyer shall provide adequate assurance of Buyer's future performance of each Assigned Contract to Seller and to the counterparties to each Assigned Contract.

6.5    <u>Notice of Certain Events</u>. Each of Buyer and Seller shall promptly notify the other Party of the occurrence of any event or condition or the existence of any fact that would reasonably be expected to have a Material Adverse Effect or to cause any of the conditions to either of the Parties' obligations to consummate the transactions contemplated by this Agreement not to be fulfilled. Notwithstanding the Seller's obligation to provide notice to Buyer, there shall not have occurred any event or circumstance that constitutes a Material Adverse Effect.

6.6    <u>Cure Obligations</u>.  Not later than five (5) business days prior to the Auction Date, Seller shall deliver to Buyer a calculation of the Cure Obligations with respect to the Assigned Contracts. Upon receiving such calculation Buyer may elect, at any time on or prior to the Auction Date, to remove any Contract from the list of Assigned Contracts on <u>Schedule 2.2</u> and reclassify such Contract as an Excluded Asset, *provided*, *however*, that, in the event the Bankruptcy Court subsequently determines that the Cure Obligations for any Assigned Contract is greater than that set forth in Seller's calculation, Buyer may elect to reclassify such Contract as an Excluded Asset at any time prior to the earlier to occur of (i) the Closing or (ii) the day that is five Business Days following such determination by the Bankruptcy Court, and *provided further*, that any such reclassification shall not reduce the Total Consideration. Buyer shall be responsible for all Cure Obligations.

6.7    <u>Access to Information, Inspections</u>.

(a)    From the date hereof through the Closing Date, and upon reasonable advance notice received from Buyer, Seller shall give Buyer and its authorized representatives reasonable access to its facilities and Books and Records relating to the Purchased Assets, such access to be exercised in a manner that does not unreasonably interfere with Seller's operations.

(b)    Following the Closing, and upon reasonable advance notice received from Seller, Buyer shall give Seller and its agents and representatives reasonable access during regular business hours, to the Transferred Employees and any Books and Records relating to the Purchased Assets, to the extent reasonably necessary to permit Seller to investigate any matter relating to or arising during any period prior to the Closing.

(c)    Buyer will use reasonable efforts to minimize any disruptions to the business of the Seller in connection with its requests or discussions pursuant to this Section 6.7.

6.8    <u>Due Diligence</u>. Buyer shall have a period of fourteen (14) days from the date of this Agreement ("<u>Due Diligence Period</u>") to conduct a due diligence investigation of the condition of the Business, the Purchased Assets, the Syracuse Facility, the Buffalo Facility, and the properties and operations of the Business as Buyer shall reasonably deem appropriate. Seller shall provide Buyer and its agents and representatives reasonable access to the facilities, offices and personnel of Seller, and to the Books and Records, in each case, to the extent related to the Business to allow Buyer to conduct its investigation. In the event Buyer's investigation is unsatisfactory to Buyer, in its sole and

14

absolute discretion, Buyer may terminate this Agreement effective immediately upon delivery of written notice to Seller prior to termination of the Due Diligence Period ("Diligence Termination Right") at which time the Deposit shall be delivered to the Buyer, and the parties shall be released from all obligations hereunder. Buyer's Diligence Termination Right expires upon expiration of the Due Diligence Period.

## ARTICLE VII
## TAXES

7.1    Taxes Related to Purchase of Purchased Assets. All Taxes, including, without limitation, all state and local Taxes in connection with the transfer of the Purchased Assets, and all recording and filing fees (collectively, "Transaction Taxes"), that may be imposed by reason of the sale, transfer, assignment and delivery of the Purchased Assets and that are not exempt under section 1146(a) of the Bankruptcy Code, shall be borne solely by Buyer. Buyer and Seller shall cooperate to determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement. At Closing, Seller shall provide to Buyer all requisite exemption certificates. Seller and Buyer shall prepare and file any and all required Tax Returns for or with respect to such Transaction Taxes with any and all appropriate Government taxing authorities.

7.2    Cooperation on Tax Matters.

(a)    Buyer and Seller shall furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Purchased Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other required or optional filings relating to Tax matters, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters and for the answer to any Government relating to Tax matters.

(b)    Buyer shall retain possession of all accounting, business, financial and Tax records and information: (i) relating to the Purchased Assets or the Assumed Liabilities that are in existence on the Closing Date and transferred to Buyer hereunder; and (ii) coming into existence after the Closing Date that relate to the Purchased Assets or the Assumed Liabilities before the Closing Date, for the minimal period from the Closing Date as required by the Tax Code. Buyer shall give Seller notice and an opportunity to retain any such records in the event that Buyer determines to destroy or dispose of them after such period. In addition, from and after the Closing Date, Buyer shall provide access to Seller (after reasonable notice and during normal business hours and without charge), to the books, records, documents and other information relating to the Purchased Assets or the Assumed Liabilities as Seller may reasonably deem necessary to: (i) properly prepare for, file, prove, answer, prosecute and defend any such Tax Return, claim, filing, tax audit, tax protest, suit, proceeding or answer; or (ii) administer or complete Seller's Bankruptcy Case. Such access shall include, without limitation, access to any computerized information retrieval systems relating to the Purchased Assets or the Assumed Liabilities.

3292141.11

7.3    <u>Allocation of Total Consideration</u>. <u>Schedule 7.3</u> sets forth a proposed allocation of the Total Consideration for the purposes of, and in accordance with, Section 1060 of the Tax Code. Buyer shall report, act and file its Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such allocation unless Seller and Buyer mutually agree to a different allocation following the Closing.

## ARTICLE VIII
## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER

The obligations of Buyer to consummate the transactions contemplated hereby are subject to the satisfaction or waiver by Buyer each of the following separate conditions precedent on or before the Closing Date:

8.1    <u>Financing</u>. No later than two (2) days prior to the Bid Deadline established in the Bid Procedures Order, the Buyer shall have obtained a final commitment, in form and substance acceptable to the Buyer, for a bridge and working capital loan at market rates and terms in the aggregate amount necessary to pay the Purchase Price.

8.2    <u>Syracuse Property</u>. No later than two (2) days prior to the Bid Deadline established in the Bid Procedures Order, Buyer shall have negotiated the form of a new lease for the Syracuse Property upon commercially reasonable terms and conditions acceptable to Buyer in its reasonable discretion.

8.3    <u>Accuracy of Representations and Warranties</u>. The representations and warranties of Seller contained herein or any certificate delivered to Buyer pursuant to this Agreement shall be true, accurate and correct as of the date of this Agreement and as of the Closing Date, as if made at and as of such date (unless any such representation or warranty refers specifically to a specified date, in which case such representation or warranty shall be true, accurate, and correct on and as of such specified date).

8.4    <u>Compliance with Agreements and Covenants</u>. Seller shall have materially performed and complied with all of its covenants, obligations, and agreements contained in this Agreement to be performed and complied with by it on or prior to the Closing Date.

8.5    <u>No Material Adverse Effect</u>. There shall not have occurred any event, fact or circumstance that has had, or is reasonably likely to have, a Material Adverse Effect.

8.6    <u>Bankruptcy Court Approval</u>. The Bankruptcy Court shall have entered a Sale Order, as a Final Order, which shall be in full force and effect and not stayed as of the Closing Date.

8.7    <u>No Injunction</u>. On the Closing Date: (i) there shall be no Order staying, reversing, modifying, vacating or amending the Sale Order; and (ii) there shall be no preliminary or permanent injunction or other Order of any court or Government declaring this Agreement invalid or unenforceable in any material respect or otherwise preventing the transactions contemplated herein from being consummated.

8.8    <u>Deliveries</u>. Seller shall have made, or be prepared to make at the Closing, all of the deliveries set forth in Section 11.2.

3292141.11

8.9    Diligence.  The Diligence Termination Right shall have expired without being exercised pursuant to Section 6.8 herein.

8.10    Labor Agreements.  To the extent required by Buyer, modifying existing Collective Bargaining Agreements.

## ARTICLE IX
## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligations of Seller to consummate the transactions contemplated hereby are subject to the satisfaction or waiver by Seller of the following conditions precedent on or before the Closing Date:

9.1    Accuracy of Representations and Warranties.  The representations and warranties of Buyer contained herein or any certificate delivered to Seller pursuant to this Agreement shall be true, accurate, and correct as of the date of this Agreement and as of the Closing Date, as if made at and as of such date (unless any such representation or warranty refers specifically to a specified date, in which case such representation or warranty shall be true, accurate and correct on and as of such specified date).

9.2    Compliance with Agreements and Covenants.  Buyer shall have performed and complied with all of its covenants, obligations, and agreements contained in this Agreement to be performed and complied with by it on or prior to the Closing Date.

9.3    Required Consents.  Seller shall have obtained the consents listed on Schedule 4.3.

9.4    Bankruptcy Court Approval.  The Bankruptcy Court shall have entered the Sale Order which shall be in full force and effect on the Closing Date.

9.5    No Injunction or Litigation.  On the Closing Date: (i) there shall be no Order staying, reversing, modifying, vacating or amending the Sale Order; (ii) there shall be no preliminary or permanent injunction or other Order of any court or Government declaring this Agreement invalid or unenforceable in any material respect or otherwise preventing the transactions contemplated herein from being consummated; and (iii) there shall not be pending or threatened any suit, action or proceeding (y) challenging or seeking to restrain, prohibit, alter or materially delay the consummation of any of the transactions contemplated by this Agreement or (z) seeking to obtain from Seller or any of its Affiliates any damages in connection with the transactions contemplated hereby.

9.6    Assigned Contract Cure.  Buyer shall, consistent with section 365(b)(1)(A) of the Bankruptcy Code and as may be negotiated between Buyer and the respective counterparty, but subject to its rights otherwise provided under this Agreement, satisfy all undisputed Cure Obligations relating to Assigned Contracts on the Closing Date.

9.7    Deliveries.  Buyer shall have made, or be prepared to make at the Closing, all of the deliveries set forth in Section 11.3.

17

3292141.11

9.8     Sale Order Date.  The Bankruptcy Court shall enter a Sale Order authorizing and approving the sale to Buyer no later than April 19, 2019.

## ARTICLE X
## EMPLOYEES AND BENEFIT PLANS

10.1    Transferred Employees.

(a)     Buyer, may, in its discretion, make written offers of employment effective as of the Closing to any or all of the current employees of Seller.

(b)     Seller shall provide Buyer with a schedule of all employees, including their positions and compensation no later than twenty (20) days prior to the Auction Date.  On or before the Bid Deadline, Buyer shall provide Seller with a list of all Seller's employees to whom Buyer has made an offer of employment to be effective on the Closing Date, and if known, indicating whether the offer of employment has been accepted.  Those employees who accept Buyer's offer of employment are referred to herein as "Transferred Employees".  Effective immediately before the Closing, Seller shall terminate the employment of all the Transferred Employees.

10.2    Employee Benefits.  Except as set forth in this Article X or as otherwise agreed to by the Parties, all liabilities and obligations in respect of Seller's past, present and future employees occurring prior to the Closing shall be Excluded Liabilities.

## ARTICLE XI
## CLOSING

11.1    Closing.  The consummation of the transactions contemplated hereby (the "Closing") shall take place at the Syracuse, New York offices of Bond Schoeneck & King, PLLC, at 10:00 a.m. (prevailing New York time) on or before May 3, 2019 (the "Closing Date").  All proceedings to be taken and all documents to be executed and delivered by all Parties at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

11.2    Deliveries by Seller.  At or prior to the Closing, Seller shall deliver to Buyer the following, each dated the Closing Date and duly executed by Seller:

(a)     Such certificates of title, bills of sale, assignments, deeds or other instruments of transfer, conveyance or assignment, all in form and substance reasonably acceptable to Buyer, as shall be effective to vest in Buyer title to the Purchased Assets free and clear of all Encumbrances other than the Assumed Liabilities and Permitted Encumbrances;

(b)     An Assignment and Assumption of Lease Agreement providing for Buyer to occupy the Buffalo Property, executed by the Buffalo Landlord;

(c)     A true and correct copy of the Sale Order; and

3292141.11

(d)    A certificate, signed by an officer of Seller, certifying as to the accuracy of Seller's representations and warranties as of the Closing Date.

11.3    <u>Deliveries by Buyer</u>.  At the Closing, Buyer shall deliver to Seller the following, each dated the Closing Date and duly executed by Buyer:

(a)    One or more Assignment and Assumption Agreements, in form and substance reasonably acceptable to Seller, evidencing Buyer's obligation to pay, discharge and perform the Assumed Liabilities, including the Cure Obligations;

(b)    A lease agreement providing for Buyer to occupy the Syracuse Property, executed by the Syracuse Landlord;

(c)    A certificate, signed by an officer of Seller, certifying as to the accuracy of Buyer's representations and warranties as of the Closing Date;

(d)    The Closing Payment;

(e)    The AR Note;

(f)    The Subordinated Note;

(g)    The Security Agreement; and

(h)    The Letter Agreement.

## ARTICLE XII
## TERMINATION

12.1    <u>Termination</u>.  This Agreement may be terminated on written notice as follows:

(a)    By mutual consent of Seller, Buyer and HSBC Bank;

(b)    By either Party, in the event of a material Breach by the other Party of any representation, warranty, covenant or obligation of such Party under this Agreement which remains uncured after notice and a reasonable opportunity to cure (which except in the case of a breach of the obligations to consummate the transaction, shall not be less than ten (10) Business Days);

(c)    By Buyer, if any of the conditions in Article VIII of this Agreement have not been satisfied in all material respects on or before the Closing Date and Buyer is not the reason why such conditions have not been satisfied, or if satisfaction of a condition is or becomes impossible (other than through the failure of Buyer to comply with its obligations under this Agreement) and Buyer has not waived the condition on or before the Closing Date;

(d)    By Seller, if any of the conditions in Article IX of this Agreement have not been satisfied in all material respects on or before the Closing Date and Seller is not the reason why such conditions have not been satisfied, or if satisfaction of a condition is or becomes impossible

3292141.11

(other than through the failure of Seller to comply with its obligations under this Agreement) and Seller has not waived the condition on or before the Closing Date;

(e)    By Seller if the Closing has not occurred by May 3, 2019;

(f)    By either Party if the Seller consummates a sale of all or substantially all of the Purchased Assets to an Alternate Bidder in accordance with Article 6;

(g)    By Buyer pursuant to Section 6.8 of this Agreement.

12.2    Effect of Termination.

(a)    In the event this Agreement is terminated pursuant to Section 12.1(a), (c) or (f), this Agreement shall be null and void and neither Party shall have any remaining obligations to the other Party with respect hereto and Seller shall return the Deposit to Buyer.

(b)    In the event Seller terminates this Agreement pursuant to Section 12.1(b) or (e), Seller shall retain the Deposit and Buyer shall be liable to Seller for any and all Losses incurred or suffered by Seller. In the event Buyer terminates this Agreement pursuant to Section 12.1(b) or (e), Seller's sole obligation to Buyer shall be to return the Deposit.

## ARTICLE XIII
## INDEMNIFICATION

13.1    No Indemnification by Seller.    All representations, warranties, covenants and agreements made by Seller in this Agreement shall terminate as of the Closing. Buyer shall bring no claim against Seller for any reason after Closing.

13.2    Indemnification by Buyer.

(a)    Buyer will indemnify, defend and hold Seller harmless from and against any Losses arising directly or indirectly from any of the following, regardless of whether the claim arises under contract, breach of warranty, tort or other legal theory:

(i)    any Breach of any representation or warranty made by Buyer in this Agreement or in any agreement or certificate delivered by Buyer at Closing;

(ii)    any Breach by Buyer of any covenant or obligation of Buyer in this Agreement or in any agreement or certificate delivered by Buyer at Closing;

(iii)    any claim by any Person for brokerage or finder's fees or commissions or similar payments that remain unpaid after the Closing and which are based upon any agreement or understanding alleged to have been made by such Person with Buyer (or any Person acting on its behalf) in connection with the contemplated transactions; or

(iv)    Buyer's operation, ownership, and utilization of the Purchased Assets after the Closing Date.

20

(b)    All of the representations, warranties, covenants, and agreements made by Buyer in this Agreement shall survive the Closing.

## ARTICLE XIV
## MISCELLANEOUS

14.1    Entire Agreement.    This Agreement constitutes the entire understanding between the Parties with respect to the subject matter contained herein and supersedes any prior understandings and agreements among them respecting such subject matter.

14.2    Headings.    The headings in this Agreement are for convenience of reference only and shall not affect its interpretation.

14.3    Notices.    All notices or other communications required hereunder shall be in writing and shall be deemed to have been given if delivered personally, on the next day if mailed by overnight mail, to the addresses of the Parties as follows:

If to Seller:

> Centerstone Linen Services, LLC d/b/a Clarus Linen Systems
> Atlas Health Care Linen Services Co., LLC d/b/a Clarus Linen Systems
> 60 Grider Street
> Buffalo, New York  14215
> Attention: Ronald Teplitsky, Chief Restructuring Officer

> with a copy to:

> Bond, Schoeneck & King, PLLC
> One Lincoln Center
> Syracuse, New York 13202
> Attention:  Camille Hill, Esq. and Stephen A. Donato, Esq.

If to Buyer:

> Linen Newco LLC
> 50 Fountain Plaza
> Suite 1700
> Buffalo, New York  14202
> Attention: Gerald Lippes

21

3292141.11

with a copy to:

Lippes Mathias Wexler Friedman LLP
50 Fountain Plaza
Suite 1700
Buffalo, New York  14202
Attention:  Raymond L. Fink, Esq. and John A. Mueller, Esq.

14.4    Exhibits and Schedules. Each Exhibit and Schedule referred to herein is incorporated into this Agreement by such reference.

14.5    Severability.  If any provision of this Agreement is held to be illegal, invalid or unenforceable such illegality, invalidity or unenforceability will not affect any other provision hereof. This Agreement shall, in such circumstances be deemed modified to the extent necessary to render enforceable the provisions hereof.

14.6    Waiver. Except as otherwise provided in this Agreement, the failure of any Party to insist upon strict performance of any of the terms or conditions of this Agreement will not constitute a waiver of any of its rights hereunder.

14.7    Assignment. Buyer may not assign any of its rights or delegate any of its obligations hereunder without the prior written consent of the Seller. Seller may freely assign its rights, but shall not assign its obligations without Buyer's prior written consent.

14.8    Successors and Assigns. This Agreement binds, inures to the benefit of, and is enforceable by the successors and permitted assigns of the Parties, including any trust which may be created as part of any plan of liquidation established by Seller, and does not confer any rights on any other Persons or entities.

14.9    Governing Law. This Agreement, and all other documents executed in connection with this Agreement shall be construed and enforced in accordance with the Laws of the State of New York, without reference to any conflict of law principles.

14.10   Venue. Buyer and Seller agree that all actions brought, arising out of, or related to the transactions contemplated in this Agreement shall be brought in the Bankruptcy Court, and the Bankruptcy Court shall retain jurisdiction to determine any and all such actions. Each Party hereby irrevocably consents to the personal and subject matter jurisdiction of the Bankruptcy Court and agrees that the Bankruptcy Court may enter final and binding judgments with respect to any controversy arising from or related to this Agreement and the transactions contemplated herein. In the event the Bankruptcy Court for any reason declines to exercise jurisdiction each Party hereby consents to the personal jurisdiction of any state or federal court having competent subject matter jurisdiction located in Onondaga County, New York.

14.11   Amendments. This Agreement may be amended only by a written instrument duly executed by all of the Parties and consented to by HSBC Bank in writing, or the Sale Order.

3292141.11

14.12   Counterparts.  This Agreement may be executed in any number of counterparts and any Party hereto may execute any such counterpart, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument.  In order to facilitate execution of this Agreement, electronic or facsimile signatures shall be deemed to be original signatures.

14.13   No Third Party Beneficiaries.  This Agreement is solely for the benefit of the Parties hereto and no provision of this Agreement shall be deemed to confer upon any other Person any remedy, claim, liability, reimbursement, cause of action or other right.

14.14   Expenses.  Except as otherwise provided in this Agreement or in the Bid Procedures Order, each of the Parties shall pay its own expenses in connection with this Agreement and the transactions contemplated hereby, including, without limitation, any legal and accounting fees, whether or not the transactions contemplated hereby are consummated.

[Remainder of Page Intentionally Left Blank]

3292141.11

IN WITNESS WHEREOF, the Parties hereto have executed and delivered this Asset Purchase Agreement as of the date first above written.

**SELLER:**

**CENTERSTONE LINEN SERVICES, LLC d/b/a CLARUS LINEN SYSTEMS**

**ATLAS HEALTH CARE LINEN SERVICES CO., LLC d/b/a CLARUS LINEN SYSTEMS**

By:
Name: Ronald Teplitsky
Title:   Chief Restructuring Officer

**BUYER:**

**LINEN NEWCO LLC**

By:
Name: Gerald Lippes
Title:   Manager

3292141.11

IN WITNESS WHEREOF, the Parties hereto have executed and delivered this Asset Purchase Agreement as of the date first above written.

**SELLER:**

**CENTERSTONE LINEN SERVICES, LLC
d/b/a CLARUS LINEN SYSTEMS**

**ATLAS HEALTH CARE LINEN SERVICES
CO., LLC d/b/a CLARUS LINEN SYSTEMS**

By: _____
Name: Ronald Teplitsky
Title:   Chief Restructuring Officer


**BUYER:**

**LINEN NEWCO LLC**

By: _____
Name: Gerald Lippes
Title:   Manager

03292141.11

**Exhibit 3.2(c)(i)**

**Subordinated Note with HSBC Bank**



**TERM NOTE**

**$1,000,000.00**                                                    **As of _____, 2019**

For value received, the undersigned **LINEN NEWCO LLC**, a New York limited liability company, with an address of [_____] (the "Borrower"), promises to pay to the order of **HSBC BANK USA, NATIONAL ASSOCIATION**, a bank organized under the laws of the United States of America with an address of 452 Fifth Avenue, 4th Floor, New York, New York 10018 (together with its successors and assigns, the "Bank"), the principal amount of One Million Dollars ($1,000,000.00) ("Loan") on or before [April ___], 2022 (the "Maturity Date"), as set forth below, together with interest from the date hereof on the unpaid principal balance from time to time outstanding until paid in full.  The Borrower shall pay consecutive monthly installments of principal of $27,777.00 commencing on [May 1], 2019, and the same amount on the first (1st) day of each month thereafter until the final installment, which shall be the unpaid balance.

The aggregate principal balance outstanding shall bear interest at a per annum rate of 8%. All accrued and unpaid interest shall be payable monthly in arrears on the 1st day of each month, commencing on [May 1], 2019.

Principal and interest shall be payable at the Bank's main office or at such other place as the Bank may designate in writing in immediately available funds in lawful money of the United States of America without set-off, deduction or counterclaim.  Interest shall be calculated on the basis of actual number of days elapsed and a 360-day year.

This Note may be prepaid in whole or in part upon thirty (30) days prior written notice to the Bank.

At the option of the Bank (but automatically in the case of an Insolvency Default (as hereinafter defined)), this Note shall become immediately due and payable without notice or demand upon the occurrence at any time of any of the following events of default (each, an "Event of Default"): (1) default of any liability, obligation, covenant or undertaking of the Borrower, any endorser or any guarantor hereof to the Bank, hereunder or otherwise, including, without limitation, failure to pay in full and when due any installment of principal or interest or default of the Borrower, any endorser or any guarantor hereof under any other loan document delivered by the Borrower, any endorser or any guarantor, or in connection with the loan evidenced by this Note or any other agreement by the Borrower, any endorser or any guarantor with the Bank; (2) failure of the Borrower, any endorser or any guarantor hereof to maintain aggregate collateral security value satisfactory to the Bank; (3) default of any liability, obligation or undertaking of the Borrower, any endorser or any guarantor hereof to any other party; (4) if any statement, representation or warranty heretofore, now or hereafter made by the Borrower, any endorser or any guarantor hereof in connection with the loan evidenced by this Note or in any supporting financial statement of the Borrower, any endorser or any guarantor hereof shall

# HSBC ◀X▶

be determined by the Bank to have been false or misleading in any material respect when made; (5) if the Borrower, any endorser or any guarantor hereof is a corporation, trust, partnership or limited liability company, the liquidation, termination or dissolution of any such organization, or the merger or consolidation of such organization into another entity, or such entity's ceasing to carry on actively its present business or the appointment of a receiver for its property; (6) the death of any endorser or any guarantor hereof and, if any endorser or any guarantor hereof is a partnership or limited liability company, the death or judicial declaration of incompetence of any partner or member; (7) the institution by or against the Borrower, any endorser or any guarantor hereof of any proceedings under the Bankruptcy Code 11 USC § 101 et seq. or any other law in which the Borrower, any endorser or any guarantor hereof is alleged to be insolvent or unable to pay its debts as they mature, or the making by the Borrower, any endorser or any guarantor hereof of an assignment for the benefit of creditors or the granting by the Borrower, any endorser or any guarantor hereof of a trust mortgage for the benefit of creditors (each of the foregoing in this subclause, an "Insolvency Default"); (8) the service upon the Bank of a writ in which the Bank is named as trustee of the Borrower, any endorser or any guarantor hereof; (9) a judgment or judgments for the payment of money shall be rendered against the Borrower, any endorser or any guarantor hereof, and any such judgment shall remain unsatisfied and in effect for any period of thirty (30) consecutive days without a stay of execution; (10) any levy, lien (including mechanics lien) except as permitted under any of the other loan documents between the Bank and the Borrower, seizure, attachment, execution or similar process shall be issued or levied on any of the property of the Borrower, any endorser or any guarantor hereof; (11) the termination or revocation of any guaranty hereof; or (12) the occurrence of such a change in the condition or affairs (financial or otherwise) of the Borrower, any endorser or any guarantor hereof, or the occurrence of any other event or circumstance, such that the Bank, in its sole discretion, deems that it is insecure or that the prospects for timely or full payment or performance of any obligation of the Borrower, any endorser or any guarantor hereof to the Bank has been or may be impaired.

Any payments received by the Bank on account of this Note shall, at the Bank's option, be applied first, to accrued and unpaid interest; second, to the unpaid principal balance hereof; third, to any costs, expenses or charges then owed to the Bank by the Borrower; and the balance to escrows, if any.  Notwithstanding the foregoing, any payments received after demand for payment shall be applied in such manner as the Bank may determine.  The Borrower hereby authorizes the Bank to charge any deposit account which the Borrower may maintain with the Bank for any payment required hereunder without prior notice to the Borrower.

If pursuant to the terms of this Note, the Borrower is at any time obligated to pay interest on the principal balance at a rate in excess of the maximum interest rate permitted by applicable law for the loan evidenced by this Note, the applicable interest rate shall be immediately reduced to such maximum rate and all previous payments in excess of the maximum rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.

**The Borrower represents to the Bank that the proceeds of this Note will not be used for personal, family or household purposes or for the purpose of purchasing or carrying**

# HSBC ◆X▶

**margin stock or margin securities within the meaning of Regulations U and X of the Board of Governors of the Federal Reserve System, 12 C.F.R. Parts 221 and 224.**

The Borrower and each endorser and guarantor hereof grant to the Bank a continuing lien on and security interest in any and all deposits or other sums at any time credited by or due from the Bank (or any of its banking or lending affiliates, or any bank acting as a participant under any loan arrangement between the Bank and the Borrower, or any third party acting on the Bank's behalf (collectively, the "Bank Affiliates")) to the Borrower and/or each endorser or guarantor hereof and any cash, securities, instruments or other property of the Borrower and each endorser and guarantor hereof in the possession of the Bank or any Bank Affiliate, whether for safekeeping or otherwise, or in transit to or from the Bank or any Bank Affiliate (regardless of the reason the Bank or Bank Affiliate had received the same or whether the Bank or Bank Affiliate has conditionally released the same) as security for the full and punctual payment and performance of all of the liabilities and obligations of the Borrower and/or any endorser or guarantor hereof to the Bank or any Bank Affiliate and such deposits and other sums may be applied or set off against such liabilities and obligations of the Borrower or any endorser or guarantor hereof to the Bank or any Bank Affiliate at any time, whether or not such are then due, whether or not demand has been made and whether or not other collateral is then available to the Bank or any Bank Affiliate.

No delay or omission on the part of the Bank in exercising any right hereunder shall operate as a waiver of such right or of any other right of the Bank, nor shall any delay, omission or waiver on any one occasion be deemed a bar to or waiver of the same or any other right on any future occasion.  The Borrower and every endorser or guarantor of this Note, regardless of the time, order or place of signing, waives presentment, demand, protest, notice of intent to accelerate, notice of acceleration and all other notices of every kind in connection with the delivery, acceptance, performance or enforcement of this Note and assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of collateral, and to the addition or release of any other party or person primarily or secondarily liable and waives all recourse to suretyship and guarantor defenses generally, including any defense based on impairment of collateral.

The Borrower and each endorser and guarantor of this Note shall indemnify, defend and hold the Bank and the Bank Affiliates and their directors, officers, employees, agents and attorneys harmless against any claim brought or threatened against the Bank by the Borrower, by any endorser or guarantor, or by any other person (as well as from attorneys' reasonable fees and expenses in connection therewith) on account of the Bank's relationship with the Borrower or any endorser or guarantor hereof (each of which may be defended, compromised, settled or pursued by the Bank with counsel of the Bank's selection, but at the expense of the Borrower and any endorser and/or guarantor), except for any claim arising out of the gross negligence or willful misconduct of the Bank.

The Borrower and each endorser and guarantor of this Note agree to pay, upon demand, costs of collection of all amounts under this Note including, without limitation, principal and interest, or in connection with the enforcement of, or realization on, any security for this Note, including, without limitation, to the extent permitted by applicable law, reasonable attorneys'

# HSBC ◆◆▶

fees and expenses. Upon the occurrence and during the continuance of an Event of Default, interest shall accrue at a rate per annum equal to the aggregate of 3.0% plus the rate provided for herein. If any payment due under this Note is unpaid for 10 days or more, the Borrower shall pay, in addition to any other sums due under this Note (and without limiting the Bank's other remedies on account thereof), a late charge equal to 5.0% of such unpaid amount.

This Note shall be binding upon the Borrower and each endorser and guarantor hereof and upon their respective heirs, successors, assigns and legal representatives, and shall inure to the benefit of the Bank and its successors, endorsees and assigns.

The liabilities of the Borrower and each Borrower, if more than one, and any endorser or guarantor of this Note are joint and several; provided, however, the release by the Bank of the Borrower or any one or more endorsers or guarantors shall not release any other person obligated on account of this Note. Any and all present and future debts of the Borrower to any endorser or guarantor of this Note are subordinated to the full payment and performance of all present and future debts and obligations of the Borrower to the Bank. Each reference in this Note to the Borrower and each Borrower, if more than one, any endorser, and any guarantor, is to such person individually and also to all such persons jointly. No person obligated on account of this Note may seek contribution from any other person also obligated, unless and until all liabilities, obligations and indebtedness to the Bank of the person from whom contribution is sought have been irrevocably satisfied in full. The release or compromise by the Bank of any collateral shall not release any person obligated on account of this Note.

The Borrower and each endorser and guarantor hereof each authorizes the Bank to complete this Note if delivered incomplete in any respect. A photographic or other reproduction of this Note may be made by the Bank, and any such reproduction shall be admissible in evidence with the same effect as the original itself in any judicial or administrative proceeding, whether or not the original is in existence.

The Borrower will from time to time execute and deliver to the Bank such documents, and take or cause to be taken, all such other further action, as the Bank may request in order to effect and confirm or vest more securely in the Bank all rights contemplated by this Note or any other loan documents related thereto (including, without limitation, to correct clerical errors) or to vest more fully in or assure to the Bank the security interest in any collateral securing this Note or to comply with applicable statute or law.

This Note is delivered to the Bank at one of its offices and shall be governed by the laws of the State of New York without giving effect to the conflicts of laws principles thereof.

Any notices under or pursuant to this Note shall be deemed duly received and effective if delivered in hand to any officer or agent of the Borrower or Bank, or if mailed by registered or certified mail, return receipt requested, addressed to the Borrower or Bank at the address set forth in this Note or as any party may from time to time designate by written notice to the other party.

# HSBC ◀✕▶

No change in any provision of this Note may be made except by a writing signed by authorized signers of both parties to this Note, except that the Bank is authorized to fill in any blank spaces and to otherwise complete this Note and correct any patent errors herein.

All of the Bank's rights and remedies not only under the provisions of this Note but also under any other agreement or transaction shall be cumulative and not alternative or exclusive, and may be exercised by the Bank at such time or times and in such order of preference as the Bank in its sole discretion may determine.

**IN ANY ACTION, SUIT OR PROCEEDING IN RESPECT OF OR ARISING OUT OF THIS NOTE, BORROWER AND EACH ENDORSER WAIVE (i) THE RIGHT TO INTERPOSE ANY SET-OFF OR COUNTERCLAIM OF ANY NATURE OR DESCRIPTION, (ii) ANY OBJECTION BASED ON FORUM NON CONVENIENS OR VENUE AND (iii) ANY CLAIM FOR CONSEQUENTIAL, PUNITIVE OR SPECIAL DAMAGES.**

The Borrower and each endorser and guarantor of this Note each irrevocably submits to the nonexclusive jurisdiction of any Federal or state court sitting in New York, over any suit, action or proceeding arising out of or relating to this Note. Each of the Borrower and each endorser and guarantor irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that the same has been brought in an inconvenient forum. Each of the Borrower and each endorser and guarantor hereby consents to any and all process which may be served in any such suit, action or proceeding, (i) by mailing a copy thereof by registered and certified mail, postage prepaid, return receipt requested, to the Borrower's, endorser's or guarantor's address shown below or as notified to the Bank and (ii) by serving the same upon the Borrower(s), endorser(s) or guarantor(s) in any other manner otherwise permitted by law, and agrees that such service shall in every respect be deemed effective service upon the Borrower or such endorser or guarantor.

**THE BORROWER, EACH ENDORSER AND GUARANTOR AND THE BANK EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, (A) WAIVES ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS NOTE, ANY OF THE OBLIGATIONS OF THE BORROWER, EACH ENDORSER AND GUARANTOR TO THE BANK, AND ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH AND (B) AGREES NOT TO SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CAN NOT BE, OR HAS NOT BEEN, WAIVED. THE BORROWER, EACH ENDORSER AND GUARANTOR AND THE BANK EACH CERTIFIES THAT NEITHER THE BANK NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE BANK WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.**



**Sanctions and Anti-Bribery Provisions**:

(a)     None of the Borrower, any of its subsidiaries, or to the knowledge of Borrower or any of its subsidiaries, any director or officer, or any employee, agent, or affiliate, of the Borrower or any of its subsidiaries is an individual or entity ("Person") that is, or is owned or controlled by Persons that are, (i) the subject of any sanctions administered or enforced by the US Department of the Treasury's Office of Foreign Assets Control ("OFAC"), the US Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasury or the Hong Kong Monetary Authority Transaction (collectively, "Sanctions"), or (ii) located , organized or resident in a country or territory that is, or whose government is, the subject of Sanctions, including, without limitation, currently, Cuba, the Crimea region of Ukraine, Iran, North Korea, Sudan and Syria.

(b)     None of the Borrower, nor to the knowledge of the Borrower, any director, officer, agent, employee, affiliate or other person acting on behalf of the Borrower or any of its subsidiaries is aware of or has taken any action, directly or indirectly, that would result in a violation by such persons of any applicable anti-bribery law, including but not limited to, the United Kingdom Bribery Act 2010 (the "UK Bribery Act") and the U.S. Foreign Corrupt Practices Act of 1977 (the "FCPA"). Furthermore, the Borrower and, to the knowledge of the Borrower, its affiliates have conducted their businesses in compliance with the UK Bribery Act, the FCPA and similar laws, rules or regulations and have instituted and maintain policies and procedures designed to ensure, and which are reasonably expected to continue to ensure, continued compliance therewith.

(c)     The Borrower will not, directly or indirectly, use the proceeds of the Loan, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person, (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions or (ii) in any other manner that would result in a violation of Sanctions by any Person (including any Person participating in the Loan, whether as underwriter, advisor, investor or otherwise).

(d)     No part of the proceeds of the Loan will be used, directly or indirectly, for any payments that could constitute a violation of any applicable anti-bribery law.

**Anti-Terrorism Laws:**

(a)     <u>General</u>.  None of the Borrower, any of its subsidiaries, or to the knowledge of Borrower or any of its subsidiaries, any director or officer, or any employee, agent, or affiliate, of the Borrower or any of its subsidiaries is in violation of any Anti-Terrorism Law or engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(b)     <u>Executive Order No. 13224</u>.  None of the Borrower, any of its subsidiaries, or to the knowledge of Borrower or any of its subsidiaries, any director or officer, or any employee, agent, or affiliate, of the Borrower or any of its subsidiaries is acting or benefiting in any

# HSBC ◀✕▶

capacity in connection with the Loan or other transactions hereunder, is any of the following (each a "Blocked Person");

a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224;

a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224;

a Person or entity with which the Bank is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

a Person or entity that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order No. 13224;

a Person or entity that is named as a "specially designated national" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control at its official website or any replacement website or other replacement official publication of such list; or

a Person or entity who is affiliated or associated with a Person or entity listed above.

Neither the Borrower nor any of its Subsidiaries, any of their agents acting in any capacity in connection with the Credit or other transactions hereunder (i) conducts any business or engages in making or receiving any contributions of funds, goods or services to or for the benefit of any Blocked Person, or (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order No. 13224.



Executed as of _____, 2019

LINEN NEWCO LLC


By _____
Name:
Title:


Doc #01-3279673.2

**Exhibit 3.2(c)(ii)**

**Security Agreement with HSBC Bank**

# GENERAL SECURITY AGREEMENT

**Date as of:** _____, 2019

**LINEN NEWCO LLC,** a New York limited liability company, whose address is [_____] ("Debtor") and **HSBC BANK USA, NATIONAL ASSOCIATION,** whose address is 452 Fifth Avenue, 4th Floor, New York, New York 10018 ("Secured Party"), agree as follows:

      1.    **Security Interest.** Debtor hereby grants to Secured Party a second-priority security interest ("Security Interest") in all right, title and interest of Debtor in all Equipment and Inventory, wherever located and whether now owned or hereafter owned or acquired by Debtor, whether or not affixed to realty, in all Proceeds and Products thereof in any form, in all parts, accessories, attachments, special tools, additions, replacements, substitutions and accessions thereto or therefor, in all supporting obligations thereof and in all increases or profits received therefrom (collectively, the "Collateral"). Capitalized terms used but not defined in this paragraph shall have the meaning given to such term in Article 9 of the Uniform Commercial Code, as in effect from time to time, of the State of New York

      2.    **Indebtedness Secured.** The Security Interest secures payment of any and all indebtedness of Debtor to Secured Party ("Indebtedness"), whether now existing or hereafter incurred, of every kind and character, direct or indirect, and whether such Indebtedness is from time to time reduced and thereafter increased, or entirely extinguished and thereafter reincurred, including, without limitation: (a) Indebtedness not yet outstanding, but contracted for, or with respect to which any other commitment by Secured Party exists; (b) all interest provided in any instrument, document, or agreement (including this Security Agreement) which accrues on any Indebtedness until payment of such Indebtedness in full; (c) any moneys payable as hereinafter provided; and (d) any debts owed or to be owed by Debtor to others which Secured Party has obtained, or may obtain, by assignment or otherwise.

      3.    **Representations and Warranties of Debtor.** Debtor represents and warrants, and, so long as this Security Agreement is in effect, shall be deemed continuously to represent and warrant that: (a) Debtor is the owner of the Collateral free of all security interests or other encumbrances, except the Security Interest and except as specified in an appropriate schedule hereto; (b) Debtor is authorized to enter into this Security Agreement; (c) any and all trade names, division names, assumed names or other names under which Debtor transacts any part of its business are specified in an appropriate schedule hereto; Debtor's business address and chief executive office or principal office are specified above or on an appropriate schedule hereto; Debtor's form and State or jurisdiction of organization are specified in an appropriate schedule hereto, Debtor's Tax ID Number and Organizational Number, if any, are specified on the Schedule hereto, and Debtor's records concerning the Collateral are kept at one of the addresses specified above; (d) each Account, General Intangible and Chattel Paper constituting Collateral is genuine and enforceable in accordance with its terms against the party obligated to

- 2 -

pay it ("Account Debtor"); and no Account Debtor has any defense, setoff, claim or counterclaim against Debtor which can be asserted against Secured Party, whether in any proceeding to enforce the Collateral or otherwise; (e) the amounts represented from time to time by Debtor to Secured Party as owing by each Account Debtor or by all Account Debtors will be and are the correct amounts actually and unconditionally owing by such Account Debtor or Debtors individually and in the aggregate, except for normal cash discounts where applicable; (f) each Instrument and each Document constituting Collateral is genuine and in all respects what it purports to be; (g) any Collateral which is a Fixture is affixed to real property at Debtor's address specified above or as specified in an appropriate schedule hereto, and such real property is owned by Debtor or by the person or persons named in such schedule and is encumbered only by the mortgage or mortgages listed on such schedule; and (h) any Collateral which is a Deposit Account, Commodity Account, Securities Account or letter of credit is specifically described on an appropriate schedule hereto.

                4.    **Covenants of Debtor**.  So long as this Security Agreement is in effect, Debtor:

                (a)    will defend the Collateral against the claims and demands of all other parties, including, without limitation, defenses, setoffs, claims and counterclaims asserted by any Account Debtor against Debtor or Secured Party, except, as to Inventory, purchasers and lessees in the ordinary course of Debtor's business; will keep the Collateral free from all security interests or other encumbrances, except the Security Interest and except as specified in an appropriate schedule hereto; and will not sell, transfer, lease, assign, deliver or otherwise dispose of any Collateral or any interest therein without the prior written consent of Secured Party, except that, until the occurrence of an event of default as specified in paragraph 10 hereof Debtor may sell or lease Inventory in the ordinary course of Debtor's business; (b) will send to Secured Party financial statements in such form and at such intervals as Secured Party shall request; will keep, in accordance with generally accepted accounting principles consistently applied, accurate and complete books and records, including, without limitation, records concerning the Collateral; at Secured Party's request, will mark any and all such books and records to indicate the Security Interest; will permit Secured Party or its agents to inspect the Collateral and to audit and make extracts from or copies of such books and records and any of Debtor's ledgers, reports, correspondence or other books and records; and will duly account to Secured Party's satisfaction, at such time or times as Secured Party may require, for any of the Collateral; (c) will send to Secured Party upon demand, all Documents and all Chattel Paper (duly indorsed to Secured Party) constituting, representing or relating to the Collateral or any part thereof, and any schedules, invoices, shipping documents, delivery receipts, purchase orders, contracts or other documents representing or relating to the Collateral or any part thereof; (d) will notify Secured Party promptly in writing of any change in Debtor's business address or chief executive office or principal office, any change in the address at which records concerning the Collateral are kept and any change in Debtor's name, identity or corporate or other structure or form or State of organization; (e) will not, without Secured Party's written consent, make or agree to make any alteration, modification or cancellation of, or substitution for, or credits, adjustments or allowances on, Accounts, General Intangibles or Chattel Paper constituting Collateral; will send

- 3 -

to Secured Party, on request, all credit and other information respecting the financial condition of any Account Debtor; and will notify Secured Party promptly of any default by any Account Debtor in payment or other performance of obligations with respect to any Collateral; (f) will keep the Collateral in good condition and repair; and will not use the Collateral in violation of any provisions of this Security Agreement, of any applicable statute, regulation or ordinance or of any policy insuring the Collateral; (g) will pay all taxes, assessments and other charges of every nature which may be imposed, levied or assessed against Debtor or any of Debtor's assets, prior to the date of attachment of any penalties or liens with respect thereto (other than liens attaching prior to payment becoming due, if payment is made when due), provided, however, Debtor shall not be required to pay any such tax, assessment or other charge so long as its validity is being contested in good faith by appropriate proceedings diligently conducted; (h) will insure the Collateral against risks, in coverage, form and amount, and by insurer, satisfactory to Secured Party, and, at Secured Party's request, will cause each policy to be payable to Secured Party as a named insured or loss payee, as its interest may appear, and deliver each policy or certificate of insurance to Secured Party; (i) will prevent the Collateral or any part thereof from being or becoming an accession to other goods not covered by this Security Agreement; (j) in connection herewith, will authorize or otherwise execute and deliver to Secured Party such financing statements, assignments and other documents and do such other things relating to the Collateral and the Security Interest as Secured Party may request, and pay all costs of title searches and filing financing statements, assignments and other documents in all public offices requested by Secured Party; and will not, without the prior written consent of Secured Party, file or authorize or permit to be filed in any public office any financing statement naming Debtor as debtor and not naming Secured Party as secured party; (k) will notify Secured Party of the particulars of the Debtor's rights under any Commercial Tort Claims promptly after such rights arise; (l) will not place the Collateral in any warehouse which may issue a negotiable document with respect thereto; (m) will not place the Collateral with any third party who has not previously (i) acknowledged the Security Interest and (ii) provided an authenticated record, in form and substance satisfactory to Secured Party, acknowledging that such third party holds possession of the Collateral for the benefit of the Secured Party; (n) with respect to all locations of Collateral leased by Debtor, will, upon request of Secured Party, obtain waivers from mortgagees and landlords in form and substance satisfactory to the Secured Party and (o) will cooperate with Secured Party in obtaining control of Collateral consisting of Deposit Accounts, Investment Property, Letter-of-Credit Rights or Electronic Chattel Paper including, but not limited to, entering into one or more control agreements, assignments, or any cash management arrangement as Secured Party may request.

        5.        **Verification of Collateral**.  Secured Party shall have the right to verify all or any Collateral in any manner and through any medium Secured Party may consider appropriate, and Debtor agrees to furnish all assistance and information and perform any acts which Secured Party may require in connection therewith and to pay all of Secured Party's costs therefor.

        6.        **Notification and Payments**.

- 4 -

Before or after the occurrence of an Event of Default, Secured Party may (i) notify all or any Account Debtors of the Security Interest and may also direct such Account Debtors to make all payments on Collateral directly to Secured Party; and (ii) enforce obligations of an Account Debtor or other person obligated on Collateral and exercise the rights of the Debtor with respect to the obligation of the Account Debtor, and with respect to property that secures the obligation of an Account Debtor or other persons obligated on the Collateral. All payments on and from Collateral received by Secured Party directly or from Debtor shall be applied to the Indebtedness in such order and manner and at such time as Secured Party shall, in its sole discretion, determine. Secured Party may demand of Debtor in writing, before or after notification to Account Debtors and without waiving in any manner the Security Interest, that any payments on and from the Collateral received by Debtor: (i) shall be held by Debtor in trust for Secured Party in the same medium in which received; (ii) shall not be commingled with any assets of Debtor; and (iii) shall be delivered to Secured Party in the form received, properly indorsed to permit collection, not later than the next business day following the day of their receipt; and Debtor shall comply with such demand. Debtor shall also promptly notify Secured Party of the return to or repossession by Debtor of Goods underlying any Collateral, and Debtor shall hold the same in trust for Secured Party and shall dispose of the same as Secured Party directs.

7.    **Registered Holder of Collateral**. If any Collateral consists of investment securities, Debtor authorizes Secured Party to transfer the same or any part thereof into its own name or that of its nominee so that Secured Party or its nominee may appear of record as the sole owner thereof; provided, that so long as no event of default has occurred, Secured Party shall send promptly to Debtor all notices, statements or other communications received by it or its nominee as such registered owner, and upon demand and receipt of payment of necessary expenses thereof, shall give to Debtor or its designee a proxy or proxies to vote and take all action with respect to such securities. If any Collateral consists of General Intangibles or Investment Property that is certificated, upon request of Secured Party, Debtor shall deliver such certificates to the Secured Party, along with a blank stock power, or other evidence of transfer, as requested by Secured Party. After the occurrence of any event of default, Debtor waives all rights to be advised of or to receive any notices, statements or communications received by Secured Party or its nominee as such record owner, and agrees that no proxy or proxies given by Secured Party to Debtor or its designee as aforesaid shall thereafter be effective.

8.    **Income from and Interest on Collateral Consisting of Instruments**.

(a)    Until the occurrence of an event of default, Debtor reserves the right to receive all income from or interest on the Collateral consisting of Instruments, and if Secured Party receives any such income or interest prior to such event of default, Secured Party shall pay the same promptly to Debtor.

(b)    Upon the occurrence of an event of default, Debtor will not demand or receive any income from or interest on such Collateral, and if Debtor receives any such income or interest without any demand by it, same shall be held by Debtor in trust for

- 5 -

Secured Party in the same medium in which received, shall not be commingled with any assets of Debtor and shall be delivered to Secured Party in the form received, properly indorsed to permit collection, not later than the next business day following the day of its receipt.  Secured Party may apply the net cash receipts from such income or interest to payment of any of the Indebtedness, provided that Secured Party shall account for and pay over to Debtor any such income or interest remaining after payment in full of the Indebtedness.

      9.     **Increases, Profits, Payments or Distributions**.

          (a)     Whether or not an event of default has occurred, Debtor authorizes Secured Party:  (i) to receive any increase in or profits on the Collateral (including, without limitation, any stock issued as a result of any stock split or dividend, any capital distributions and the like), and to hold the same as part of the Collateral; and (ii) to receive any payment or distribution on the Collateral upon redemption by, or dissolution and liquidation of, the issuer; to surrender such Collateral or any part thereof in exchange therefor; and to hold the net cash receipts from any such payment or distribution as part of the Collateral.

          (b)     If Debtor receives any such increase, profits, payments or distributions, Debtor will receive and deliver same promptly to Secured Party on the same terms and conditions set forth in paragraph 8(b) hereof respecting income or interest, to be held by Secured Party as part of the Collateral.

      10.     **Events of Default**.

          (a)     Any of the following events or conditions shall constitute an event of default hereunder:  (i) nonpayment when due, whether by acceleration or otherwise, of principal of or interest on any Indebtedness, or default by Debtor in the performance of any obligation, term or condition of this Security Agreement or any other agreement between Debtor and Secured Party; (ii) death or judicial declaration of incompetency of Debtor, if an individual; (iii) the filing by or against Debtor of a request or petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as a bankrupt, relief as a debtor or other relief under the bankruptcy, insolvency or similar laws of the United States or any state or territory thereof or any foreign jurisdiction, now or hereafter in effect; (iv) the making of any general assignment by Debtor for the benefit of creditors; the appointment of a receiver or trustee for Debtor or for any assets of Debtor, including, without limitation, the appointment of or taking possession by a "custodian", as defined in the federal Bankruptcy Code; the making of any, or sending notice of any intended, bulk sale; or the institution by or against Debtor of any other type of insolvency proceeding (under the federal Bankruptcy Code or otherwise) or of any formal or informal proceeding for the dissolution or liquidation of, settlement of claims against or winding up of affairs of, Debtor; (v) the sale, assignment, transfer or delivery of all or substantially all of the assets of Debtor; the cessation by Debtor as a going business concern; the entry of judgment against Debtor, other than a judgment for which Debtor is fully insured, if ten days thereafter such judgment is not satisfied, vacated, bonded or stayed pending appeal; or if Debtor is generally not paying Debtor's debts as such debts become due; (vi) the occurrence of any event

- 6 -

described in paragraph 10(a)(ii), (iii), (iv) or (v) hereof with respect to any indorser, guarantor or any other party liable for, or whose assets or any interest therein secures, payment of any Indebtedness ("Third Party"), or the occurrence of any such event with respect to any general partner of Debtor, if Debtor is a partnership; (vii) if any certificate, statement, representation, warranty or audit heretofore or hereafter furnished by or on behalf of Debtor or any Third Party, pursuant to or in connection with this Security Agreement, or otherwise (including, without limitation, representations and warranties contained herein), or as an inducement to Secured Party to extend any credit to or to enter into this or any other agreement with Debtor, proves to have been false in any material respect at the time as of which the facts therein set forth were stated or certified, or to have omitted any substantial contingent or unliquidated liability or claim against Debtor or any such Third Party; or, if upon the date of execution of this Security Agreement, there shall have been any materially adverse change in any of the facts disclosed by any such certificate, statement, representation, warranty or audit, which change shall not have been disclosed in writing to Secured Party at or prior to the time of such execution; (viii) nonpayment by Debtor when due of any indebtedness for borrowed money owing to any third party, or the occurrence of any event which could result in acceleration of payment of any such indebtedness; or (ix) the reorganization, merger or consolidation of Debtor (or the making of any agreement therefor) without the prior written consent of Secured Party.

(b)    Secured Party, at its sole election, may declare all or any part of any Indebtedness not payable on demand to be immediately due and payable without demand or notice of any kind upon the happening of any event of default (other than an event of default under either paragraph 10(a)(iii) or (iv) hereof), or if Secured Party in good faith believes that the prospect of payment of all or any part of the Indebtedness or performance of Debtor's obligations under this Security Agreement or any other agreement now or hereafter in effect between Debtor and Secured Party is impaired.  All or any part of any Indebtedness not payable on demand shall be immediately due and payable without demand or notice of any kind upon the happening of one or more events of default under paragraph 10(a)(iii) or (iv) hereof.  The provisions of this paragraph are not intended in any way to affect any rights of Secured Party with respect to any Indebtedness which may now or hereafter be payable on demand.

(c)    Secured Party's rights and remedies with respect to the Collateral shall be those of a Secured Party under the Uniform Commercial Code and under any other applicable law, as each of the same may from time to time be in effect, in addition to those rights granted herein and in any other agreement now or hereafter in effect between Debtor and Secured Party.  Upon the existence or occurrence of an event of default, Secured Party may require Debtor to assemble the Collateral and make it available to Secured Party at a place or places designated by Secured Party, and Secured Party may use and operate the Collateral, render the Collateral unusable or dispose of the Collateral in a commercially reasonable manner.

(d)    Without in any way requiring notice to be given in the following time and manner, Debtor agrees that any notice by Secured Party of sale, disposition or other intended action hereunder or in connection herewith, whether required by the Uniform Commercial Code or otherwise, shall constitute reasonable notice to Debtor if such notice is

- 7 -

mailed by regular or certified mail, postage prepaid, at least ten (10) days prior to such action, to either of Debtor's address or addresses specified above or to any other address which Debtor has specified in writing to Secured Party as the address to which notices hereunder shall be given to Debtor.

        (e)     Secured Party shall have no obligation to clean up or otherwise prepare the Collateral for sale, and such inaction will not be considered adversely to affect the commercial reasonableness of any such sale of the Collateral.

        (f)     Secured Party may comply with any applicable law requirements in connection with a disposition of the Collateral, and such compliance will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

        (g)     Secured Party may sell the Collateral without giving any warranties. Secured Party may specifically disclaim any warranties of title or the like. This procedure will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

        (h)     If Secured Party sells any of the Collateral on credit, Debtor will be credited only with payments actually made by the purchaser, received by Secured Party and applied to the Indebtedness. If the purchaser fails to pay for the Collateral, Secured Party may resell the Collateral, and Debtor shall be credited with the proceeds of the sale.

        (i)     Debtor agrees to pay on demand all costs and expenses (including reasonable attorneys' fees and legal expenses) incurred by Secured Party in enforcing this Security Agreement, in realizing upon or protecting any Collateral and in enforcing and collecting any Indebtedness or any guaranty thereof, including, without limitation, if Secured Party retains counsel for advice, suit, appeal, insolvency or other proceedings under the federal Bankruptcy Code or otherwise, or for any of the above purposes, the reasonable attorneys' fees and expenses incurred by Secured Party. Payment of all costs and expenses hereunder is secured by the Collateral.

        11.    **Miscellaneous**.

        (a)     Debtor hereby authorizes Secured Party, at Debtor's expense, to file such financing statement or statements relating to the Collateral without Debtor's signature thereon as Secured Party at its option may deem appropriate, and appoints Secured Party as Debtor's attorney-in-fact (without requiring Secured Party) to execute any such financing statement or statements in Debtor's name and to perform all other acts which Secured Party deems appropriate to perfect and continue the Security Interest and to protect, preserve and realize upon the Collateral. This power of attorney shall not be affected by the subsequent disability or incompetence of Debtor.

- 8 -

(b)     Secured Party may demand, collect and sue on any of the Accounts, Chattel Paper, Instruments and General Intangibles (in either Debtor's or Secured Party's name at the latter's option); may enforce, compromise, settle or discharge such Collateral without discharging the Indebtedness or any part thereof; and may indorse Debtor's name on any and all checks, commercial paper, and any other Instruments pertaining to or constituting Collateral.

(c) (i)    As further security for payment of the Indebtedness, Debtor hereby grants to Secured Party a Security Interest in and lien on any and all property of Debtor which is or may hereafter be in the possession or control of Secured Party in any capacity or of any third party acting on its behalf, including, without limitation, all deposit and other accounts and all moneys owed or to be owed by Secured Party to Debtor; and with respect to all of such property, Secured Party shall have the same rights hereunder as it has with respect to the Collateral; (ii) Without limiting any other right of Secured Party, whenever Secured Party has the right to declare any Indebtedness to be immediately due and payable (whether or not it has so declared), Secured Party at its sole election may set off against the Indebtedness any and all moneys then or thereafter owed to Debtor by Secured Party in any capacity, whether or not the Indebtedness or the obligation to pay such moneys owed by Secured Party is then due, and Secured Party shall be deemed to have exercised such right of set off immediately at the time of such election even though any charge therefor is made or entered on Secured Party's records subsequent thereto.

(d)     Upon Debtor's failure to perform any of its duties hereunder, Secured Party may, but shall not be obligated to, perform any or all such duties, including, without limitation, payment of taxes, assessments, insurance and other charges and expenses as herein provided, and Debtor shall pay an amount equal to the cost thereof to Secured Party on demand by Secured Party.  Payment of all moneys hereunder shall be secured by the Collateral.

(e)     No course of dealing between Debtor and Secured Party and no delay or omission by Secured Party in exercising any right or remedy hereunder or with respect to any Indebtedness shall operate as a waiver thereof or of any other right or remedy, and no single or partial exercise thereof shall preclude any other or further exercise thereof or the exercise of any other right or remedy.  Secured Party may remedy any default by Debtor hereunder or with respect to any Indebtedness in any reasonable manner without waiving the default remedied and without waiving any other prior or subsequent default by Debtor.  All rights and remedies of Secured Party hereunder are cumulative and may be exercised simultaneously.

(f)     Secured Party shall have no obligation to take, and Debtor shall have the sole responsibility for taking, any and all steps to preserve rights against any and all prior parties to any Instrument, Document or Chattel Paper constituting Collateral whether or not in Secured Party's possession.  Secured Party shall not be responsible to Debtor for loss or damage resulting from Secured Party's failure to enforce or collect any such Collateral or to collect any moneys due or to become due thereunder.  Debtor waives protest of any Instrument

- 9 -

constituting Collateral at any time held by Secured Party on which Debtor is in any way liable and waives notice of any other action taken by Secured Party.

(g)    Debtor authorizes Secured Party, without notice or demand and without affecting Debtor's obligations hereunder, from time to time:  (i) to exchange, enforce or release any collateral or any part thereof (other than the Collateral) taken from any party for payment of the Indebtedness or any part thereof; (ii) to release, substitute or modify any obligation of any indorser, guarantor or other party in any way obligated to pay the Indebtedness or any part thereof, or any party who has given any security, mortgage or other interest in any other collateral as security for the payment of the Indebtedness or any part thereof; (iii) upon the occurrence of any event of default as hereinabove provided, to direct the order or manner of disposition of the Collateral and any and all other collateral and the enforcement of any and all indorsements, guaranties and other obligations relating to the Indebtedness or any part thereof, as Secured Party, in its sole discretion, may determine; and (iv) to determine how, when and what application of payments and credits, if any, shall be made on the Indebtedness or any part thereof.

(h)    The rights and benefits of Secured Party hereunder shall, if Secured Party so directs, inure to any party acquiring any interest in the Indebtedness or any part thereof.

(i)    Secured Party and Debtor as used herein shall include the heirs, executors or administrators, or successors or assigns, of those parties.

(j)    If more than one Debtor executes this Security Agreement, the term "Debtor" shall include each as well as all of them and their obligations, warranties and representations hereunder shall be joint and several.

(k)    No modification, rescission, waiver, release or amendment of any provision of this Security Agreement shall be made, except by a written agreement subscribed or otherwise authenticated by Debtor and by a duly authorized officer of Secured Party.

(l)    This Security Agreement and the transaction evidenced hereby shall be construed under the laws of New York State, as the same may from time to time be in effect without regard to principles of conflicts of laws.

(m)    All terms, unless otherwise defined in this Security Agreement, shall have the definitions set forth in the Uniform Commercial Code adopted in New York State, as the same may from time to time be in effect.

(n)    Debtor hereby irrevocably appoints Secured Party the Debtor's agent with full power, in the same manner, to the same extent and with the same effect as if Debtor were to do the same:  to receive and collect all mail addressed to Debtor; to direct the place of delivery thereof to any location designated by Secured Party; to open such mail; to

- 10 -

remove all contents therefrom; to retain all contents thereof constituting or relating to the Collateral; and to perform all other acts which Secured Party deems appropriate to protect, preserve and realize upon the Collateral. The agency hereby created is unconditional and shall not terminate until all of the Indebtedness is paid in full and until all commitments by Secured Party to lend funds to Debtor have expired or been terminated. This power of attorney shall not be affected by the subsequent disability or incompetence of Debtor.

(o)    This Security Agreement is and is intended to be a continuing Security Agreement and shall remain in full force and effect until the officer in charge of the Lending Office, Department or Division of Secured Party indicated above shall actually receive from Debtor written notice of its discontinuance; provided, however, this Security Agreement shall remain in full force and effect thereafter until all of the Indebtedness outstanding, or contracted or committed for (whether or not outstanding), before the receipt of such notice by Secured Party, and any extensions or renewals thereof (whether made before or after receipt of such notice), together with interest accruing thereon after such notice, shall be finally and irrevocably paid in full. If, after receipt of any payment of all or any part of the Indebtedness, Secured Party is for any reason compelled to surrender such payment to any person or entity, because such payment is determined to be void or voidable as a preference, impermissible setoff, or a diversion of trust funds, or for any other reason, this Security Agreement shall continue in full force notwithstanding any contrary action which may have been taken by Secured Party in reliance upon such payment, and any such contrary action so taken shall be without prejudice to Secured Party's rights under this Security Agreement and shall be deemed to have been conditioned upon such payment having become final and irrevocable.

Doc #01-3279788.1

[Signature Page Follows]

LINEN NEWCO LLC,
a New York limited liability company

By: _____
Name: _____
Title: _____

STATE OF NEW YORK     )
                      ) SS.:
COUNTY OF _____     )

      On the ___ day of _____, 2019, before me, the undersigned, a notary public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

[Signature Page to General Security Agreement]

## SCHEDULE

1.    Other encumbrances, if any (¶¶ 3a, 4a):

2.    Other names under which Debtor transacts business (¶ 3c):

3.    Debtor's form of organization (¶ 3c).

4.    Debtor's State or jurisdiction of organization (¶ 3c).

5.    Debtor's Tax ID Number and Organizational Number, if any (¶ 3c).

6.    (a) Fixtures affixed to real property (¶ 3g):

      (b) Owner of such real property (¶ 3g):

      (c) Mortgages on real property (¶ 3g):

7.    Collateral consisting of Deposit Accounts, Commodity Accounts, Securities Accounts, or letters of credit (¶3h):

      (a)    Name and address of depositary bank, securities intermediary, commodities intermediary or letter of credit issuer, as applicable.

8.    Additional schedules describing Collateral, if any, follow hereafter (¶ 1).

**Exhibit 3.2(d)(i)**

**AR Note with HSBC Bank**



**TERM NOTE**

**$700,000.00**                                    **As of _____, 2019**

For value received, the undersigned **LINEN NEWCO LLC**, a New York limited liability company, with an address of [＿＿＿＿＿] (the "Borrower"), promises to pay to the order of **HSBC BANK USA, NATIONAL ASSOCIATION**, a bank organized under the laws of the United States of America with an address of 452 Fifth Avenue, 4th Floor, New York, New York 10018 (together with its successors and assigns, the "Bank"), the principal amount of Seven Hundred Thousand Dollars ($700,000.00) on or before [＿＿＿＿], 2019 [70 days] (the "Maturity Date"), as set forth below, together with interest from the date hereof on the unpaid principal balance from time to time outstanding until paid in full. The Borrower shall pay consecutive weekly installments of principal of $70,000.00 commencing on [May 1], 2019 [1 week after Closing Date], and the same amount on the first (1st) day of each month thereafter until the final installment, which shall be the unpaid balance.

The aggregate principal balance outstanding shall bear interest at a per annum rate of interest equal to zero percent (0%) through the Maturity Date.

Principal and interest shall be payable at the Bank's main office or at such other place as the Bank may designate in writing in immediately available funds in lawful money of the United States of America without set-off, deduction or counterclaim. Interest shall be calculated on the basis of actual number of days elapsed and a 360-day year.

This Note may be prepaid in whole or in part upon thirty (30) days prior written notice to the Bank.

At the option of the Bank (but automatically in the case of an Insolvency Default (as hereinafter defined)), this Note shall become immediately due and payable without notice or demand upon the occurrence at any time of any of the following events of default (each, an "Event of Default"): (1) default of any liability, obligation, covenant or undertaking of the Borrower, any endorser or any guarantor hereof to the Bank, hereunder or otherwise, including, without limitation, failure to pay in full and when due any installment of principal or interest or default of the Borrower, any endorser or any guarantor hereof under any other loan document delivered by the Borrower, any endorser or any guarantor, or in connection with the loan evidenced by this Note or any other agreement by the Borrower, any endorser or any guarantor with the Bank; (2) failure of the Borrower, any endorser or any guarantor hereof to maintain aggregate collateral security value satisfactory to the Bank; (3) default of any liability, obligation or undertaking of the Borrower, any endorser or any guarantor hereof to any other party; (4) if any statement, representation or warranty heretofore, now or hereafter made by the Borrower, any endorser or any guarantor hereof in connection with the loan evidenced by this Note or in any supporting financial statement of the Borrower, any endorser or any guarantor hereof shall be determined by the Bank to have been false or misleading in any material respect when made;

- 1 -

# HSBC ◆X▶

(5) if the Borrower, any endorser or any guarantor hereof is a corporation, trust, partnership or limited liability company, the liquidation, termination or dissolution of any such organization, or the merger or consolidation of such organization into another entity, or such entity's ceasing to carry on actively its present business or the appointment of a receiver for its property; (6) the death of any endorser or any guarantor hereof and, if any endorser or any guarantor hereof is a partnership or limited liability company, the death or judicial declaration of incompetence of any partner or member; (7) the institution by or against the Borrower, any endorser or any guarantor hereof of any proceedings under the Bankruptcy Code 11 USC § 101 et seq. or any other law in which the Borrower, any endorser or any guarantor hereof is alleged to be insolvent or unable to pay its debts as they mature, or the making by the Borrower, any endorser or any guarantor hereof of an assignment for the benefit of creditors or the granting by the Borrower, any endorser or any guarantor hereof of a trust mortgage for the benefit of creditors (each of the foregoing in this subclause, an "Insolvency Default"); (8) the service upon the Bank of a writ in which the Bank is named as trustee of the Borrower, any endorser or any guarantor hereof; (9) a judgment or judgments for the payment of money shall be rendered against the Borrower, any endorser or any guarantor hereof, and any such judgment shall remain unsatisfied and in effect for any period of thirty (30) consecutive days without a stay of execution; (10) any levy, lien (including mechanics lien) except as permitted under any of the other loan documents between the Bank and the Borrower, seizure, attachment, execution or similar process shall be issued or levied on any of the property of the Borrower, any endorser or any guarantor hereof; (11) the termination or revocation of any guaranty hereof; or (12) the occurrence of such a change in the condition or affairs (financial or otherwise) of the Borrower, any endorser or any guarantor hereof, or the occurrence of any other event or circumstance, such that the Bank, in its sole discretion, deems that it is insecure or that the prospects for timely or full payment or performance of any obligation of the Borrower, any endorser or any guarantor hereof to the Bank has been or may be impaired.

Any payments received by the Bank on account of this Note shall, at the Bank's option, be applied first, to accrued and unpaid interest; second, to the unpaid principal balance hereof; third, to any costs, expenses or charges then owed to the Bank by the Borrower; and the balance to escrows, if any. Notwithstanding the foregoing, any payments received after demand for payment shall be applied in such manner as the Bank may determine. The Borrower hereby authorizes the Bank to charge any deposit account which the Borrower may maintain with the Bank for any payment required hereunder without prior notice to the Borrower.

If pursuant to the terms of this Note, the Borrower is at any time obligated to pay interest on the principal balance at a rate in excess of the maximum interest rate permitted by applicable law for the loan evidenced by this Note, the applicable interest rate shall be immediately reduced to such maximum rate and all previous payments in excess of the maximum rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.

**The Borrower represents to the Bank that the proceeds of this Note will not be used for personal, family or household purposes or for the purpose of purchasing or carrying margin stock or margin securities within the meaning of Regulations U and X of the Board of Governors of the Federal Reserve System, 12 C.F.R. Parts 221 and 224.**



The Borrower and each endorser and guarantor hereof grant to the Bank a continuing lien on and security interest in any and all deposits or other sums at any time credited by or due from the Bank (or any of its banking or lending affiliates, or any bank acting as a participant under any loan arrangement between the Bank and the Borrower, or any third party acting on the Bank's behalf (collectively, the "Bank Affiliates")) to the Borrower and/or each endorser or guarantor hereof and any cash, securities, instruments or other property of the Borrower and each endorser and guarantor hereof in the possession of the Bank or any Bank Affiliate, whether for safekeeping or otherwise, or in transit to or from the Bank or any Bank Affiliate (regardless of the reason the Bank or Bank Affiliate had received the same or whether the Bank or Bank Affiliate has conditionally released the same) as security for the full and punctual payment and performance of all of the liabilities and obligations of the Borrower and/or any endorser or guarantor hereof to the Bank or any Bank Affiliate and such deposits and other sums may be applied or set off against such liabilities and obligations of the Borrower or any endorser or guarantor hereof to the Bank or any Bank Affiliate at any time, whether or not such are then due, whether or not demand has been made and whether or not other collateral is then available to the Bank or any Bank Affiliate.

No delay or omission on the part of the Bank in exercising any right hereunder shall operate as a waiver of such right or of any other right of the Bank, nor shall any delay, omission or waiver on any one occasion be deemed a bar to or waiver of the same or any other right on any future occasion. The Borrower and every endorser or guarantor of this Note, regardless of the time, order or place of signing, waives presentment, demand, protest, notice of intent to accelerate, notice of acceleration and all other notices of every kind in connection with the delivery, acceptance, performance or enforcement of this Note and assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of collateral, and to the addition or release of any other party or person primarily or secondarily liable and waives all recourse to suretyship and guarantor defenses generally, including any defense based on impairment of collateral.

The Borrower and each endorser and guarantor of this Note shall indemnify, defend and hold the Bank and the Bank Affiliates and their directors, officers, employees, agents and attorneys harmless against any claim brought or threatened against the Bank by the Borrower, by any endorser or guarantor, or by any other person (as well as from attorneys' reasonable fees and expenses in connection therewith) on account of the Bank's relationship with the Borrower or any endorser or guarantor hereof (each of which may be defended, compromised, settled or pursued by the Bank with counsel of the Bank's selection, but at the expense of the Borrower and any endorser and/or guarantor), except for any claim arising out of the gross negligence or willful misconduct of the Bank.

The Borrower and each endorser and guarantor of this Note agree to pay, upon demand, costs of collection of all amounts under this Note including, without limitation, principal and interest, or in connection with the enforcement of, or realization on, any security for this Note, including, without limitation, to the extent permitted by applicable law, reasonable attorneys' fees and expenses. Upon the occurrence and during the continuance of an Event of Default, interest shall accrue at a rate per annum equal to the aggregate of 5.0% plus the rate provided for



herein. If any payment due under this Note is unpaid for 10 days or more, the Borrower shall pay, in addition to any other sums due under this Note (and without limiting the Bank's other remedies on account thereof), a late charge equal to 5.0% of such unpaid amount.

This Note shall be binding upon the Borrower and each endorser and guarantor hereof and upon their respective heirs, successors, assigns and legal representatives, and shall inure to the benefit of the Bank and its successors, endorsees and assigns.

The liabilities of the Borrower and each Borrower, if more than one, and any endorser or guarantor of this Note are joint and several; provided, however, the release by the Bank of the Borrower or any one or more endorsers or guarantors shall not release any other person obligated on account of this Note. Any and all present and future debts of the Borrower to any endorser or guarantor of this Note are subordinated to the full payment and performance of all present and future debts and obligations of the Borrower to the Bank. Each reference in this Note to the Borrower and each Borrower, if more than one, any endorser, and any guarantor, is to such person individually and also to all such persons jointly. No person obligated on account of this Note may seek contribution from any other person also obligated, unless and until all liabilities, obligations and indebtedness to the Bank of the person from whom contribution is sought have been irrevocably satisfied in full. The release or compromise by the Bank of any collateral shall not release any person obligated on account of this Note.

The Borrower and each endorser and guarantor hereof each authorizes the Bank to complete this Note if delivered incomplete in any respect. A photographic or other reproduction of this Note may be made by the Bank, and any such reproduction shall be admissible in evidence with the same effect as the original itself in any judicial or administrative proceeding, whether or not the original is in existence.

The Borrower will from time to time execute and deliver to the Bank such documents, and take or cause to be taken, all such other further action, as the Bank may request in order to effect and confirm or vest more securely in the Bank all rights contemplated by this Note or any other loan documents related thereto (including, without limitation, to correct clerical errors) or to vest more fully in or assure to the Bank the security interest in any collateral securing this Note or to comply with applicable statute or law.

This Note is delivered to the Bank at one of its offices and shall be governed by the laws of the State of New York without giving effect to the conflicts of laws principles thereof.

Any notices under or pursuant to this Note shall be deemed duly received and effective if delivered in hand to any officer or agent of the Borrower or Bank, or if mailed by registered or certified mail, return receipt requested, addressed to the Borrower or Bank at the address set forth in this Note or as any party may from time to time designate by written notice to the other party.

No change in any provision of this Note may be made except by a writing signed by authorized signers of both parties to this Note, except that the Bank is authorized to fill in any blank spaces and to otherwise complete this Note and correct any patent errors herein.

# HSBC ◆X▶

All of the Bank's rights and remedies not only under the provisions of this Note but also under any other agreement or transaction shall be cumulative and not alternative or exclusive, and may be exercised by the Bank at such time or times and in such order of preference as the Bank in its sole discretion may determine.

**IN ANY ACTION, SUIT OR PROCEEDING IN RESPECT OF OR ARISING OUT OF THIS NOTE, BORROWER AND EACH ENDORSER WAIVE (i) THE RIGHT TO INTERPOSE ANY SET-OFF OR COUNTERCLAIM OF ANY NATURE OR DESCRIPTION, (ii) ANY OBJECTION BASED ON FORUM NON CONVENIENS OR VENUE AND (iii) ANY CLAIM FOR CONSEQUENTIAL, PUNITIVE OR SPECIAL DAMAGES.**

The Borrower and each endorser and guarantor of this Note each irrevocably submits to the nonexclusive jurisdiction of any Federal or state court sitting in New York, over any suit, action or proceeding arising out of or relating to this Note. Each of the Borrower and each endorser and guarantor irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that the same has been brought in an inconvenient forum. Each of the Borrower and each endorser and guarantor hereby consents to any and all process which may be served in any such suit, action or proceeding, (i) by mailing a copy thereof by registered and certified mail, postage prepaid, return receipt requested, to the Borrower's, endorser's or guarantor's address shown below or as notified to the Bank and (ii) by serving the same upon the Borrower(s), endorser(s) or guarantor(s) in any other manner otherwise permitted by law, and agrees that such service shall in every respect be deemed effective service upon the Borrower or such endorser or guarantor.

**THE BORROWER, EACH ENDORSER AND GUARANTOR AND THE BANK EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, (A) WAIVES ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS NOTE, ANY OF THE OBLIGATIONS OF THE BORROWER, EACH ENDORSER AND GUARANTOR TO THE BANK, AND ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH AND (B) AGREES NOT TO SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CAN NOT BE, OR HAS NOT BEEN, WAIVED. THE BORROWER, EACH ENDORSER AND GUARANTOR AND THE BANK EACH CERTIFIES THAT NEITHER THE BANK NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE BANK WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.**

**Sanctions and Anti-Bribery Provisions**:

(a)    None of the Borrower, any of its subsidiaries, or to the knowledge of Borrower or any of its subsidiaries, any director or officer, or any employee, agent, or affiliate,

# HSBC ◀▧▶

of the Borrower or any of its subsidiaries is an individual or entity ("Person") that is, or is owned or controlled by Persons that are, (i) the subject of any sanctions administered or enforced by the US Department of the Treasury's Office of Foreign Assets Control ("OFAC"), the US Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasury or the Hong Kong Monetary Authority Transaction (collectively, "Sanctions"), or (ii) located , organized or resident in a country or territory that is, or whose government is, the subject of Sanctions, including, without limitation, currently, Cuba, the Crimea region of Ukraine, Iran, North Korea, Sudan and Syria.

(b)     None of the Borrower, nor to the knowledge of the Borrower, any director, officer, agent, employee, affiliate or other person acting on behalf of the Borrower or any of its subsidiaries is aware of or has taken any action, directly or indirectly, that would result in a violation by such persons of any applicable anti-bribery law, including but not limited to, the United Kingdom Bribery Act 2010 (the "UK Bribery Act") and the U.S. Foreign Corrupt Practices Act of 1977 (the "FCPA"). Furthermore, the Borrower and, to the knowledge of the Borrower, its affiliates have conducted their businesses in compliance with the UK Bribery Act, the FCPA and similar laws, rules or regulations and have instituted and maintain policies and procedures designed to ensure, and which are reasonably expected to continue to ensure, continued compliance therewith.

(c)     The Borrower will not, directly or indirectly, use the proceeds of the Loan, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person, (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions or (ii) in any other manner that would result in a violation of Sanctions by any Person (including any Person participating in the Loan, whether as underwriter, advisor, investor or otherwise).

(d)     No part of the proceeds of the Loan will be used, directly or indirectly, for any payments that could constitute a violation of any applicable anti-bribery law.

**<u>Anti-Terrorism Laws:</u>**

(a)     <u>General.</u>  None of the Borrower, any of its subsidiaries, or to the knowledge of Borrower or any of its subsidiaries, any director or officer, or any employee, agent, or affiliate, of the Borrower or any of its subsidiaries is in violation of any Anti-Terrorism Law or engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(b)     <u>Executive Order No. 13224.</u>  None of the Borrower, any of its subsidiaries, or to the knowledge of Borrower or any of its subsidiaries, any director or officer, or any employee, agent, or affiliate, of the Borrower or any of its subsidiaries is acting or benefiting in any capacity in connection with the Loan or other transactions hereunder, is any of the following (each a "Blocked Person");

# HSBC ◆X▶

a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224;

a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224;

a Person or entity with which the Bank is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

a Person or entity that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order No. 13224;

a Person or entity that is named as a "specially designated national" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control at its official website or any replacement website or other replacement official publication of such list; or

a Person or entity who is affiliated or associated with a Person or entity listed above.

Neither the Borrower nor any of its Subsidiaries, any of their agents acting in any capacity in connection with the Credit or other transactions hereunder (i) conducts any business or engages in making or receiving any contributions of funds, goods or services to or for the benefit of any Blocked Person, or (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order No. 13224.

**HSBC ◆✕▶**

Executed as of _____, **2019**

LINEN NEWCO LLC


By _____
Name:
Title:


Doc #01-3279791.2

**Exhibit 3.2(d)(ii)**

**Letter Agreement with HSBC Bank**

April [___], 2019

**VIA E-MAIL**

Linen Newco LLC
[To be added]
Attention:

Re:    Agreement for Payment of Remaining AR Payment

Ladies and Gentlemen:

Reference is made to that certain Asset Purchase Agreement ("Purchase Agreement") by and between Centerstone Linen Services, LLC and Atlas Health Care Linen Services Co., LLC (collectively, the "Seller") and [Linen Newco LLC] ("Buyer") dated March [___], 2019. All capitalized terms used and not otherwise defined herein shall have the meanings assigned to them in the Purchase Agreement.

As set forth in the Purchase Agreement, Seller wishes to sell assign, convey, transfer and deliver to Buyer, and Buyer wishes to purchase, acquire and take assignment and delivery of, all of Seller's right, title and interest in the Purchased Assets. The Purchased Assets are encumbered by valid, first-priority liens ("Liens") of HSBC Bank USA, National Association ("HSBC Bank") securing certain indebtedness and other obligations of the Seller to HSBC Bank arising under (i) that certain Loan and Security Agreement dated October 29, 2013, as it may have been amended, restated, modified, supplemented, or replaced from time to time ("Prepetition Loan Agreement"), and (ii) that certain Senior Secured Super-Priority Debtor-in-Possession Loan and Security Agreement, dated December 20, 2018, as it may have been amended, restated, modified, supplemented, or replaced from time to time ("DIP Loan Agreement").

Seller and Buyer have requested that HSBC Bank release the Liens on the Purchased Assets. HSBC Bank has agreed to release the Liens upon receipt of the Purchase Price. HSBC Bank, Buyer and Seller have agreed to the terms set forth in this Letter Agreement ("Agreement") for the payment of the remaining AR Payment (as set forth in Section 3.2(d)(ii) of the Purchase Agreement). For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, HSBC Bank, Buyer and Seller intending to be legally bound agree as follows:

At the Closing, Seller shall provide to HSBC Bank a detailed list of all Accounts Receivable, including the contact information for each account debtor of each Account Receivable.

Following the Closing Date, Buyer shall use its best collection efforts to collect the Accounts Receivable and shall remit to HSBC Bank all amounts collected from the Accounts Receivable ("Collections") upon receipt, commencing on the Closing Date and continuing until such date as Collections in the aggregate amount of Four Hundred Fifty Thousand Dollars ($450,000.00) ("Remaining AR Payment") have been remitted to HSBC Bank.

Following the Closing Date, Buyer shall provide to HSBC Bank on the Friday of each week, commencing the first Friday after the Closing Date and continuing until HSBC Bank has received payment in full of the Remaining AR Payment, a report describing the status of collection efforts for each Account Receivable.

If, on the date that is ten (10) weeks after the Closing Date, HSBC Bank has not received payment in full of the Remaining AR Payment, then HSBC Bank may, in its sole discretion, elect to have the remaining Accounts Receivable assigned to HSBC Bank by the Purchaser and HSBC Bank may pursue collection of such Accounts Receivable. Should HSBC Bank make such an election, the Buyer shall promptly execute any and all documentation necessary to effectuate such an assignment.

HSBC Bank expressly reserves all of its rights and remedies under the Prepetition Loan Agreement, the DIP Loan Agreement, the Final Order, and the Other Documents (each as defined in the DIP Loan Agreement) and under applicable law or in equity. Nothing contained in this Agreement or in any communications between HSBC Bank and the Buyer and/or the Seller shall be a waiver of any rights or remedies of HSBC Bank.

This Agreement shall be construed in accordance with, and governed in all respects by, the laws of the State of New York.

This Agreement can be executed in separate counterparts each of which will be deemed an original and all of which together shall constitute one and the same agreement. A signed copy of this Agreement delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement. Please return, however, a signed original copy of this Agreement to me.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

[SIGNATURE PAGE FOLLOWS]

Doc #01-3593980.2

**HSBC BANK USA, NATIONAL ASSOCIATION**

_____

**Fred Schimel, Vice President**

**SELLER:**

**CENTERSTONE LINEN SERVICES, LLC
d/b/a CLARUS LINEN SYSTEMS**

**ATLAS  HEALTH  CARE  LINEN  SERVICES  CO.,  LLC  d/b/a  CLARUS  LINEN
SYSTEMS**

By: _____

Name: Ronald Teplitsky

Title:   Chief Restructuring Officer

**BUYER:**

**LINEN NEWCO LLC**

By: _____

Name:

Title:

**SELLER'S SCHEDULES**

to

**ASSET PURCHASE AGREEMENT**

between

**CENTERSTONE LINEN SERVICES, LLC**
**ATLAS HEALTH CARE LINEN SERVICES CO., LLC**

and

**LINEN NEWCO LLC**

**Dated March 13, 2019**

3312887.1

**Schedule 2.1(a)**

**Equipment and Fixed Assets[1]**

<u>Syracuse:</u>

Heat Seal Alligator
New Time Clock
Scale
New Valves For Sterilizer
Steris -Heat Exchanger
Steris -Doors
Ice Machine
Soil Lift
Jensen Press Plate
Assets from Winchester

*Soil Room*:
Suprtrk Soil System
Suprtrk Rail System
Soil Elec & Communication
Supertrack Soils System
Soil & Washroom Installation
Supertrack Monorail
E-Tech Cart Dumper
Hoppers For Soil Line Expansion
Cable For Soil Line Expansion
Cable For Soil Line Expansion
Tables For Upper Soil Line
Soil Room Ductwork
Soil Bag Cell Amplifiers
Soil Hopper Upgrade
New Rollers For Soil Line
Pulley For Soil Conveyor
Refurbished Lift
Overhead Clean Rail
Soil System Cylinders
Parts For Overhead Rail
Reducers For Conveyor
Re-Do Bag Incline

---

[1] The following list may include certain items that have been retired from service and/or disposed due to obsolescence, breakage or wear, in each case, in the ordinary course of business, but which may not have been removed from the Sellers' books and records. Accordingly, the inclusion of any particular item on the attached lists does not necessarily indicate that the Sellers retain, or can convey to Buyer, any right title or interest in such item. To the extent that the Sellers retain any right, title or interest in and to any such item, such right, title and interest shall be conveyed to Buyer pursuant to the terms of the Agreement.

3312887.1

Soil Hopper Displays
Micross Overhead Rail Control System
Soil Conveyor
Motor For Soil Conveyor
Trolleys For Soil Bags
Soil Line Trolleys
Gear For Shuttles
Supertrack Soil Trolleys
Soil Hoppers
Flender Motor For Supertrack
Switches For Soil System
Supertrack Trolley Wheels
Mounting Brackets For Soil Bags
Drive Roller For Shuttle 1
Gear Motor  For Shuttle Conveyors
Tingue, Brown Super Track Rail
Tingue, Brown Soil System
Calibration floor scale
Warehouse scale
OM-I9-2
Laundry chutes
Equipment transferred from Troy

*Wash Room:*
Tunnel Washer
Senking Installation
Braun Op Re-Work
Braun Dryers-4
Ductwork & Flashing
Braun Lint Traps-4
Spdchk Prscake Convyr
Gardner Bypass Convyr
Gardner 440p Convyr
Gardner 550pt Convyr
Evro 40hp Motor
Gould Pump
Shuttle Area Safety Switches
Moved Steam Header In Wash Room
New Gearbox-Senking Tunnel
Repl Drive For Senking Tunnel
Rebuild Hydraulic Pump-Jensen Press
Gear Motor For Basket In Plant 2 Dryer
Motor For Dryer 3
Pump For Senking
Pump For Senking
Controls For Dryer 3

3312887.1

Inverter - Senking Tunnel
Motors & Gear Boxes
Linear Rail & Bearing
Drive Wheels For Tunnel
New Pump
Senking Press Repair
Braun Dryer Motor
Tunnel Sensors
Pump Motor For Senking
Idler Wheels For Senking
Dryer Hoist Motor+Gear Box
Replace Rolls On Senking
Repair Drain Valve-Senking
Dryer Replacement Rollers
Senking Drain
Re-Bed Bruner Water Softnr
Dryer Panel Front & Sensor
Roller Chain For Senking Press
Cpu For Dryer #5
Waste Water Blower
Conveyor & Brackets
Overhead Rail For Trolley
Upgrade Trolley Track System
440 Op Dryer Blower Wheel
Bottom Door Section 1 Dryer
Motors & Reducers
Trolleys & Shuttle Wheels
Parts For Dryers 1-5
Metering Pump & Valve Rebuild Kit
Prep For New Washer & Dryers
Jensen Tunnel Washer
Jensen Press
Jensen Wash Shuttles & Conveyors
Jensen Control For Braun Dryers
Jensen Gas Dryers
Jensen Dryer Shuttles & Conveyors
Ductwork For New Dryers
Jensen Ss Top Drainage On Press
Jensen Update Senking Controls
Prep For New Washer & Dryers
Aluminum Catwalk
Perimeter Guard Fencing+Safety Locks
Dryer Screen Lint Remover
Plumbing & Elec For Pumps
Inverter For O.P. Washer
Dryer Conveyors

3312887.1

Braun Op Washers - Upgrades
Marlo Water Softener
Vfd Install & Programming
Boards For Braun
Chicago Dryer Amplifier
Cushion & Shaft For Senking Tunnel
Braun Board Processor
Kolstad Softener Repairs
Rollers For Dryer Conveyor
Belt For Tunnel Press
Braun Dryer Rebuild
New Tank For Water Re-Use
Dryer Door Panels & Access Doors
Rollers For Dryer Conveyor
Soil Load Cells
Jensen Valve For Tunnel
Jensen Digital Dryers Controller
Jensen Ipc For Tunnel
Braun Ring Basket For 500pt Dryer
Power Drive For Shuttles
Gear Motor For Shuttles
Gear Motor For Braun Dryer
Jensen Valve For Press
Jensen Valve For Tunnel
Electric Ball Valve For Tunnel
Press 1 Discharge Belt
Jensen Slide For Press 2
Weldment, Left Hand, Blower
Press 2 Chain Guards
Tunnel Water Fill Valves
Bearing Rebuild Kit
Transmission Seal /MRCI 80.UO3A112M.4
Metric Chain
Shaft/Driving Ejector
48 trolly hangers
Heat Exchanger
40 Trolly Hangers
Trinity equipment-2 milnor washers
Clinical Move
Tunnel support wheels
Cart Dumper
Soil Conveyer
Cart Dumper
Soil Hoppers
Press cushion
Pusher on press

3312887.1

Open Pocket Repair
Ellis Z842C Washer from Self Regional
Jensen Tunnel drive chaing
Tunnel-1 Re-use pump
Drum Drive
Boilder
Soil Ring Assy

*Flatwork Department*:
Braun Spf, Sigma R To F
Edge Maxx Folder
Chicago Edge Spreader Feeder
Chicago Edge Spreader Feeder
Air Cylinder Repair Kits For Iron 3
Motor For Iron 1
Inverter For Iron 1
Omega Folder
The Edge Feeder
Installation
New Lights
Iron 2 Gear Box
Rw Martin Feeder / Folder
Duct For Iron 3 Fan
Stacker Repl Board
Steam Chest For Iron 2
Steam Header Iron 1 & 2
Repairs To Steam Trap
Boards For Blanket Stacker
Stacker Motor & Gearbox
Shafts For Stack Machine
Repair Roll #8 On Iron #1
Braun Sheet Folder
Braun Sheet Stacker
Replumb Iron #1
Iron #1 Feeder Air Cylinders
Transformer For Strapper
Refurbish Ironer 1
Spf Upgrade For Spf
Roller Chain For Ironer
Sensors Emitters Receivers For Feeders
Ironer Gaskets Bushings Drives
Braun Spf Control W/ Chip
Braun Omega Program Board
Air Cylinder For Edge Feeder
Counters & Enclosures
Roller uhmw white

Recover Iron

*Dry Work Department*:
Mosca Strapping Machine
Braun Sigma Sm Folder
Theta Blanket Folder
Typac Strapper
Used Hypro Chest
Eam-Mosca Strapping Mach
Braun Sigma Sp Folder
Braun Sigma Sp Folder
Bath Blkt Fldr Control Board
Conveyor Ribbons
Speed Reducer
Roller Chain
Folding Guards
Replaced drive roller on press 1
Folder/cross-folder prec series
Vacuum/Bushing Refurbishment

*Power Plant*:
Rotary Screw Compressor
Air Dryer
Motorized Ball Valve For Boiler
Pump To Empty T.E.A.
Steam Line Insulation
Self-Priming Pump
Replace Shelf & New Refractory
Boiler Stack Ductwork
New Air Compressor
Tea Heat Reclaimer
Gas & Electric Upgrades
Boiler Condensate Pump
Repair Boiler Stack Economizer
Johnston Boiler
Wall Exhaust Fans
6 Gal Condensate Pump W/Tank
Installation - Boiler
Inverter
Cylinder
Compressor Duct
Rebed softeners
Cleaver Brooks 200 hp from Winchester
Industrial Boiler 150hp from Winchester
Boiler from Winchester
Boiler from Winchester

3312887.1

Atlas Copco Air Compressor Drive Motor

*Other Syracuse Assets*:
Lanceray Bronze Trailer
Ty-Pac Strap Machine
Ty-Pac Strapping Machine
Fire Alarm System Upgrade
Heater For Shipping Dept
Rail System
Security / Entry System
Card Access Upgrade
Sprinkler System Upgrade
Bench Scale
Bench Scale
Replace Wiring For Fire Alarm
Singer Industrial Sewing Machine
Singer Industrial Sewing Machine
Singer Industrial Sewing Machine
New Time Clocks (2)
Juki Sewing Machine
Surveillance Cameras
Inverter
Car Computer work station
10 TON ROOF TOP UNIT
Forklift rebuild
Scissors Lift
Band Saw
Shelving For Parts Room
Cogz Mgmt Program
Greenlee Conveyor Sheave
Haun Welder
Floor Scrubber Repairs
Shelving For Parts Room
Carts '86 Setup
Base Stock Carts
Metal Barcodes For Carts
Metal Barcodes For Carts
Carts
Cart Bases
24 Carts P72 - The Laundry List
Meese Carts For Production Area
Leebaw Carts 7" Lower Cutout - 100
Advance Piping
Doors For New Shipping Dock
Railing For Clean Dock
Sprinkler System

3312887.1

Mp Employee Entrance Door
Sprinkler System Upgrade
Air Conditioning Ductwork
Sprinkler System Upgrade
Upgrade Sprinkler System
Repair Rooftop Heating Unit
New Carpet In Office
Employee Entrance Door At 320
H.D. 5' Wide Swinging Door
Decals For New Trailer
Cafeteria Stairs
Cafeteria duct work
Cafeteria Work
Cornerstone Telephones
Copier / Scanner For Plant Office
Office Furniture
File Server For Quick Bks-Pro Rata Share
Communications Upgrade- Pro Rata Share
New Phone System- Pro Rata Share
Windows & Quickbook Upgrade-Pro Rata
Set-Up For Linen Master
Set-Up For Linen Master
Symantec System Back-Up
Fishbowl Purchasing Software
Barcode Handhelds For St E
Barcode Handhelds For Kaleida
Jb Kane - New E-Mail Server
Barcode Handhelds
Wireless Mobile Computer@Loretto
Handhelds For Buffalo
Handhelds For Customers
Hp Probook and 4300 W/21.5"Monitor
Hp Lj Ent 600 M602n Printer
Hp Lj Ent 600 M602n Printer
Datalogic Powerscan Kit
Hp 4300 Pro I3-3220,Monitor,Powerscan Kit
MC55A0 complete kit
MC55A0 complete kit
MC55A0 complete kit
Computers
Onboarding computers from Centerstone
Computers from Centerstone
HP Probook 14" LED Notebook
Ellis Handheld Printers
CDW BKQ4840
Maxon Hd Lift Gate

Trailer 25
Trailer 25
27' box truck graphics

Buffalo:

Stainless Steel Drain Assembly
Capitalize transportation and installation costs for fixed assets from Winchester
Card Module/Switch
Cable, trolly; membrane
Computer

*Wash Room*:
Cart Dumper
Soil Heat
Soil Heat
Soil Heat
Hook up and repaired Steam Tunnel
Tunnel 1 Drive Wheel
Feed Tank
Sorting Station XBOX Controllers
Computer Upgrade Tunnel Washer
Air Dryer Glauber Equipment Inv 5118204 and 5118354
Capitalize Dryer Motors_Volland Electrical InvPSI286915
Membrane_Lavatech Laundry inv 70654
Keyboard_ Lavatech Laundry inv 70949
Friction wheel Lavatec Invoice 71224
Main membrane- Lavatec inv 71539
Main membrane- Lavatec inv 71540
Hi-perm poly Tingue Brown inv 231136
Lavatec Laundry Technology Inc. quote 15-6834
Capitalize clutch, brake, display board
Capitalize power panel for washroom
Reclass to CIP Lavatec Inv #67261
Reclass to CIP Lavatec Inv #67509
Reclass to CIP Tingue, Brown Inv #200453
Washroom-upgrade rail system-Lavatec Laundry invoice #67539
Gear Plate for Drainage
Bearing for Conveyor
Tunnel #1 Tank Water Probes
Dryer
Main Water Pump
Manifold w/10 valves

*Dryfold Department*:
New Shuttle Electric Chain

3312887.1

*Power Plant*:
5.5 kw ATB AC Motor
Air Compressor
Diesel Farm
Centrifugal pump
Upgraded Compressor

*Other Buffalo Assets*:
3 PROLIANT RSI GT 400 TIMECLOCKS
Ice Machine
Laundry Carts
Carts
Supervisors Office Furniture
Locker Banks
Service Charge for Weighing System
Computers - 6 Probooks and 2 Monitors
BARCODES - 2 BLUETOOTH+POWER SPLY
Computer Equipment
HP ProBook 4440s i3-3110M PC
Computers from Centerstone
Zebra ZT410 Thermal Printer
New laptop for new hire
Laptop and Handheld Printer
Laptop for Mike Donaldson
Backup Desktop Computers
HP LaserJet Pro Printer
RFID Project
Computer Upgrade Tunnel Equipment
Powerscan

Other Assets:
Vaspian Phone System
Time Clock from Troy
Server for corporate
Transfer of computers to Pit
Computer equipment
Computer - Giardino
Computers for Corporate
Computer equipment
Computer - Clarus on Call
Laptops for PSR's: Steve Crowley
2 of 5 laptops for PSRs
Computer
2 HP Probook 14" LED Notebook & 2 HP docking stations
Corporate back-up computers
HP ZBOOK Mobile Workstation

3312887.1

HP Probook 14: LED Notebook (5CG5032PJ7)
Jake Hawkins HP ProBook
New Laptop for COO and spare laptop
Computers for Corporate
Computers for Corporate
AIRWATCH SOFTWARE
Joy Robertson HP Computer
Zebra RW220 Printer (# XRDJ153000140)
5 HP SB 600 Mini Computers
4 HP 600 desktops
Zebra ZT230 Label Printer
Computer Equipment
Computer Equipment
Computer Equipment
Computer Equipment
Computer Equipment
Computer Equipment
Computer Equipment
Computer Equipment
Computer Equipment
Computer Equipment
Computer Equipment
Computer Equipment
Computer Equipment
Computer Equipment
Computer Equipment
Computer Equipment
Computer Equipment
Computer Equipment - JE #2211
Computer Equipment - JE #2211
Computer Equipment - JE #2211
Computer Equipment - JE #2211
Computer Equipment - JE #2211
Computer Equipment - JE #2211
Computer Equipment - JE #2211
HP Laserjet Enterprise 700 Color MFP
Furniture - New - Austell
Furniture - Used - Austell
Cubicles - Austell
Chairs and tables - Austell
Furniture - various - Austell
Guest chairs - Austell
Cubicles from Aaron Rents - Austell
Phone equipment - Austell
Corporate Office Furniture

**Schedule 2.1(f)**

**Seller Intellectual Property**

To be determined.

3312887.1

**Schedule 2.2**

**Assigned Contracts**

To be determined.

**Schedule 2.3(i)**

**Excluded Assets**

To be determined.

**Schedule 2.4(c)**

**Assumed Liabilities and Cure Obligations**

To be determined.

**Schedule 4.3**

**Consents**

None.

## Schedule 4.6

### Permits

1.      Onondaga County Industrial Wastewater Discharge Permit, Permit # 65, issued July 23, 2018.

2.      Authorization to Discharge Under the Buffalo Pollutant Discharge Elimination System, Permit # 17-08-BU270, effective August 1, 2017.

3312887.1

## Schedule 4.7

## Litigation

| Plaintiff | Defendant(s) | Date Complaint Served | Court | Amount Demanded | Status |
|---|---|---|---|---|---|
| American Zurich Ins. Co. | Atlas Centerstone | May 2018 | NYS Sup. Ct., Erie County | $22,673.75 | Pending – no judgment entered |
| Midway Industrial Supply | Clarus Systems (Troy) | 10/24/18 Demand Letter | Buffalo City Ct. | $3,564.89 | Unknown if claim was filed with court |
| Tamiko Favors | Centerstone | 10/15/18 | Fulton County, GA | Unknown | Pending (harassment claim defended by ins. co.) |
| Troy Boiler Works, Inc. | Clarus Linen Systems | 11/20/18 | NYS Sup. Ct. Rensselaer Co. | $12,458.23 | Pending |
| ACA Enterprises, LLC | Atlas | 11/15/18 | Court of Common Pleas, Sandusky, OH | $45,339.00 | Pending |
| Teems Electric Company | Centerstone | 12/05/18 | Catoosa County, GA | $48,674.73 | Pending |
| ACN Companies, LLC | Centerstone | 09/07/18 | Syracuse City Court | $172,726.87 and Eviction | Pending |

3312887.1

<u>**Schedule 4.9**</u>

<u>**Employees and Collective Bargaining Agreements**</u>

See attached employee lists.

Collective Bargaining Agreements:

1.     Agreement between Teamster Union Local 294 and Clarus Linen Services Drivers dated October 1, 2016.

2.     Agreement between Teamster Local Union 182 and Atlas Health Care Linen Services Maintenance dated July 1, 2014, as amended.

3.     Agreement between Clarus Linen Systems and Local 2607 Rochester Regional Joint Board, Workers United, an affiliate of SEIU, dated September 4, 2014, as amended.

4.     Collective Bargaining Agreement between Clarus Linen Systems and International Union of Operating Engineers, Local 17-17S AFL-CIO, effective April 13, 2016.

5.     Agreement between Clarus Linen Systems and Rochester Regional Joint Board, Local 51, effective November 1, 2016.

6.     Agreement between Atlas Health Care Linen Services Co., LLC, d/b/a Clarus Linen Systems and International Union of Operating Engineers, Local 95-95A AFL-CIO, effective June 1, 2015, as amended.

7.     Tentative Agreement between Clarus Linen Systems and Laundry, Distribution & Food Service Joint Board, effective January 1, 2015, as amended.

Employee Roster as of 2019-03-04
Source: EmployeeCensus.accdb

| Employee Status | Employee Type | PlantName | Hire Date | First Name | Middle Name | Last Name | Sex | Department | DepartmentName | Title | Union Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| A | FT | Corporate | 4/9/2013 | Anne | K | Dinatale | F | 125 | Corporate Accounting | Assistant Controller | |
| A | FT | Corporate | 4/1/2013 | Jamie | Leigh | Giardino | F | 105 | Executive | Director of Communications and Public Relations | |
| A | FT | Corporate | 6/18/2013 | Karen | A. | Lanigan | F | 125 | Corporate Accounting | Accounts Payable Clerk | |
| A | FT | Corporate | 3/7/2016 | Emily | Katherine | Carlino | F | 125 | Corporate Accounting | Executive Assistant | |
| A | FT | Corporate | 5/1/2018 | Robert | D | Potter | M | 125 | Corporate Accounting | Sales Analyst | |
| A | FT | Corporate | 2/25/2015 | Twyla | Shondra | Hardy | F | 125 | Corporate Accounting | Benefits Specialist | |
| A | FT | Corporate | 10/22/1996 | Angel | | Ashley | F | 110 | Plant Management | Regional Operations Director | |
| A | FT | Corporate | 12/16/2013 | Nicole | Kristine | Lojek | F | 125 | Corporate Accounting | Billing Specialist | |
| A | FT | Corporate | 6/12/2017 | Dina | Louise | DiGiuseppe | F | 125 | Corporate Accounting | Procurement Analyst | |
| A | FT | Corporate | 5/23/2016 | Tracey | Renee | Thomas | F | 125 | Corporate Accounting | Payroll Supervisor | |
| A | FT | Corporate | 12/14/2015 | Tami | Lynn | Allen | F | 125 | Corporate Accounting | North Regional Systems Specialist | |
| A | FT | Corporate | 2/2/2015 | Paul | A | LaFave | M | 125 | Corporate Accounting | Director of Enterprise Systems | |
| A | FT | Corporate | 10/6/2014 | Sara | Marie | Frank | F | 152 | Service | Clarus On Call Manager | |
| A | FT | Corporate | 2/15/2016 | Alita | | Terry | F | 125 | Corporate Accounting | Senior Staff Accountant | |
| A | FT | Corporate | 5/2/2016 | Kevin | P | McDonough | M | 105 | Executive | Environmental Health & Safety Director | |
| A | PT | Corporate | 6/7/2016 | Kaylee | Jae | Konczal | F | 125 | Corporate Accounting | File Clerk | |
| A | FT | Corporate | 10/1/2012 | John | | Giardino | M | 105 | Executive | Chief Executive Officer | |
| A | FT | Corporate | 12/19/2016 | Darlene | C | Ziemba | F | 125 | Corporate Accounting | Collections Specialist | |
| A | FT | Corporate | 11/27/2012 | Marc | E | Yonkers | M | 125 | Corporate Accounting | Director of Finance & Accounting | |
| A | FT | Corporate | 8/21/2015 | Hellen | Isabel | Villagran | F | 152 | Service | Manager of Client Services | |
| A | FT | Corporate | 12/4/2017 | Pooja | Devendrabhai | Patel | F | 125 | Corporate Accounting | Staff Accountant | |
| A | FT | Corporate | 9/1/2014 | Billy | Austin | Fowler | M | 153 | Sales | Manager of Client Services - South Region | |
| A | FT | Corporate | 10/2/2013 | Lauren | B | Hutchison | F | 154 | Patient Service Rep | Regional Patient Serv Rep South | |
| A | FT | Corporate | 6/1/2008 | Titilayo Jordinia | | Robertson | F | 125 | Corporate Accounting | Manager of LinenMaster Support & Training | |
| A | FT | Corporate | 7/30/2018 | Kendric | K | McCarty | M | 110 | Plant Management | Operations Manager | |
| A | FT | Corporate | 3/14/2017 | Gregg | Andrew | Thomas | M | 152 | Service | Manager of Business Development | |

Employee Roster as of 2019-03-04
Source: EmployeeCensus.accdb

| Employee Status | Employee Type | PlantName | Hire Date | First Name | Middle Name | Last Name | Sex | Department | DepartmentName | Title | Union Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| A | FT | Buffalo | 7/26/2016 | Arthur | William | Jefferson | M | 209 | Mount St. Marys | Linen Distribution Technician | |
| A | FT | Buffalo | 5/27/2016 | Tsbkts | Kidane | Meheretab | F | 186 | Clean Processing | Biller | RBUF |
| A | FT | Buffalo | 4/15/2013 | John | D | King Jr. | M | 200 | BUFFALO GENERAL | Linen Distribution Manager | |
| A | FT | Buffalo | 4/15/2013 | Sandra | N | Mullen | F | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 4/4/2018 | Timothy | | Sikes | M | 200 | BUFFALO GENERAL | Linen Distribution Technician | |
| A | FT | Buffalo | 6/13/2016 | Amber | J | Arricale | F | 120 | Plant Admin | Operations Administrative Assistant | |
| A | FT | Buffalo | 2/6/2017 | Orlondra | Amertise Doniesha | Clark | F | 186 | Clean Processing | Laundry Administrative Assistant | |
| A | FT | Buffalo | 4/15/2013 | Michael | D | McCrayer | M | 180 | Soil Processing | Soil Processing | RBUF |
| A | PT | Buffalo | 5/26/2014 | Jaclyn | L | Guerra | F | 203 | DEGRAFF | Linen Distribution Technician | |
| A | FT | Buffalo | 4/9/2018 | Nyaganza | | Jolie | F | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 4/15/2013 | Sapreena | A | Williams | F | 186 | Clean Processing | Biller | RBUF |
| A | FT | Buffalo | 4/15/2013 | Monique | | Sanders | F | 186 | Clean Processing | Biller | RBUF |
| A | FT | Buffalo | 5/4/2017 | Kevin | Jamaal | Maddox | M | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 12/1/2013 | Osmany | | Gonzalez | M | 150 | Drivers | Transportation Supervisor | |
| A | FT | Buffalo | 4/15/2013 | Derek | Lamont | Lewis | M | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 3/1/2018 | Islah | F | paige | M | 186 | Clean Processing | | |
| A | FT | Buffalo | 4/15/2013 | Christine | M | Lewis | F | 207 | SUBURBAN | Linen Distribution Technician | |
| A | FT | Buffalo | 11/8/2016 | Annette | Yvette | Bray | F | 207 | SUBURBAN | Linen Distribution Technician | |
| A | FT | Buffalo | 5/8/2017 | Terry | P | Dixon | M | 130 | Engineering - Non Union | Maintenance Supervisor | |
| A | FT | Buffalo | 4/15/2013 | Curtis | | Flakes | M | 160 | Floor Supervision | Production Supervisor | |
| A | FT | Buffalo | 7/22/2016 | Ryan | Lamoine Matthew | Foster | M | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 4/15/2013 | Baltazar | | Michael | M | 180 | Soil Processing | Soil Sorter | RBUF |
| A | FT | Buffalo | 7/2/2018 | Kayla | R | Williams | F | 200 | BUFFALO GENERAL | Linen Distribution Technician | |
| A | FT | Buffalo | 4/15/2013 | Beshane | | Alem | M | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 4/15/2013 | Tesfahannes | Teklemariam | Legesse | M | 186 | Clean Processing | Packer | RBUF |
| A | FT | Buffalo | 4/15/2013 | Kevin | | Walker | M | 129 | Engineering Union | Maintenance Mechanic 2 | EN17 |
| A | FT | Buffalo | 2/1/2016 | Nan Mui | | Kyi | F | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 2/26/2015 | Roseda | | Browne | F | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 8/19/2013 | Dayvonna | | Tocker | F | 186 | Clean Processing | Biller | RBUF |
| A | FT | Buffalo | 8/16/2017 | Anthony | Dwayne | Miller | M | 200 | BUFFALO GENERAL | Linen Distribution Technician | |
| A | FT | Buffalo | 8/5/2013 | Alice | B | Nowlin | F | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 4/15/2013 | Shmendi | | Welday | M | 129 | Engineering Union | Maintenance Mechanic 2 | EN17 |
| A | FT | Buffalo | 4/15/2013 | Tesfaye | | Adebebe | M | 186 | Clean Processing | Dryer Operator | RBUF |
| A | FT | Buffalo | 8/16/2016 | Tewolde | Tesfagaber | Tewidemedhin | M | 180 | Soil Processing | Soil Sorter | RBUF |
| A | FT | Buffalo | 12/15/2016 | Moises | | Zabula-Mejia | M | 150 | Drivers | Driver | |
| A | FT | Buffalo | 7/7/2017 | Jerry | Dave | Staufenberger | M | 150 | Drivers | Driver | |
| A | FT | Buffalo | 11/8/2016 | Mue | | Tee | F | 180 | Soil Processing | Soil Processing | RBUF |
| A | FT | Buffalo | 4/15/2013 | Saeed | | Idris | M | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 4/15/2013 | Yosef | Nwaya | Benhie | M | 180 | Soil Processing | Soil Sorter | RBUF |
| A | FT | Buffalo | 4/15/2013 | Barbara | | Hayes | F | 186 | Clean Processing | Biller | RBUF |
| F | FT | Buffalo | 5/27/2016 | Mamakon | | Kamara | F | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 4/15/2013 | Beshane | Ghebremariam | Oqbaslassie | M | 160 | Floor Supervision | Production Supervisor | |
| A | FT | Buffalo | 4/15/2013 | Melvin | | Easley | M | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 8/1/2012 | Kathleen | L | Wojna | F | 200 | BUFFALO GENERAL | Linen Distribution Technician | |
| A | FT | Buffalo | 4/15/2013 | Angela | M | Lofton | F | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 9/7/2016 | Moe | | Kit | F | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 8/6/2018 | DeVika | R | Szymanski-Lynch | F | 207 | SUBURBAN | Linen Distribution Technician | |
| A | FT | Buffalo | 10/2/2013 | Kelley | A | Canazzi | F | 154 | Patient Service Rep | Patient Services Representative | |
| A | FT | Buffalo | 4/15/2013 | Jesse | | Miller | M | 186 | Clean Processing | Biller | RBUF |
| A | FT | Buffalo | 4/15/2013 | Bu | | Meh | F | 186 | Clean Processing | Biller | RBUF |
| A | PT | Buffalo | 4/15/2013 | Aaron | | McElroy | M | 129 | Engineering Union | Maintenance Mechanic 2 | EN17 |
| A | FT | Buffalo | 4/15/2013 | Tam La | | Htoo | M | 129 | Engineering Union | Maintenance Helper | EN17 |
| A | FT | Buffalo | 12/11/2014 | Jean Nepomuscene | | Sekanyana | M | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 4/15/2013 | Robert | D | McNab | M | 186 | Clean Processing | Team Lead | |
| A | FT | Buffalo | 5/10/2016 | Johir | | Ahmed | M | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 12/4/2015 | Dorris | | Waplo | F | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 5/7/2018 | Ma | Nuay | Leh | M | 180 | Soil Processing | Soil Sorter | RBUF |
| A | FT | Buffalo | 8/27/2013 | David | R | Schreiber | M | 129 | Engineering Union | Maintenance Mechanic 2 | EN17 |
| A | FT | Buffalo | 4/15/2013 | Melissa | N | Taylor | F | 160 | Floor Supervision | Plant Manager | |
| A | FT | Buffalo | 4/15/2013 | Rashard | D | Randle | M | 129 | Engineering Union | Maintenance Mechanic 3 | EN17 |
| A | FT | Buffalo | 2/23/2016 | Jamaine | O | Cranford | M | 200 | BUFFALO GENERAL | Linen Distribution Technician | |
| A | FT | Buffalo | 4/15/2013 | Veola | | Brown | F | 175 | Scrubs /OR Processing | Packer | RBUF |
| A | FT | Buffalo | 5/15/2018 | Karl | L | Miller | M | 200 | BUFFALO GENERAL | Linen Distribution Technician | |
| A | FT | Buffalo | 5/10/2016 | Tufayel | | Ahmed | M | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 2/4/2016 | MD Abdul | | Ahad | M | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 4/15/2013 | Matilda | | Brown | F | 175 | Scrubs /OR Processing | Packer | RBUF |
| A | FT | Buffalo | 9/8/2016 | Charlisha | Marie | Cameron | F | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 4/15/2013 | Brianna | | Newkirk | F | 180 | Soil Processing | Soil Sorter | RBUF |
| A | FT | Buffalo | 4/15/2013 | Bianca | K | Newkirk | F | 152 | Service | Client Service Specialist | |
| A | FT | Buffalo | 4/15/2013 | Raymond | | Brunson | M | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 4/15/2013 | Antoinette | | Williams | F | 186 | Clean Processing | Packer | RBUF |
| A | FT | Buffalo | 11/28/2017 | Alain | M | Ituma | M | 180 | Soil Processing | Soil Sorter | RBUF |
| A | FT | Buffalo | 11/28/2017 | Zakoria | | Hussain | M | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 2/20/2017 | Mohammed | Nazmul | Islam | M | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 4/27/2017 | John | Joseph | Edel | M | 150 | Drivers | Driver | |
| A | FT | Buffalo | 6/26/2017 | Heldit | | Soe | M | 180 | Soil Processing | Soil Sorter | RBUF |
| A | FT | Buffalo | 4/15/2013 | Derrick | B | King | M | 180 | Soil Processing | Soil Sorter | RBUF |
| A | FT | Buffalo | 2/21/2019 | Dante | L | Jacobs | M | 200 | BUFFALO GENERAL | | |
| A | FT | Buffalo | 4/15/2013 | Robert | D | Turner | M | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 2/25/2019 | Carl | R | Mccloud | M | 130 | Engineering - Non Union | Maintenance Mechanic 3 | |
| A | FT | Buffalo | 4/15/2013 | Ma San | | Ye | F | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 4/15/2013 | Brandon | | Brown | M | 180 | Soil Processing | Soil Sorter | RBUF |
| A | FT | Buffalo | 8/18/2014 | Anthony | C | Rathbun | M | 207 | SUBURBAN | Linen Distribution Supervisor | |
| A | FT | Buffalo | 5/3/2012 | James | | Allen | M | 208 | WOMEN & CHILDREN'S | Linen Distribution Technician | |
| A | FT | Buffalo | 4/12/2018 | Mu | | Po | F | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 10/20/2015 | Marsha | | Young | F | 200 | BUFFALO GENERAL | Linen Distribution Technician | |
| A | FT | Buffalo | 9/23/2015 | Devonte | M | Funderburg | M | 180 | Soil Processing | Soil Sorter | RBUF |
| A | FT | Buffalo | 5/8/2017 | Rolando | G | Scott | M | 131 | Housekeeping | Janitor | RBUF |
| A | FT | Buffalo | 7/24/2017 | Willette | Marie | Szymanski | F | 208 | WOMEN & CHILDREN'S | Linen Distribution Technician | |
| A | FT | Buffalo | 5/10/2016 | Shahin | | Ahmed | M | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 12/28/2017 | Kevin | Mark | Skibinski | M | 129 | Engineering Union | Maintenance Mechanic 1 | EN17 |
| A | PT | Buffalo | 3/28/2017 | Mamie | Lavell | Hooks | F | 203 | DEGRAFF | Linen Distribution Technician | |
| A | FT | Buffalo | 5/8/2017 | Isatu | | Mansaray | F | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 6/1/2017 | Brigina | T | Green | F | 209 | Mount St. Marys | Linen Distribution Technician | |
| A | FT | Buffalo | 12/29/2011 | Dawit | | Gehexegheir | M | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 10/6/2015 | Christer | | Law | M | 180 | Soil Processing | Washer Operator | RBUF |
| A | FT | Buffalo | 10/11/2016 | Mue | | Mue | F | 180 | Soil Processing | Soil Sorter | RBUF |
| A | FT | Buffalo | 6/30/2014 | Franklin | Thomas | Smith | M | 110 | Plant Management | Operations Manager | |
| A | FT | Buffalo | 4/15/2013 | Kenneth | | Wright | M | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 4/15/2013 | Catherine | | Davis | F | 160 | Floor Supervision | Production Supervisor | |
| A | FT | Buffalo | 7/11/2017 | Antowane | Darnell | Simmons | M | 200 | BUFFALO GENERAL | | |

Employee Roster as of 2019-03-04
Source: EmployeeCensus.accdb

| Employee Status | Employee Type | PlantName | Hire Date | First Name | Middle Name | Last Name | Sex | Department | DepartmentName | Title | Union Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WC | FT | Buffalo | 12/12/2014 | Michael | D | Taylor | M | 208 | WOMEN & CHILDREN'S | Linen Distribution Technician | |
| A | FT | Buffalo | 4/15/2013 | Mohamed | | Hussian | M | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 4/15/2013 | Musa Juma | | Waledi | M | 180 | Soil Processing | Soil Sorter | RBUF |
| A | FT | Buffalo | 3/27/2018 | Shwe | | Thein | M | 180 | Soil Processing | Soil Sorter | RBUF |
| A | FT | Buffalo | 7/17/2017 | Abeba | Negasi | Tesfamikael | F | 186 | Clean Processing | Laundry Operator | RBUF |
| A | PT | Buffalo | 11/15/2018 | Fernando | B | CORDOVA | M | 150 | Drivers | Driver | |
| A | FT | Buffalo | 12/1/2013 | John | E | Hunter | M | 150 | Drivers | Driver | |
| A | FT | Buffalo | 12/28/2017 | Berhane | Alem | Araya | M | 186 | Clean Processing | Laundry Operator | RBUF |
| L | FT | Buffalo | 6/8/2015 | Hiwot | Welemariym | Gebregergs | F | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 7/27/2017 | Carls | Alain | Balan | M | 150 | Drivers | Driver | |
| A | FT | Buffalo | 11/30/2018 | Mark | E | Cook | M | 200 | BUFFALO GENERAL | Linen Distribution Manager | |
| A | FT | Buffalo | 6/30/2017 | Aimee | | Nyinawumwani | F | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 11/16/2018 | Bihane | k | Hintsa | M | 180 | Soil Processing | Soil Sorter | |
| A | FT | Buffalo | 1/23/2018 | Kiza | | Tchambundjwa | M | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 11/27/2018 | Martha | | Irakoze | F | 200 | BUFFALO GENERAL | Linen Distribution Technician | |
| A | FT | Buffalo | 3/4/2015 | Yin Aye | | Hlaing | F | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 2/23/2015 | Donatille | | Ayinkamiye | F | 180 | Soil Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 5/12/2018 | Trhas | | Araya | F | 180 | Soil Processing | Soil Sorter | RBUF |
| A | FT | Buffalo | 3/29/2018 | Yerom | E | Yimer | F | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 3/27/2018 | Abdul | M | Salek | M | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 7/25/2016 | Genet | Guesh | Woldegebriel | F | 131 | Housekeeping | Janitor | RBUF |
| A | FT | Buffalo | 10/11/2016 | Azim | Abdul | Mohammad | M | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 8/26/2013 | Vaz | | Manuel | M | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 8/16/2016 | Kidane | Mehereta | Gedey | M | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 11/12/2015 | Siddig | | Adam | M | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 5/17/2016 | Iqbal | | Hussain | M | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 8/26/2013 | Rosa | | Kumba | F | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Buffalo | 6/26/2017 | Mohammad | S | Islam Shah | M | 180 | Soil Processing | Soil Sorter | RBUF |
| A | FT | Buffalo | 8/5/2013 | Kassahun | S | Abebe | M | 180 | Soil Processing | Soil Sorter | RBUF |
| A | FT | Buffalo | 5/10/2018 | Hagos | G | Gebremariam | M | 180 | Soil Processing | Soil Sorter | RBUF |
| A | FT | Buffalo | 6/30/2017 | Iqubal | | Hussain | M | 186 | Clean Processing | Laundry Operator | RBUF |
| A | FT | Pittsburgh | 4/1/2012 | Samuel | G | Hextia | M | 129 | Engineering Union | Maintenance Mechanic 3 | AFLCIO |
| A | FT | Syracuse | 12/18/2015 | Bleh | | Htoo | M | 180 | Soil Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 8/16/2013 | Kevin | Michael | Montreal | M | 150 | Drivers | Driver | TEAM |
| A | FT | Syracuse | 12/11/2012 | Jennifer | | Lopez | F | 173 | Specialty Processing | Packer | |
| A | FT | Syracuse | 2/17/2014 | Kyaw | | Kyaw | M | 180 | Soil Processing | Soil Sorter | RSYR |
| A | FT | Syracuse | 6/26/2009 | Pah | | Klay | M | 180 | Soil Processing | Soil Sorter | RSYR |
| A | FT | Syracuse | 6/9/2003 | Guy R. | | Dingman | M | 150 | Drivers | Driver | TEAM |
| A | FT | Syracuse | 12/22/2015 | Richard | L | Spier | M | 160 | Floor Supervision | Production Manager | |
| A | FT | Syracuse | 3/7/2011 | Eh Ka Lu | | Moon | F | 180 | Soil Processing | Soil Sorter | RSYR |
| A | FT | Syracuse | 2/12/2016 | Jeffrey | J | Gordon | M | 150 | Drivers | Driver | TEAM |
| A | FT | Syracuse | 3/20/2017 | Min | Min | Oo | M | 131 | Housekeeping | Janitor | |
| A | FT | Syracuse | 5/16/2005 | Stephen | | Mangano | M | 150 | Drivers | Driver | TEAM |
| A | FT | Syracuse | 7/25/2008 | Pako | | Na | M | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 6/29/2008 | Jine | | Nar | M | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 4/20/2006 | Levern | L. | Paw | F | 175 | Scrubs /OR Processing | Packer | RSYR |
| A | FT | Syracuse | 11/29/2009 | Paw | | Yeh | M | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 8/28/2008 | Saw | | Yeh | M | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 7/17/2017 | Stephen | B | Wirsig | M | 129 | Engineering Union | Maintenance Mechanic 1 | TEAM |
| A | FT | Syracuse | 1/4/2019 | Thomas | G | Peters | M | 150 | Drivers | Driver | TEAM |
| A | FT | Syracuse | 2/15/2019 | Noemi | | Morales | F | 173 | Specialty Processing | Packer | |
| A | FT | Syracuse | 4/2/2018 | Ma | | Kue | F | 186 | Clean Processing | Packer | RSYR |
| A | FT | Syracuse | 9/6/2009 | Dee | | Tu | M | 180 | Soil Processing | Soil Sorter | RSYR |
| A | FT | Syracuse | 12/17/2015 | Sulema | | Bautista Echevarria | F | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 8/2/1993 | Richard D. | | Shoop | M | 129 | Engineering Union | Maintenance Mechanic 3 | TEAM |
| A | FT | Syracuse | 10/19/2016 | Richard | G | Martin | M | 175 | Scrubs /OR Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 8/29/2010 | Mar | | Jury | M | 171 | Mending / Refurbish | Mender | RSYR |
| A | FT | Syracuse | 3/28/2012 | Than | | Way | M | 180 | Soil Processing | Soil Sorter | RSYR |
| A | FT | Syracuse | 7/10/2018 | Kyat | | Kan | M | 186 | Clean Processing | Packer | RSYR |
| A | FT | Syracuse | 5/3/2012 | Lar | | Ku | M | 180 | Soil Processing | Soil Sorter | RSYR |
| A | FT | Syracuse | 3/7/2013 | Isabelle | M | Crossman | F | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 6/18/2013 | Htoo | | Tha | F | 186 | Clean Processing | Laundry Operator | RSYR |
| WC | FT | Syracuse | 3/13/2011 | Juan A | | Almarales | M | 150 | Drivers | Driver | TEAM |
| A | FT | Syracuse | 8/12/2014 | Kaw Lar | | Mu | F | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 9/16/1977 | Brenda L. | | Howe | F | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 1/28/2019 | Jonathan | R | Wright-Jamison | M | 150 | Drivers | Driver | |
| A | PT | Syracuse | 11/28/2007 | Theresa | | Bolognone | F | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 2/10/2012 | Pamela | R | Evans | F | 173 | Specialty Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 1/9/2013 | Bah Sho | | Gay | M | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 5/9/2011 | Gregorina | | Morel | F | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 12/24/2018 | Brian | C | Snow | M | 150 | Drivers | Driver | RSYR |
| A | FT | Syracuse | 8/4/2016 | James | R | Gray | M | 173 | Specialty Processing | Washer Operator | RSYR |
| A | FT | Syracuse | 8/20/2013 | Tihona | | Lee | F | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 8/15/2018 | Thadah | | Say | F | 175 | Scrubs /OR Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 9/15/2015 | Ana A. | | Pino Jordan | F | 173 | Specialty Processing | Laundry Operator | |
| A | FT | Syracuse | 8/28/2002 | Kevin D. | | Parsons | M | 150 | Drivers | Driver | TEAM |
| A | FT | Syracuse | 7/11/2017 | Zaw | | Walt | M | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 10/31/2011 | Tho Mu | | Paw | F | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 3/1/2018 | Marc | W | Snow | M | 180 | Soil Processing | Soil Sorter | RSYR |
| A | FT | Syracuse | 6/4/2012 | Ta | | Mia | M | 180 | Soil Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 6/6/2018 | Po | S | Hay | M | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 5/3/2016 | Roxanne | M | Deel | F | 175 | Scrubs /OR Processing | Packer | RSYR |
| WC | FT | Syracuse | 5/8/2002 | Clemente I Montero | | Alarcon | M | 173 | Specialty Processing | Washer Operator | RSYR |
| A | FT | Syracuse | 4/1/2015 | Ryan | | Franz | M | 150 | Drivers | Driver Helper | TEAM |
| A | FT | Syracuse | 4/23/1999 | Angelo J. | | Selmon | M | 150 | Drivers | Driver | TEAM |
| A | FT | Syracuse | 7/10/2017 | Adam | M | Proper | M | 129 | Engineering Union | Maintenance Mechanic 1 | TEAM |
| A | FT | Syracuse | 7/5/2016 | Kyle | | Radley | M | 150 | Drivers | Driver | TEAM |
| A | FT | Syracuse | 9/3/2011 | Ni | | Thaw | M | 131 | Housekeeping | Janitor | |
| A | FT | Syracuse | 11/20/2013 | Matthew | John | Donella | M | 173 | Specialty Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 7/10/2017 | Emily | M | Trumble | F | 152 | Service | Linen Asset Mgr | |
| A | FT | Syracuse | 5/5/2015 | Yoanna | | Herrera | F | 186 | Clean Processing | Packer | RSYR |
| A | FT | Syracuse | 8/1/1988 | John E. | | Barnum Jr | M | 180 | Soil Processing | Washer Operator | RSYR |
| A | FT | Syracuse | 8/2/2016 | Carl | J | VanBuren | M | 150 | Drivers | Transportation Manager | |
| A | FT | Syracuse | 8/2/2016 | Keith | R | Proper | M | 129 | Engineering Union | Maintenance Mechanic 2 | TEAM |
| A | FT | Syracuse | 8/20/2009 | Ka Law | | Paw | M | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 8/15/2010 | Dah | | Gay | M | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 2/2/2016 | Maria | J | Curral | F | 173 | Specialty Processing | Packer | RSYR |
| A | FT | Syracuse | 10/24/2010 | Eh | | Moo | M | 186 | Clean Processing | Packer | RSYR |
| A | FT | Syracuse | 1/30/2008 | Pae | | Bu | M | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 7/17/1996 | Sonia I. | | Galdon | F | 175 | Scrubs /OR Processing | Team Lead | |
| A | FT | Syracuse | 4/8/2016 | Anna | M | Darcy | F | 186 | Clean Processing | Laundry Operator | RSYR |

3/13/2019  3:50 PM

C:\Users\chmielk\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\MPFR8G1F\2019-03-04 Employee Roster - Atlas (2).xlsx  Atlas

Employee Roster as of 2019-03-04
Source: EmployeeCensus.accdb

| Employee Status | Employee Type | PlantName | Hire Date | First Name | Middle Name | Last Name | Sex | Department | DepartmentName | Title | Union Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| A | FT | Syracuse | 2/11/2019 | Charles | W | Piquet | M | 130 | Engineering - Non Union | Maintenance Manager | |
| A | FT | Syracuse | 11/28/2007 | Hsanyo | | Howe | M | 180 | Soil Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 7/20/2015 | Jesse | George | Jackowski | M | 150 | Drivers | Driver | TEAM |
| A | FT | Syracuse | 3/30/2015 | Radelle | James | Days | M | 150 | Drivers | Driver | TEAM |
| A | FT | Syracuse | 8/22/2010 | Khin | | Win | M | 180 | Soil Processing | Soil Sorter | RSYR |
| A | FT | Syracuse | 7/11/2018 | Ehkpaw | H | Sunshine | M | 186 | Clean Processing | Biller | RSYR |
| A | FT | Syracuse | 11/28/2007 | Naing | | Soe | M | 186 | Clean Processing | Biller | RSYR |
| A | FT | Syracuse | 2/13/2008 | Eh Ka | | Lu | M | 180 | Soil Processing | Soil Sorter | RSYR |
| A | FT | Syracuse | 2/22/2009 | Michael C. | | Fiore | M | 180 | Soil Processing | Soil Sorter | RSYR |
| A | FT | Syracuse | 8/29/2005 | Robert H. | | Cummings | M | 150 | Drivers | Driver | TEAM |
| A | FT | Syracuse | 9/11/2017 | Anthony | John | Berube | M | 129 | Engineering Union | Maintenance Mechanic 1 | TEAM |
| A | FT | Syracuse | 2/11/2019 | Xandar | Z | Burke | M | 150 | Drivers | Driver | |
| A | FT | Syracuse | 12/14/2015 | Timothy | Patrick | O'Donnell | M | 150 | Drivers | Driver | TEAM |
| A | FT | Syracuse | 2/20/2019 | Janet | | Newman | F | 186 | Clean Processing | Laundry Operator | |
| A | FT | Syracuse | 4/1/2012 | Robert | J | Reeder | M | 150 | Drivers | Driver | TEAM |
| A | FT | Syracuse | 8/6/2007 | Paul | F | Delaski | M | 129 | Engineering Union | Maintenance Mechanic 2 | TEAM |
| A | FT | Syracuse | 11/11/2002 | Maria | | Gomez | F | 173 | Specialty Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 2/22/2019 | Law Rah | | Kah | F | 186 | Clean Processing | Laundry Operator | |
| A | FT | Syracuse | 3/23/1976 | Sharon L. | | Bazen | F | 160 | Floor Supervision | Production Manager | |
| A | PT | Syracuse | 11/29/2010 | Michael L | | Weeks | M | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 12/3/2018 | Leeandra | M | Torrance | F | 120 | Plant Admin | Operations Administrative Assistant | |
| A | FT | Syracuse | 9/17/2018 | Karen | A | Parkhurst | F | 120 | Plant Admin | Operations Administrative Assistant | |
| A | FT | Syracuse | 2/27/2008 | Ka | | Toe | M | 186 | Clean Processing | Biller | RSYR |
| A | FT | Syracuse | 2/7/2018 | James | S | Baxton | M | 202 | CROUSE | Linen Distribution Technician | |
| A | FT | Syracuse | 12/15/2014 | Eduardo | M | Barrot | M | 150 | Drivers | Driver | TEAM |
| A | FT | Syracuse | 9/11/2006 | Nurys H | | Cedeno | F | 173 | Specialty Processing | Biller | RSYR |
| A | FT | Syracuse | 2/25/2013 | Paw | | Eh | F | 186 | Clean Processing | Packer | RSYR |
| A | FT | Syracuse | 11/15/2018 | Eh | | Ler | M | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 6/6/2018 | Kue | | Dee | F | 175 | Scrubs /OR Processing | Packer | |
| A | FT | Syracuse | 4/19/2015 | Maw | | Lit | M | 180 | Soil Processing | Soil Sorter | RSYR |
| A | FT | Syracuse | 1/2/2013 | Jah | | Lah | F | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 9/2/2014 | Ah | | Kit | M | 186 | Clean Processing | Soil Sorter | RSYR |
| A | FT | Syracuse | 8/5/2014 | Say | May | Htoo | M | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 8/12/1991 | George L. | | Holden | M | 180 | Soil Processing | Soil Sorter | RSYR |
| A | FT | Syracuse | 2/19/2014 | Htoo | | Hel | F | 186 | Clean Processing | Packer | RSYR |
| A | FT | Syracuse | 4/25/2017 | Car | | Toon | M | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 11/28/2018 | George | | Picklesimer | M | 129 | Engineering Union | Maintenance Mechanic 3 | TEAM |
| A | FT | Syracuse | 8/5/2014 | Tu | | Ter | M | 186 | Clean Processing | Packer | RSYR |
| A | FT | Syracuse | 8/5/2013 | Blay Blaw | | Wah | M | 186 | Clean Processing | Packer | RSYR |
| A | FT | Syracuse | 2/13/2018 | Julian | | Rodriguez-Quinones | M | 180 | Soil Processing | Soil Sorter | RSYR |
| A | FT | Syracuse | 6/15/2006 | Julian | | Parrilla | M | 180 | Soil Processing | Soil Sorter | RSYR |
| A | FT | Syracuse | 1/2/2019 | Carlos | | Cruz | M | 201 | COMMUNITY | Packer | |
| A | FT | Syracuse | 11/29/2012 | Kenny | | Escalera | M | 180 | Soil Processing | Soil Sorter | RSYR |
| A | FT | Syracuse | 1/23/2019 | Miguel | A | Martinez-Jimenez | M | 186 | Clean Processing | Laundry Operator | |
| A | FT | Syracuse | 7/27/2016 | Luis | Antonio | Orozco-Martinez | M | 160 | Floor Supervision | Production Manager | |
| A | FT | Syracuse | 12/22/2014 | Jazmin | | Medina Alomar | F | 160 | Floor Supervision | Plant Manager | |
| A | FT | Syracuse | 9/30/2014 | Hector | L | Canales Manso | M | 180 | Soil Processing | Washer Operator | RSYR |
| A | FT | Syracuse | 8/30/2010 | Jonathan | | Sanchez | M | 202 | CROUSE | Linen Distribution Technician | |
| WC | FT | Syracuse | 7/27/2009 | Eduardo Hernandez | | Carrasquillo | M | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 9/20/2004 | Osvaldo | | Carrasquillo | M | 201 | COMMUNITY | Linen Distribution Technician | |
| A | FT | Syracuse | 10/31/2016 | Jose | R | Moreno | M | 186 | Clean Processing | Packer | RSYR |
| A | FT | Syracuse | 6/11/2012 | Brenda | L | Monserrate | F | 202 | CROUSE | Linen Distribution Technician | |
| A | FT | Syracuse | 9/16/2015 | Carmen | N | Medina Alomar | F | 202 | CROUSE | Linen Distribution Technician | |
| A | FT | Syracuse | 7/10/2006 | Jacqueline | | Brito Dejesus | F | 173 | Specialty Processing | Packer | RSYR |
| A | FT | Syracuse | 10/11/2016 | Jartiza | E | Orozco | F | 171 | Mending / Refurbish | Mender | RSYR |
| A | FT | Syracuse | 12/11/2009 | Edwin Torres | | Escalera | M | 180 | Soil Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 4/3/2014 | Eh | | No | M | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 8/19/2009 | David | | Escalera | M | 150 | Drivers | Dock Helper | TEAM |
| A | FT | Syracuse | 2/6/2018 | Hector | Esteban | Lacen Perez | M | 180 | Soil Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 9/11/2018 | Jose | A | Cabrera Rivera | M | 173 | Specialty Processing | Clinical Soil Sorter | |
| A | FT | Syracuse | 10/3/2018 | Luis | E | Ramos Diaz | M | 180 | Soil Processing | Soil Sorter | RSYR |
| A | FT | Syracuse | 12/22/2015 | Luis | E | Alvira | M | 173 | Specialty Processing | Clinical Packer | RSYR |
| A | FT | Syracuse | 2/22/2019 | Pedro | A | Boria | M | 186 | Clean Processing | Laundry Operator | |
| A | FT | Syracuse | 3/28/2011 | Luis | J | Ayala Escalera | M | 180 | Soil Processing | Washer Operator | RSYR |
| A | FT | Syracuse | 9/25/2018 | Ingrid | M | Carrasquillo Hance | F | 173 | Specialty Processing | Clinical Soil Sorter | |
| A | FT | Syracuse | 1/10/2019 | Hector | M | Matos-Acevedo | M | 180 | Soil Processing | Soil Sorter | |
| A | FT | Syracuse | 4/7/2014 | Kelvin | | Medina Osorio | M | 180 | Soil Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 5/4/2012 | Michael | O | Cirino | M | 180 | Soil Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 11/20/2018 | Jesus | M | Pizarro Osorio | M | 180 | Soil Processing | Soil Sorter | RSYR |
| A | FT | Syracuse | 6/14/2011 | Julissa M B | Anibal | Pizarro | F | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 1/10/2018 | Christopher | Anibal | Lopez-Ortiz | M | 202 | CROUSE | Linen Distribution Technician | |
| A | FT | Syracuse | 8/9/2009 | Susana | | Mateo | F | 175 | Scrubs /OR Processing | Packer | |
| A | FT | Syracuse | 5/29/2018 | Luis | A | Gutierrez Hernandez | M | 110 | Plant Management | Operations Manager | |
| A | FT | Syracuse | 3/1/2019 | Myo | | Chek | M | 186 | Clean Processing | Laundry Operator | |
| A | FT | Syracuse | 11/19/2012 | Timothy | | Shwe | M | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 4/25/2017 | Ta | | Lay | M | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 4/2/2018 | Sae | M | Paw | F | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 12/8/2015 | Lar | | Salay | F | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 1/23/2018 | Paw | Pa | Htoo | M | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 9/25/2002 | Gladys | | Creaches | F | 171 | Mending / Refurbish | Mender | RSYR |
| A | FT | Syracuse | 10/20/2014 | Isnaide | | Garcia Estrada | F | 175 | Scrubs /OR Processing | Packer | |
| A | FT | Syracuse | 11/2/2016 | Pwe | | Htoo | M | 180 | Soil Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 6/6/2018 | Htoo Tha | B | Paw | F | 186 | Clean Processing | Laundry Operator | RSYR |
| A | FT | Syracuse | 9/25/2018 | Abu Siddiq Bin | | Muzafar Hussin | M | 173 | Specialty Processing | Clinical Soil Sorter | |
| A | FT | Syracuse | 1/12/2015 | Bob | S | Kpeisaye | M | 129 | Engineering Union | Maintenance Helper | TEAM |
| A | FT | Syracuse | 9/2/2014 | Boe | | Loe | M | 180 | Soil Processing | Soil Sorter | RSYR |
| A | FT | Syracuse | 4/26/2016 | Day | Pi | Sie | M | 180 | Soil Processing | Soil Sorter | RSYR |
| A | FT | Syracuse | 10/12/2017 | Mwe | | Htoo | M | 180 | Soil Processing | Packer | RSYR |

3/13/2019  3:50 PM

C:\Users\chmielk\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\MPFR8G1F\2019-03-04 Employee Roster - Atlas (2).xlsx  Atlas

**<u>Schedule 7.3</u>**

**<u>Allocation</u>**

To be determined.