UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In Re:

    CENTERSTONE LINEN SERVICES, LLC,
    d/b/a "Clarus Linen Services", et. al,

                    Debtors

Case No. 18-31754-5-mcr
Main Case
Chapter 11 Cases
Jointly Administered

-------------------------------------

In Re:

    ATLAS HEALTH CARE LINEN
     SERVICES, CO., LLC,
    d/b/a "Clarus Linen Systems",

                    Debtor

Case No. 18-31753-5-mcr
Chapter 11
Jointly Administered

**SUPPLEMENTAL AFFIDAVIT IN SUPPORT OF
REJECTION MOTIONS BY CATHOLIC HEALTH SYSTEM, INC., MERCY
HOSPITAL OF BUFFALO, SISTERS OF CHARITY HOSPITAL OF BUFFALO, NEW
YORK, KENMORE MERCY HOSPITAL, AND MOUNT ST. MARY'S HOSPITAL OF
NIAGARA FALLS**

STATE OF NEW YORK    )
COUNTY OF ONONDAGA ) ss.:

    LOUIS LEVINE, being duly sworn, deposes and says that:

    1.    I am a member of the firm of Melvin & Melvin, PLLC, the attorneys for Catholic Health System, Inc., Mercy Hospital of Buffalo, Sisters of Charity Hospital of Buffalo, New York, Kenmore Mercy Hospital, and Mount St. Mary's Hospital of Niagara Falls (cumulatively, the "**Catholic Hospitals**"), in this case and I am duly licensed to practice law in this Court.

    2.    This Affidavit is submitted in Supplemental support of the motions made by the Catholic Hospitals ("**Rejection Motions**") for Orders pursuant to 11 USC Section 365, *inter alia*

1

requiring the immediate rejection of the Altus Contract, the Participation Agreement and the MSM Contract (as defined in the Rejection Motions, and cumulatively, the "**CHS Agreements**").

3. On May 29, 2019, Debtor filed its proposed Asset Purchase Agreement ("ASPA") with Clean Textile Systems, L.P. ("**CleanCare**"). The APA did not provide for the assignment to CleanCare of any of the CHS Agreements.

4. It is the position of the Catholic Hospitals that the closing of the sale of the Debtor's assets will prevent Debtor from servicing the Catholic Hospitals at all ever again. By definition the complete discontinuance of all services will constitute a total breach by Debtor of the CHS Agreements, and will make subsequent assumption by Debtor impossible. Accordingly, it is respectfully urged that the Court should grant the Rejection Motions.

5. Catholic Hospitals request that the Order granting the Rejection Motions provide that the rejection of the CHS Agreements does not become effective until the earlier of the closing of the APA or the date of June 28, 2019, with a further requirement that Debtor continue to provide linen and laundry services to the Catholic Hospitals pursuant to the CHS Agreements through such date ("Although rejection serves to relieve a debtor from certain financial obligations, the breach created by rejection under the Bankruptcy Code does not terminate rights and obligations under the contract - - - rejection's effect is to give rise to a remedy in the non-debtor party for breach of the rejected contract - - - Rejection has absolutely no effect upon the contract's continued existence; the contract is not cancelled, repudiated, rescinded or in any other fashion terminated- - - it is clear that rejection in itself does not eliminate the non-debtor's rights under the contract", Top Rank, Inc. v. Ortiz, 400 B.R. 755, 765 (CD CA 2009); "Rejection of the executory contract - - - is not tantamount to the termination of all of the rights of the parties

under the contract - - - the effect of a rejection is that a breach is deemed to exist - - - (and) does not affect the parties' substantive rights under the contract", In re Annabel, 263 B.R.19, 25 (NDNY 2001)).

6. The aforesaid timing is necessary to safely facilitate the transition of laundry and linen services from Debtor to the Catholic Hospitals' new vendor.

7. In particular, a sudden or precipitous discontinuance of service by Debtor, prior to the completion of the transition to the new vendor, could be very dangerous or even hazardous to the welfare of the patients of the Catholic Hospitals. In this regard it is respectfully noted that the Catholic Hospitals are all not-for-profit institutions providing medical and surgical services to about 50% of the population of Erie County. The health and welfare of the patients of the Catholic Hospitals would be better assured by the continued provision of linen and laundry services by Debtor through the date of the closing of the APA (or June 30, whichever is earlier) to make sure that the new vendor has been completely installed.

8. The requested timing would be very short, at most four weeks. The Debtor and its estate would not be harmed by the granting of the requested timing because Debtor would continue to be paid by Catholic Hospitals at the regular contract rate. Moreover, Debtor's continued provision of services to the Catholic Hospitals through the date of closing would help minimize the amount of damages which otherwise might accrue against Debtor by reason of the rejection.

9. It is also respectfully noted that the Catholic Hospitals' scheduling of the transition of laundry and linen services from Debtor to the new vendor was complicated at least to some extent by the unanticipated adjournments which were required for the hearing of the Sale Motion.

10. In Debtor's Response ("**Response**") dated May 1, 2019 (Docket number 394), Debtor stated (emphasis supplied): "The Debtor will agree to reject the Altus Agreement, the Participating Hospital Agreement and the MSM Agreement only on the following conditions: (i) <u>a sale or sales of the Debtor's and Centerstone's assets closes</u> - - -". Accordingly, Debtor already has taken the position that the effective date of the rejection of the CHS Agreements should await the closing of the sale of Debtor's assets. (Debtor also stated that the entry of a scheduling order concerning the claims held by Debtor against the Catholic Hospitals should be a condition to the effective date of a rejection order. The Catholic Hospitals object to that contention on the grounds that: (i) a claim for monetary damages must be brought pursuant to an adversary proceeding (FRBP 7001(1):"The following are adversary proceedings- - - (1) a proceeding to recover money or other property - - -."), and (ii) a debtor cannot make a claim for damages in the context of a motion to compel rejection filed by the counter-party because the making of that claim would have to be deemed a cross-motion and there is no provision in the FRBP or LBR for the filing of a cross-motion.)

11. The letter of Melvin & Melvin to Debtor's counsel dated April 23, 2019 (Exhibit C of Debtor's Response) did <u>not</u> seek to terminate the CHS Agreements (as alleged in paragraph 15 of Debtor's Response). Those letters stated <u>only</u> that the Catholic Hospitals would not voluntarily enter into new agreements with the third parties chosen by Debtor nor, by implication, modify the CHS Agreements ("Section 365 provides that a debtor's assumption and assignment cannot modify an agreement's express terms; <u>it does not require the other party to the contract to agree to changes,</u> even if the overall impact lowers its costs" (<u>In re: Fleming Cos.</u>, 2004 Bankr. LEXIS 198, page 5 (D. DE 2004), emphasis supplied); "The contract terms cannot

be modified <u>against the will of a contracting party</u>" (<u>In re: McDaniel</u>, 89 B.R. 861, 863(E.D. WA 1988), emphasis supplied); ("Nothing in the Code suggests that the debtor may not modify its contracts <u>when all parties to the contract consent</u>" (<u>City of Covington v. Covington Landing, Ltd. Partnership</u>, 71 F.3d 1221, 1227 (6th Cir 1995), emphasis supplied).

12.    Moreover, the April 23, 2019 letter to Debtor's counsel reiterated the position of the Catholic Hospitals that Debtor must either <u>perform</u> the CHS Agreements pursuant to their terms or else reject them. In particular the letter to Debtor's counsel stated (emphasis supplied): "The Catholic Hospitals will <u>expect and require the debtor to maintain service to them on a daily basis</u> until orders have been entered formally rejecting the aforesaid contracts."

13.    The letters of April 23, 2019 had been issued to Debtor's counsel and counsel for Newco and CleanCare as a courtesy to advise them that the Catholic Hospitals did not want to enter into a contract with those bidders. Prior to April 23, 2019, representative of the Catholic Hospitals had met with both Newco and CleanCare to discuss a transition of laundry services. Moreover, Melvin & Melvin had had discussions with counsel for both Newco and CleanCare concerning same. The letters of April 23, 2019 were merely a conclusion to those discussions.

14.    Accordingly, it is the position of CHS and the Catholic Hospitals that this Court should issue an Order granting the Rejection Motions in full but requiring the rejection of the CHS Agreements to become effective as of the earlier of the closing of the sale of Debtor's assets to CleanCare, or June 28, 2019, and further requiring that Debtor continue to provide linen and laundry services to the Catholic Hospitals pursuant to the CHS Agreements through such date.

5

WHEREFORE, Catholic Health System, Inc., Mercy Hospital of Buffalo, Sisters of Charity Hospital of Buffalo, New York, Kenmore Mercy Hospital, and Mount St. Mary's Hospital of Niagara Falls request an Order pursuant to 11 USC Section 365 granting the Rejection Motions in full, and in particular:

    (a) requiring the rejection of the Altus Contract, the Participation Agreement and the MSM Contract to be effective as of the earlier of June 28, 2019 or the closing of the sale of Debtor's assets to CleanCare, and furthermore

    (b) requiring that Debtor continue to provide linen and laundry services to the Catholic Hospitals pursuant to the CHS Agreements through such date; and

Catholic Health System, Inc., Mercy Hospital of Buffalo, Buffalo Hospital of the Sisters of Charity, Kenmore Mercy Hospital and Mount St. Mary's Hospital of Niagara Falls furthermore request an Order granting to them such other and further relief which as to the Court may seem just and proper.

_____
LOUIS LEVINE

Sworn to before me this 30th
Day of May 2019

_____
Notary Public

Jan E. Slater
Notary Public, State of New York
Qualified in Onondaga County
No. 01SL6074969
My Comm. Exp. 05/27/2022