UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| | ) Case Nos. |
| CENTERSTONE LINEN SERVICES, LLC, | ) 18-31754 (Main Case) |
| ATLAS HEALTH CARE LINEN SERVICES CO., LLC, | ) 18-31753 |
| ALLIANCE LAUNDRY & TEXTILE SERVICE, LLC, | ) 18-31755 |
| ALLIANCE LAUNDRY AND TEXTILE SERVICE OF | ) 18-31756 |
| ATLANTA, LLC, and | ) |
| ALLIANCE LTS WINCHESTER, LLC | ) 18-31757 |
| *d/b/a Clarus Linen Systems*[1], | ) |
| | ) Chapter 11 Cases |
| Debtors. | ) Jointly Administered |
| | ) |

## DISCLOSURE STATEMENT TO ACCOMPANY DEBTORS' JOINT
## CHAPTER 11 PLAN OF LIQUIDATION DATED AUGUST 2, 2019

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF NEW YORK FOR USE IN THE SOLICITATION OF ACCEPTANCES OF THE JOINT CHAPTER 11 PLAN OF LIQUIDATION DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISTRIBUTION OF THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS A SOLICITATION OF ACCEPTANCES OF SUCH PLAN. THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.**

**BOND, SCHOENECK & KING, PLLC**
Stephen A. Donato, Esq.
Camille W. Hill, Esq.
One Lincoln Center
Syracuse, New York 13202
Tel: (315) 218-8000
Email: sdonato@bsk.com
        chill@bsk.com
*Counsel to the Debtors*

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Centerstone Linen Services, LLC d/b/a Clarus Linen Systems (5594); Atlas Health Care Linen Services Co., LLC d/b/a Clarus Linen Systems (2681); Alliance Laundry & Textile Service, LLC d/b/a Clarus Linen Systems (8284); Alliance Laundry and Textile Service of Atlanta, LLC d/b/a Clarus Linen Systems (4065); and Alliance LTS Winchester, LLC d/b/a Clarus Linen Systems (0892).

I.      INTRODUCTION ................................................................................................... 4
        A.    Explanation of Chapter 11 ............................................................... 5
        B.    Preliminary Statement and Summary of Recoveries ......................... 5
        C.    Who is Entitled to Vote on the Plan................................................. 7
        D.    Definitions; Certain Exhibits ........................................................... 7
        E.    Notice to Creditors .......................................................................... 8
        F.    Disclosure Statement Enclosures ..................................................... 9
        G.    Summary of Voting Procedures........................................................ 9

II.     GENERAL INFORMATION ABOUT THE DEBTOR ..................................... 10
        A.    The History of the Debtors ............................................................ 10
        B.    Equity and Debt Structure ............................................................. 12
        C.    Events Leading To Commencement Of Chapter 11 Cases............... 13

III.    THE CHAPTER 11 CASES ............................................................................. 13
        A.    Filing ............................................................................................ 13
        B.    Administration of the Cases ........................................................... 13
        C.    Bankruptcy Court First Day Orders ............................................... 13
        D.    Appointment of Creditors' Committee ............................................ 14
        E.    Retention and Compensation of Professionals ............................... 14
        F.    Debtor in Possession Financing, Use of Cash Collateral and Adequate Protection . 14
        G.    Sale of Alliance Assets .................................................................. 15
        H.    Sale of Buffalo Assets .................................................................... 15
        I.    The Syracuse Assets ...................................................................... 15
        J.    Executory Contracts and Unexpired Leases .................................... 16
        K.    Bar Date For Filing Prepetition and Post-Petition Proofs of Claims ................... 17

IV.     SUMMARY OF THE PLAN ............................................................................ 17
        A.    Summary of Classification and Treatment of Claims and Interests Under
              the Plan ........................................................................................ 19
        B.    Implementation of Plan ................................................................... 22
        C.    Liquidating Trustee ........................................................................ 24
        D.    Executory Contracts ....................................................................... 26
        E.    Releases, Injunction and Exculpation ............................................. 27

V.      ESTIMATED DISTRIBUTIONS ...................................................................... 28

VI.     VOTING REQUIREMENTS, ACCEPTANCE, CONFIRMATION AND
        CONSUMMATION OF THE PLAN ................................................................ 29
        A.    General .......................................................................................... 29
        B.    Eligibility to Vote ......................................................................... 30
        C.    Estimation and Temporary Allowance of Claims............................ 30
        D.    Acceptance Requirements ............................................................... 30
        E.    Transmission of Ballots .................................................................. 30
        F.    Acceptances Required From Impaired Classes ............................... 31
        G.    Confirmation Without Acceptance of All Impaired Classes ("Cram-down") . 31
        H.    Feasibility of the Plan .................................................................... 32
        I.    Best Interests of Creditors.............................................................. 32

VII.    CERTAIN RISK FACTORS TO BE CONSIDERED ........................................ 33

3384894.4

VIII.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ................. 35

IX.    ALTERNATIVES TO CONFIRMATION OF THE PLAN ........................................... 38

X.     ALTERNATIVE PLANS OF REORGANIZATION ................................................... 38

XI.    CONFIRMATION HEARING .................................................................................... 38

XII.   CONCLUSION ............................................................................................................ 40

EXHIBIT

Exhibit A        Distribution and Liquidation Analyses

3384894.4

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

This Disclosure Statement (the "Disclosure Statement") provides information regarding the Joint Chapter 11 Plan of Liquidation dated August 2, 2019 (the "Plan") filed contemporaneously herewith by debtors Centerstone Linen Services, LLC d/b/a Clarus Lien Systems ("Centerstone"), Atlas Health Care Linen Services Co., LLC d/b/a Clarus Linen Systems ("Atlas"), Alliance Laundry & Textile Service, LLC d/b/a Clarus Linen Systems ("Alliance"), Alliance Laundry and Textile Service of Atlanta, LLC d/b/a Clarus Linen Systems ("Atlanta") and Alliance LTS Winchester, LLC d/b/a Clarus Linen Systems ("Winchester") (collectively, the Debtors").   The purpose of the Disclosure Statement is to provide such information as may be deemed material, important and necessary to the Creditors to make a reasonably informed decision in exercising their right to vote for acceptance of the Plan.

The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified herein, and the delivery of this Disclosure Statement shall not create an implication that there has been no change in information stated since the date hereof.

The Debtors believe that the Plan will enable the Debtors to successfully complete the liquidation of their Assets and Distribution of proceeds from the sales of substantially all of their operating Assets as described more fully below.   The Debtors and the Official Committee of Unsecured Creditors (the "Committee") believe that acceptance of the Plan is in the best interests of the Debtors, the Chapter 11 Estates and the Creditors.

**THE DEBTORS AND THE COMMITTEE URGE CREDITORS TO VOTE TO ACCEPT THE PLAN.**

———————————

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE.   THE DEBTORS ARE THE PROPONENTS OF THE PLAN.   THE PLAN PROVIDES FOR THE PROPOSED METHOD OF DISTRIBUTION OF PROCEEDS FROM THE SALES OF THE ASSETS, THE LIQUIDATION OF THE DEBTORS' REMAINING ASSETS AND THE DISTRIBUTIONS THAT CREDITORS OF THE DEBTORS WILL RECEIVE IN THE DEBTORS' CHAPTER 11 CASES.**

———————————

**NO PERSON MAY GIVE ANY INFORMATION ON BEHALF OF THE DEBTORS REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN, OTHER THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT EXCEPT FOR THE COMMITTEE CONSISTENT WITH ITS OBLIGATIONS ARISING UNDER 11 U.S.C. § 1103(c)(3).**

———————————

**THIS DISCLOSURE STATEMENT IS DESIGNED TO PROVIDE ADEQUATE INFORMATION TO ENABLE HOLDERS OF CLAIMS AGAINST THE DEBTORS TO**

MAKE AN INFORMED JUDGMENT ON WHETHER TO ACCEPT OR REJECT THE PLAN.  ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.   PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR    ENTIRETY    BY    REFERENCE    TO    THE    PLAN    FILED CONTEMPORANEOUSLY HEREWITH, OTHER EXHIBITS ANNEXED HERETO AND OTHER DOCUMENTS REFERENCED AS FILED WITH THE BANKRUPTCY COURT PRIOR TO THE END OF THE SOLICITATION PERIOD FOR THE PLAN. NO MATERIALS OTHER THAN THE ACCOMPANYING MATERIALS ATTACHED HERETO OR REFERENCED HEREIN HAVE BEEN APPROVED BY THE BANKRUPTCY    COURT    OR    THE    DEBTORS    FOR    USE    IN    SOLICITING ACCEPTANCES OR REJECTIONS OF THE PLAN.  SUBSEQUENT TO THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT: (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN REMAIN MATERIALLY ACCURATE, AND    (B) THIS    DISCLOSURE    STATEMENT    CONTAINS    ALL    MATERIAL INFORMATION.

THE DEBTORS HAVE PROPOSED THE PLAN AND THUS URGE ALL HOLDERS OF IMPAIRED CLAIMS IN CLASSES 1 AND 3 TO VOTE TO ACCEPT THE PLAN BY RETURNING THEIR PROPERLY EXECUTED AND COMPLETED BALLOTS SO THAT THE BALLOTS ARE RECEIVED ON OR BEFORE SEPTEMBER 10, 2019 AT:

> **Bond, Schoeneck & King, PLLC**
> **One Lincoln Center**
> **Syracuse, New York  13202**
> **Attn:  Kristin M. Doner**
> **Telephone:  (315) 218-8264**
> **Email:  kdoner@bsk.com**

PERSONS OR ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED, AND SHOULD BE AWARE THAT ACTUAL DISTRIBUTIONS MAY VARY FROM THE ESTIMATES CONTAINED HEREIN.

[THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY ORDER OF THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION OF A KIND AND IN SUFFICIENT DETAIL TO ENABLE HOLDERS OF CLAIMS TO MAKE AN INFORMED JUDGMENT WITH RESPECT TO VOTING TO ACCEPT OR

3384894.4

REJECT THE PLAN. HOWEVER, THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A RECOMMENDATION OR DETERMINATION BY THE BANKRUPTCY COURT AS TO THE MERITS OF THE PLAN.]

———————————

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC"), OR ANY SIMILAR PUBLIC GOVERNMENTAL OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT, THE INFORMATION CONTAINED HEREIN, OR THE MERITS OF THE PLAN.

———————————

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT SHALL BE DEEMED AN ADMISSION FOR ANY OTHER PURPOSE EXCEPT TO OBTAIN APPROVAL OF THE DISCLOSURE STATEMENT AND PLAN.

———————————

IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PLAN SUMMARY CONTAINED HEREIN AND THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN. ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

———————————

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS BASED PRIMARILY ON THE CURRENT EXPECTATIONS OF THE DEBTORS AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AFFECTING THE FINANCIAL CONDITION OF THE DEBTORS AND THE LIQUIDATING TRUST. IN PARTICULAR, STATEMENTS USING WORDS SUCH AS "BELIEVE", "MAY", "ESTIMATE", "CONTINUE", "ANTICIPATE", "INTEND", "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED BELOW UNDER SECTION IV(A). IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. CONSEQUENTLY, THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN SHOULD NOT BE REGARDED AS REPRESENTATIONS BY ANY OF THE DEBTORS, THEIR ADVISORS, OR ANY OTHER PERSON THAT THE PROJECTED FINANCIAL CONDITIONS OR RESULTS OF THE DISPOSITION OF ASSETS CAN OR WILL BE ACHIEVED. EXCEPT AS

OTHERWISE REQUIRED BY LAW, NONE OF THE DEBTORS UNDERTAKE ANY OBLIGATION TO UPDATE OR REVISE PUBLICLY ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE FOLLOWING APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT.

———————

EXCEPT AS OTHERWISE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

———————

AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING, OR POSSIBLE ADDITIONAL LITIGATION TO BE BROUGHT BY, ON BEHALF OF OR AGAINST, THE DEBTORS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER BY ANY PERSON, PARTY OR ENTITY, AND NOTHING IN THIS DISCLOSURE STATEMENT SHALL BE DEEMED AN ADMISSION FOR ANY OTHER PURPOSE EXCEPT TO OBTAIN APPROVAL OF THE DISCLOSURE STATEMENT AND PLAN. AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS. THIS DISCLOSURE STATEMENT SHALL BE CONSIDERED TO BE A SETTLEMENT DOCUMENT PURSUANT TO FEDERAL RULE OF EVIDENCE 408.

———————

ALL CAPITALIZED TERMS AND PHRASES USED IN THIS DISCLOSURE STATEMENT AND NOT OTHERWISE DEFINED HEREIN WILL HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN OR THE BANKRUPTCY CODE.

## I. INTRODUCTION

The Debtors filed the Plan in the Debtors' cases numbered 18-31753 through 18-31757 (the "Chapter 11 Cases") pending in the United States Bankruptcy Court for the Northern District of New York (the "Bankruptcy Court") under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"). The Debtors are distributing this Disclosure Statement, pursuant to Section 1125 of the Bankruptcy Code, to provide the Debtors' Creditors with adequate information so that they can make an informed

3384894.4

judgment on whether to vote to accept or reject the Plan. Please read this Disclosure Statement and the Plan carefully and follow the instructions set forth below to vote on the Plan.

A.      Explanation of Chapter 11.

Chapter 11 is the principal business reorganization Chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize or sell its business and liquidate for the benefit of itself, its creditors and equity holders. In addition to permitting rehabilitation of a debtor (or permitting the debtor to continue operating in anticipation of an asset sale), another goal of Chapter 11 is to promote equality of treatment for similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a Chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession". Upon filing a petition for Chapter 11 relief and during the pendency of a case, the Bankruptcy Code imposes an automatic stay against creditors' attempts to collect or enforce, through litigation or otherwise, claims against the debtor. The automatic stay provisions of Section 362 of the Bankruptcy Code, unless modified by court order, will generally prohibit or restrict attempts by creditors to collect or enforce any claims that arose prior to the commencement of the Chapter 11 case against the debtor.

The Bankruptcy Code provides for the formation of an official committee of unsecured creditors in a Chapter 11 case to represent the interests of creditors in the case. On January 10, 2019, the United States Trustee appointed the Committee in the Chapter 11 Cases.

The consummation of a plan is the principal objective of a Chapter 11 case. A plan sets forth, among other things, the treatment of, and means for satisfying, claims against and equity interests in the debtor. Confirmation of a plan by the bankruptcy court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor.

A Chapter 11 plan is the vehicle for satisfying or otherwise addressing the claims against and interests in a debtor. After a plan has been filed, the holders of claims against or equity interests in a debtor that are impaired and entitled to receive distributions under the plan are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, however, Section 1125 of the Bankruptcy Code requires a debtor or other plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Debtors are submitting this Disclosure Statement to satisfy the requirements of Section 1125 of the Bankruptcy Code.

B.      Preliminary Statement and Summary of Recoveries.

On December 19, 2018 (the "Petition Date"), the Debtors filed separate voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court. Until the closings of the Asset Sales described below, the Debtors continued in the management and possession of their assets and businesses as Debtors in Possession pursuant to sections 1107 and

3384894.4

1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Cases.

The Plan is predicated on the sales of substantially all of the Debtors' Assets (the "Asset Sales"), the liquidation of Remaining Assets, the collection of Accounts Receivable. The Plan will be implemented through this process and the Debtors will make Distributions from the proceeds as set forth in the Plan.

As a result of the foregoing, the Plan contemplates the payment in full in Cash of all Administrative Claims, Fee Claims, U.S. Trustee Fees and the HSBC Administrative DIP Claim against the Debtors, unless the holders of such Claims agree otherwise to less favorable treatment. The Priority Claims and general unsecured Claims will be paid pursuant to the terms of the Liquidation Trust Agreement to be implemented by the Committee.

The primary objectives of the Plan are: (i) to provide a mechanism for Distribution of the remaining proceeds of the Asset Sales being held in trust for the benefit of the Estates; (ii) completing the liquidation of the Debtors' remaining assets, including, for example, Avoidance Actions, Recovery Actions and Causes of Action held by, or in favor of, the Debtors; (iii) reconciling and fixing the Claims asserted against the Debtors; and (iv) distributing the net liquidation proceeds in conformity with the Distribution scheme provided by the Bankruptcy Code. As described below, a substantial portion of the Debtors' Assets have already been sold to third parties. The balance of the Assets will be administered as set forth herein pursuant to the terms of the Liquidation Trust Agreement.

The Debtors ceased operating their last facility effective July 19, 2019 and will sell or otherwise dispose of their Remaining Assets and wind down their affairs consistent with the Plan. Because the Plan is a plan of liquidation, pursuant to Section 1141(d)(3) of the Bankruptcy Code, the Debtors will not receive a discharge. All Interests in the Debtors will be canceled and, because the Allowed Claims of general unsecured Creditors will not be paid in full due to insufficient funds, no Distributions will be made under the Plan on account of any such Interests in the Debtors.

The table below summarizes the treatment for Creditors and holders of Interests under the Plan. For a complete explanation, please refer to the discussion in **Section IV, Subsection A** of this Disclosure Statement, entitled "Summary of Classification and Treatment of Claims Under the Plan" and to the Plan itself.

| Class | Description | Treatment if Claim Allowed | Estimated Amount on Effective Date | Estimated Recovery if Claim Allowed |
|---|---|---|---|---|
| Unclassified | Administrative Claims | Pay in full as allowed – not entitled to vote | $848,049.00 (as of 8/2/19) | 100% |
| Unclassified | Fee Claims | Pay in full as allowed-not entitled to vote | $660,199.46 | 100% |

3384894.4

| Unclassified | U.S. Trustee Fees | Pay in full as allowed–not entitled to vote | $79,239.00 | 100% |
|---|---|---|---|---|
| Unclassified | HSBC Bank Administrative DIP Claim | Paid in full as allowed – not entitled to vote | $1,168,336.23 as of July 30, 2019[2] | 100% |
| Class 1 | HSBC Bank Secured Claim | Impaired and Entitled to Vote | Up to $18,678,189.92 as of July 30, 2019 | To Be Determined |
| Class 2 | Unsecured Priority Claims | Unimpaired | $150,000.00 (estimated) | 100% |
| Class 3 | General Unsecured Claims | Impaired and Entitled to Vote | $29,842,485.45[3] | To Be Determined |
| Class 4 | Interests in Debtors | Impaired and Not Entitled to Vote | N/A | 0% |

The Debtors and the Committee have approved the Plan and the transactions contemplated thereby and recommend that all Creditors whose votes are being solicited submit ballots to accept the Plan.

C.    Who is Entitled to Vote on the Plan.

Only Impaired Classes receiving a Distribution under the Plan are entitled to vote on the Plan. As such, Claims in Classes 1 and 3 are Impaired, and the holders of Claims in those Classes are entitled to vote on the Plan. Holders of Interests in Class 4 are not entitled to vote because no Distributions will be paid under the Plan on account of such Interests and therefore those holders are deemed to have rejected the Plan.

D.    Definitions; Certain Exhibits.

1.    Definitions. Unless otherwise defined herein, capitalized terms used in this Disclosure Statement will be defined as set forth in the Plan or as defined in the Bankruptcy Code.

2.    Certain Exhibits. Copies of a Distribution Analysis under the Plan and a Liquidation Analysis under Chapter 7 are attached hereto as **Exhibit A**. Also, in reviewing this Disclosure Statement and the Plan, and in determining whether to vote for or against the Plan, Creditors (including parties who received payments or transfers from the Debtors within 90 days

---

[2]    Plus outstanding letters of credit totaling $1,080,000.00.

[3]    Class 3 includes the general unsecured Claims asserted in all five of the Chapter 11 Cases aggregating approximately $11,842,485.45, plus the HSBC Bank Unsecured Deficiency Claim to the extent the HSBC Bank Secured Claim is not paid in full. The HSBC Bank Unsecured Deficiency Claim is estimated by the Debtors to be in excess of $18,000,000.00.

3384894.4

prior to the Petition Date and insiders who received payments or transfers from the Debtors within one year before the Petition Date) and other parties should consider that Causes of Action of the Debtors may exist against them, that, except as otherwise set forth in the Plan, the Plan preserves all Causes of Action of the Debtors, and that the Plan authorizes the Liquidating Trustee to prosecute same.

E.    Notice to Creditors.

1.    Purpose of Disclosure Statement.    The purpose of this Disclosure Statement is to provide Creditors with information that (i) summarizes the Plan and alternatives to the Plan, (ii) advises Creditors of their rights under the Plan, (iii) assists Creditors entitled to vote in making informed decisions as to whether they should vote to accept or reject the Plan, and (iv) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of Chapter 11 of the Bankruptcy Code and should be confirmed.    This Disclosure Statement contains important information regarding (A) the Debtor' history, (B) developments in these Chapter 11 Cases, (C) the Plan, including a summary and analysis thereof, and (D) considerations pertinent to acceptance or rejection of the Plan.    This Disclosure Statement is designed to provide holders of Impaired Claims that are entitled to vote to accept or reject the Plan with adequate information to enable such holders to make a reasonably informed decision with respect to the Plan prior to exercising the right to vote to accept or reject the Plan.    All Creditors are encouraged to read this Disclosure Statement and its exhibits carefully and in their entirety before deciding to vote either to accept or reject the Plan.

2.    Information Contained in this Disclosure Statement.    This Disclosure Statement is the only document authorized by the Bankruptcy Court to be used in connection with the solicitation of votes accepting the Plan.    No solicitation of votes may be made except pursuant to this Disclosure Statement or another disclosure statement approved by the Bankruptcy Court, and no Person has been authorized by the Bankruptcy Court or the Debtors to use or disclose any information concerning the Debtors other than the information contained herein.    Other than as explicitly set forth in this Disclosure Statement, you should not rely upon any information relating to the Debtors, their Estates, the values of their Assets, the nature or amounts of their liabilities, its Creditors' Claims, or the amount or value of any Distributions made under the Plan.    All financial information and historical information contained in this Disclosure Statement has been provided by the Debtors. The Disclosure Statement is accurate to the best of the Debtors' knowledge, information and belief.    The Debtors have endeavored to make this Disclosure Statement as clear and comprehensive as possible in order to furnish Creditors with adequate information to make an informed decision regarding acceptance or rejection of the Plan.

**PLEASE READ THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN FILED CONTEMPORANEOUSLY HEREWITH, IN THEIR ENTIRETY PRIOR TO VOTING ON THE PLAN.  THE DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN FOR THE CONVENIENCE OF CREDITORS, BUT THE PLAN ITSELF QUALIFIES ALL SUCH SUMMARIES.  ACCORDINGLY, IF THERE EXISTS ANY INCONSISTENCY BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN WILL CONTROL.**

3384894.4

F.     <u>Disclosure Statement Enclosures</u>.

Accompanying this Disclosure Statement are the following enclosures:

1.     <u>Disclosure Statement Approval Order</u>.    A copy of the Order of the Bankruptcy Court dated August ___, 2019, approving this Disclosure Statement and, among other things, establishing procedures for voting on the Plan, and scheduling the hearing to consider, and the deadline for objecting to, confirmation of the Plan (the "<u>Disclosure Statement Approval Order</u>").

2.     <u>Notice of Confirmation Hearing</u>.    A copy of the notice of the deadline for submitting ballots to accept or reject the Plan and, among other things, the date, time and place of the hearing to confirm the Plan, and the deadline for filing objections to confirmation of the Plan (the "<u>Notice of Confirmation Hearing</u>").

3.     <u>Ballot</u>.    A Ballot (and return envelope) for voting to accept or reject the Plan, unless you are not entitled to vote.    See **Section VI** below for an explanation of which parties in interest are entitled to vote.

G.     <u>Summary of Voting Procedures</u>.

1.     <u>Vote Solicitation and Deadline</u>.    To be counted, your Ballot must be received, pursuant to the following instructions, by the Debtors' counsel at following address, on or before September 10, 2019 (the "<u>Voting Deadline</u>"):

Bond, Schoeneck & King, PLLC
One Lincoln Center
Syracuse, New York 13202
Attn: Kristin M. Doner

**IF YOU HOLD A CLAIM ENTITLED TO VOTE:**

Please complete the information requested on the Ballot; sign, date and indicate your vote on the Ballot; and return the completed Ballot in the enclosed pre-addressed, postage-paid envelope so that it is actually received by the Debtors' counsel on or before the Voting Deadline.

**DO NOT RETURN YOUR INVOICES, DEBT INSTRUMENTS, NOTES, CERTIFICATES OR ANY EQUITY SECURITIES THAT YOU MAY HAVE WITH YOUR BALLOT.**

2.     <u>Acceptance of the Plan</u>.    Under the Bankruptcy Code, an impaired class of claims entitled to vote has accepted a plan, if, of those voting, the holders of two-thirds (2/3) in dollar amount, and more than one-half (1/2) in number, of claims accept.

3384894.4

3.    <u>Hearing on Confirmation of Plan</u>.  The Bankruptcy Court has scheduled a hearing to consider confirmation (*i.e.*, approval) of the Plan commencing on **September 19, 2019 at 11:00 a.m. (Eastern Time)** (the "<u>Confirmation Hearing</u>"), in the United States Bankruptcy Court for the Northern District of New York in Syracuse, New York.  The Confirmation Hearing may be adjourned from time to time without further notice other than by announcement in the Bankruptcy Court on the scheduled hearing date or upon the Debtors filing a notice of adjournment.

## II.    **GENERAL INFORMATION ABOUT THE DEBTORS**

A.    <u>The History of the Debtors</u>.

1.    <u>Centerstone</u> – Centerstone is a closely-held Delaware limited liability company with a principal office and place of business located at 60 Grider Street, Buffalo, New York 14215.  It is the corporate parent of four subsidiary corporations: Atlas, Alliance, Atlanta and Winchester.  Prior to, and throughout the pendency of the Chapter 11 Cases, Centerstone provided back-office and administrative support for those subsidiaries and is the entity into whose bank account all accounts receivable collected by the Debtors were deposited and from which all operating cash was disbursed to the operating subsidiaries.  Centerstone was formed on October 15, 2007 and its current iteration was formed following the acquisition of Atlas, Alliance and Atlanta in mid-2008.  Centerstone employed approximately 24 non-union employees.

The three classes of membership interests in Centerstone are (i) a Mezzanine Interest, (ii) Class A Preferred Interests and (iii) Common Interests.  As of the Petition Date, the Mezzanine Interest was owned by Linen Investors, LLC (41.86% share of all interests); the Class A Preferred Interests were owned by Atlas Syracuse Holdings, Inc. (9.9948% share of all interests) and Xdolos Eqity, LLC (10.4657% share of all interests); and the Common Interests were owned by GGCLS, LLC (23.0246% share of all interests) and F&L, LLC (14.6520% share of all interests).

2.    <u>Atlas</u> – Atlas is a Delaware limited liability company that previously operated four linen rental and commercial laundry facilities at the following locations: (i) 414 Taylor Street, Syracuse, New York 13202 (the "<u>Syracuse Facility</u>"); (ii) 60 Grider Street, Buffalo, New York 14215 (the "<u>Buffalo Facility</u>"); (iii) 3 East Industrial Parkway, Troy, New York 12180 (the "<u>Troy Facility</u>"); and (iv) 304 Jumonville Street, Pittsburgh, Pennsylvania 15219 (the "<u>Pittsburgh Facility</u>").  The Pittsburgh Facility ceased operating in December 2017, the Troy Facility ceased operating on December 14, 2018, the Buffalo Facility ceased operating on June 24, 2019 and the Syracuse Facility ceased operating on July 19, 2019.

As of the Petition Date, the Syracuse Facility employed approximately 157 employees, and approximately 149 were hourly wage earners and the remaining 8 were salaried personnel.  The workforce at the Syracuse Facility was unionized and Atlas is a party to three Collective Bargaining Agreements covering the Syracuse employees: (i) the Rochester Regional Joint Board, Local 2607 (101 production employees – Agreement is currently under extension); (ii) the Teamsters, Local Union 182 (8 engineering/maintenance employees – Agreement expired on June 30, 2018); and (iii) the Teamsters, Local Union 294 (21 drivers – Agreement expires on

10

September 30, 2019). Atlas is also a member of the respective Multi-Employer Pension Plans for those three unions. Atlas owned all of the personal property assets located at the Syracuse Facility; however, the Syracuse Facility was leased from landlord ACN Companies, LLC ("ACN Companies").

As of the Petition Date, the Buffalo Facility employed approximately 150 employees, and approximately 141 were hourly wage earners and the remaining 9 were salaried personnel. The workforce at the Buffalo Facility was unionized and Atlas is a party to two Collective Bargaining Agreements covering the Buffalo employees: (i) the International Union of Operating Engineers, Local 17-17S AFL-CIO (6 engineering/maintenance employees – Agreement expired on April 12, 2019) and (ii) the Rochester Regional Joint Board, Local 51 (96 production employees – Agreement expires on October 31, 2019). Atlas leased the Buffalo Facility and the majority of the personal property assets located at the Buffalo Facility from lessor 60 Grider, LLC[4].

The Troy Facility ceased operating on December 14, 2018. As of the Petition Date, this Facility had approximately 20 active hourly employees who were winding down the Troy operations. The workforce at the Troy Facility was unionized and Atlas is a party to one Collective Bargaining Agreement covering the Troy employees: the Laundry, Distribution and Food Service Joint Board (54 employees – Agreement is currently under extension). Atlas owned all of the personal property assets located at the Troy Facility; however, the Troy Facility was leased from landlord ACN Companies and was vacated on January 31, 2019.

3.    Alliance – Alliance is a Georgia limited liability company that operated three linen rental and commercial laundry facilities at the following locations: (i) 355 Old Greenville Road, Spartanburg, South Carolina 29301 (the "Spartanburg Facility"); (ii) 1631 Willingham Drive, East Point, Georgia 30344 (the "East Point Facility"); and (iii) 404 Hodges Avenue, Albany, Georgia 31701 (the "Tristate Facility"). Alliance employed approximately 350 employees at its three facilities, all of whom were non-union. Alliance owned all of the personal property assets located at the Spartanburg Facility and East Point Facility. The Spartanburg Facility and the East Point Facility were leased from landlords ULS Acquisitions, LLC and Willingham 1631, LLC, respectively. Alliance leased the Tristate Facility and a majority of the personal property located at the Tristate Facility from Phoebe Putney Memorial Hospital, Inc.

4.    Atlanta – Atlanta is a Georgia limited liability company that previously operated a linen rental and commercial laundry facility located at 1700 Maple Avenue, S.W., Rome, Georgia 30161 (the "Rome Facility"). The Rome Facility ceased operating during June 2018 and Atlanta had no employees as of the Petition Date. The Rome Facility was leased from a third-party landlord and that lease terminated in June 2018.

5.    Winchester – Winchester is a Tennessee limited liability company that previously operated a linen rental and commercial laundry facility located at 1280 Baxter Lane, Winchester, Tennessee 37398 (the "Winchester Facility"). The Winchester Facility ceased

---

[4]    The Debtors' former Chief Executive Officer, John J. Giardino, owns a 100% membership interest in 60 Grider, LLC.

3384894.4

operating in April 2016 and Winchester had no employees as of the Petition Date. The Winchester Facility was leased from a third-party landlord and that lease terminated in April 2016.

As set forth in the Schedules A/B filed by the Debtors in these Chapter 11 Cases, the Debtors owned Assets valued, on an aggregate basis, at $23,145,719.04 as of the Petition Date [*See,* Debtors' Schedules, Docket Nos. 114-121]. The Debtors did not own any real property, and the Assets consisted of personal property only. The Assets were not appraised prior to the Petition Date. As discussed in Section B below, the Assets are subject to the blanket liens and security interests securing the indebtedness owed to HSBC Bank, which HSBC Bank Prepetition Claim aggregated to $23,137,682.11 on the Petition Date.

B.    Equity and Debt Structure.

As discussed above, 100% of the outstanding membership interests in Atlas, Alliance, Atlanta and Winchester are owned by Centerstone. The membership interests in Centerstone are owned by the entities described in Section II(A)(1). There is no public market for the Debtors' membership interests.

As of the Petition Date, the Debtors were jointly and severally indebted to secured creditor HSBC Bank pursuant to a Loan and Security Agreement dated October 29, 2013 (as amended, "Loan Agreement"), a Revolving Credit Note dated October 29, 2013, in the original principal amount of $20,000,000 ("Revolving Credit Note"), a Term Loan A Note dated October 29, 2013, in the original principal amount of $2,752,000 ("Term Loan A Note"), a Term Loan B Note dated October 29, 2013, in the original principal amount of $3,437,000 ("Term Loan B Note"), and one or more Equipment Notes dated October 29, 2013, in the aggregate original principal amounts of $6,000,000 (collectively "Equipment Note"). The Loan Agreement, Revolving Credit Note, Term Loan Note A, Term Loan Note B, Equipment Note, all Guaranties, and all documents executed and delivered in connection therewith or relating thereto (including all renewals, modifications and replacements thereof, including, without limitation, the Guaranties) are the "Loan Documents". As of December 18, 2018, the principal amounts of the Debtors' obligations owed to HSBC Bank under the Loan Documents were as follows:

a.    Revolving Credit Note - $19,529,345.46;
b.    Term Loan A Note - $0.00
c.    Term Loan B Note - $920,625.00
d.    Equipment Note - $1,428,025.29

Additional amounts for accrued interest, attorneys' fees and expenses were due by the Debtors to HSBC Bank under the Loan Documents. Repayment of the amounts due HSBC Bank under the Loan Documents is secured by duly-perfected security interests in, and first position liens upon, substantially all of the Debtors' Assets.

As a result of the Debtors' defaults under the Loan Documents, on March 30, 2018, the Debtors and HSBC Bank entered into a Forbearance Agreement covering the period through August 31, 2018. On or about May 10, 2018, the Debtors engaged business brokerage firm SSG Advisors, LLC ("SSG") which undertook extensive efforts to market the Debtors'

3384894.4

assets and business operations for sale. The forbearance period was extended beyond August 31, 2018. HSBC Bank also required the Debtors to retain a chief restructuring officer ("CRO") as a further condition to the Forbearance Agreement. On October 8, 2018, the Debtors retained Ronald Teplitsky of Next Point, LLC to act as the Debtors' CRO. The CRO continues to provide independent management of the Debtors' financial affairs and business operations. The CRO's duties include, among other things, (a) performing detailed financial reviews of the Debtors, (b) identifying cost reductions and operation improvement opportunities and (c) developing possible restructuring plans and strategic alternatives to maximize the enterprise value of the Debtors. Since his retention, the CRO has been actively engaged in overseeing the Debtors' business operations and in administering the Chapter 11 Cases.

     C.    <u>Events Leading to Commencement of Chapter 11 Cases</u>.

During the two-year period leading up to the Petition Date, the Debtors' revenues declined due to the Debtors' inability to purchase additional linens to satisfy its contractual obligations to customers and the resulting loss of customer contracts. As a result, the Debtors incurred a consolidated operating loss for 2018 of between $13.5 million and $14 million. During that period, the Debtors explored all available options in an effort to reorganize their financial affairs, including seeking refinancing and new capital contributions, and selling some or all of their assets. They also reduced expenses and made other operational adjustments, including closing below-capacity plants and laying off a number of employees. The foregoing operating adjustments, however, did not produce the required amount of relief. Absent chapter 11 relief, the Debtors projected that they would not have had sufficient cash flow to continue their operations over the long term. The Debtors, in consultation with the CRO, concluded that the best option to protect the value of their operations for Creditors and to preserve the jobs of their employees was to enter into the Chapter 11 Cases and sell their businesses as going concerns.

## III.    **THE CHAPTER 11 CASES**

     A.    <u>Filing</u>. On the Petition Date, the Debtors filed five separate voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Chapter 11 Cases are administered under main case number 18-31754. The Honorable Margaret Cangilos-Ruiz, Chief United States Bankruptcy Judge, has presided over the Chapter 11 Cases since the Petition Date.

     B.    <u>Administration of the Cases</u>. After the Petition Date, and in accordance with Sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continued to operate their businesses and manage their Assets as debtors in possession. As of the date of this Disclosure Statement, no trustee or examiner has been appointed in the Chapter 11 Cases, nor has any motion for a trustee or examiner been made. The Debtors' cases are being jointly administered pursuant to Orders of Joint Administration entered by the Bankruptcy Court in the Chapter 11 Cases on December 20, 2018.

     C.    <u>Bankruptcy Court First Day Orders</u>. On December 20, 2018, the Bankruptcy Court entered a number of orders granting the Debtors various forms of final relief. In particular, the Debtors obtained orders, among others:

3384894.4

1.    authorizing the Debtors to maintain existing bank accounts and business forms;

2.    authorizing the Debtors to pay prepetition payroll and related employee benefits;

3.    authorizing the Debtors to continue workers' compensation programs and insurance policies and pay all obligations owing thereunder; and

4.    authorizing the Debtors to pay prepetition taxes and regulatory fees.

D.    Appointment of Creditors' Committee.  On January 10, 2019, the United States Trustee for the Northern District of New York appointed the following Creditors to the Committee:

1.    Ryder Truck Rental, Inc.

2.    Superior Group of Companies, Inc.

3.    Tyler Staffing Services, Inc.

E.    Retention and Compensation of Professionals.

1.    Bankruptcy Counsel.  On January 31, 2019, the Debtors filed an application to retain Bond, Schoeneck & King, PLLC ("Bond") as their bankruptcy counsel. An Order approving the retention of Bond was entered on February 7, 2019 [Docket No. 186].

2.    Financial Advisors and Investment Bankers.  On January 31, 2019, the Debtors filed an application to retain Next Point, LLC and Ronald Teplitsky as their CRO. An Order approving the retention of Next Point, LLC and Mr. Teplitsky was entered on February 5, 2019 [Docket No. 178].

3.    Professionals Retained by the Creditors' Committee.  During the Chapter 11 Cases, the Committee retained CKR Law, LLC ("CKR") as its legal advisor on February 5, 2019 [Docket No. 179].  By Order entered on July 9, 2019, the Court entered an Order substituting Montgomery McCracken Walker & Rhoades LLP for CKR as counsel to the Committee [Docket No. 526].

F.    Debtor in Possession Financing, Use of Cash Collateral and Adequate Protection.

The Debtors also sought permission to obtain post-petition financing from HSBC Bank and to use the Cash Collateral of HSBC Bank.  In exchange for the post-petition financing and consent of HSBC Bank to use Cash Collateral, on December 21, 2018, the Bankruptcy Court entered an Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing on a Super-Priority, Senior Secured Basis and (B) Use Cash Collateral, (II) Granting (A) Liens and Super-Priority Claims and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief [Docket No. 33] (the "Interim DIP Order").  On February 14, 2019, the Bankruptcy Court

3384894.4

entered the Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing on a Super-Priority, Senior Secured Basis and (B) Use Cash Collateral, (II) Granting (A) Liens and Super-Priority Claims and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief [Docket No. 234] (the "Original DIP Order"), as amended by the Order Amending Final DIP Order [Docket No. 357] ("Amendment to Final DIP Order"), as amended by the Second Order Amending Final DIP Order [Docket No. 430] ("Second Amendment to Final DIP Order"), as amended by the Third Order Amending Final DIP Order [Docket No. 463] ("Third Amendment to Final DIP Order"), as amended by the Fourth Order Amending Final DIP Order [Docket No. 503] ("Fourth Amendment to Final DIP Order"), as amended by the Fifth Order Amending Final DIP Order [Docket No. 516] ("Fifth Amendment to Final DIP Order"), as amended by the Sixth Order Amending Final DIP Order [Docket No. 545] ("Sixth Amendment to Final DIP Order"), and collectively with the Interim DIP Order, Original DIP Order, Amendment to Final DIP Order, Second Amendment to Final DIP Order, Third Amendment to Final DIP Order, Fourth Amendment to Final DIP Order, Fifth Amendment to Final DIP Order, Sixth Amendment to Final DIP Order, the "Final DIP Order".  The post-petition financing and use of Cash Collateral was essential to ensure that the Debtors could fund their post-petition operating requirements and preserve and maintain their Assets and the infrastructure of their businesses to achieve the sales of substantially all of their Assets under the Bankruptcy Code.

      G.     Sale of Alliance Assets.

      On December 19, 2018, Alliance entered into an Asset Purchase Agreement (the "Crown APA") with Crown Health Care Laundry Services, LLC ("Crown") pursuant to which Crown sought to purchase substantially all of the assets owned by Alliance.  On December 21, 2018, Alliance filed a Motion for Entry of Orders (A) (I) Authorizing the Sale of Substantially All of Alliance's Asset Free and Clear of All Liens, Claims, Interests and Encumbrances, Subject to the Terms of the Asset Purchase Agreement and Subject to Higher and/or Better Offers' (II) Authorizing and Approving the Form of a Certain Asset Purchase Agreement With Crown Health Care Laundry Services, LLC; and (III) Authorizing Alliance to Consummate All Transactions Related to the Proposed Sale; (B) Approving Bidding Procedures and Other Related Relief; and (C) Authorizing Alliance to Assume Certain Executory Contracts and Unexpired Leases and Assign Such Contracts and Leases to Purchaser Crown Health Care Laundry Services, LLC [Docket No. 34] (the "Crown Sale Motion").   On January 15, 2019, the Bankruptcy Court entered an Order Approving Bidding and Sale Procedures [Docket No. 134] (the "Crown Bidding Procedures Order").

      Pursuant to the terms of the Crown Bidding Procedures Order, Alliance conducted an auction sale of its assets on February 7, 2019 at the offices of Debtors' counsel.  Prior to the commencement of the auction, Crown exercised its option to exclude the equipment located at the East Point Facility (the "East Point Equipment") from the assets to be purchased under the Crown APA.  No other bidders appeared at the auction to bid on the assets sought to be purchased by Crown; however, two prospective purchasers appeared to bid on the East Point Equipment.  Alliance conducted an auction of the East Point Equipment, and at the conclusion designated the bid submitted by AMCP Clean Acquisition, LLC ("AMCP") in the amount of $525,300.00 as the highest and best bid for the East Point Equipment.

On February 19, 2019, the Bankruptcy Court entered an Order approving the sale of substantially all of Alliance's assets to Crown. The sale to Crown closed on February 22, 2019 and Crown paid a purchase price of $3,588,694.04. On February 22, 2019, the Bankruptcy Court entered an Order approving the sale of the East Point Equipment to AMCP. The sale to AMCP closed on February 26, 2019 and AMCP paid the purchase price of $525,300.00.

After reserving SSG's sale commission in the amount of $200,000.00, funds for professionals totaling $140,000.00, funds for the Debtors' Estates in the amount of $200,000.00 and $70,000.00 for the payment of Allowed Claims under section 503(b)(9) of the Bankruptcy Code, the balance of the sale proceeds for Alliance's assets in the amount of $3,465,279.52 was paid to HSBC Bank in accordance with the terms of the Final DIP Order and orders approving the sales.

H.      Sale of Buffalo Assets.

On March 13, 2019, Centerstone and Atlas entered into an Asset Purchase Agreement with Linen Newco, LLC ("Linen Newco") pursuant to which Linen Newco proposed to purchase substantially all of the assets located at the Buffalo Facility owned by Centerstone and Atlas, and the assets at the Syracuse Facility owned by Atlas (the "Linen Newco APA"). Also on March 13, 2019, Centerstone and Atlas filed a motion seeking authority to sell their assets to Linen Newco and to establish bidding procedures governing the asset sale [Docket No. 285]. On March 20, 2019, the Bankruptcy Court entered an Order Approving Bidding and Sale Procedures (the "Atlas Bidding Procedures Order") [Docket No. 299]. The various bidding and sale deadlines established in the Atlas Bidding Procedures Order were thereafter extended by Orders of the Bankruptcy Court dated April 11, April 25, May 8 and May 21, 2019 [Docket Nos. 349, 373, 417 and 434]. On April 30, 3019, Linen Newco withdrew the Linen Newco APA, and on May 29, 2019, Centerstone and Atlas entered into an Asset Purchase Agreement (the "Clean Textile APA") with Clean Textile Systems, L.P. ("Clean Textile") pursuant to which Clean Textile sought to purchase substantially all of the personal property assets and accounts receivable located at the Buffalo Facility (the "Buffalo Assets"). On June 5, 2019, the Bankruptcy Court entered an Order approving the sale of the Buffalo Assets to Clean Textile and that sale closed on June 24, 2019.

After reserving aside SSG's sale commission in the amount of $75,000.00, operating funds for Atlas in the amount of $140,000.00, rent payments due 60 Grider, LLC in the amount of $45,000.00 and $40,000.00 for the Debtors' Estates, the balance of the sale proceeds in the amount of $706,389.17 was paid to HSBC Bank in accordance with the terms of the Final DIP Order and order approving the sale.

I.      The Syracuse Assets.

Despite the best efforts of Atlas and SSG, Atlas was unable to consummate a sale of the personal property located at the Syracuse Facility (the "Syracuse Assets") as a going concern to a third-party operator. Consequently, the Syracuse Facility ceased operating on July 19, 2019. As of the date of this Disclosure Statement, Atlas is in the process of liquidating the equipment and linen inventory located at the Syracuse Facility and collecting all of the Debtors'

16

remaining and outstanding accounts receivable.  The proceeds received for those assets will be paid to HSBC Bank in accordance with the terms of the Final DIP Order, as amended.

J.    Executory Contracts and Unexpired Leases.

1.    Assumption of Contracts and Leases.  Pursuant to the Crown APA and the Clean Textile APA, the Debtors assumed and assigned certain executory contracts and unexpired leases to Crown and Clean Textile, respectively.  Cure Payments, if any, that were due were paid in accordance with the terms of the Crown APA and Clean Textile APA, respectively.  No other orders authorizing the assumption of executory contracts or unexpired leases have been entered in the Chapter 11 Cases.

2.    Rejection of Contracts and Leases.  Except as otherwise set forth in the Plan, the Crown APA and the Clean Textile APA, each contract of the Debtors that is not assumed and assigned to a third party that has not expired by its own terms or been previously rejected by the Debtors shall be rejected as of the Effective Date.  As of the Effective Date, the Debtors will terminate their 401(k) retirement plan.  In addition, all employment, severance, retirement, indemnification, employee benefit, profit-sharing and related policies, plans or agreements, whether or not qualified under ERISA, health care plans, disability plans and incentive plans, that were in effect on the Petition Date and that have not previously been terminated or superseded shall be terminated and deemed rejected.  The Debtors do not have any retiree benefit obligations within the meaning of 11 U.S.C. §1129(a)(13), and therefore the Plan complies with that section of the Bankruptcy Code.

K.    Bar Date For Filing Prepetition and Post-Petition Proofs of Claims.

The Debtors filed their respective Schedules of Assets and Liabilities (the "Schedules") and Statements of Financial Affairs on January 11, 2019.  By an Order dated March 4, 2019 (the "Bar Date Order"), the Bankruptcy Court fixed April 30, 2019 (the "Bar Date") as the date by which proofs of claims for prepetition Claims and Claims asserted under section 503(b)(9) of the Bankruptcy Code had to be filed against the Debtors.  Under the Bar Date Order and the Plan, unless otherwise ordered by the Bankruptcy Court, any person or entity that was required to file a timely proof of claim and failed to do so on or before the Bar Date will not be entitled, with respect to such Claim, to receive any payment or Distribution of property from the Debtors, their successors or assigns, and will be forever barred from asserting such Claim against the Debtors' Estates.  The Liquidating Trustee will review and reconcile Claims and will file appropriate objections thereto.

IV.    **SUMMARY OF THE PLAN**

**THE FOLLOWING IS A SUMMARY OF THE SIGNIFICANT ELEMENTS OF THE PLAN.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN.**

Only administrative expense claims, claims and interests that are "allowed" may receive distributions under a Chapter 11 plan. An "allowed" administrative expense claim, claim or interest simply means that the debtor or liquidating trustee, if applicable, agrees, or in the

17

3384894.4

event of a dispute, the Bankruptcy Court determines, that the administrative expense claim, claim or interest, including the amount thereof, is in fact a valid obligation of, or interest in, the debtor. Section 503 of the Bankruptcy Code provides that an administrative expense claim may be allowed after notice and hearing. Section 502(a) of the Bankruptcy Code provides that a timely filed claim or interest is automatically "allowed" unless the debtor or another party-in-interest objects. However, Section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in a bankruptcy case even if a proof of claim is filed. These include, without limitation, claims that are unenforceable under the governing agreement or applicable non-bankruptcy law, claims for unmatured interest on unsecured and/or undersecured obligations, property tax claims in excess of the debtor's equity in the property, claims for certain services that exceed their reasonable value, nonresidential real property lease and employment contract rejection damage claims in excess of specified amounts, and late-filed claims. In addition, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or interest that either is not listed on the debtor's schedules or is listed as disputed, contingent, or unliquidated if the holder has not filed a proof of claim or Interest before the deadline to file proofs of claim and interests.

The Bankruptcy Code also requires that, for purposes of treatment and voting, a Chapter 11 plan divides the different claims against, and interests in, the debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or interests which give rise to different legal rights, the holders of such claims and/or interests may find themselves as members of multiple classes of claims and/or interests.

Under a Chapter 11 plan, the separate classes of claims and interests must be designated either as "impaired" (altered by the plan in any way) or "unimpaired" (unaltered by the plan). If a class of claims or interests is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims or interests, such as the right to vote on the plan (unless the plan provides for no distribution to the holder, in which case, the holder is deemed to reject the plan), and the right to receive an amount under the Chapter 11 plan that is not less than the value that the holder would receive if the debtor were liquidated under Chapter 7. Under Section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless, with respect to each claim or interest of such class, the plan (i) does not alter the legal, equitable or contractual rights of the holders of such claims or interests or (ii) irrespective of the holders' right to receive accelerated payment of such claims or interests after the occurrence of a default, cures all defaults (other than those arising from, among other things, the debtor's insolvency or the commencement of a bankruptcy case), reinstates the maturity of the claims or interests in the class, compensates the holders of such claims or interests for any damages incurred as a result of their reasonable reliance upon any acceleration rights and does not otherwise alter their legal, equitable or contractual rights. Typically, this means that the holder of an unimpaired claim will receive, on the later of the effective date of the plan or the date on which amounts owing are due and payable, payment in full, in cash, with post-petition interest to the extent permitted and provided under the governing agreement between the parties (or, if there is no agreement, under applicable non-bankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms. Thus, other than its right to accelerate a debtor's obligations, the holder of an unimpaired claim will be placed in the same position it would have been in had the debtor's case not been commenced. Consistent with these

18

3384894.4

requirements, the Plan divides the Claims against, and Interests in, the Debtors into the following Classes and affords the treatments outlined below.

If the Plan is confirmed by the Bankruptcy Court and is then consummated as is set forth below, holders of Claims will receive the Distributions described below. Upon the Effective Date, the treatment of each Class of Claims under the Plan will be binding upon the Debtors, all holders of Claims, and all Persons whether or not such Persons are to receive any payments or other Distributions under the Plan and whether or not such Persons have voted to accept the Plan.

A.     Summary of Classification and Treatment of Claims and Interest Under the Plan.

Claims and Interests are divided into four Classes under the Plan, and the proposed treatment of Claims varies among Classes. Administrative Claims, Fee Claims, U.S. Trustee Fees and the HSBC Bank Administrative DIP Claim are not classified. The Plan contains (i) one Class of unimpaired Claims, which consist of Unsecured Priority Claims (Class 2) and (ii) three Classes of impaired Claims and Interests which consist of the HSBC Bank Secured Claim, General Unsecured Claims, and Interests in the Debtors (Classes 1, 3 and 4). The meaning of "Impairment", and the consequences of voting on the Plan, are set forth in Section 4 of the Plan.

The following section briefly summarizes the classification and treatment of Claims under the Plan.

**Unclassified Claims**

*Administrative Claims.* Administrative Claim are Claims for payment of an administrative expense or cost of a kind specified in section 503(b) of the Bankruptcy Code and referenced in sections 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code including, without limitation, the actual, necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors, including wages, salaries and taxes incurred by the Estates after the commencement of the Chapter 11 Cases; provided, however, the term does not include Fee Claims or U.S. Trustee Fees, which are treated separately in the Plan. Administrative Claims also include Claims for the payment of amounts due for goods received by the Debtors in the ordinary course of business within 20 days before the Petition Date under section 503(b)(9) of the Bankruptcy Code.

Except as otherwise provided in the Plan, by written agreement of the holder of an Allowed Administrative Claim to accept different and less favorable treatment than provided under the Plan, or by order of the Court, a Person holding an Allowed Administrative Claim will receive Cash equal to 100% of the unpaid portion of such Allowed Administrative Claim as soon as practicable upon the later of the Effective Date or the date the Administrative Claim is allowed.

As of the date of this Disclosure Statement, the Debtors estimate that all of the accrued but unpaid Allowed Administrative Claims will be paid in full in accordance with the Budgets attached to the Final DIP Order.

3384894.4

*Fee Claims.* As defined in Section 1.41 of the Plan, a Fee Claim is a Claim for payment of legal or other professional services provided to the Debtors or Committee in the Chapter 11 Cases. Except as otherwise provided in the Plan, by written agreement of the holder of a Fee Claim to accept different and less favorable treatment than provided under the Plan, or by order of the Bankruptcy Court, a Person holding an Allowed Fee Claim will receive Cash equal to 100% of the unpaid portion of such Allowed Fee Claim, as soon as practicable after the later of: (a) the fifth Business Day after the Effective Date; or (b) the date on which such Person becomes the holder of such an Allowed Fee Claim. The Fee Claims shall not be payable from the Estate Carve-Out.

Each Person retained or requesting compensation in this Chapter 11 Case, pursuant to sections 330, 331 or 503(b) of the Bankruptcy Code, must file with the Bankruptcy Court an application for allowance of any Fee Claim by August 22, 2019. All such Fee Claims for which an application is not timely filed shall be forever barred. Objections to such applications may be filed in accordance with the Bankruptcy Rules. The Bankruptcy Court shall determine all such Fee Claims.

Funds have been reserved to pay the Fee Claims as set forth in the Budgets attached to the Final DIP Order. As of the date of this Disclosure Statement, the Debtors estimate that the accrued Fee Claims due Professionals through the Effective Date of the Plan are as follows:

| Debtor's Professionals: | Amt. due through 7/31/2019 | Estimated through end of cases | Estimated Total Fees |
|---|---|---|---|
| Bond, Schoeneck & King | $257,156.65 | $ 75,000.00 | $332,165.65 |
| Next Point/Teplitsky | $ 62,308.81 | $ 40,725.00 | $103,033.81 |
| **Grand Totals** | $319,465.46 | $115,725.00 | $435,199.46 |

| Committee Professionals: | Amt. due through 7/31/2019 | Estimated through end of cases | Estimated Total Fees |
|---|---|---|---|
| CKR Law | $15,000.00 | $     0.00 | $ 15,000.00 |
| Montgomery, McCraken | $60,000.00 | $ 50,000.00 | $110,000.00 |
| **Grand Total** | $75,000.00 | $ 50,000.00 | $225,000.00 |

*U.S. Trustee Fees.* All U.S. Trustee Fees will be paid in full by the Debtors or the Liquidating Trustee, as the case may be, as they become due and owing and shall continue to be paid until such time that (i) a final decree is entered closing the Chapter 11 Cases, a Final Order converting the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code or a Final Order dismissing the Chapter 11 Cases is entered and (ii) the Liquidating Trustee has met all Post-Confirmation Operating Report Requirements of the U.S. Trustee's Operating Guidelines and Reporting Requirements for debtors in possession and trustees (unless the Bankruptcy Court orders otherwise), including filing, and serving upon the U.S. Trustee, post-Confirmation quarterly reports of disbursements made during each calendar quarter.

3384894.4

*HSBC Bank Administrative DIP Claim.* Pursuant to the Final DIP Order, the Debtors obtained a post-petition senior secured superpriority administrative revolving line of credit to fund the Debtors' Chapter 11 operations, which line of credit, as of July 31, 2019, totals $1,168,336.23, and converted $1,080,000.00 in pre-petition letters of credit issued to post-petition letters of credit. The HSBC Bank Administrative DIP Claim is Allowed and will be paid in full by the Debtors or the Liquidating Trustee. Until the HSBC Bank Administrative DIP Claim is paid in full, HSBC Bank's liens and security interests shall remain affixed to the Remaining Syracuse Assets (subject to the Estate Carve-Out), Remaining Accounts Receivable and HSBC Bank Collateral.

**Classified Claims**

Class 1 – HSBC Bank Secured Claim. This Class consists of the HSBC Bank Allowed Secured Claim which is Allowed in its entirety. Until the Effective Date and thereafter in accordance with the terms of the Final DIP Order, as amended, and the Liquidating Trust Agreement, HSBC Bank shall receive the proceeds of the liquidation sales of the Remaining Syracuse Assets (except to the extent such proceeds are part of the Estate Carve-Out), collection of the Remaining Accounts Receivable, and any other HSBC Bank Collateral. Until the HSBC Bank Allowed Secured Claim is paid in full, HSBC Bank's liens and security interests shall remain affixed to the Remaining Syracuse Assets (subject to the Estate Carve-Out), Remaining Accounts Receivable, and the HSBC Bank Collateral. On or after the Effective Date, in HSBC Bank's sole discretion, the Liquidating Trust and/or Trustee shall transfer, assign, or abandon to HSBC Bank, some or all of the Remaining Syracuse Assets (with the exception of amounts related to the Estate Carve-Out), the Remaining Accounts Receivable, and the HSBC Bank Collateral (the "Assigned Assets"), for which HSBC Bank will report to the Liquidating Trustee on the first business day of each month as to the proceeds collected from the recovery or liquidation of such Assigned Assets, which proceeds shall reduce the HSBC Bank Administrative DIP Claim if still outstanding, or the HSBC Bank Allowed Secured Claim, as the case may be. The treatment described herein shall be in partial satisfaction of the HSBC Bank Allowed Secured Claim. Except as provided in Section 3.3.1 of the Plan, HSBC Bank shall not assert any claims of any nature against the Liquidating Trustee or Liquidating Trust for amounts still owing on account of the HSBC Bank Allowed Secured Claim to the extent not satisfied from the proceeds set forth in Section 3.3.1 of the Plan, leaving solely the HSBC Bank Unsecured Deficiency Claim, which shall be treated as a Class 3 Claim as described below.

Class 2 – Unsecured Priority Claims. Class 2 consists of Creditors holding Allowed Priority Claims. The Liquidating Trustee will review the Debtors' Schedules and each Priority Claim filed in the Chapter 11 Cases and file objections, if necessary. Each holder of an Allowed Class 2 Claim shall be paid with priority as set forth in section 507(a) of the Bankruptcy Code, in full, prior to any Distribution to any holder of a Claim in Class 3, from funds budgeted for such Claims in the Budget attached to the Sixth Order Amending Final DIP Order (or budget attached to any subsequent amendment), and to the extent such budgeted funds are not sufficient to cover all such Allowed Class 2 Claims, from the Estate Carve-Out.

Class 3 – Unsecured Claims. Class 3 consists of the general unsecured claims of all five Debtors aggregating approximately $11,842,485.45, plus the HSBC Bank Unsecured Deficiency Claim estimated to be in excess of $18,000,000.00. Unless otherwise agreed by the

21

applicable holder of an Allowed Claim in this Class to accept different and less favorable treatment, each holder of an Allowed Unsecured Claim shall be entitled to receive such holder's *pro rata* share of the Estate Carve-Out, Recovery Actions, and the proceeds of any future liquidated unencumbered assets (less the expenses of the Liquidating Trustee and Distributions to Class 2 Claimants) (collectively, the "Liquidating Trust Assets").   The Estate Carve-Out consists of:

- $200,000.00 from the Alliance Asset Sale proceeds;

- $40,000 from the Atlas-Buffalo Sale proceeds;

- $10,000 from the collection of the Debtors' accounts receivable; plus

- An amount equal to 5% of the Syracuse linen sale proceeds and 5% of the Remaining Syracuse Assets sale proceeds.

The Estate Carve-Out funds will be transferred to the Liquidating Trustee on the Effective Date of the Plan for deposit into the Liquidating Trust.  The proceeds of any liquidated unencumbered assets shall also be deposited into the Liquidating Trust.

The Debtors shall also assign to the Committee and Liquidating Trustee the Recovery Actions which shall be prosecuted by the Liquidating Trustee in accordance with the terms of the Liquidating Trust Agreement.   The proceeds of the Recovery Actions shall be deposited into the Liquidating Trust for the benefit of the Class 2 and Class 3 Creditors.   The HSBC Bank Unsecured Deficiency Claim is Allowed in its entirety.   The HSBC Bank Unsecured Deficiency Allowed Claim shall not share in the Distribution of the Estate Carve-Out, but HSBC Bank shall otherwise be entitled to its *pro rata* share of Distributions to Allowed Class 3 Claim holders of the Liquidating Trust Assets, capped at a *pro rata* share of 50% of all such Class 3 Distributions.   The amount to be recovered in connection with the Recovery Actions cannot be determined at this time.

Class 4 – Interests.  Each holder of an Interest will not receive any Distribution on account of such Interest.  Each holder of an Interest shall not receive or retain an Interest or other property or interests of the Debtors on account of such Interest.

B.    Implementation of Plan.

1.    Substantive Consolidation for Plan Purposes Only.  The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order substantively consolidating the Debtors' Estates into a single consolidated Estate, solely for all purposes associated with confirmation and consummation of the Plan.  In the Second Circuit, the seminal case addressing the issue of substantive consolidation is *Union Savings Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.)*, 860 F.2d 515 (2d Cir. 1988).   The sole purpose of substantive consolidation is to ensure the equitable treatment of all creditors.  The Debtors' pre-petition and post-petition operations were sufficiently entangled that it would be difficult to separate each Debtor as a separate operating entity.  Most significantly, the Debtors all operated under the single assumed name of "Clarus Linen Systems" with all of their customers.  All of the linen service agreements, invoices and correspondence between the Debtors and their customers

3384894.4

were in the name of "Clarus". Similarly, nearly all of the Debtors' transactions with their creditors were under the name of "Clarus". Further, and as discussed more fully in the cash management motion approved by the Court, the customer receivables collected on behalf of all of the Debtors were deposited into a single centralized Payment Account maintained by Centerstone at HSBC Bank. HSBC Bank swept the Payment Account daily to pay down a centralized Loan Account. Funds were then drawn from the Loan Account to fund the centralized Operating Account maintained by Centerstone. All disbursements were paid out of the Operating Account. The Debtors' operating obligations were then satisfied either by direct payment from the Operating Account or by payment from three separate Controlled Disbursement Accounts, which were funded by the Operating Account. This collection and disbursement arrangement continued throughout the post-petition period and is reflected in the Monthly Operating Reports filed on a consolidated basis in the Centerstone case since the Petition Date. Finally, the funds reserved for Creditors in the Estate Carve-Out are comingled for the benefit of all Creditors and are not allocated to any particular Chapter 11 Case. Based upon the foregoing, the Debtors respectfully submit that substantive consolidation of the Chapter 11 Cases for Plan purposes only is appropriate and ensures equitable treatment of all Creditors.

On the Effective Date, for Plan purposes only, the Debtors shall be deemed merged into Centerstone, and (a) all assets and liabilities of the Debtors shall be deemed merged into Centerstone; (b) all guaranties of any Debtor of the payment, performance, or collection of the obligations of another Debtor shall be eliminated and cancelled; (c) any obligation of any Debtor and all guaranties thereof executed by one or more of the other Debtors shall be treated as a single obligation, and such guaranties shall be deemed a single Claim against the consolidated Debtors; (d) all joint obligations of two or more Debtors, and all multiple Claims against such entities on account of such joint obligations shall be treated and Allowed only as a single Claim against the consolidated Debtors; and (e) each Claim filed in the Chapter 11 Case of any Debtor shall be deemed filed against the consolidated Debtors and a single obligation of the Debtors on and after the Effective Date. Entry of the Confirmation Order will constitute the approval, pursuant to the Bankruptcy Code section 105(a), effective as of the Effective Date, of the deemed substantive consolidation of the Chapter 11 Cases for purposes of voting on, confirmation of, and Distributions under the Plan.

Notwithstanding the foregoing, the deemed consolidation and substantive consolidation (each for Plan purposes only) shall not (other than for purposes related to funding Distributions under the Plan) affect (a) the legal and organizational structure of the Debtors; (b) pre- and post-Petition Date guaranties, liens and security interests that were required to be maintained (i) in connection with any executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or will be assumed by the Debtors or (ii) pursuant to the Plan; (c) Distributions out of any insurance policies or proceeds of such policies; and (d) the tax treatment of the Debtors. Furthermore, notwithstanding the foregoing, the deemed consolidation and substantive consolidation (each for Plan purposes only), shall not affect the statutory obligation of each and every Debtor to pay quarterly fees to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6).

In the event that the Bankruptcy Court does not order such deemed substantive consolidation of the Debtors, then except as specifically set forth in the Plan, (a) nothing in the Plan or the Disclosure Statement may constitute or be deemed to constitute an admission that one

3384894.4

of the Debtors is subject to or liable for any Claim against any other Debtor; (b) Claims against multiple Debtors may be treated as separate Claims against each applicable Debtor for all purposes (including, without limitation, Distributions and voting) and such Claims may be administered as provided in the Plan; (c) the Debtors may not, nor may they be required to, resolicit votes with respect to the Plan; and (d) the Debtors may seek Confirmation of the Plan as if the Plan is a separate Plan for each of the Debtors.

The substantive consolidation effected pursuant to Section 5.1 of the Plan shall not affect, without limitation:  (i) the Debtors' or the Estates' (x) defenses to any Claim or Cause of Action, including with respect to the Recovery Actions, including, without limitation, the ability to assert any counterclaim, (y) setoff or recoupment rights, or (z) requirements for any third party to establish mutuality prior to substantive consolidation in order to assert a right of setoff against the Debtors or the Estates; or (ii) distributions to the Debtors and/or the Estates out of any insurance policies or the proceeds of such policies.

2.    <u>Funding of the Plan</u>.  The Unclassified Claims will be paid in full from the Debtors' operating account or certain funds that have been reserved pursuant to the terms of the Final DIP Order, as amended, during the pendency of the Chapter 11 Cases.  On the Effective Date, the Liquidation Trust will become effective in accordance with the terms of the Liquidation Trust Agreement and the Estate Carve-Out will be paid to the Liquidating Trustee.

3.    <u>CRO</u>.  On the Effective Date, Next Point and Mr. Teplitsky will be relieved of their duties as the CRO of the Debtors.

C.    <u>Liquidating Trustee</u>.

The Confirmation Order shall provide for the appointment of a Liquidating Trustee.  The Liquidating Trustee shall be deemed the Estates' representative in accordance with section 1123 of the Bankruptcy Code and shall have all powers, authority and responsibilities specified in the Plan, including, without limitation, the powers and duties of a trustee under sections 704 and 1106 of the Bankruptcy Code, as set forth in the Liquidating Trust Agreement which shall be filed as a Plan supplement in advance of the hearing to approve this Disclosure Statement, in form and substance reasonably acceptable to the Committee and the Debtors, in consultation with HSBC Bank, that will be executed by the Debtors and the Liquidating Trustee, the Committee and HSBC Bank in September, 2019.

The Liquidating Trustee shall provide to the Debtors and Committee an Affidavit of Disinterestedness and an engagement letter.  The Liquidating Trustee shall be supervised by the Office of the United States Trustee and shall file semi-annual status reports with the Bankruptcy Court.  In the event that the Liquidating Trustee becomes unable or unwilling to perform his/her duties under the Plan, a substitute Liquidating Trustee will be selected upon consultation with the Office of the United States Trustee.

As of the Effective Date, and except as otherwise provided in the Plan, including Sections 2.3 and 3.3.1 providing for the retention of HSBC Bank's liens and security interests, pursuant to the provisions of sections 1141(b) and (c) of the Bankruptcy Code, all unliquidated Assets, including the Recovery Actions, Causes of Action, Remaining Syracuse Assets,

3384894.4

Remaining Accounts Receivable, and HSBC Bank Collateral shall vest in the Liquidating Trust free and clear of all Claims, liens, encumbrances, charges, membership interests and other interests, including, for the avoidance of doubt, derivative Causes of Action that have been, or may be, brought on behalf of the Debtors, including any pending or future derivative Causes of Action, subject to the terms and conditions of this Plan and the Confirmation Order.

The Liquidating Trustee will act for the Debtors in a fiduciary capacity as applicable to a board of directors and shall be responsible for the liquidation of the Debtors' remaining Assets, administration of the Plan and wind-down of the Debtors and their Estates post-Effective Date, subject to the provisions of the Plan. The powers and duties of the Liquidating Trustee shall include, and the Liquidating Trustee shall be authorized:

a. to invest Cash in accordance with Section 345 of the Bankruptcy Code, and withdraw and make Distributions of Cash to holders of Allowed Claims and pay taxes, if any, and other obligations owed by the Debtors or incurred by the Liquidating Trustee in connection with the wind-down of the Estates in accordance with the Plan;

b. to receive, manage, invest, supervise, and protect the Assets, including paying taxes, if any, or other obligations incurred in connection with the Assets;

c. to engage attorneys, consultants, agents, employees and all professional persons to assist the Liquidating Trustee with respect to the Liquidating Trustee's responsibilities;

d. to administer all Assets;

e. to pay the fees and expenses for the attorneys, consultants, agents, employees and professionals engaged by the Liquidating Trustee and to pay all other expenses in connection with administering the Plan and winding down the affairs of the Debtors subject to the terms of the Plan;

f. to execute and deliver all documents, and take all actions, necessary to consummate the Plan and wind-down the Debtors' businesses and effectuate the dissolution of the Debtors;

g. to sell at public or private sale, assign, transfer, abandon or otherwise dispose of any of the Assets, in consultation with HSBC Bank, and convert the same to Cash;

h. to oversee compliance with the Debtors' accounting, finance and reporting obligations;

i. to oversee the filing of final tax returns, audits and other corporate dissolution documents if required;

j. to perform any additional corporate actions as necessary to carry out the wind-down, liquidation and dissolution of the Debtors;

3384894.4

k.      to object to, and without further supervision or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and Confirmation Order, to compromise and settle Claims;

l.      to act on behalf of the Debtors and the Estates in all adversary proceedings and contested matters (including, without limitation, any Recovery Actions and Causes of Action), then pending or that can be commenced in the Court and in all actions and proceedings pending or commenced elsewhere to settle, retain, enforce, dispute or adjust any such claim, Recovery Actions or Causes of Action and otherwise pursue actions involving the Assets that could arise or be asserted at any time under the Bankruptcy Code or otherwise, unless otherwise waived or relinquished in the Plan, and, without further supervision or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and Confirmation Order, to assign, transfer, compromise and/or settle such claims and causes of action above;

m.      to implement and/or enforce all provisions of the Plan;

n.      to use such other powers as may be vested in or assumed by the Liquidating Trustee pursuant to the Plan or Court order or as may be necessary and proper to carry out the provisions of the Plan; and

o.      to account to HSBC Bank commencing the first day of the first month after the Effective Date and on the first day of each month thereafter which the Liquidating Trust remains, regarding the disposition of all Remaining Syracuse Assets, Remaining Accounts Receivable, and any other HSBC Bank Collateral transferred to the Liquidating Trust.

The Debtors agree to coordinate with the Liquidating Trustee and HSBC Bank regarding the transfer of records, documents and information to the Liquidating Trust and HSBC Bank.  Prior to discarding any records, documents or information, the Debtors agree to coordinate with the Committee, and the Committee shall confirm that the Liquidating Trust and HSBC Bank does not need such documents or information in connection with the Liquidating Trust's and HSBC Bank's reconciliation (or pursuit) of claims, the wind down the Chapter 11 Cases, or the disposition of the Remaining Syracuse Assets, Remaining Accounts Receivables and the HSBC Bank Collateral, which records, documents and information shall not be discarded absent order of the Bankruptcy Court.

D.      Executory Contracts.

Except as otherwise set forth in the Plan, each executory contract or unexpired lease described on Section III(J)(2) above that has not been assumed or assigned to a third party and that has not expired by its own terms before the Effective Date shall be rejected as of the Effective Date.    As of the Effective Date, all employment, severance, retirement, indemnification, employee benefit, profit-sharing and related policies, plans or agreements, whether or not qualified under ERISA, health care plans, disability plans and incentive plans, that were in effect on the Petition Date and that have not previously been terminated or superseded shall be terminated and deemed rejected.  For the avoidance of doubt, for any motion

3384894.4

seeking to reject executory contracts or unexpired leases where the Bankruptcy Court has not yet ruled on such motion, such motion, such purported executory contract or unexpired lease shall be rejected as of the Effective Date.

Any Claim for damages arising from the rejection of any executory contract or unexpired lease under the Plan must be filed with the Court and served upon the Liquidating Trustee within thirty days after the Effective Date or such other deadline established by the Court. Any Claim arising from the rejection of an executory contract or unexpired lease not filed within such time will be forever barred from receiving any Distribution under the Plan or asserting any Claims against the Debtor, the Estate or the Liquidating Trustee.

     E.    <u>Satisfaction, Release and Injunction</u>.

***Satisfaction and Release.*** Except as otherwise specifically provided by the Plan, the Distributions and rights that are provided in the Plan will be in complete satisfaction and release, effective as of the Effective Date, of (i) all Claims and Causes of Action against, liabilities of, liens on, charges, encumbrances, security interests, obligations of and interests in the Assets, or the direct or indirect Assets and properties of the Debtors, whether known or unknown, and (ii) all Causes of Action, whether known or unknown, either directly or derivatively through the Debtors, or the successors and assigns of the Debtors based on the same subject matter as any Claim or any other interests, in each case, regardless of whether a proof of Claim was filed, whether or not Allowed, and whether or not the holder of the Claim has voted on the Plan, or based on any act or omission, transaction or other activity or security, instrument or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date that was or could have been the subject of any Claim, in each case regardless of whether a Proof of Claim form was filed, whether or not Allowed and whether or not the holder of the Claim has voted on the Plan. In accordance with section 1141(d)(3) of the Bankruptcy Code, confirmation of the Plan shall not operate to discharge or release any Claim against the Debtors.

***Exculpation.*** The Debtors, the Committee, the Committee members, HSBC Bank, and their respective counsel, (present and former members, officers, directors and employees solely in the case of the Committee, the Committee members and HSBC Bank), representatives, advisors, attorneys and agents acting in such capacity shall have no liability whatsoever to any holder or purported holder of an Administrative Claim or Claim for any act or omission specifically in connection with, or arising out of, the Plan, this Disclosure Statement, the negotiation of the Plan, the pursuit of approval of this Disclosure Statement or the solicitation of votes for confirmation of the Plan, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan, or any transaction contemplated by the Plan or this Disclosure Statement or in furtherance thereof, except for willful misconduct or gross negligence as determined by a Final Order, and, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. This Exculpation clause shall not be effective concerning the conduct of the Chapter 11 Cases generally.

Nothing in this section shall (i) be construed to exculpate any entity from fraud, gross negligence, willful misconduct, malpractice, criminal conduct, misuse of confidential information that causes damages, or *ultra vires* acts or (ii) limit the liability of the professionals

27

of the Debtors and the Committee to their respective clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8, Rule 1.8(h)(1) (2015).

*Injunction*. Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date all entities are permanently enjoined from taking any of the following actions against the Released Parties or any of their respective successors or assigns, or any of their respective assets or properties, on account of any Claim: (1) commencing or continuing in any manner any action or other proceeding with respect to a Claim; (2) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order with respect to a Claim; (3) creating, perfecting or enforcing any lien or encumbrance with respect to a Claim; or (4) commencing or continuing any action that does not comply with or is inconsistent with the Plan.

*Term of Stays*. Except as otherwise provided in the Plan, all injunctions and the stay provided for in the Chapter 11 Cases pursuant to Section 362 of the Bankruptcy Code, shall remain in full force and effect until the Chapter 11 Cases are closed.

Except as otherwise provided in the Plan, upon entry of the Confirmation Order, all Persons or entities who have held, hold, or may hold Claims or membership or other interests in the Debtors are permanently enjoined, on and after the Effective Date, with respect to all Claims and membership and other interests in the Debtors from (a) commencing, conducting or continuing in any manner, directly or indirectly, any proceeding of any kind against or affecting the Debtors, the Released Parties, the Liquidating Trustee, or their property, (b) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting or otherwise recovering by any means or manner, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the Released Parties, the Liquidating Trustee, or their property, (c) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Released Parties, the Liquidating Trustee, or their property, (d) asserting any right of setoff, directly or indirectly, against any obligation due the Debtors, the Released Parties, the Liquidating Trustee, or their property, except as contemplated or allowed by this Plan, the Bankruptcy Code, or applicable law, (e) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan, (f) commencing, continuing or asserting in any manner any action or other proceeding of any kind with respect to any Claims and causes of action which are extinguished or released pursuant to the Plan, and (g) taking any action to interfere with the implementation and consummation of the Plan.

## V.    **ESTIMATED DISTRIBUTIONS**

The Debtors currently estimate that the Allowed Administrative Claims, Fee Claims, U.S. Trustee Fees and HSBC Bank Administrative DIP Claim will be satisfied in full in accordance with the Budget attached to the Final DIP Order. As noted, the holder of the HSBC Bank Allowed Secured Claim will receive proceeds from the liquidation sales of the Remaining Syracuse Assets and proceeds of the collection of the Debtors' Remaining Accounts Receivable or, in HSBC Bank's discretion on or after the Effective Date, turnover, abandonment to, or assignment of the Remaining Accounts Receivable from the Liquidating Trustee in partial satisfaction of the HSBC Bank Secured Claim.

3384894.4

The estimated Distribution amounts set forth in this Disclosure Statement do not include any potential recoveries from Avoidance Actions, Recovery Actions or other Causes of Action that may be pursued in the future by the Liquidating Trustee.  Unless otherwise provided in the Plan, all Avoidance Actions, Recovery Actions and Causes of Action are preserved for the Debtors and their Estates.  The likely proceeds of the Avoidance Actions, Recovery Actions and Causes of Action are uncertain and highly speculative at this point.  Accordingly, the Debtors are unable to project what recovery may be realized through the prosecution of the Avoidance Actions, Recovery Actions and Causes of Action.

Subject to the foregoing, the Debtors and Liquidation Trustee will have sufficient Cash to satisfy Allowed Administrative Claims, Fee Claims, U.S. Trustee Claims and HSBC Administrative DIP Claim in full (or in such lesser amounts as otherwise agreed to by the holders of such Claims), pay the Class 2 Unsecured Priority Claims in full and to make a Distribution on account of Class 3 Unsecured Claims in amounts equal to approximately ____% to ____% of the Allowed Unsecured Claims.

## VI.    VOTING REQUIREMENTS, ACCEPTANCE, CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.    General.

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Plan and the Debtors, including that: (i) the Plan classifies Claims in a permissible manner; (ii) the Plan complies with the applicable provisions of the Bankruptcy Code; (iii) the Debtors complied with the applicable provisions of the Bankruptcy Code; (iv) the Debtors have proposed the Plan in good faith and not by any means forbidden by law; (v) the disclosures required by Section 1125 of the Bankruptcy Code has been made; (vi) the Plan has been accepted by the requisite votes of holders of Claims, except to the extent that "cram-down" is available under Section 1129(b) of the Bankruptcy Code (*see* discussion on "Cram-down" in Section G below), (vii) the Plan is feasible and confirmation of the Plan will not likely be followed by the liquidation or the need for further financial reorganization of the Debtors, unless such liquidation is proposed under the Plan; (viii) the Plan is in the "best interests" of all holders of Claims in an impaired Class by providing to such holders on account of their Claims property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a Chapter 7 liquidation, unless each holder of a Claim in such Class has accepted the Plan (*see* Section I below entitled "Best Interests of Creditors"); (ix) all fees and expenses payable under 28 U.S.C. § 1930 together with interest, if any, under 31 U.S.C. § 3717 (relating to bankruptcy fees payable to the Clerk of the Bankruptcy Court and U.S. Trustee Fees) have been paid or the Plan provides for the payment of such fees on the Effective Date; and (x) the Debtors must have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors or as successor to the Debtors under the Plan, and the appointment to or continuance in such office by such individual must be consistent with public policy.

The Debtors believe that the Plan satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code.  Certain of these requirements are discussed in more detail below.  The Debtors have proposed the Plan in good faith.

3384894.4

B.   Eligibility to Vote.

Pursuant to the Bankruptcy Code, only classes of claims against or interests of a debtor that are "impaired" (within the meaning of section 1124 of the Bankruptcy Code) under the terms and provisions of a plan of reorganization or liquidation are entitled to vote to accept or reject a plan. A class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or interests of that class are modified, other than by curing defaults and reinstating maturity. Classes of claims and interests that are not impaired are not entitled to vote on a plan and, under section 1126(f) of the Bankruptcy Code, are conclusively presumed to have accepted a plan. Therefore, the votes of holders of such unimpaired classes are not being solicited. In addition, under section 1126(g) of the Bankruptcy Code, Classes of impaired Claims and Interests in these Chapter 11 Cases that receive no Distributions under the Plan are deemed to have rejected the Plan and the votes of such holders will not be solicited. See "Summary of Classification and Treatment of Claims under the Plan" for a summary of the classification and treatment of Claims under the Plan, as well as a designation of whether each Class is impaired or unimpaired.

Under the Plan, only holders of Class 1 and Class 3 Claims are impaired and entitled to vote to accept or reject the Plan. Any Claim in a Class entitled to vote as to which an objection has been filed and has not been withdrawn or dismissed prior to the Confirmation Hearing is not entitled to vote unless the Bankruptcy Court, pursuant to Bankruptcy Rule 3018(a) and upon application of the holder whose Claim has been objected to, temporarily allows the Claim in an amount that the Bankruptcy Court deems proper solely for the purpose of accepting or rejecting the Plan. Claims filed after the Bar Date, unless deemed timely filed by the Bankruptcy Court, also are not entitled to vote.

C.   Estimation and Temporary Allowance of Claims.

Pursuant to Section 502 of the Bankruptcy Code and Bankruptcy Rule 3018, the Bankruptcy Court may estimate and temporarily allow a Claim for voting and other purposes. The Debtors or holders of particular Claims may seek an order of the Bankruptcy Court temporarily allowing, for voting purposes only, certain Disputed Claims.

D.   Acceptance Requirements.

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by creditors that hold at least two-thirds in dollar amount and more than one-half in number of the allowed claims of such class who actually vote for acceptance or rejection of a plan. The vote of a holder of a claim may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that the acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

E.   Transmission of Ballots.

All holders of undisputed Claims in Classes 1 and 3 (including any Claims that are temporarily Allowed for voting purposes) as of August 1, 2019 are entitled to vote to accept or reject the Plan and may do so by completing the appropriate ballot which is enclosed with this Disclosure Statement.   PLEASE CAREFULLY FOLLOW THE INSTRUCTIONS

3384894.4

ACCOMPANYING THE ENCLOSED BALLOT, AS DESCRIBED IN THE INTRODUCTION OF THIS DISCLOSURE STATEMENT.

**VOTING ON THE PLAN BY EACH HOLDER OF AN IMPAIRED CLAIM ENTITLED TO VOTE ON THE PLAN IS IMPORTANT. IF YOU HOLD CLAIMS IN MORE THAN ONE CLASS YOU MAY RECEIVE MORE THAN ONE BALLOT. YOU SHOULD COMPLETE, SIGN, AND RETURN EACH BALLOT THAT YOU RECEIVE.**

 F. <u>Acceptances Required From Impaired Classes</u>.

   In order for a plan to be confirmed without resort to the "cram-down" provisions of the Bankruptcy Code, each class of impaired claims must be determined to have accepted the Plan. As previously mentioned, each class of impaired Claims will be determined to have accepted the Plan if holders accept the Plan by votes (i) representing at least two-thirds in amount of Allowed Claims in such impaired Class of those holders actually voting and (ii) more than one-half in number of Allowed Claims in such Class of those holders actually voting.

   The holders of Class 1 and Class 3 Claims are impaired under the Plan, and the Debtors are soliciting acceptances for the Plan from the holders of Allowed Claims in such Classes. Class 2 is unimpaired under the Plan and, therefore, is deemed to have accepted the Plan. Class 4 is impaired and deemed to reject the Plan.

 G. <u>Confirmation Without Acceptance of All Impaired Classes ("Cram-down")</u>.

   In the event that a plan otherwise satisfies the Bankruptcy Code's requirements for confirmation, but one or more classes of claims votes to reject the plan, a plan proponent has the right to seek confirmation of its plan under the "cram-down" provisions of the Bankruptcy Code.

   The Bankruptcy Court can "cram-down" the Plan at the Debtors' request only if at least one impaired Class of Claims, (excluding the votes of insiders), has accepted the Plan and all other requirements of section 1129(a) of the Bankruptcy Code are satisfied.

   In addition, the Bankruptcy Court must find that, as to each impaired Class that has not accepted the Plan, the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to such non-accepting Class.

   A plan does not "discriminate unfairly" within the meaning of the Bankruptcy Code if the dissenting class will receive value relatively equal to the value given to all other similarly situated classes.

   A plan is "fair and equitable" within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for its claims or interests.

   A plan is "fair and equitable" as to a class of secured claims that rejects a plan if the plan provides (a)(i) that the holders of claims included in the rejecting class retain the liens securing those claims whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (ii) that

3384894.4

each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, equal to at least the value of the holder's interest in the estate's interest in such property; or (b) for the realization by such holders of the indubitable equivalent of such claims.

If a class of unsecured claims rejects a plan, the plan may still be confirmed as long as the plan provides (a) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim, or (b) that the holder of any claim or any interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

If a class of interests rejects a plan, the plan may still be confirmed as long as the plan provides (a) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest, or (b) that the holder of any interest that is junior to the interest of such class will not receive or retain under the plan on account of such junior interest any property at all.

Under the Plan, no holder in a Class of Claims is to receive Cash or other property in excess of the full amount of its Allowed Claim. Moreover, no Claim or Interest that is junior to the holders of Unsecured Claims will receive any Distribution under the Plan. Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any impaired Class of Claims or Interests and is fair and equitable with respect to each such Class under section 1129(b) of the Bankruptcy Code.

H.    Feasibility of the Plan.

In connection with confirmation of the Plan, the Bankruptcy Court will have to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors unless the Plan provides for the liquidation of the Debtors. Since the Plan provides for the liquidation of the Debtors, the Bankruptcy Court will find that the Plan is feasible if it determines that the Debtors will be able to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to meet its post-Confirmation Date obligations to pay for the costs of administering and fully consummating the Plan, including the backing of the Liquidating Trustee with sufficient funds to proceed with the liquidation of the Debtors' remaining Assets. The Debtors believe the Plan satisfies the financial feasibility requirement imposed by the Bankruptcy Code.

I.    Best Interests of Creditors.

To confirm the Plan over the objections of dissenting holders of impaired Claims, the Bankruptcy Court must also independently determine that the Plan is in the "best interests" of all dissenting holders of Claims impaired under the Plan. Under the "best interests" test, the Bankruptcy Court must find that the Plan provides to each dissenting holder of an impaired

3384894.4

Claim a recovery of a value at least equal to the value, as of the Effective Date, of the Distribution that each such holder would receive were the Debtor liquidated under Chapter 7 of the Bankruptcy Code. Since it is the Debtors' belief that the Plan is comparable to a liquidation, a liquidation under Chapter 7 of the Bankruptcy Code would merely increase administrative costs in the form of Chapter 7 trustee's fees and other professional fees.

## VII.    CERTAIN RISK FACTORS TO BE CONSIDERED

The holder of an impaired Claim should consider carefully the following risk factors as well as all of the other information contained in this Disclosure Statement, including the Plan and other Exhibits hereto, before deciding whether to vote to accept or reject the Plan.

The recovery projections included in this Disclosure Statement are dependent upon certain matters, most of which are beyond the control of the Liquidating Trustee and some of which may well not materialize. Unanticipated events and circumstances occurring subsequent to the preparation of the projections may affect the actual recoveries. Therefore, the actual recoveries achieved by the Liquidating Trustee may vary from the projected recoveries included herein. These variations may be material.

1.    Risks Relating to Bankruptcy

a.    Parties in Interest May Object to the Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

b.    The Debtors May Fail to Satisfy Vote Requirements.

In the event that votes are received in a number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan.

c.    The Debtors May Not Be Able to Obtain Confirmation of the Plan.

With regard to any proposed plan of reorganization or liquidation, the party seeking confirmation of a plan may not receive the requisite acceptances to confirm such plan. If the requisite acceptances of the Plan are received, the Debtors intend to seek confirmation of the Plan by the Bankruptcy Court. If the requisite acceptances of the Plan are not received, the

33

3384894.4

Debtors may nevertheless seek confirmation of the Plan notwithstanding the dissent of certain Classes of Claims. The Bankruptcy Court may confirm the Plan pursuant to the "cram-down" provisions of the Bankruptcy Code if the Plan satisfies Section 1129(b) of the Bankruptcy Code. To confirm the Plan over the objection of a dissenting Class, the Bankruptcy Court also must find that at least one impaired Class (which cannot be an "insider" Class) has accepted the Plan.

Even if the requisite acceptances of the Plan are received, the Bankruptcy Court is not obligated to confirm the Plan as proposed. A dissenting holder of a Claim against the Debtors could challenge the balloting procedures as not being in compliance with the Bankruptcy Code, which could mean that the results of the balloting may be invalid. If the Bankruptcy Court determines that the balloting procedures are appropriate and the results are valid, the Bankruptcy Court could still decline to confirm the Plan, if the Bankruptcy Court finds that any of the statutory requirements for confirmation have not been met.

If the Plan is not confirmed by the Bankruptcy Court, (a) the Debtors may not be able to complete the liquidation of their businesses; (b) the Distributions that holders of Claims ultimately would receive, if any, with respect to their Claims is uncertain; and (c) there is no assurance that the Debtors or any other party will be able to successfully develop, prosecute, confirm and consummate an alternative plan that will be acceptable to the Bankruptcy Court and the holders of Claims.

> d.    Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in the Plan, Confirmation of the Plan and the occurrence of the Effective Date are subject to a number of conditions precedent, including, without limitation that (i) all of the requirements of the Bankruptcy Code for Confirmation of the Plan shall have been satisfied; (ii) the Court shall have entered a final Confirmation Order; and (iii) the Liquidation Trust Agreement shall be in form and substance satisfactory to the Debtors, the Committee and HSBC Bank.

> e.    Certain Tax Implications of the Debtors' Chapter 11 Cases.

Holders of Allowed Claims should carefully review Section VIII herein, "Certain Federal Income Tax Consequences of the Plan", to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors.

> f.    Litigation Recovery is Uncertain.

It is possible that the Liquidating Trustee will receive no recovery on any of the retained Avoidance Actions, Recovery Actions or Causes of Action. While the Plan is not predicated on any recoveries being received, it will mean that the sole source of recovery for holders of Class 2 Unsecured Priority Claims and Class 3 Unsecured Claims will be the Estate Carve-Out as set forth in the Plan.

## VIII.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain holders of Claims. The following summary does not address the U.S. federal income tax consequences to holders of Claims or Interests not entitled to vote to accept or reject the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan. The discussion below is not binding upon the IRS or the Bankruptcy Court. No assurance can be given that the IRS would not assert, or that a Bankruptcy Court would not sustain, a different position than any position discussed herein. This summary does not apply to holders of Claims that are not "U.S. persons" (as such phrase is defined in the IRC). This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain holders in light of their individual circumstances. This discussion does not address tax issues with respect to such holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, foreign taxpayers, persons who are related to the Debtors within the meaning of the IRC, persons using a mark-to-market method of accounting, holders of Claims who are themselves in bankruptcy, and regulated investment companies and those holding, or who will hold, Claims, as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, estate, gift, or non-U.S. taxation is addressed. Furthermore, this summary assumes that a holder of a Claim holds only Claims in a single Class and holds a Claim as a "capital asset" (within the meaning of Section 1221 of the Tax Code). Except as stated otherwise, this summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX RELATED PENALTIES UNDER THE IRC. TAX ADVICE CONTAINED IN THIS DISCLOSURE

3384894.4

STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

      1.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors

      a.      Sale

An asset sale by a debtor will be a taxable sale for federal income tax purposes, with the result that the debtor will recognize taxable income or loss equal to the difference between the adjusted basis of its assets transferred and the amount realized on such sale. The amount realized would be equal to the cash purchase price in the case of a cash sale (assuming there are no liabilities assumed or liabilities to which the purchased assets are subject). In a foreclosure or deemed foreclosure, the amount realized would be the principal amount of the debt cancelled. Any recognized gain or loss would not be taxable to the debtor as a partnership but would flow through to each of its members in accordance with the debtor's operating agreement.

      b.      Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of Cash paid, (y) the issue price of any new indebtedness of the taxpayer issued and (z) the fair market value of any new consideration (including new stock) given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a Bankruptcy Court in a case under Chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. In the case of a partnership, this rule is applied not to the partnership, but to the partners of the partnership, with the result that if the partners are not subject to Chapter 11, this beneficial rule does not apply and COD Income realized by the partnership would be recognized to the partners to the extent such partners are solvent or rendered solvent. If the rule does apply to any partner debtor, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income. In general, tax attributes will be reduced in the following order: (a) net operating loss carryovers; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits. A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to Section 108(b)(5) of the IRC. In the context of a consolidated group of corporations, the tax rules provide for a complex ordering mechanism in determining how the tax attributes of one member can be reduced by the COD Income of another member.

      c.      Alternative Minimum Tax

3384894.4

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, except for alternative tax NOLs generated in or deducted as carryforwards in taxable years ending in certain years, which can offset 100% of a corporation's AMTI, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards. Additionally, under Section 56(g)(4)(G) of the IRC, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under Section 382(h) of the IRC, immediately before the ownership change.

### d.    Accrued Interest

To the extent that any amount received by a holder of a Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the holder's gross income, such amount will be taxable to the holder as ordinary interest income. Conversely, a holder of an Allowed Claim will generally recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the holder's gross income but was not paid in full by the Debtors.

The extent to which the consideration received by a holder of an Allowed Claim will be attributable to accrued interest on the debts constituting the Allowed Claim is unclear. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the Plan, Distributions in respect of Allowed Claims will be allocated first to the principal amount of such claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS or the Bankruptcy Court with respect to the appropriate tax treatment for Creditors. The IRS is likely to take the position that all consideration should first be applied to accrued interest and only thereafter to principal.

### e.    Withholding and Reporting

The Liquidating Trustee will withhold all amounts required by law to be withheld from payments of interest. The Liquidating Trustee will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a holder of a Claim. Additionally, backup withholding, currently at a rate of 24%, will generally apply to such payments if a holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Any amounts withheld under the backup

3384894.4

withholding rules will be allowed as a credit against such holder's U.S. federal income tax liability and may entitle such holder to a refund from the IRS, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## IX.    ALTERNATIVES TO CONFIRMATION OF THE PLAN

The Debtors believe that the Plan affords the holders of Claims the potential for the greatest realization in these Chapter 11 Cases and, thus, is in the best interests of such holders. If the Plan is not confirmed, however, the alternative would likely be the liquidation of the Debtors' remaining Assets and Distribution to Creditors under Chapter 7. As discussed, the Debtors believe that confirmation of the Plan is significantly better for Creditors than a Chapter 7 liquidation.

## X.    ALTERNATIVE PLANS OF REORGANIZATION

If the Plan is not confirmed, the Debtors or any other party-in-interest in the Chapter 11 Cases could propose a different plan or plans. The Debtors and Committee believe that under an alternative plan, there would be little, if any, funds available for Distribution to the Class 3 Unsecured Creditors in the Chapter 11 Cases. Moreover, the filing of alternative plans would result in additional costs in administering the Chapter 11 Cases and significant delays in making Distributions.

## XI.    CONFIRMATION HEARING

By order of the Bankruptcy Court dated August ___, 2019, the Confirmation Hearing has been scheduled to commence on September 19, 2019 at 11:00 a.m. (Eastern Time), before the Honorable Margaret Cangilos-Ruiz, Chief United States Bankruptcy Judge, in the United States Bankruptcy Court for the Northern District of New York. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjourned hearing. Any

3384894.4

objection to confirmation must be made in writing, filed with the Clerk of the Bankruptcy Court and served upon the following parties, together with proof of service thereof, no later than September 12, 2019:

<u>To the Debtors:</u>

Stephen A. Donato, Esq.
Camille W. Hill, Esq.
BOND, SCHOENECK & KING, PLLC
One Lincoln Center
Syracuse, New York 13202-1355
Email:  sdonato@bsk.com
            chill@bsk.com
Telephone:  (315) 218-8000


<u>To HSBC Bank</u>:

Angela Z. Miller, Esq.
PHILLIPS LYTLE LLP
One Canalside
125 Main Street
Buffalo, New York  14203-2887
Email:  amiller@phillpslytle.com
Telephone:  (716) 847-7060

<u>To the Committee</u>:

David M. Banker, Esq.
Montgomery McCracken Walker & Rhoades LLP
437 Madison Avenue
New York, New York  10022
Email:  dbanker@mmwr.com
Telephone:  (212) 551-7759

<u>To the United States Trustee</u>:

Erin P. Champion, Esq.
Office of the United States Trustee
105 U.S. Courthouse
10 Broad Street
Utica, New York  13501
Email:  Erin.Champion@usdoj.gov
Telephone:  (315) 793-8127

3384894.4

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

At the Confirmation Hearing, the Bankruptcy Court must determine whether the requirements of Section 1129 of the Bankruptcy Code have been satisfied and, upon demonstration of such compliance, the Bankruptcy Court will enter the Confirmation Order.

## XII. <u>CONCLUSION</u>

The Debtors and the Committee submit that the Plan complies in all respects with Chapter 11 of the Bankruptcy Code and recommend to holders of Claims who are entitled to vote on the Plan that they vote to accept the Plan. The Debtors and Committee remind such holders that, to be counted, each ballot, signed and marked to indicate the holder's vote, must be **actually received** by Debtors' counsel on or before September 10, 2019, at the following address:

> Bond, Schoeneck & King, PLLC
> One Lincoln Center
> Syracuse, New York  13202
> Attn:  Kristin M. Doner

[Signature page follows]

3384894.4

Dated:    August 2, 2019
        Syracuse, New York

Respectfully submitted,

CENTERSTONE LINEN SERVICES, LLC
ATLAS HEALTH CARE LINEN SERVICES
CO., LLC
ALLIANCE LAUNDRY & TEXTILE SERVICE,
LLC
ALLIANCE LAUNDRY AND TEXTILE
SERVICE OF ATLANTA, LLC
ALLIANCE LTS WINCHESTER, LLC
All d/b/a Clarus Linen Systems

By:    _____
Ronald Teplitsky, Chief Restructuring Officer


BOND, SCHOENECK & KING, PLLC

By:    _____
Stephen A. Donato, Esq., of counsel
(Bar Roll #101522)
Camille W. Hill, Esq., of counsel
(Bar Roll #501876)
Office and Post Office Address:
110 West Fayette Street
One Lincoln Center
Syracuse, New York  13202-1355
Telephone:  (315) 218-8000
Facsimile:  (315) 218-8100
Email:  sdonato@bsk.com
       chill@bsk.com

*Counsel to the Debtors*

# EXHIBIT "A"

### Debtors' Plan Distribution Analysis

#### Cash Available

Final DIP Budget:        See Budget attached to Sixth Order Amending Final DIP Order
Estate Carve-Out:        $250,000.00 + 5% of linen and Remaining Syracuse Asset sales

| Class | Amount | Distribution |
|---|---|---|
| Administrative Claims (as of 8/2/19): | $ 848,049.00 | 100% |
| Fee Claims: | $ 660,199.46 | 100% |
| HSBC Bank Administrative DIP Claim: | $ 1,163,336.23 | 100% |
| Class 1 HSBC Bank Secured Claim: | $18,678,189.92 | Partial |
| Class 2 Unsecured Priority Claims (est.) | $ 150,000.00 | 100% |
| Class 3 General Unsecured Claims: | $29,842,485.45 | Pro Rata Share of Estate Carve Out Plus Liquidating Trust Assets |
| Class 4 Interests | $ 0.00 | 0% |

### Debtors' Liquidation Analysis

#### Cash Available

Final DIP Budget:        See Budget attached to Sixth Order Amending Final DIP Order
Estate Carve-Out:        $250,000.00 + 5% of linen and Remaining Syracuse Asset sales

| Class | Amount | Distribution |
|---|---|---|
| Administrative Claims: | $ 848,049.00 | Partial |
| Fee Claims: | $ 660,199.46 | Partial |
| HSBC Bank Administrative DIP Claim: | $ 1,163,336.23 | Partial |
| Class 1 HSBC Bank Secured Claim: | $18,678,189.92 | Partial |
| Class 2 Unsecured Priority Claims (est.) | $ 150,000.00 | Partial |
| Class 3 General Unsecured Claims: | $29,842,485.45 | 0% |
| Class 4 Interests | $ 0.00 | 0% |

3388887.1